E-FILED

Thursday, 09 April, 2026  02:50:09 PM

Clerk, U.S. District Court, ILCD



APR 0 9 2026

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

| | |
|---|---|
| JOHN DOE,<br>　　Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE<br>UNIVERSITY OF ILLINOIS;<br>ALEXANDER VICKERY-HOLLAND,<br>in his individual and official capacities;<br>MARIAH YOUNG,<br>in her individual and official capacities;<br>CHARLES LEE ISBELL JR., Chancellor,<br>in his official capacity,<br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. ___26-cv-2104___

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff John Doe (real name concurrently submitted to the Court for *in camera* review pending this Court's ruling on Plaintiff's Motion to Proceed Under Pseudonym), proceeding *pro se*, respectfully alleges as follows:

**INTRODUCTION**

1. This action arises from the University of Illinois Urbana-Champaign's ("UIUC" or "the University") unlawful five-year dismissal of Plaintiff John Doe following a disciplinary proceeding riddled with due process violations, documented bias, and factual error. *See* Exhibit 02 (Subcommittee Decision Notification). Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fourteenth Amendment to the United States

Constitution, and for breach of contract under Illinois law, seeking immediate injunctive relief and damages. *See Goss v. Lopez*, 419 U.S. 565, 579 (1975) (holding that students facing suspension have a property interest in continued enrollment protected by due process); *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976) (establishing the balancing test for evaluating the adequacy of procedural protections); *Doe v. Purdue Univ.*, 928 F.3d 652, 663–64 (7th Cir. 2019) (finding due process violations where a university denied cross-examination and relied on a biased adjudicator).

2. The University denied Plaintiff the right to cross-examine the complainant—a right expressly guaranteed by the University's own Student Code and the United States Constitution. This denial was effectuated not by the complainant's voluntary absence, but by the University's explicit decision to neither invite the complainant to the hearing nor invite her to review the official investigative materials.

3. The University permitted an investigator to abandon her contractual duty of neutrality and function instead as an adversarial prosecutor. Furthermore, the University flagrantly violated its own mandatory notice and investigation timelines, and reached its most severe findings of sexual misconduct without ever identifying, producing, or viewing a single image depicting nudity.

4. The Panel Chair used his inherent administrative authority to foreclose Plaintiff's presentation of a mitigating argument on the record, announced his conclusion on the central factual dispute before deliberations began, and then signed the Subcommittee Decision Notification without recusing himself.

5. The University then imposed a career-ending five-year dismissal that matches or exceeds sanctions for violent felonies within the University system, completely ignoring nine

documented mitigating factors, including the complainant's own request to withdraw the complaint.

6. Plaintiff exhausted all internal remedies by timely appealing to the Senate Committee on Student Discipline ("SCSD"), which on March 31, 2026, summarily affirmed the Panel's decision. Written notice was provided on April 8, 2026, at which point the dismissal became immediately enforceable and Plaintiff was barred from campus on penalty of trespass. The appeal committee's rationale itself reveals the depth of institutional failure: it claimed no policy bars the investigator from asking adversarial questions (though no policy affirmatively grants that authority either, and the investigator's defined role does not include it), found the complainant was "not required to participate" while ignoring that OSCR affirmatively excluded her, and asserted the actual image was "included in the evidence" despite the evidence packet containing only a technically unviewable rendering—and despite the Panel's refusal to view the actual image when Plaintiff offered it at the hearing. *See* Exhibit 07 (SCSD Appeal Decision Letter).

7. Plaintiff seeks declaratory, injunctive, and monetary relief, including immediate interim relief necessary to preserve his academic status while this Court adjudicates the merits of his claims.

**NATURE OF THE ACTION**

8. Plaintiff brings this action under 42 U.S.C. § 1983 to redress violations of rights secured by the Fourteenth Amendment to the United States Constitution.

9. Plaintiff also brings claims under Illinois law arising from the University's failure to comply with the procedural promises contained in its governing disciplinary rules and policies. *See*

*Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772–74 (7th Cir. 2013) (recognizing enforceable contractual obligations arising from a university's published disciplinary rules); *Malhotra v. Univ. of Ill. Urbana-Champaign*, 77 F.4th 532, 536–38 (7th Cir. 2023) (applying contract principles to university disciplinary procedures and evaluating stigma-plus claims in the student discipline context).

10. The disciplinary finding and resulting dismissal imposed reputational stigma together with a concrete alteration of Plaintiff's legal and academic status, thereby depriving him of liberty interests protected by the Fourteenth Amendment. *See Doe v. Purdue Univ.*, 928 F.3d 652, 661–62 (7th Cir. 2019); *Dupuy v. Samuels*, 397 F.3d 493, 503–10 (7th Cir. 2005) (articulating the stigma-plus framework for liberty deprivation under the Fourteenth Amendment).

11. Plaintiff seeks injunctive relief preventing enforcement of the dismissal, declaratory relief concerning the unlawfulness of the disciplinary process, damages as allowed by law, and such further relief as the Court deems just and proper.

**JURISDICTION AND VENUE**

12. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

13. This Court has supplemental jurisdiction over Plaintiff's state law breach of contract claim pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

14. Venue is proper in the Central District of Illinois, Urbana Division, pursuant to 28 U.S.C. § 1391, because the events giving rise to this action occurred in Champaign County, Illinois, and UIUC is located within this District.

