E-FILED
Thursday, 09 April, 2026 02:53:25 PM
Clerk, U.S. District Court, ILCD

Emergency TRO

FILED
APR 09 2026
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

JOHN DOE,
Plaintiff,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS;
ALEXANDER VICKERY-HOLLAND, in his individual and official capacities;
MARIAH YOUNG, in her individual and official capacities;
CHARLES LEE ISBELL JR., Chancellor, in his official capacity,
Defendants.

Case No. 26-cv-2104

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

**AND PRELIMINARY INJUNCTION**

Plaintiff John Doe, proceeding *pro se*, respectfully moves this Court for a Temporary Restraining Order (TRO) and Preliminary Injunction enjoining Defendants from enforcing a five-year disciplinary dismissal and directing the University of Illinois Urbana-Champaign ("UIUC" or "the University") to immediately restore Plaintiff to his status as a student in good standing.

In support of this Motion, Plaintiff states as follows:

## I. INTRODUCTION

1. This Court is tasked with determining whether the University of Illinois violated Plaintiff's constitutional and contractual rights to such an extent that entry of emergency injunctive relief is warranted.

2. Plaintiff, an accelerated computer science student with a 4.0 GPA and no prior disciplinary history, was subjected to a five-year dismissal based on an entirely online relationship with an unaffiliated individual who explicitly requested to withdraw her complaint. *See* Exhibit 02 (Subcommittee Decision Notification).

3. The underlying disciplinary proceedings were marked by fundamental structural defects. Plaintiff was denied the right to cross-examine the complainant—not because the complainant chose to be absent, but because OSCR affirmatively decided not to invite her. The University further permitted the investigator to assume an adversarial role, violated its own investigation timelines, and reached its most severe findings of sexual misconduct without ever identifying, producing, or viewing a single image depicting nudity. *See* Exhibit 05 (Selected Quotes from Hearing Recording); Exhibit 06 (Image Comparison Table); Exhibit 10 (Procedural Timeline and Sanction Comparator).

4. On March 31, 2026, the SCSD appeal committee summarily affirmed the Panel's decision. Written notice was provided on April 8, 2026, and Plaintiff is now immediately prohibited from attending classes on campus or sitting for in-person examinations on penalty of trespass. Every day that passes without judicial intervention is actively and irreversibly destroying Plaintiff's Spring 2026 semester. The appeal committee's reasoning itself underscores the need for judicial intervention: it claimed no policy bars the investigator from asking adversarial questions (though no policy affirmatively grants that authority either), found the complainant had a "right to not

attend" (ignoring that she was never invited), and asserted the image was "included in the evidence" (despite being unviewable in the format provided, and despite the Panel's refusal to view the actual image when Plaintiff offered it). *See* Exhibit 07 (SCSD Appeal Decision Letter). The University will not self-correct. All internal remedies are exhausted.

5. Plaintiff seeks immediate injunctive relief because the five-year dismissal and accompanying sexual misconduct finding effectuate a total deprivation of his occupational liberty. This career foreclosure, coupled with a transcript notation that triggers the compelled disclosure of a sexual misconduct finding, constitutes irreparable harm that cannot be remedied by monetary damages at the conclusion of this litigation. *See* Exhibit 02 (Subcommittee Decision Notification).

6. **Notice Pursuant to Fed. R. Civ. P. 65(b):** Notice of this Motion, along with the accompanying Verified Complaint and exhibits, has been served upon Defendants' counsel of record via electronic mail, providing the University with an opportunity to be heard on this emergency request.

## II. LEGAL STANDARD

7. To obtain preliminary injunctive relief, a plaintiff must show that (1) his underlying case has some likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) he will suffer irreparable harm without the injunction. *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007) (setting forth the three-factor test for preliminary injunctive relief).

8. If those factors are established, the court must then balance the irreparable harm to the non-moving party if the injunction is granted against the irreparable harm to the moving party if the injunction is denied, while also considering the public interest.

## III. ARGUMENT

### A. Plaintiff Has a Substantial Likelihood of Success on the Merits

9. Plaintiff has a substantial likelihood of success on his claims that the University deprived him of protected property and liberty interests without procedural due process.

***Deprivation of a Property Interest***

10. In the higher education context, a student possesses a constitutionally protected property interest in their education when a contract with the university entitles them to specific rights. *Doe v. Purdue Univ.*, 928 F.3d 652, 659 (7th Cir. 2019) (holding that a student has a protected property interest in continued enrollment where university rules create specific contractual promises).