**PARTIES**

15. Plaintiff John Doe is an undergraduate student at UIUC enrolled in the computer science program. Plaintiff's real name, Student ID, and contact information have been concurrently submitted to the Court for *in camera* review pending this Court's ruling on Plaintiff's Motion to Proceed Under Pseudonym. Plaintiff's full identity is known to Defendants.

16. Defendant Board of Trustees of the University of Illinois is the governing body of the University of Illinois system, a public university organized under the laws of the State of Illinois. At all relevant times, the Board operated UIUC and its Office for Student Conflict Resolution ("OSCR"). The Board is named as a defendant for purposes of Plaintiff's breach of contract claim. Plaintiff recognizes that the Board is not a "person" subject to damages liability under § 1983. *See Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 391 (7th Cir. 2020) (holding that the Board of Trustees is not a "person" amenable to suit under § 1983); *Kaimowitz v. Bd. of Trs. of Univ. of Ill.*, 951 F.2d 765, 767 (7th Cir. 1991) (same).

17. Defendant Alexander Vickery-Holland is an Assistant Dean of Students at UIUC and served as the non-voting Chair of the disciplinary hearing at issue. He is sued in his individual capacity for damages and in his official capacity for injunctive relief under 42 U.S.C. § 1983.

18. Defendant Mariah Young is an OSCR Investigator at UIUC who conducted the investigation and participated in the disciplinary hearing at issue. She is sued in her individual capacity for damages and in her official capacity for injunctive relief under 42 U.S.C. § 1983.

19. Defendant Charles Lee Isbell Jr. is the Chancellor of UIUC and the highest administrative officer responsible for student affairs and the enforcement of disciplinary outcomes at UIUC. He is sued in his official capacity for prospective injunctive relief consistent with *Ex parte Young*, 209 U.S. 123 (1908) (permitting suits against state officials in their official capacities for prospective injunctive relief).

20. At all relevant times, these individual Defendants participated in, supervised, approved, enforced, or were otherwise responsible for the disciplinary actions challenged in this Complaint.

## FACTUAL BACKGROUND

### A. Background and Online Nature of the Conduct

21. Plaintiff is an accelerated computer science student with a 4.0 grade point average. Prior to this incident, he had no disciplinary history of any kind at UIUC or any other institution. *See* Exhibit 13a (UIUC Transcript); Exhibit 13b (High School Transcript).

22. Plaintiff is currently enrolled in 13 critical credits of advanced computer science coursework (CS 211, CS 374, CS 411, and CS 441) for the Spring 2026 semester, with only five weeks and 23.5 total hours of on-campus time remaining. Every course Plaintiff takes after Spring 2026 can be completed entirely online or at a different institution and transferred for credit. *See* Exhibit 11 (Spring 2026 Courses and Degree Plan).

23. Plaintiff first became acquainted with an individual located in the United Kingdom (hereinafter referred to as the non-party complainant, "Jane Roe") through the digital platform Discord in approximately February 2025. Between July and August 2025, their interactions developed into a mutual online relationship conducted entirely through Discord. All communications occurred while Plaintiff was located off campus during the summer term. *See* Exhibit 09 (Complainant Request to Dismiss).

24. During the course of the relationship, Plaintiff understood Roe to be approximately two years younger than himself. The University classified without verification that Roe was 16 at the time of the alleged conduct. Plaintiff does not dispute the online relationship. However, Plaintiff disputes the University's characterization of the images exchanged online at issue: Plaintiff testified at the hearing that the images he possessed were not nude, and that the image he sent depicted him wearing gray Hanes underwear without nudity. The Panel reached its findings on these points without identifying, recovering, or viewing a single image depicting nudity. *See* Exhibit 06 (Image Comparison Table); Exhibit 09 (Complainant Request to Dismiss).

25. The University found Plaintiff responsible for violations of the Student Code including sexual exploitation (§ 1-302.b.3), and imposed a five-year dismissal. Plaintiff challenges not the University's authority to investigate student conduct generally, but the specific procedural deficiencies that rendered the process fundamentally unfair and the resulting sanction arbitrary and disproportionate. *See* Exhibit 02 (Subcommittee Decision Notification).

26. Roe has no affiliation with UIUC. She is not a student, employee, or program participant, and she never entered University property in connection with any alleged conduct.

27. University Student Code § 1-104(d) states: "The university shall not regulate the social life of students or their organizations except as such regulations may apply to use of university premises, facilities, or premises approved for student residences." *See* Exhibit 01a (UIUC Student Code).

28. Furthermore, § 1-301 states the university "accepts jurisdiction only in those instances in which the university community's interest is substantially affected." Student Disciplinary Procedures § 1.05 enumerates factors for off-campus jurisdiction, including whether the alleged victim is a member of the campus community, the university's ability to gather information, and whether the conduct has an on-campus nexus. *See* Exhibit 01a (UIUC Student Code).

29. Despite the conduct occurring entirely online, off-campus, during the summer, and involving a non-affiliated individual, the University asserted jurisdiction and initiated disciplinary proceedings against Plaintiff. No documented analysis of the § 1.05 factors appears in the record.