11. Here, Appendix D of the Student Code serves as a binding contract. It explicitly guarantees Plaintiff the right to question the complainant through the chair, the right to a neutral investigator, the mandate that biased officials recuse themselves, adherence to strict procedural timelines, and the right to an objective evaluation of evidence. *See* Exhibit 01b (UIUC Appendix D).

12. As a threshold matter, Plaintiff has a substantial likelihood of showing the University lacked jurisdiction entirely. According to university policies, "[t]he university shall not regulate the social life of students or their organizations except as such regulations may apply to use of university premises, facilities, or premises approved for student residences." § 1-104(d). Furthermore, § 1-301 explicitly limits the basis for discipline, stating that the "discipline system

accepts jurisdiction only in those instances in which the university community's interest is substantially affected." *See* Exhibit 01a (UIUC Student Code).

13. The University's assertion of jurisdiction here is unsupported. This matter involved an entirely online, voluntary social relationship with an individual unaffiliated with the university, and none of the communications were sent or received on university property. No documented analysis demonstrates how this private off-campus relationship "substantially affected" a university community interest. The complainant explicitly admitted her complaint was driven by personal jealousy rather than any cognizable harm, stating on the record: "[N]othing you did was harmful to me. I was hurt that you were talking to Intro." *See* Exhibit 03 (SCSD Appeal Filing); Exhibit 09 (Complainant Request to Dismiss).

14. The University also failed to weigh the specific factors mandated by § 1.05 of the Student Disciplinary Procedures for off-campus jurisdiction. These factors weigh against jurisdiction. First, "whether an alleged victim is a member of the campus community": the complainant claims to be a UK-based individual with no affiliation to UIUC. Second, "the ability of the university to gather information, including the statements of witnesses": the complainant did not participate in the investigation or hearing. Third, "whether the off-campus conduct is part of a series of actions that occurred either on or off campus": this was an isolated online relationship with no on-campus nexus. The appeal committee's one-sentence conclusion that "this case met this standard" without addressing any of these mandatory factors confirms the absence of a reasoned jurisdictional analysis. *See* Exhibit 01c (UIUC Student Disciplinary Procedures 24-25); Exhibit 07 (SCSD Appeal Decision Letter).

15. Moreover, the University engaged in a prejudicial procedural framework. While prosecuting this as a non-Title IX student conduct case under Appendix D, official University correspondence—including the Charge Letter and Dismissal Letter—formally copied the Title IX Office. This allowed the University to invoke the severity of its Title IX sexual misconduct apparatus while stripping Plaintiff of the enhanced procedural protections—such as mandatory live cross-examination and the right to request an advisor—that federal Title IX regulations require. *See* Exhibit 02 (Subcommittee Decision Notification); Exhibit 04 (OSCR Charge Notice Letter).

16. The University breached its contractual due process guarantees. The complainant was absent from the investigation and the hearing. On the hearing record, OSCR Investigator Mariah Young explicitly stated that "due to the complainant being a minor, she was not invited to review the investigative materials or participate in the hearing." There is no provision in University policy authorizing the blanket exclusion of a complainant on this basis. This administrative decision unilaterally extinguished Plaintiff's promised right to cross-examination. The appeal committee's ratification of this exclusion—by claiming the complainant had a "right to not attend"—ignores the dispositive factual distinction: the complainant was not invited, and therefore could not have failed to appear. *See* Exhibit 05 (Selected Quotes from Hearing Recording).

17. Plaintiff's likelihood of success on the cross-examination claim is particularly strong because the deprivation was not merely procedural—it was substantive. The complainant in this case had affirmatively sought dismissal of the case, contacted OSCR to request its withdrawal, and messaged Plaintiff on October 22, 2025, apologizing and stating she would try to get the case dismissed. She is the one witness whose live testimony would have allowed the Panel to hear directly about the actual nature of the conversations and images exchanged between the parties,

the complainant's own characterization of events rather than the University's inferences, and the circumstances surrounding the October 22 messages—which the University recharacterized as "interference" despite Plaintiff having no knowledge that an investigation existed at that time. By affirmatively excluding the complainant from the proceeding, the University forced the Panel to infer proof of Student Code violations from unsworn text-based characterizations and digitally obstructed evidence, rather than hearing from the person whose testimony would have directly undermined the factual basis of those findings.