**B. Notice Timelines and Administrative Processing**

30. On August 29, 2025, the University filed a formal complaint against Plaintiff *in lieu* of the complainant. The University's stated justification for initiating the complaint itself was "due to the severity of the alleged actions reported to the University Title IX Office." *See* Exhibit 16 (OSCR Summary of Steps Taken).

31. Despite explicitly citing a report to the Title IX Office to justify filing the complaint on the complainant's behalf, the University processed the prosecution as a non-Title IX student conduct case under Appendix D. Official University correspondence, including the Charge Letter and

Dismissal Letter, continued to formally copy the Title IX Office. *See* Exhibit 02 (Subcommittee Decision Notification); Exhibit 04 (OSCR Charge Notice Letter).

32. Furthermore, despite the University initiating the complaint itself on August 29, Plaintiff did not receive any notice of the allegations or the investigation until November 5, 2025—68 calendar days later. The University record contains no documented "individualized safety and risk analysis" authorizing a delayed notice under Appendix D, § 4(m). *See* Exhibit 01b (UIUC Appendix D).

33. Fourteen days prior to Plaintiff receiving this notice, on October 22, 2025, the complainant sent a Discord message to Plaintiff stating: "I'm sorry. I'll be trying to get the case with you dismissed." The complainant subsequently contacted OSCR on October 25, 2025, to inquire about the possibility of dismissing the case. The University refused to dismiss and subsequently charged Plaintiff with "interference" based on the October 22 conversation—a conversation that occurred before Plaintiff had any knowledge that an investigation existed. *See* Exhibit 09 (Complainant Request to Dismiss).

34. Appendix D, § 9(a) caps the investigation and hearing process at 60 business days, permitting extensions in 10-day increments only if written notice of the delay and the reason for the delay is provided to the parties. *See* Exhibit 01b (UIUC Appendix D).

35. The disciplinary process spanned from August 29, 2025, to the issuance of the written decision on March 17, 2026—a period of approximately 143 business days. At no point did the University issue Plaintiff a written extension notice citing good cause for the delay. *See* Exhibit 10 (Procedural Timeline and Sanction Comparator). *See Purdue*, 928 F.3d at 663–64; *Charleston*, 741 F.3d at 772–74.

## C. The Investigation and Hearing Process

36. The complainant did not participate in the investigation or the hearing.

37. On the hearing record, OSCR Investigator Mariah Young stated: "due to the complainant being a minor, she was not invited to review the investigative materials or participate in the hearing." Consequently, Plaintiff was not provided an opportunity to cross-examine the complainant, despite Appendix D expressly granting the respondent a final opportunity to question the complainant through the chair. *See* Exhibit 05 (Selected Quotes from Hearing Recording). *See Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019); *Doe v. Baum*, 903 F.3d 575, 581–85 (6th Cir. 2018) (holding that cross-examination is essential to due process in university sexual misconduct proceedings where credibility is at issue).

38. Appendix D defines the investigator's role at the hearing as presenting a statement and answering questions from the Panel and the parties. During the hearing, Investigator Young instead asked Plaintiff direct, adversarial questions, including: "Was your penis erected in that photo?" and "Why didn't you share with anybody that you all had a relationship beyond friendship?" *See* Exhibit 05 (Selected Quotes from Hearing Recording). *See Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975) (recognizing that combining investigative and adjudicative functions may raise due process concerns); *Osteen v. Henley*, 13 F.3d 221, 225–26 (7th Cir. 1993) (requiring fundamental fairness, including an impartial decisionmaker, in university disciplinary proceedings).

39. During the hearing, Plaintiff attempted to raise the minimal age difference between himself and Roe as a mitigating factor. Panel Chair Assistant Dean Alexander Vickery-Holland shut down this line of argument on the record, stating: "I will not entertain, we were just teenagers.

That is not something that we're going to entertain in this conversation." Appendix D authorizes the Chair to instruct a questioner to reword questions intended to disparage or harass, but does not authorize the Chair to foreclose a respondent's presentation of mitigating circumstances. By cutting off this argument in the presence of the voting Panel members before deliberations, the Chair signaled which considerations were and were not to be weighed. *See* Exhibit 05 (Selected Quotes from Hearing Recording).

40. Prior to the commencement of Panel deliberations, Chair Vickery-Holland asked Plaintiff: "Why would we have a purple box here if it wasn't covering something up?" Chair Vickery-Holland subsequently signed the final Subcommittee Decision Notification. Appendix D requires any individual materially involved in the administration of the procedure to recuse themselves if they demonstrate a conflict of interest or bias. *See* Exhibit 05 (Selected Quotes from Hearing Recording). *See Withrow*, 421 U.S. at 46–47; *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (holding that due process requires recusal where circumstances create an unconstitutional probability of bias).

**D. Evidentiary Findings and Sanctions**

41. The Panel found Plaintiff responsible for possessing nude photographs of the complainant. No physical image or file depicting nudity was introduced into the evidentiary record. The Panel based this finding on text-based chat logs characterizing the unseen images. *See* Exhibit 02 (Subcommittee Decision Notification). Plaintiff testified at the hearing that he did not solicit explicit photos and that the images he actually possessed were not nude. *See* Exhibit 05 (Selected Quotes from Hearing Recording)

42. Regarding the secondary charge of sending a nude image, the evidence packet provided to the Panel contained a version of the image with a purple box digitally overlaid on the content. Plaintiff had no reason to anticipate the Panel would rely on this specific overlaid image as the basis for a nudity finding. *See* Exhibit 06 (Image Comparison Table).