18. The constitutional right to cross-examination does not depend on an explicit statutory grant; it scales with the severity of the deprivation at stake. *Goss*, 419 U.S. at 584; *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Multiple federal circuits have recognized that cross-examination is constitutionally required in university disciplinary proceedings where, as here, the outcome depends on credibility and the sanctions are severe. *See Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (holding that "without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives"); *Purdue*, 928 F.3d at 663–64; *Doe v. Univ. of N. Carolina Sys.*, No. 24-1301, 2025 WL 1006277 (4th Cir. Apr. 4, 2025). This constitutional basis is independently reinforced by the University's own contractual guarantee. Appendix D, § 7 expressly provides the respondent an opportunity to question the complainant through the chair. The University did not merely fail to provide this guarantee—it affirmatively prevented its exercise by excluding the complainant from the proceeding entirely. This dual constitutional and contractual basis substantially strengthens Plaintiff's likelihood of prevailing on the merits. *See Charleston*, 741 F.3d at 772–74; *Purdue*, 928 F.3d at 659.

19. The promised neutrality of the proceedings was further compromised by the conduct of the officials orchestrating the hearing. Appendix D, § 7(g)(3) defines the investigator's role at the hearing as presenting an overview and answering questions; it does not affirmatively grant the investigator authority to question the respondent. By contrast, the policy expressly states that "Panel members will then question the respondent"—an explicit grant of questioning authority conspicuously absent from the investigator's defined role. Yet, Investigator Young posed at least five leading, guilt-presuming questions to Plaintiff on the record, including asking, "Was your penis erected in that photo?" and "Why didn't you share with anybody that you all had a relationship beyond friendship?" The appeal committee's defense—that "there is no policy in the disciplinary procedures that bars an investigator from asking questions"—ignores that § 7(g)(3) affirmatively defines and limits the investigator's function, and that the policy reserves questioning authority to Panel members and parties. *See* Exhibit 01b (UIUC Appendix D); Exhibit 05 (Selected Quotes from Hearing Recording).

20. This was compounded by the Panel Chair, Assistant Dean Alexander Vickery-Holland. As the designated neutral facilitator, the Chair was contractually obligated under Appendix D, § 7(f)(12) to intervene against harassing or degrading questions. Instead, he allowed Investigator Young's questioning to proceed unchecked. Furthermore, the Chair shut down Plaintiff's argument regarding the minimal age difference between the parties, explicitly stating: "I will not entertain, we were just teenagers. That is not something that we're going to entertain in this conversation." By cutting off this argument in the presence of the voting Panel members before deliberations, the Chair signaled which mitigating considerations were and were not to be weighed. Before deliberations began, he also signaled his conclusion on the central factual dispute, asking Plaintiff, "John, why would we have a purple box here if it wasn't covering

something up?" The Chair refused to recuse himself. *See* Exhibit 05 (Selected Quotes from Hearing Recording).

21. The University further breached the contract by violating mandatory notice and timeline provisions. Appendix D, § 4(e) and § 4(m) mandate timely notification of allegations. The University received the complaint on August 29, 2025, but issued no notice until November 5, 2025—68 days later. Policy permits such a delay only with a documented "individualized safety and risk analysis," which was never conducted. This delay severely prejudiced Plaintiff: the October 22, 2025 message that formed the centerpiece of his "interference" charge occurred 14 days before he had any knowledge that an investigation existed or a No Contact Order was in place. *See* Exhibit 04 (OSCR Charge Notice Letter); Exhibit 10 (Procedural Timeline and Sanction Comparator).

22. Furthermore, Appendix D, § 9(a) caps the investigation and hearing process at 60 business days unless written extension notices citing "good cause" are provided to the parties for each 10-day increment. The University extended this process to approximately 143 business days—exceeding the maximum by over 80 business days—without issuing a single written extension notice. The appeal committee acknowledged the timeline violation ("while the investigator did not provide updates every ten business days") but dismissed it as immaterial, without explaining how an investigation running more than double the permitted duration could have no effect on the outcome. *See* Exhibit 10 (Procedural Timeline and Sanction Comparator).

23. The Panel also abandoned an objective evaluation of evidence. The most consequential finding—that Plaintiff possessed nude photographs of the complainant—was reached without any image depicting nudity being identified, produced, or independently verified in the

proceedings. The Panel based this finding solely on unverified text-chat characterizations. Plaintiff's live testimony—the only direct evidence on this issue—was that the images saved were not actually nude. *See* Exhibit 05 (Selected Quotes from Hearing Recording).