43. When the image was raised during the hearing, Investigator Young screen-shared the University's 3,000-page evidence PDF and navigated to the image in question. However, because the original image had been uploaded to Discord with a "spoiler" tag, the PDF export rendered it as an opaque gray box—making the actual image content unviewable in the format the Panel possessed. Plaintiff had no opportunity to navigate to this specific page of a 3,000-page document in real time.

44. Plaintiff explicitly explained to the Panel that the opaque box was a PDF rendering artifact. Plaintiff offered to immediately pull up his live Discord application to show the Panel the actual, unedited transmitted image—which he testified depicted him wearing gray Hanes underwear without nudity—stating on the record: "And, you know, I can add on, if there's like a further doubt about that, I can pull up my own conversation live with the complainant and try to find that image and share it with the panel if necessary." The Panel did not accept Plaintiff's offer and moved to a new line of questioning. Plaintiff reasonably understood that the Panel had accepted his uncontroverted testimony. Instead, the Panel subsequently relied on the opaque gray box and the purple overlay to infer nudity, issuing a finding of responsibility for sexual misconduct. *See* Exhibit 05 (Selected Quotes from Hearing Recording). *See Purdue*, 928 F.3d at 663–64.

45. The Panel imposed a sanction of a five-year disciplinary dismissal. *See* Exhibit 02 (Subcommittee Decision Notification).

46. The University's Sanctioning Guidance outlines factors that may mitigate disciplinary sanctions. The final Subcommittee Decision Notification did not identify or apply any mitigating factors, but listed aggravating factors. *See* Exhibit 01d (UIUC Sanctioning Guidance).

47. Evidence of the following mitigating factors was present in the record but omitted from the Subcommittee Decision Notification's sanctioning rationale: (1) Plaintiff's lack of any prior disciplinary history; (2) his voluntary enrollment in counseling prior to the charge letter; (3) his cooperation with the investigation; (4) the lack of physical contact; (5) the lack of distribution to third parties; (6) the complainant's initiation of the dismissal request; (7) Plaintiff's 4.0 academic record; (8) the lack of UIUC community involvement; and (9) Roe's statement in the evidentiary record regarding her motivation: "[N]othing you did was harmful to me. I was hurt that you were talking to Intro." *See* Exhibit 09 (Complainant Request to Dismiss); Exhibit 10 (Procedural Timeline and Sanction Comparator); Exhibit 15 (Counseling Completion Letter).

48. Within the University system, a finding of rape carries a standard two-year dismissal, arson carries a three-year dismissal, and armed robbery carries a one-year dismissal. *See* Exhibit 01d (UIUC Sanctioning Guidance). The five-year penalty imposed on Plaintiff matches or exceeds sanctions for these violent physical offenses. Furthermore, the dismissal letter relied upon aggravating factors that were redundant with the alleged charges. *See* Exhibit 10 (Procedural Timeline and Sanction Comparator).

**E. The Title IX Procedural Framework**

49. The University fundamentally compromised the fairness of the proceedings by initiating a complaint *in lieu* of the complainant based on reports to the Title IX Office, and copying the Title IX Office on official correspondence.

50. This allowed the University to invoke the severe stigma of the Title IX sexual misconduct apparatus while deliberately stripping Plaintiff of the enhanced procedural protections—such as mandatory live cross-examination and the right to request an advisor—that federal Title IX regulations expressly require.

**F. Exhaustion of Remedies and the Appeal Committee's Ratification**

51. Plaintiff timely filed an appeal with the Senate Committee on Student Discipline (SCSD), raising procedural irregularity, bias, new evidence, and disproportionate sanctions. On March 31, 2026, the appeal committee summarily affirmed the Panel's decision, concluding that "none of the criteria for appeal were substantially met." Written notice was provided on April 8, 2026, and the dismissal is now in immediate effect. *See* Exhibit 07 (SCSD Appeal Decision Letter). Plaintiff does not concede that exhaustion is required for his § 1983 claims. *See Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982) (holding that exhaustion of state administrative remedies is not a prerequisite to a § 1983 action).

52. The appeal committee's rationale reveals that the institution ratified every procedural defect challenged herein. Specifically:

   a. **Jurisdiction**: The appeal committee offered a single conclusory sentence—that "this case met this standard"—without identifying any specific university community interest that was substantially affected, and without addressing the § 1.05 factors that the University is mandated to weigh.

   b. **Cross-Examination**: The appeal committee stated that "the complainant is not required to participate in the process and has the right to not attend any meetings or

hearings." This rationale ignores the central factual predicate: the complainant did not voluntarily decline to participate. OSCR Investigator Young stated on the record that the complainant "was not invited to review the investigative materials or participate in the hearing." An uninvited party cannot have exercised a "right to not attend."