24. For the secondary charge of sending a nude image, the evidence packet contained a version of the image with a purple box digitally overlaid on it. Plaintiff had no reason to anticipate the Panel would rely on this specific overlaid image as the basis for a nudity finding. When the image was raised during the hearing, Investigator Young screen-shared the University's 3,000-page evidence PDF and navigated to the image—but the Discord "spoiler" tag rendered it as an opaque gray box in the PDF format, making it unviewable. *See* Exhibit 06 (Image Comparison Table).

25. Plaintiff explicitly explained that the box was a PDF rendering artifact and offered to immediately produce the real image—which depicts gray Hanes underwear with no nudity—stating: "And, you know, I can add on, if there's like a further doubt about that, I can pull up my own conversation live with the complainant and try to find that image and share it with the panel if necessary." The Panel did not accept this offer and transitioned to a new line of questioning. Plaintiff reasonably understood the Panel had accepted his uncontroverted testimony. Instead, the Panel subsequently relied on the artifact to support a finding of sexual misconduct. *See* Exhibit 05 (Selected Quotes from Hearing Recording); Exhibit 06 (Image Comparison Table). The appeal committee's response—that the image "was included in the evidence" and Plaintiff "could have chosen to submit the other version"—ignores both the unviewable format and the Panel's own refusal to view the actual image when it was offered. *See* Exhibit 07 (SCSD Appeal Decision Letter).

26. Finally, the resulting five-year dismissal is disproportionate. It matches or exceeds the University's standard punishments for proven violent physical crimes, including rape (two years), arson (three years), and armed robbery (one year). To the extent the University relies on enhanced sanctioning categories, this justification is undermined by its failure to independently verify the complainant's age or demographic identity, and its failure to identify or view a single image depicting nudity. *See* Exhibit 01d (UIUC Sanctioning Guidance); Exhibit 10 (Procedural Timeline and Sanction Comparator).

27. In issuing this sanction, the Subcommittee Decision Notification cited only aggravating factors and completely omitted nine documented mitigating factors recognized by University guidance, including: (1) no prior disciplinary history; (2) voluntary enrollment in counseling before the charge letter; (3) full cooperation with the investigation; (4) no physical contact; (5) no distribution to third parties; (6) the complainant's admission of no harm ("[N]othing you did was harmful to me. I was hurt that you were talking to Intro"); (7) the complainant's initiation of the dismissal request 14 days before the No Contact Order; (8) Plaintiff's 4.0 GPA on an accelerated track; and (9) no community harm from an unaffiliated complainant. The appeal committee claimed these factors were "considered" in closed deliberation, but the complete absence of any mitigating factor from the written decision—combined with the Chair's on-the-record instruction not to "entertain" the age-difference argument in the presence of voting Panel members—raises a substantial inference that mitigating considerations were discounted. *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019). *See* Exhibit 01d (UIUC Sanctioning Guidance); Exhibit 15 (Counseling Completion Letter).

***Deprivation of an Occupational Liberty Interest***

28. Plaintiff has also been deprived of his occupational liberty. To succeed on this theory, Plaintiff must satisfy the "stigma-plus" test, showing the state inflicted reputational damage accompanied by an alteration in legal status.

29. Unlike the plaintiff in *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532 (7th Cir. 2023) (finding a two-semester suspension for a generic code violation insufficient for stigma-plus, but distinguishable from cases involving specific sexual misconduct findings and compelled disclosure), whose two-semester suspension for a generic Student Code violation was deemed a mere "setback," Plaintiff's five-year dismissal carries a specific finding of sexual misconduct that triggers compelled disclosure obligations under FERPA waivers and the SF-86 Questionnaire for National Security Positions.

30. Under *Purdue*, 928 F.3d at 661–62, a liberty interest is deprived when the disclosure of stigmatizing information is compelled, certain, and not self-published. Plaintiff is functionally compelled to execute FERPA waivers and authorize UIUC to disclose this disciplinary record as a condition of all future academic and specialized employment applications. UIUC's own published policies confirm that when a student signs a release, the University will disclose "a statement describing the behavior for which you have been held accountable" and "any sections of the Student Code you have been found to have violated." *See* Exhibit 01e (UIUC FAQs Regarding Academic Integrity Records).

31. Plaintiff is an active member of the University's competitive cybersecurity organization, SIGPwny, and is pursuing a career with the United States Cyber Command. *See* Exhibit 14 (Resume).