c. **Investigator Bias**: The appeal committee determined that "there is no policy in the disciplinary procedures that bars an investigator from asking questions." While the policy does not contain an express prohibition, neither does it affirmatively grant the investigator any questioning authority over the respondent. Appendix D, § 7(g)(3) defines the investigator's entire role at the hearing as: (1) making an optional opening statement, (2) being questioned by Panel members, and (3) being questioned by the parties through the Chair. By contrast, the policy expressly states that "Panel members will then question the respondent"—an explicit grant of questioning authority that is conspicuously absent from the investigator's defined role.

d. **New Evidence**: The appeal committee stated that the image "was included in the evidence and therefore [Plaintiff] could have chosen to submit the other version." This mischaracterizes the evidentiary record. The evidence packet contained a version of the image with a purple box digitally overlaid on it. When the image was raised during the hearing, the Discord "spoiler" tag rendered the image as an opaque gray box in the PDF format, making it unviewable. Plaintiff explicitly offered to pull up his live Discord application and show the Panel the actual transmitted image. The Panel did not accept this offer.

e. **Mitigating Factors**: The appeal committee claimed that mitigating factors were "considered" during closed deliberation and that "the case had aggravating factors of a significance to then increase the sanction above the sanctioning guidance." Yet the Subcommittee Decision Notification identifies zero mitigating factors, and the Chair's on-the-record instruction not to "entertain" the age-difference argument—made in the presence of voting Panel members before deliberations—raises a substantial inference that the Panel was influenced to discount mitigating considerations.

f. **Sanctions**: The appeal committee found that "the evidence overwhelmingly demonstrated violations of the Student Code and therefore the sanctions were appropriate given the degree to which the code was violated." This conclusory affirmation provides no reasoned analysis of how a five-year dismissal is proportionate when the University's own sanctioning guidance prescribes substantially lower sanctions for violent physical offenses.

53. By completing this appellate process, Plaintiff has exhausted all available internal administrative remedies. The challenged dismissal remains in effect, and Plaintiff continues to suffer the academic, reputational, and professional consequences of that sanction.

## COUNT I

**42 U.S.C. § 1983 — Procedural Due Process and Deprivation of Liberty Interest**

*Against Defendants Alexander Vickery-Holland and Mariah Young in their individual capacities for damages, and against Defendants Alexander Vickery-Holland, Mariah Young, and Charles Lee Isbell Jr. in their official capacities for prospective injunctive relief*

54. Plaintiff realleges and incorporates by reference paragraphs 1 through 54 as though fully set forth herein.

55. At all relevant times, Defendants acted under color of state law. The University of Illinois Urbana-Champaign is a public institution, and Defendants exercised state-conferred authority in investigating, adjudicating, affirming, enforcing, or otherwise participating in the disciplinary action challenged in this Complaint.

56. Before imposing severe discipline, including a five-year dismissal, Defendants were required to provide Plaintiff with the process guaranteed by the Fourteenth Amendment. *See Goss*, 419 U.S. at 579; *Mathews*, 424 U.S. at 333–35.

***Deprivation of a Property Interest***

57. Plaintiff has a protected property interest in his continued enrollment at UIUC arising from a contractual relationship with the University. This contract includes the Student Code and Appendix D, which contain specific, identifiable promises upon which Plaintiff relied. *See Charleston*, 741 F.3d at 772–74; *Purdue*, 928 F.3d at 659.

58. Specifically, Appendix D, § 7 guarantees the respondent the opportunity to question the complainant through the chair, thereby contractually securing the right to cross-examination. Appendix D, § 4(e)(7) explicitly guarantees the presumption of innocence. Appendix D, § 12 guarantees a neutral adjudicator by mandating recusal for bias or conflict of interest. Appendix D further guarantees adherence to mandatory notice requirements and strict 60-business-day procedural timelines, alongside an overarching guarantee of an objective evaluation of evidence. *See* Exhibit 01b (UIUC Appendix D).

*Deprivation of an Occupational Liberty Interest (Stigma-Plus)*

59. Plaintiff has a protected liberty interest in pursuing his chosen career. UIUC's finding that Plaintiff engaged in sexual misconduct is severely stigmatizing. The change in his status from a student in good standing to one dismissed for five years satisfies the "plus" factor of the stigma-plus test. *See Purdue*, 928 F.3d at 661–62; *Dupuy*, 397 F.3d at 503–10.

60. While educational records are generally protected by FERPA, Plaintiff is functionally compelled to execute FERPA waivers and authorize UIUC to disclose this severe disciplinary record as a mandatory condition of all future academic and specialized employment applications.

61. UIUC's own published policies explicitly confirm that when a student signs a records release, the University will disclose "a statement describing the behavior for which you have been held accountable" and "any sections of the Student Code you have been found to have violated." *See* Exhibit 01e (UIUC FAQs Regarding Academic Integrity Records).

62. Computer Science is universally recognized as one of the most rigorously selective degree programs in higher education. The compelled disclosure of a five-year sexual misconduct dismissal renders Plaintiff's ability to successfully transfer to a comparable program extraordinarily difficult.

63. Plaintiff is an active member of UIUC's competitive cybersecurity organization, SIGPwny, regularly competes in Capture the Flag (CTF) challenges, and has an established, specialized trajectory pursuing a career with the United States Cyber Command. *See* Exhibit 14 (Resume).