32. A career at U.S. Cyber Command requires passing a federal background investigation and obtaining a security clearance. To be considered for these roles, Plaintiff will be legally compelled to authorize disclosure of his disciplinary record via the SF-86. Under federal adjudicative guidelines (Guidelines D and E), a five-year university dismissal for sexual misconduct constitutes a presumptive disqualifying condition. Just as the Seventh Circuit recognized in *Purdue*, where a flawed Title IX finding triggered an expulsion from the naval career path, Plaintiff faces a similar functional barrier to entry into the federal defense sector. *See* Exhibit 08 (National Security Adjudicative Guidelines).

**B. Plaintiff Will Suffer Irreparable Harm with No Adequate Remedy at Law**

33. Plaintiff's circumstances are materially distinct from cases where a mere "academic gap" or temporary delay in graduation does not constitute irreparable harm. Plaintiff is not facing a simple interruption of studies that can be remedied by returning to campus a year later. The crux of Plaintiff's irreparable harm lies in the compelled disclosure of the disciplinary record, which transforms a delay into an active barrier.

34. Because the five-year dismissal notation exists on Plaintiff's transcript today, Plaintiff is paralyzed academically. To mitigate his educational damages during dismissal, Plaintiff must transfer to another institution. However, prospective institutions universally require applicants to disclose their disciplinary history and sign a records release. As UIUC's own published Provost policies confirm, executing this release forces the publication of the specific sexual misconduct finding and the underlying behavioral allegations. *See* Exhibit 01e (UIUC FAQs Regarding Academic Integrity Records).

35. This is compounded by the nature of Plaintiff's academic track. Computer Science is among the most selective degree programs in higher education. Successfully transferring into a comparable program mid-degree is exceptionally difficult even for candidates with unblemished records. Attempting to navigate this competitive transfer process while burdened by a compelled disclosure of sexual misconduct renders transfer effectively impossible.

36. Furthermore, a future expungement cannot retroactively restore closed windows of professional opportunity. Plaintiff's established trajectory is in the federal cybersecurity sector. Entry into these roles mandates rigorous background investigations and clearance prescreening via the SF-86. The immediate imposition of a five-year dismissal for sexual misconduct triggers presumptive background check disqualifications under federal adjudicative guidelines. *See* Exhibit 08 (National Security Adjudicative Guidelines).

37. The federal defense sector does not hold recruitment slots open for years while applicants litigate university disputes. For the duration of the dismissal, this record effectively disqualifies Plaintiff from initiating the application process for his chosen career. The window of opportunity is destroyed today.

38. Finally, the timing of the dismissal creates immediate, irreversible destruction of the current academic term. The appeal panel's decision was affirmed on March 31, 2026, and written notice was provided on April 8, 2026. As of that date, Plaintiff is barred from campus and faces trespass sanctions if he attempts to attend class or sit for examinations in person. Each day that Plaintiff is excluded from his courses—which are built around in-person lectures, collaborative group projects, and scheduled examinations—inflicts compounding, unrecoverable academic harm. Plaintiff is enrolled in 13 critical credits of advanced computer science coursework (CS 211, CS

374, CS 411, and CS 441) for the Spring 2026 semester, with only five weeks remaining until finals. To complete the remainder of this semester, Plaintiff needs only 23.5 total hours of on-campus time for scheduled in-person examinations and class sessions. A final judgment in two or three years cannot retroactively recreate the collaborative dynamics, lost lectures, and vested work in a partially completed semester. The Seventh Circuit has long held that harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008) (defining irreparable harm as injury that cannot be prevented or fully rectified by the final judgment). *See* Exhibit 11 (Spring 2026 Courses and Degree Plan).

**C. The Balance of Harms Heavily Favors Plaintiff**

39. The balance of harms tips decidedly in Plaintiff's favor.

40. The status quo for the purposes of injunctive relief is defined as "the last peaceable, uncontested status existing between the parties before the dispute developed." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (defining the status quo as the last peaceable, uncontested status between the parties). Here, the last peaceable status was Plaintiff actively enrolled as a student in good standing. A TRO is needed to preserve that status while this Court reviews the University's process.

41. The University has a legitimate interest in maintaining campus safety and enforcing its policies. However, the University faces no concrete threat to campus safety in this case. All alleged conduct occurred online via a private Discord channel, involved an unaffiliated individual located in the United Kingdom, and involved no physical contact whatsoever.