64. A career within the national security and defense infrastructure requires passing a rigorous federal background investigation. Plaintiff will be legally compelled to authorize UIUC to disclose his disciplinary record via the SF-86 Questionnaire for National Security Positions.

65. Under federal adjudicative guidelines (specifically Guidelines D and E), a five-year university dismissal for sexual misconduct constitutes a presumptive disqualifying condition for a security clearance. This creates an immediate barrier to entry into the federal defense sector. *See* Exhibit 08 (National Security Adjudicative Guidelines).

66. Plaintiff recognizes that *Malhotra v. Univ. of Ill. Urbana-Champaign*, 77 F.4th 532, 538–40 (7th Cir. 2023), will inform the scope of this claim on the merits.

### *Procedural Due Process Violations*

67. Defendants deprived Plaintiff of his protected interests without due process of law.

68. The University initiated this proceeding under the severe allegation that Plaintiff had received illicit images, yet the investigation failed to identify, recover, or produce a single physical image to substantiate this claim.

69. Rather than objectively acknowledging this lack of physical evidence, Investigator Young abandoned her contractual duty of neutrality and functioned as an active prosecutor by posing leading, guilt-presuming questions, including the degrading question, "Was your penis erected in that photo?" *See* Exhibit 05 (Selected Quotes from Hearing Recording).

70. Panel Chair Vickery-Holland compounded this structural bias by (a) prematurely shutting down Plaintiff's mitigating defenses on the record; (b) publicly announcing his predetermined

conclusion on the central factual dispute before deliberations; and (c) signing the final Subcommittee Decision Notification without recusing himself despite this demonstrated bias. *See* Exhibit 05 (Selected Quotes from Hearing Recording).

71. The University affirmatively excluded the complainant from the hearing, permanently extinguishing Plaintiff's right to cross-examination—a right expressly guaranteed by Appendix D, § 7. This exclusion was not based on any policy provision but on the investigator's unilateral determination. *See* Exhibit 05 (Selected Quotes from Hearing Recording).

72. The constitutional right to cross-examination in student disciplinary proceedings does not depend on an explicit statutory grant. It is rooted in the Due Process Clause of the Fourteenth Amendment and is evaluated under the *Mathews v. Eldridge* balancing test, 424 U.S. 319, 335 (1976), which requires courts to weigh the private interest affected, the risk of erroneous deprivation through the procedures used, and the government's interest. Here, all three factors compel cross-examination: Plaintiff's private interest in his education, career, and reputation is profound; the risk of erroneous deprivation is acute where the Panel relied on the complainant's characterizations of events and images without Plaintiff ever having the opportunity to challenge those characterizations directly; and the University's interest in efficient adjudication does not justify the complete elimination of the respondent's ability to test the claims against him.

73. Cross-examination was not a procedural formality in this case—it was the mechanism by which the Panel would have learned critical facts that it never heard. The complainant had affirmatively sought dismissal of the case, contacted OSCR to request its withdrawal, and sent Plaintiff a message on October 22, 2025, apologizing and informing him that she would be trying to get the case dismissed. Had the complainant been permitted to testify and be questioned, the

Panel would have heard directly about the actual nature of the conversations and images exchanged, the complainant's own account of events rather than the University's characterizations, and the circumstances surrounding her October 22 messages—messages that the University recharacterized as "interference" despite Plaintiff having no knowledge that an investigation existed at that time. Instead, by affirmatively excluding the complainant from the proceeding, the University forced the Panel to rely on unsworn text-based characterizations and digitally obstructed evidence to infer proof of Student Code violations—without ever hearing from the one witness whose live testimony would have directly undermined the factual basis of those findings.

74. Federal courts have increasingly recognized this constitutional imperative. The Sixth Circuit held in *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018), that cross-examination is constitutionally required when credibility is at issue, because "without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives." The Seventh Circuit in *Purdue*, 928 F.3d at 663–64, found due process violations where the complainant did not appear and the respondent had no opportunity to cross-examine her. Most recently, the Fourth Circuit established that cross-examination is essential to ensuring a meaningful hearing in higher-education disciplinary proceedings where credibility determinations are at stake and potential sanctions are severe. *Doe v. Univ. of N. Carolina Sys.*, No. 24-1301, 2025 WL 1006277 (4th Cir. Apr. 4, 2025). Moreover, Plaintiff need not rely solely on a freestanding constitutional right to cross-examination because the University *contractually guaranteed* this right. Appendix D, § 7 expressly provides the respondent a final opportunity to question the complainant through the chair. A public university that promises cross-examination in its published disciplinary framework and then unilaterally

extinguishes that right—not through the complainant's voluntary absence, but through the institution's own affirmative decision to exclude the complainant—has deprived the respondent of a contractual entitlement that independently satisfies the property-interest prong of the due process analysis. *See Charleston*, 741 F.3d at 772–74; *Purdue*, 928 F.3d at 659.

75. The University's own appeal committee ratified each of these defects with reasoning that contradicts the University's own published policies and the factual record. *See* Exhibit 07 (SCSD Appeal Decision Letter).