42. Plaintiff has offered to complete his remaining credits entirely online without setting foot on the UIUC campus, which addresses any residual safety concern the University could raise. Unlike cases where injunctive relief would force a university to fundamentally alter its curriculum, Plaintiff asks only to maintain the status quo—to be permitted to continue his current semester and pursue the remainder of his studies online. *See* Exhibit 11 (Spring 2026 Courses and Degree Plan).

43. Denying the injunction and enforcing a mid-semester dismissal will also harm innocent third parties. Plaintiff's advanced computer science courses rely on collaborative, semester-long group work. Abruptly withdrawing Plaintiff from these courses weeks before final projects are due will strand his classmates and disrupt their academic progress.

44. Conversely, granting a TRO merely preserves the status quo while this Court determines whether the University's process satisfied constitutional requirements. The harm to Plaintiff without an injunction is severe and irreversible; the harm to the University with an injunction is negligible.

**D. The Public Interest Favors Granting the TRO**

45. The public has a well-established interest in ensuring that state-funded educational institutions adhere to the United States Constitution and honor their own contractual guarantees of due process. When a public university imposes severe sanctions through a proceeding that departs from its own published rules, it undermines public trust in the university system.

46. Enforcing fundamental fairness in disciplinary hearings does not contravene the University's interest in campus safety or effective policy enforcement; it strengthens both. The public interest

is best served when severe sanctions for sexual misconduct result from an objective, truth-seeking process. By staying this dismissal and allowing Plaintiff to complete his current coursework remotely, this Court will preserve the integrity of higher education disciplinary proceedings.

**E. Alternative Relief**

47. In the event the Court is not inclined to order full reinstatement at this stage, Plaintiff respectfully requests in the alternative that the Court (a) stay the enforcement of the transcript notation reflecting the sexual misconduct finding pending resolution of this action, and (b) direct the University to preserve Plaintiff's Spring 2026 grades and credits earned through the date of this Order, so that Plaintiff's partially completed semester is not irrevocably destroyed while this Court adjudicates the merits.

**F. Security Pursuant to Fed. R. Civ. P. 65(c)**

48. Federal Rule of Civil Procedure 65(c) provides that a court may issue a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined.

49. The Seventh Circuit has long recognized that a district court has the discretion to waive the security requirement or set the bond at zero when there is no danger that the opposing party will incur any measurable financial damages from the injunction. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (recognizing district court discretion to waive the bond requirement where no measurable damages would result).

50. Here, the University will suffer no monetary damages, administrative costs, or financial hardship if it is temporarily restrained from enforcing the dismissal and is required to allow Plaintiff to finish his current semester remotely. Therefore, Plaintiff respectfully requests that this Court exercise its discretion to waive the security requirement or set the bond at zero dollars. *See* Exhibit 11 (Spring 2026 Courses and Degree Plan).

## IV. CONCLUSION

Plaintiff has demonstrated a substantial likelihood of success on his claims that the University deprived him of protected property and occupational liberty interests without due process. Plaintiff has exhausted all internal remedies, and the appeal committee's ratification of the procedural defects—with reasoning that contradicts the University's own published policies—confirms that judicial intervention is the only remaining avenue for relief. The appeal panel's decision was affirmed on March 31, 2026, and written notice was provided on April 8, 2026. Plaintiff is now barred from campus on penalty of trespass, and every day without relief actively and irreversibly destroys his Spring 2026 semester. The five-year dismissal imposed through a process that departed from the University's own rules must be stayed. The resulting foreclosure of Plaintiff's career constitutes irreparable harm for which there is no adequate remedy at law, and the balance of harms weighs in his favor. *See* Exhibit 07 (SCSD Appeal Decision Letter).

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order:

1. Granting a Temporary Restraining Order enjoining Defendants from enforcing the five-year dismissal;

2. Directing UIUC to immediately restore Plaintiff to his status as an enrolled student, with the ability to submit his remaining coursework through existing online portals and attend the 23.5 remaining hours of in-person examinations and class sessions as normally scheduled;

3. In the alternative, staying the transcript notation and preserving Plaintiff's Spring 2026 grades and credits pending resolution;

4. In the further alternative, enjoining the enforcement of the dismissal until UIUC provides a constitutionally adequate hearing before an unbiased panel with full procedural protections;

5. Waiving the security requirement under Fed. R. Civ. P. 65(c); and

6. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

~~/s/ [Real Name]~~

JOHN DOE, Plaintiff

Proceeding *pro se*

[Address — filed under seal]

[Telephone — filed under seal]

[Email — filed under seal]

[Real name - filed under seal]

Dated: April 9, 2026