76. The University fundamentally compromised the fairness of the proceedings by initiating a complaint *in lieu* of the complainant based on reports to the Title IX Office, and copying the Title IX Office on official correspondence. This allowed the University to invoke the stigma of the Title IX sexual misconduct apparatus while deliberately stripping Plaintiff of the enhanced procedural protections—such as mandatory live cross-examination and the right to request an advisor—that federal Title IX regulations expressly require.

***Disproportionate Sanctioning***

77. The Panel imposed a five-year dismissal, a penalty that exceeds the University's standard punishments for proven violent physical felonies. Within the University system, a finding of rape carries a standard two-year dismissal, arson carries a three-year dismissal, and armed robbery carries a one-year dismissal.

78. To justify this five-year penalty, the dismissal letter relied upon aggravating factors that were redundant with the alleged charges. Furthermore, to the extent the University attempts to justify

this sanction by relying on enhanced sanctioning categories, this defense is undermined by the University's failure to independently verify Roe's age or view a single image depicting nudity.

79. In issuing this sanction, the Subcommittee Decision Notification completely ignored nine documented mitigating factors, including Roe's admission of no harm and her own initiation of the dismissal request. *See* Exhibit 03 (SCSD Appeal Filing).

***Individual Liability of Non-Voting Officials***

80. Although Defendants Vickery-Holland and Young did not cast formal votes on the Panel's decision, their individual liability under § 1983 does not depend on being the final decisionmaker. Section 1983 imposes liability on every person who, acting under color of state law, causes the deprivation of a constitutional right. *See Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (imposing liability on non-voting Title IX coordinator and advisory committee members whose actions shaped the outcome); *Morfin v. City of East Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003) ("An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.") (emphasis on participation as sufficient basis).

81. Defendant Vickery-Holland was the proximate cause of multiple deprivations. He controlled the hearing as Chair, foreclosed Plaintiff's presentation of mitigating circumstances in the presence of voting Panel members, announced his predetermined conclusion on the central factual dispute before deliberations, and signed the Subcommittee Decision Notification. These actions directly shaped the Panel's factual findings and sanction determination.

82. Defendant Young was likewise the proximate cause of constitutional deprivations. She unilaterally decided not to invite the complainant, thereby extinguishing Plaintiff's right to cross-examination. She abandoned her defined neutral role and functioned as an adversarial prosecutor at the hearing, shaping the Panel's understanding of the evidence through leading, guilt-presuming questions. She controlled the presentation of the 3,000-page evidence PDF and navigated to the unviewable image that the Panel ultimately relied upon for its nudity finding.

*The Appeal Did Not Cure the Hearing Defects*

83. The SCSD appeal committee's review did not cure the constitutional deficiencies of the original hearing. An appellate process that ratifies procedural violations rather than correcting them does not satisfy due process. *See Doe v. Purdue Univ.*, 928 F.3d at 663–64 (finding due process violation despite post-hearing appellate review where the appeal process failed to correct the original defects).

84. The appeal committee did not conduct an independent factual review. It did not re-interview witnesses, re-examine evidence, or hold a hearing. Instead, it summarily affirmed the Panel's findings using reasoning that contradicts the factual record and the University's own published policies, as detailed in paragraph 53 above. An appeal body that treats the complainant's involuntary exclusion as a voluntary choice, that treats an unviewable image as available evidence, and that treats the complete absence of documented mitigating factors as proof they were "considered" has not provided the constitutionally required check on the original proceeding.

*Clearly Established Law*

85. At all times relevant to this Complaint, the constitutional rights violated by Defendants Vickery-Holland and Young were clearly established.

86. It has been clearly established in the Seventh Circuit since at least *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019), that a university student facing severe disciplinary sanctions is entitled to a fundamentally fair process, including cross-examination and an unbiased adjudicator. The absence of a federal statute codifying the right to cross-examination in student disciplinary proceedings does not diminish this constitutional guarantee. Due process requirements are not static; they are calibrated to the stakes involved. *See Goss*, 419 U.S. at 579 (holding that longer suspensions or expulsions "may require more formal procedures"). A five-year dismissal for sexual misconduct—carrying compelled disclosure obligations, career foreclosure, and lasting reputational harm—demands the most rigorous procedural safeguards the Fourteenth Amendment affords. Moreover, even courts that have declined to hold cross-examination categorically required have recognized its constitutional necessity where, as here, the proceeding turns on credibility and the sanctions are severe. *See Doe v. Univ. of N. Carolina Sys.*, No. 24-1301, 2025 WL 1006277 (4th Cir. Apr. 4, 2025); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

87. Furthermore, it is clearly established that state actors may not base severe punitive actions on arbitrary grounds devoid of a factual basis. No reasonable official could have believed their conduct was constitutionally permissible.

88. Taken together, these defects rendered the proceeding fundamentally unfair and constitutionally inadequate. *See Goss*, 419 U.S. at 579; *Purdue*, 928 F.3d at 663–64; *Osteen*, 13 F.3d at 225–26.

89. As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer loss of educational status, disruption of academic progress, reputational injury, emotional distress, and other damages.

90. Plaintiff is entitled to declaratory and injunctive relief, together with compensatory damages and any further relief permitted by law.

## COUNT II

### Breach of Contract / Illinois Law

### Against Defendant Board of Trustees of the University of Illinois

91. Plaintiff realleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

92. At all relevant times, the relationship between Plaintiff and the University included contractual obligations arising from the University's published rules, policies, and disciplinary procedures, including the Student Code and Appendix D. *See Charleston*, 741 F.3d at 772–74; *Malhotra*, 77 F.4th at 536–38.

93. Those policies and procedures promised Plaintiff, among other things, fair notice of allegations, adherence to specified procedures and timelines, administration of the disciplinary process in accordance with defined institutional roles, fair consideration of evidence, and a hearing process consistent with the University's published framework.

94. Plaintiff performed his obligations under that contractual relationship or was otherwise excused from further performance.

95. Defendant Board of Trustees materially breached those contractual obligations in the following respects:

a. Asserting jurisdiction over purely off-campus, online conduct involving a non-affiliated party without demonstrating a substantial effect on the university community, in direct violation of § 1-104(d), § 1-301, and § 1.05, and without conducting the documented analysis of the § 1.05 factors required by the Student Disciplinary Procedures;

b. Initiating a complaint in lieu of the complainant based on Title IX reports, but denying Plaintiff the corresponding Title IX procedural protections, including the right to request an advisor;

c. Failing to dismiss the complaint upon the complainant's explicit withdrawal;

d. Denying cross-examination by deliberately excluding the complainant from all proceedings, rather than by the complainant's voluntary absence;

e. Violating the mandatory 60-business-day investigation timeline caps without providing any of the required written notices of delay;

f. Delaying the initial notice of allegations for 68 days without conducting an individualized safety analysis;

g. Permitting an investigator to act as an adversarial prosecutor rather than a neutral presenter of facts, in direct violation of the role defined by Appendix D, § 7(g)(3);

h. Failing to enforce the recusal of Defendant Vickery-Holland for explicit, demonstrated bias;

i. Abandoning an objective evaluation of evidence by relying on digital artifacts while refusing to view unedited evidence; and

j. Imposing an arbitrary five-year dismissal completely disproportionate to published guidelines, relying on arbitrary aggravating factors while ignoring nine documented mitigating factors. *See Charleston*, 741 F.3d at 772–74; *Eiland v. Wolf*, 764 F. Supp. 1162, 1177–78 (N.D. Ill. 1991) (recognizing a breach of contract claim where a university failed to follow its own disciplinary procedures).

96. The appeal committee's ratification of each of these breaches with reasoning that contradicts the University's own published policies constitutes additional evidence of the University's systematic failure to comply with its contractual commitments.

97. As a direct and proximate result of those breaches, Plaintiff suffered and continues to suffer academic, financial, reputational, and other damages.

98. Plaintiff is entitled to injunctive relief, damages, and such other relief as the Court deems proper under Illinois law.

## COUNT III

### Declaratory Judgment (28 U.S.C. § 2201)

### Against All Defendants

99. Plaintiff realleges and incorporates by reference paragraphs 1 through 98 as though fully set forth herein.

100. An actual and judicially cognizable controversy exists between Plaintiff and Defendants regarding whether Defendants' conduct during the disciplinary investigation, hearing, and subsequent appeal violated Plaintiff's clearly established constitutional rights under the Fourteenth Amendment.

101. Plaintiff seeks, and is entitled to, a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201, officially declaring that Defendants' policies, practices, and actions in investigating, adjudicating, and affirming on appeal the disciplinary action at issue deprived Plaintiff of his constitutionally protected property and liberty interests without due process of law.

102. This declaration is necessary and appropriate to serve as the foundation for the permanent injunctive relief required to restore Plaintiff's academic and occupational standing.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A. Issue a Temporary Restraining Order immediately restraining Defendants from enforcing the five-year dismissal, and directing UIUC to reinstate Plaintiff to full enrollment status, with the ability to submit his remaining coursework through existing online portals and attend the 23.5 remaining hours of in-person examinations and class sessions as normally scheduled;

B. Issue a Preliminary Injunction continuing such relief through the pendency of this action;

C. Issue a Permanent Injunction directing UIUC to vacate the Panel's findings, dismiss the disciplinary case, and permanently expunge the disciplinary notation from Plaintiff's transcript; or in the alternative, order a new disciplinary hearing before an unbiased panel that engages in an objective evaluation of the actual physical record;

D. Declare that Defendants violated Plaintiff's rights under the Fourteenth Amendment and Illinois law, and that the challenged disciplinary process, resulting dismissal, and subsequent appeal affirmance were unlawful;

E. Award compensatory damages against Defendants Vickery-Holland and Young for injuries suffered as a result of their unlawful conduct;

F. Award punitive damages against Defendants Vickery-Holland and Young, individually, for conduct undertaken with deliberate indifference to Plaintiff's clearly established constitutional rights;

G. Award pre-judgment and post-judgment interest as allowed by law; and

H. Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

## VERIFICATION

I, John Doe, am the Plaintiff in this action. I have read the foregoing Verified Complaint and the factual allegations contained therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April 9th, 2026

JOHN DOE, Plaintiff

Proceeding *pro se*

Respectfully submitted,

JOHN DOE, Plaintiff

Proceeding *pro se*

[Real name — filed under seal]

[Address — filed under seal]

[Telephone — filed under seal]

[Email — filed under seal]


Dated: April 9, 2026