E-FILED
Friday, 10 April, 2026 03:32:38 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 01a

# STUDENT CODE

2025-2026

University of Illinois Urbana-Champaign



# STUDENT CODE

2025-2026

University of Illinois Urbana-Champaign



■

# PREFACE

The Student Code is a collection of rules, regulations, policies, and procedures that apply to, or otherwise directly impact, students at the University of Illinois Urbana-Champaign. Although it is not an exhaustive list of such policies, it is the most expansive list available in a single document. It is divided into three articles:

Article 1 – Student Rights and Responsibilities
Article 2 – General Policies and Regulations
Article 3 – Academic Policies and Regulations

Unless otherwise noted, the rules stated in this Student Code apply to all undergraduate, graduate, and professional students enrolled at the university. All students are expected to review this document, especially Article 1, prior to attending classes so that they may begin their work at Illinois with knowledge both of their rights as students and of their responsibilities as members of the academic community. A printed booklet containing only Article 1 is also available in the Office of the Dean of Students.

The most current version of the Student Code is always available online at studentcode.illinois.edu. The print version may not reflect the most recent changes.

# THE COUNCIL ON
# STUDENT CONDUCT EXPECTATIONS AND ACCOUNTABILITY

The Council on Student Conduct Expectations and Accountability is a standing committee of the Urbana-Champaign Senate composed of faculty members, administrators, and students. Its responsibilities are outlined in the Senate Bylaws, which provide in relevant part:

(a) Duties
The Council is a committee of the Senate. Regarding policies governing student conduct expectations and accountability, the Council shall:
(1) Periodically review, report, and make recommendations for changes to the conduct governance system, including policies, procedures, and practices that align with best practices;
(2) Develop and recommend to the Chancellor policies on student affairs (*Statutes*, Article XI, Section 1.a);
(3) Review proposed revisions to the policies and transmit to the Chancellor its approval, disapproval, or further proposed revisions;
(4) Refer any policies on academic matters, including requirements for degrees and standards of academic performance, to the Senate Committee on Educational Policy, except that the Council shall have jurisdiction over academic misconduct such as cheating, falsification, fabrication, plagiarism, or destruction of educational materials or resources;
(5) Meet annually with the Senate Committee on Student Discipline to review the implementation of the policies; and
(6) File notice of all proposed revisions to the policies with the Office of the Dean of Students and with the Clerk of the Senate.

(b) Coordination of Duties with the Office of the Dean of Students
The Council shall request the assistance of the Office of the Dean of Students to coordinate the following duties:
(1) Provide administrative support to the Council;
(2) Notify the Council of any federal, state, or local mandates regarding student conduct expectations and accountability;
(3) Serve as a repository for revisions to the policies governing student conduct expectations and accountability that may include reference to student policies outside the jurisdiction of the Council; and
(4) Publish and disseminate the policies governing student conduct expectations and accountability (historically referenced as the Student Code) to the university community by August 1 of each year in a convenient form as determined by the Council.

(c) Membership
The Council shall consist of:
(1) Six faculty members, of whom one shall be elected chair by the Senate;
(2) Seven student members, four undergraduates, three graduate or professional students;
(3) Four campus administrative officers with due regard for appropriate areas of concern and in consultation with the Chancellor or the Chancellor's designee;
(4) One member of the Senate Committee on Educational Policy, selected by that Committee (*ex officio*);
(5) One member of the Council of Undergraduate Deans (*ex officio*), selected by that Council;
(6) One designee of the Dean of the Graduate College (*ex officio)*; and
(7) The Dean of Students or the Dean's designee (*ex officio*).

## PROCEDURE FOR AMENDING THE STUDENT CODE

As outlined previously, the Council on Student Conduct Expectations and Accountability is responsible for drafting amendments to the rules set out in the Student Code, subject to final approval by the Chancellor. Proposed amendments come from many sources. For example, the Council itself generates many proposals in exercising its oversight function stated in the Senate Bylaws. Suggested amendments also have come from students, faculty members, and campus academic and administrative units. In addition, the Chancellor, the Dean of Students, and other campus administrators periodically appoint campus task forces to study specific issues and make recommendations that ultimately require amendments to the Student Code.

To propose an amendment to the Student Code, a member of the academic community should first discuss the proposal with the appropriate constituency groups, committees, and departments to collect feedback and recommendations. Then, the proposal author must either complete the online form available at https://forms.illinois.edu/sec/4131863 or email studentcode@illinois.edu for a document version of the form and written instructions.

The Council Chair assigns all proposed rule amendments, both internal and external, an agenda item number and schedules each for discussion at one or more regularly scheduled Council meetings. Many agenda items require significant additional discussion with the proposing party and other members of the campus community who may be affected by the proposed change. If the Council votes to recommend a rule change, the committee will follow the steps outlined above and in the Senate Bylaws.

For all proposed amendments to the Student Code that fall outside of the Council's jurisdiction, the Council Chair will determine which policy-making body (or bodies) is responsible for the affected section and forward the proposal to that body (or bodies) for discussion. If all responsible bodies approve the proposal, or an amended version thereof, the Council Chair will then assign the proposal an agenda item number and follow the steps outlined in the previous paragraph. In such cases, the Council is only empowered to adjust formatting, typography, spelling, etc. to match the current Student Code.

In instances in which a quorum of voting members of the Council is not or cannot be present for a meeting of the Council (e.g., during summer), the Dean of Students is authorized to move forward to the Chancellor for review any proposed regulatory or mandated rule change that would have ordinarily been considered by the Council and voted on by a quorum of voting members. The Dean of Students shall provide the Chancellor with the feedback about the proposed rule change(s) received from members of the Council who attended the meeting that did not have a quorum, along with a recommendation on whether the Chancellor should approve such rule change(s).

Once a proposed change has been approved by the Chancellor, it is scheduled for inclusion in the Student Code text. Although a change may become effective immediately upon approval, most changes are held until the end of the academic year for inclusion in the following year's Student Code.

■

# CONTENTS

## ARTICLE 1 – STUDENT RIGHTS AND RESPONSIBILITIES

**PART 1. STUDENT RIGHTS**

1-101 Preamble ..... 1
1-102 In the Classroom ..... 1
1-103 Campus Expression ..... 2
1-104 Privacy ..... 2
1-105 Student Records ..... 2
1-106 Student Affairs ..... 3
1-107 Policy for the Provision of Religious Accommodations for Students ..... 4
1-108 Nondiscrimination Policy ..... 4
1-109 Policy on Workplace-Related Intimate Personal Relationships ..... 6
1-110 Policy for the Provision of Academic Accommodations, Auxiliary Aids & Services for Students with Disabilities ..... 6
1-111 Sexual Misconduct Policy ..... 7

**PART 2. GENERAL RESPONSIBILITIES OF STUDENTS**

1-201 Responsibilities of Students ..... 13

**PART 3. STUDENT DISCIPLINE**

1-301 Basis for Discipline – Source and Jurisdiction ..... 14
1-302 Rules of Conduct ..... 15
1-303 Falsification of Documents ..... 17
1-304 Identification Cards ..... 18
1-305 Policy on Drugs ..... 19
1-306 Alcoholic Beverages – Preamble ..... 19
1-307 Alcoholic Beverages – General Rules ..... 20
1-308 Alcoholic Beverages – Special Rules Relating to University Property ..... 20
1-309 Possession or Storage of Weapons ..... 21
1-310 Unauthorized Use, Abuse, or Interference with Fire Protection Equipment, Building Security Systems, Security or Fire Personnel, or Warning Devices ..... 22
1-311 Certain Consequences of Disciplinary Action ..... 22

**PART 4. ACADEMIC INTEGRITY POLICY AND PROCEDURE**

1-401 Policy Statement; Application; Definitions ..... 22
1-402 Academic Integrity Infractions ..... 23
1-403 Initial Determination ..... 24
1-404 Sanctions and Student Status ..... 26
1-405 Appeal Procedures ..... 27
1-406 Continuing Jurisdiction of the Senate Committee on Student Discipline ..... 30
1-407 Reporting and Record Keeping ..... 30

**PART 5. CLASS ATTENDANCE**
1-501 All Students ....................31
1-502 Student Athletes ....................33
**PART 6. EDUCATIONAL TECHNOLOGIES**
1-601 All Students ....................33

ARTICLE 2 – GENERAL POLICIES AND REGULATIONS

**PART 1. MEDICAL POLICIES**
2-101 Health Requirements ....................35
2-102 Mandatory Assessment ....................35
2-103 Student Health Insurance ....................36
2-104 Policy for Individuals With Contagious Diseases ....................38
2-105 Policy and Procedures for Medical Withdrawal ....................38
2-106 Policy and Procedures for Retroactive Medical Withdrawal ....................41

**PART 2. HOUSING POLICIES**
2-201 Certified Single Student Housing ....................43
2-202 Living Quarters of Students ....................44

**PART 3. REGISTERED ORGANIZATIONS AND ORGANIZATION FUND**
2-301 Classification of Organizations ....................44
2-302 Preamble ....................45
2-303 Requirements for Registration for Registered Organizations and Registered Student Organizations ....................46
2-304 Sanctions of Registered Organizations ....................47
2-305 University Credit Policies ....................47
2-306 Alcoholic Beverages Policies ....................47
2-307 Custodial Fund ....................48
2-308 Registered Organization Administrative Custodial Fund – Purpose ....................48
2-309 Organization Custodial Fund – Status ....................48
2-310 Organization Custodial Fund – Scope ....................49
2-311 Registered Organization Custodial Fund – Administration ....................49
2-312 Purposes for Which Organization Funds May Be Used ....................50
2-313 Procedures for Registered Organization Custodial Fund Operations ....................50
2-314 Withdrawal of Registered Organization Fund Privileges ....................51
2-315 Dormant Accounts ....................51
2-316 Student Organization Advisory Board ....................51
2-317 Functions of the Student Organization Advisory Board ....................52
2-318 Annual Meetings ....................52

**PART 4. UNIVERSITY PROPERTY AND FACILITIES – IN GENERAL**
2-401 Pets and Animals on University Property ....................53
2-402 Using Library Resources – Policies and Processes ....................53
2-403 Smoke and Tobacco Free Campus Policy ....................54
2-404 Chalking Policy ....................55
2-405 Protected Speech and Association ....................56
2-406 Solicitation and Commercial Activity in University Residence Halls ....................56
2-407 Posting and Distribution of Handout Materials ....................57

**PART 5. USE OF UNIVERSITY PREMISES AND FACILITIES**

2-501 Preamble ....... 58
2-502 Eligibility ....... 58
2-503 Reservation Procedures ....... 58
2-504 The Priority System – Priorities for Use of Space ....... 59
2-505 Operation of the Priority System ....... 60
2-506 Requirements and Limitations ....... 60
2-507 Committees Related to the Use of University Premises and Facilities ....... 62

**PART 6. MOTOR VEHICLES AND BICYCLES**

2-601 Operation of Motor Vehicles ....... 62
2-602 Automobiles ....... 62
2-603 Use of Motorcycles (Including Motor Scooters and Motor-Drive Bicycles) ....... 63
2-604 Parking Citations ....... 63
2-605 Operation of Bicycles ....... 64
2-606 Use of In-Line Skates, Roller Skates, and Skateboards ....... 64

**PART 7. CHANCELLOR'S EMERGENCY POWERS**

2-701 Basis for Chancellor's Emergency Powers ....... 64

**PART 8. MISSING STUDENT NOTIFICATION POLICY**

2-801 Confidential Contact Identification ....... 65
2-802 Reporting a Suspected Missing Student ....... 65
2-803 Handling ....... 65

**PART 9.INVOLUNTARY WITHDRAWAL**

2-901 Policy and Procedures for Involuntary Withdrawal ....... 65

ARTICLE 3 – ACADEMIC POLICIES AND REGULATIONS

**PART 1. GRADES AND GRADING SYSTEM**

3-101 Academic Work Report Requirements ....... 69
3-102 Grading System – Grades Authorized for All Colleges ....... 69
3-103 Computation of Scholastic Averages ....... 69
3-104 Other Grade Symbols in Use ....... 70
3-105 Credit-No Credit Grading Options ....... 72
3-106 Grade Corrections ....... 73
3-107 Procedures for Review of Alleged Capricious Grading ....... 73
3-108 Procedures for Review of Instructor's Ability to Communicate Clearly ....... 74
3-109 Academic Progress ....... 75
3-110 Academic Standing Rules ....... 75

**PART 2. EXAMINATIONS**

3-201 Final Examinations ....... 76
3-202 Outside-of-Class-Period Examinations ....... 78
3-203 Proficiency Examinations ....... 79
3-204 Special Examinations ....... 80

**PART 3. REGISTRATION, COURSE CHANGES, AND WITHDRAWAL**

3-301 Number of Hours Required ....... 81

3-302 Classification of Undergraduate Students ........ 82
3-303 Registration ........ 82
3-304 Registration of Nondegree Students ........ 83
3-305 Registration of Auditors ........ 83
3-306 Payments ........ 84
3-307 Late Registration ........ 84
3-308 Cancellation of Registration ........ 85
3-309 Repeated Undergraduate Courses and Campus Grade Replacement ........ 85
3-310 Self-Paced Online Courses ........ 86
3-311 Adding and Dropping Courses ........ 86
3-312 Withdrawal from the University – General Rules ........ 87
3-313 Excused Absences and Departure from the University for U.S. Military or Other U.S. National Defense Services ........ 87

**PART 4. UNDERGRADUATE ACADEMIC RECOGNITION**

3-401 The Dean’s List ........ 88
3-402 Campus Honors Program – Chancellor’s Scholars ........ 89
3-403 Edmund J. James Scholars ........ 89
3-404 University Honors – Bronze Tablet ........ 89
3-405 Undergraduate College Honors ........ 90

**PART 5. REGISTRATION CHARGES**

3-501 Tuition Assessment ........ 90
3-502 Tuition Assessment – University Employees ........ 90
3-503 Tuition Waivers ........ 91
3-504 Tuition – Waiver of Nonresident Portion ........ 93
3-505 Fee Assessments ........ 94
3-506 Fee Waivers and Exemptions ........ 96
3-507 Payment Requirement ........ 100
3-508 Refunds of Registration Charges ........ 100
3-509 Students in Debt to the University ........ 101

**PART 6. STUDENT RECORDS – GUIDELINES AND REGULATIONS GOVERNING ACCESS AND RELEASE**

3-601 Authorization and Responsibility for Policy Implementation ........ 101
3-602 Definitions ........ 102
3-603 Access to Student’s Personally Identifiable Education Records ........ 103
3-604 Regulations for Record Custodians ........ 104
3-605 Classification, Locations, and Custodians of Student Records ........ 105
3-606 Procedures for Student Access and Challenge ........ 106
3-607 FERPA Hearing Panel ........ 107
3-608 Disposal of Inactive Records ........ 107
3-609 Release of Student Information and Academic Records by the Office of the Registrar ........ 108

**PART 7. TRANSCRIPTS**

3-701 Availability ........ 109
3-702 Information Appearing on All Transcripts ........ 109
3-703 Other Symbols Appearing on Transcripts ........ 109
3-704 Description and Definition of Information Appearing on Transcripts ........ 110

**PART 8. GRADUATION**
3-801 Credit Requirements for Degrees ........ 111
3-802 Minimum Scholarship Requirements for the Bachelor's Degree ........ 111

**PART 9. RESIDENCY STATUS REGULATIONS** **112**

Definitions ........ 113
Acronyms ........ 114

■

# ARTICLE 1 – STUDENT RIGHTS AND RESPONSIBILITIES

## PART 1. STUDENT RIGHTS

### § 1-101 Preamble

(a) A student at the University of Illinois Urbana-Champaign is a member of a university community of which all members have at least the rights and responsibilities common to all citizens, free from institutional censorship; affiliation with the university as a student does not diminish the rights or responsibilities held by a student or any other community member as a citizen of larger communities of the state, the nation, and the world.

(b) Any rules or regulations considered necessary to govern the interaction of the members of the university community are intended to reflect values that community members must share in common if the purpose of the community to advance education and to enhance the educational development of students is to be fulfilled. These values include the freedom to learn, free and open expression within limits that do not interfere with the rights of others, free and disinterested inquiry, intellectual honesty, sustained and independent search for truth, the exercise of critical judgment, respect for the dignity of others, and personal and institutional openness to constructive change. The following enumeration of rights shall not be construed to deny or disparage other rights retained by these individuals in their capacity as members of the campus community or as citizens of the community at large.

### § 1-102 In the Classroom

The instructor, in the classroom and in conference, should encourage free discussion, inquiry, and expression. Student performance should not be evaluated on opinions or conduct in matters unrelated to academic standards.

(a) Students should be free to take reasoned exception to the data or views offered in any course of study and to reserve judgment about matters of opinion, but they are responsible for learning the content of any course of study for which they are enrolled.

(b) Students should have protection through orderly procedures against prejudiced or capricious academic evaluation. At the same time, they are responsible for maintaining standards of academic performance established for each course in which they are enrolled.

(c) Information about student views, beliefs, and political associations that instructors acquire in the course of their work as instructors, advisers, and counselors should be considered confidential. Protection against improper disclosure is a serious professional obligation. Judgments of ability and character may be provided under appropriate circumstances, normally with the knowledge or consent of the student.

(d) The instructor is in charge of the orderly conduct of the class and may exclude a student or an auditor who does not comply with a reasonable request in this regard. If the student is registered for the course and if the disruption is repeated or so egregious as to violate other conduct regulations, (usually § 1-302(f)), the instructor, after consultation with the department head or designee and the Director of the Office for Student Conflict Resolution, may exclude the student from the class until such time as the disciplinary matter has been resolved. If the disciplinary matter is resolved in a manner that permits the student to return to class, the instructor, in consultation with the department head and the Director of the Office for Student Conflict Resolution or designee, shall decide whether and to what extent the student will be permitted to make up course work missed while excluded from class.

(e) Should students feel that their rights as a student have been violated, students may discuss the matter, to the extent possible, with their instructor in the relevant course. If a resolution cannot be reached, students may contact the head of the department in which the course

is being offered. If further assistance is needed, students may contact the dean's office of the college offering the course. Assistance navigating the process is available through the Connie Frank CARE Center in the Office of the Dean of Students at (217) 333-0050 or helpdean@illinois.edu Monday-Friday between the hours of 8:30 a.m. and 5:00 p.m.

### § 1-103 Campus Expression

(a) Discussion and expression of all views is permitted within the bounds of established principles of the First Amendment to the Constitution of the United States, and subject to reasonable time, place, and manner restrictions that are consistent with established First Amendment principles.

(b) Members and organizations in the university community may invite and hear any persons of their own choosing, subject only to reasonable requirements on time, place, and manner for use of university property.

(c) The campus press and media are to be free of censorship. The editors and managers shall not be arbitrarily suspended because of student, faculty, administration, alumni, or community disapproval of editorial policy or content.

(d) The right to speech and association protected by the First Amendment to the Constitution of the United States, such as peaceful protest and demonstration, is recognized within the university community. The university retains the right to establish parameters to help provide a safe environment, protect property, and promote the proper functioning of the university's teaching, research, economic development and public service missions, and business operations. Outdoor, publicly accessible areas of university property may be used for protected speech and association subject to restrictions in the Expressive Activity on Campus policy in the Campus Administrative Manual.

### § 1-104 Privacy

(a) Members of the university community have the same rights of privacy as other citizens and surrender none of those rights by becoming members of the academic community. These rights of privacy extend to residence hall living. Nothing in university regulations or contracts shall give university officials authority to consent to a search by police or other government officials of offices assigned or living quarters leased to individuals except in response to a properly executed search warrant or search incident to an arrest.

(b) When the university seeks access to an office assigned or living quarters leased to an individual to determine compliance with provisions of applicable multiple dwelling unit laws, ordinances, and regulations, or for improvement or repairs, the occupant shall be notified of such action not less than twenty-four hours in advance. There may be entry without notice in emergencies where imminent danger to life, safety, health, or property is reasonably feared and for custodial service.

(c) The university may not conduct or permit a search of an office assigned or living quarters leased to an individual except in response to a properly executed search warrant or search incident to an arrest.

(d) The university shall not regulate the social life of students or their organizations except as such regulations may apply to use of university premises, facilities, or premises approved for student residences. Additional regulations for living units may be made by a democratically constituted student government for the unit.

(e) The university shall not regulate the hours individuals may keep.

### § 1-105 Student Records

(a) The university and its subdivisions should have a carefully considered policy as to the information which should be part of a student's permanent educational record and as to the conditions of its disclosure. To minimize the risk of improper disclosure, academic and disciplinary records are normally separate. (See, however, § 3-704(a).) Access to the student's own records and files is guaranteed to each individual and is subject only to reasonable regulation as to time, place, and supervision.

(b) Transcripts of academic records should contain only information about academic status and conditions relating to the student's eligibility for continuing registration on this campus. Information from disciplinary or counseling files should not be available to unauthorized persons on campus, or to any person off campus without the express consent of the subject involved, except in cases where the student is not competent to grant such consent. In such cases, information will be made available only where the safety of persons or property is involved. No records should be kept which reflect the political activities or beliefs of students.

(c) Provisions should also be made for periodic routine destruction of noncurrent disciplinary records. Administrative staff and faculty members should respect confidential information about students which they acquire in the course of their work.

(d) The records and files of individuals no longer at the university shall continue to be subject to the provisions of this document.

**§ 1-106 Student Affairs**
In student affairs, certain standards must be maintained if the freedom of students is to be preserved.

(a) Freedom of Association
Students bring to the campus a variety of interests previously acquired and develop many new interests as members of the academic community. They should be free to organize and join associations to promote their common interests.
(1) The membership, policies, and actions of a Registered Organization (RO) and Registered Student Organization (RSO) usually will be determined by the vote of only those persons who hold bona fide membership in the college or university community.
(2) Affiliation with an extramural organization should not of itself disqualify a student organization from institutional recognition.
(3) Registered Organizations and Registered Student Organizations are not required to have campus advisors. However, if they chose to have one, each organization should be free to choose its own adviser, and institutional recognition should not be withheld or withdrawn solely because of the inability of a student organization to secure an adviser. Campus advisers may advise organizations in the exercise of responsibility, but they should not have the authority to control the policy of such organizations.
(4) The name(s) and address(es) of an agent or agents, and/or officers of a Registered Organization or Registered Student Organization are required as a condition of registration.
(5) Campus organizations, including those affiliated with an extramural organization, shall not discriminate in the selection of its members or in the access to its programs, services, and activities on the basis of race, color, religion, sex, national origin, ancestry, age, marital status, disability, sexual orientation including gender identity, unfavorable discharge from the military or status as a protected veteran and will comply with all applicable federal and state nondiscrimination, laws, orders and regulations, except as specifically exempted by law.

(b) Freedom of Inquiry and Expression
(1) Students, Registered Organizations and Registered Student Organizations should be free to examine and to discuss all questions of interest to them, and to express opinions publicly and privately subject to restrictions that are consistent with established First Amendment principles. They should always be free to support causes by orderly means which do not disrupt the regular and essential operation of the institution. At the same time, it should be made clear to the academic and the larger community that in their public expressions or demonstrations, students or student organizations speak only for themselves.

(2) Students should be allowed to invite and hear any person of their own choosing subject only to reasonable requirements on time, place, and manner for using university property. Those routine procedures required by an institution before a guest speaker is invited to appear on campus should be designed only to ensure that there is orderly scheduling of facilities, adequate financial underwriting for costs of services to be

provided by the university, adequate preparation for the event, and that the occasion is conducted in a manner appropriate to an academic community. The university's control of campus facilities should not be used as a device of censorship. It should be made clear to the academic and larger community that sponsorship of guest speakers does not necessarily imply approval or endorsement of the views expressed either by the sponsoring group or the institution.

**§ 1-107 Policy for the Provision of Religious Accommodations for Students**

(a) It is the policy of the University of Illinois Urbana-Champaign to reasonably accommodate its students' religious beliefs, observances, and practices that conflict with a student's class attendance or participation in a scheduled examination or work requirement, consistent with state and federal law.

(b) Students must request a reasonable accommodation for their religious belief, observance, and practice in advance of the conflict to allow time for both consideration of the request and alternate procedures to be prepared. Not requesting an accommodation reasonably in advance of the conflict may result in a delay or denial of the accommodation.

(c) A reasonable accommodation for a religious belief, observance, and practice is defined as a change that allows the student to participate in their religious belief, observance, and practice and which does not fundamentally alter the educational requirement or place an undue hardship on an instructor, department, or office.

(d) Students must direct a request for a reasonable accommodation for a religious belief, observance, and practice to the instructor(s) of the affected course(s), who shall review the request and determine whether a reasonable accommodation can be made. The Office of the Dean of Students provides an optional resource on its website to assist students as they are making such requests to their instructors.

(e) If an instructor denies a student's request for a reasonable accommodation for a religious belief, observance, and practice, the student may appeal the decision in writing to the dean or dean's designee of the academic unit offering the course. Before taking action, the dean or dean's designee will ask the instructor to explain their decision in writing.

**§ 1-108 Nondiscrimination Policy**

(a) The commitment of the university to the most fundamental principles of academic freedom, equality of opportunity, and human dignity requires that decisions involving students and employees be based on individual merit and be free from invidious discrimination in all its forms.

(b) It is the policy of the university not to engage in discrimination or harassment against any person because of race, color, religion, sex, national origin (including shared ancestry or ethnic characteristics), ancestry, age, marital status, order of protection status, genetic information, disability, pregnancy, sexual orientation, gender identity, unfavorable discharge from the military, or status as a protected veteran, and to comply with all federal and state nondiscrimination, equal opportunity, and affirmative action laws, orders, and regulations.

(c) It is the policy of the university not to consider arrest record as the basis to inform hiring decisions, employment actions, or real estate transactions to include rental or leasing of real property.

(d) It is the policy of the university not to engage in discrimination, harassment, or retaliation in employment based on citizenship status, family responsibilities, or reproductive health decisions. The protected classifications listed in this paragraph will be interpreted in a manner consistent with the Illinois Human Rights Act.

(e) This policy prohibits retaliation as defined below.

(f) University employees with supervisory or management responsibilities are obligated to report any and all observations and complaints of discrimination and harassment promptly to the Office for Access and Equity.

(g) Any individual found to have violated this policy may be subject to sanction and/or discipline, up to and including termination or removal.

(h) Definitions

(1) Discrimination

To be subject to different treatment based on actual or perceived membership in a protected classification, and to thereby experience an adverse employment or academic action or be excluded from participation in or denied the benefits of a university program or activity.

Discrimination includes the denial of a reasonable accommodation as determined in accordance with university policy (including the Student Code) to which a qualified individual is entitled on the basis of disability; pregnancy, childbirth, or related medical condition; a sincerely-held religious belief, observance, or practice; or any other protected classification for which a reasonable accommodation must be provided under applicable law. Relevant university policy for the purposes of this paragraph includes, but is not limited to, the Reasonable Accommodations policy (CAM HR-67) and Sections 1-107 and 1-110 of the Student Code.

Discrimination may also include harassment, which is defined below.

(2) Harassment

A form of discrimination and unwelcome conduct based on an individual's actual or perceived membership in a protected classification. The unwelcome conduct may be verbal, written, electronic or physical in nature. This policy is violated when the unwelcome conduct is based on one or more of the protected classifications, and:

(A) Based on the totality of the circumstances, is (1) subjectively and objectively offensive; and (2) so severe or pervasive that it (3) adversely affects a term or condition of employment or participation in a university program or activity, or limits or denies a person's ability to participate in or benefit from a university program or activity; or

(B) Performed by a person having power or authority over another in which submission to or rejection of such conduct is used, explicitly or implicitly, as the basis for decisions adversely affecting an individual's educational and/or employment opportunities, participation, assessments, or status at the university.

(3) Retaliation

Any action, or attempted action, directly or indirectly, against any person(s), because they have, in good faith, reported or disclosed a violation of this policy, filed a complaint of discrimination, or in any other way participated in an investigation, proceeding, complaint, or hearing under this policy. Retaliation includes, but is not limited to, harassment, discrimination, threats, job termination or other disciplinary action, negative job performance evaluations, adjustment in pay or responsibilities, or actions that have a negative impact on academic progress. Actions are considered retaliation if they have a materially adverse effect on the working, academic, or living environment of a person or if they hinder or prevent the person from effectively carrying out their university responsibilities. Any person or group within the scope of this policy who engages in retaliation is subject to a separate complaint of retaliation under this policy.

(i) The most recent version of the Nondiscrimination Policy (HR-48) is available in the Campus Administrative Manual (https://cam.illinois.edu/policies/hr-48/).

(j) For additional information on the equal opportunity, affirmative action, and harassment policies of the university, please contact the Office for Access & Equity (OAE) at:

614 E. Daniel Street, Suite 303
Champaign, IL 61820
(217) 333-0885
oae.illinois.edu

(k) For additional information on Title VI, please contact the Title VI Coordinator at the Title VI Office at:

Title VI Coordinator
614 E. Daniel Street, Suite 303
Champaign, IL 61820
(217) 300-1311
TitleVIOffice@illinois.edu

(l) For additional information on Title IX, please contact the Title IX Coordinator at the Title IX Office at:
614 E. Daniel Street, Suite 303
Champaign, IL 61820
(844) 616-7978
titleixcoordinator@illinois.edu
wecare.illinois.edu/titleix

(m) For additional information on ADA (Americans with Disabilities Act) or 504 (Section 504 on the Rehabilitation Act of 1973), please contact the ADA Coordinator in the ADA Division at the Office for Access and Equity at:
614 E. Daniel Street, Suite 303
Champaign, IL 61820
(217) 333-0885
adacoordinator@illinois.edu
oae.illinois.edu

### § 1-109 Policy on Workplace-Related Intimate Personal Relationships

The university's policy on workplace-related intimate personal relationships, including relationships between employees and students, may be reviewed at https://www.hr.uillinois.edu/cms/One.aspx?portalId=4292&pageId=1411896.

### § 1-110 Policy for the Provision of Academic Accommodations, Auxiliary Aids & Services for Students with Disabilities

(a) It is the policy of the University of Illinois Urbana-Champaign to provide admitted and current students with disabilities reasonable academic accommodations, auxiliary aids and services (hereinafter referred to as academic accommodations). The Division of Disability Resources and Educational Services (DRES) is the unit tasked with providing these academic accommodations to accepted and current students.

(b) DRES provides services for degree-seeking and non-degree seeking, undergraduate, graduate, and professional students at the university. Admitted and currently enrolled students are required to self-identify as an individual with a disability through a process outlined in this policy and discussed in detail the DRES Procedures for the Provision of Academic Accommodations for Students with Disabilities. Students should use the Application for DRES Services form to self-identify and to complete their request for services. Students who need assistance or are unable to complete the Application for Services using this form, should contact DRES to submit their request for academic accommodations by emailing disability@illinois.edu or by calling DRES at (217) 333-1970.

(c) When a disability is non-obvious, students will be required to provide documentation to support their need for academic accommodations due to an underlying disability. Documentation requirements are available in the DRES Procedures for the Provision of Academic Accommodations for Students with Disabilities.

(d) Upon review of any applicable medical documentation, DRES will make a determination of disability. When a determination of disability is found, students are required to engage in the interactive process with DRES to discuss the student's individual needs and discuss ways that an academic accommodation may assist them. Meetings may be in-person or remote.

(e) After completion of the interactive process, DRES will document the reasonable accommodations selected and provide the student with a Letter of Academic Accommodations outlining the available academic accommodations to present as necessary to their course instructors or other academic advisors as needed.

(f) To receive the academic accommodations outlined in the Letter of Academic Accommodations, students are required to provide their Letter to each instructor either in person or by email.

(g) Academic accommodations are not retroactive. If a student does not provide a Letter of Accommodation at the beginning of a semester, the student's Academic Accommodation will only be in effect prospectively from the time the instructor receives the Letter.

(h) Students may appeal a decision of DRES to the ADA Coordinator in the following situations by email at adacoordinator@illinois.edu or calling 217-333-0885:
(1) Where a student believes a determination of disability was made in error.
(2) When a student does not agree with the provision of academic accommodation provided by DRES and as outlined in their Letter of Academic Accommodation.
(3) Where a student believes an instructor or faculty member has failed to implement or incorrectly implemented a current Letter of Academic Accommodation. In this case, a student may seek an informal or formal review through the Academic Accommodation Implementation Review (AAIR) procedures as documented in the DRES Procedures for the Provision of Academic Accommodations for Students with Disabilities.

(i) The appeals process in Section (h) above is distinct from the university's procedures for investigating and adjudicating behavior pursuant to the university's Nondiscrimination Policy as codified in Section 1-108 of the Student Code. Students may submit complaints based on discrimination by faculty or staff on the basis of disability to the EEO Division of the Office for Access & Equity, and by emailing the Office for Student Conflict Resolution (OSCR) if the alleged discriminatory conduct involves behavior by students.

(j) Students with disabilities who are involved in university processes including hearings for violations of the Student Code may request accommodations related to the investigation and hearing process. Students should request accommodations as soon as possible to ensure the university has adequate time to review any required documentation of the disability and to issue the accommodation letter. Students should submit such requests directly to their DRES Access Specialist or register for services with DRES using the DRES Application for Services. Students should notify their OSCR contact of their request for services related to a hearing or investigation to ensure the appropriate personnel are able to implement any approved accommodation related to their proceedings. Students submitting requests within five business days of a deadline or hearing may not receive requested accommodations on the basis of insufficient notice.

### § 1-111 Sexual Misconduct Policy

(a) Purpose

The purpose of this policy is to provide a safe and welcoming educational and work environment and to establish standards of conduct that are appropriate for our campus community; and to comply with Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106; Section 304 of the Violence Against Women Reauthorization Act of 2013 ("VAWA"), 20 U.S.C. 1092(f), and its implementing regulations, 34 C.F.R. Part 668.46; Title VII of the Civil Rights Act of 1964 ("Title VII"); the Illinois Human Rights Act; and the Illinois Preventing Sexual Violence in Higher Education Act, 110 ILCS 155/1 et seq.

This policy was revised in July 2020 as part of the effort to align the university's policy and procedures with new Title IX regulations and to incorporate recommendations made by the Committee on Faculty Sexual Misconduct for addressing unwelcome sexual, sex or gender-based conduct by employees. When investigating and adjudicating complaints of "Title IX Sexual Harassment" (as defined below), federal regulations require the university to follow specific procedures, some of which are unique to Title IX. This policy also addresses other categories of sexual misconduct that do not fall within the definition of "Title IX Sexual Harassment" (for example, because of the nature of the alleged conduct, where it took place, or who was involved) but that may violate other conduct requirements.

The purpose of this policy in delineating which conduct is "Title IX Sexual Harassment" is not to imply that the university considers certain conduct more or less objectionable, nor to discourage any person from submitting a report. Rather, the purpose of this policy is to

ensure that all persons who experience sexual misconduct described in this policy have full access to the rights and resources they are entitled to, and that every complaint is handled fairly and equitably, in a manner consistent with applicable law, and with the ultimate aim of maintaining an institutional climate of safety and accountability. Title IX requires a definition of "Title IX Sexual Harassment" that provides a floor—not a ceiling—to the varied forms of misconduct that can be prohibited at a university, and the University of Illinois has decided to go beyond this floor to promote a safe and welcoming culture and climate.

Relation to Other Laws and Policies
Conduct prohibited by this policy may violate other laws and policies, including, but not limited to, the university's Nondiscrimination Policy, the university Code of Conduct, and the Student Code. Sexual misconduct that constitutes Title IX Sexual Harassment will be addressed pursuant to the university's Title IX grievance procedure(s). Nothing in this policy prevents the university from addressing prohibited sexual misconduct that does not trigger the university's Title IX response obligations under other applicable policies and procedures.

In addition, this policy does not cover every allegation of discrimination based on sex. Other university policies prohibit discrimination and harassment that would not constitute sexual misconduct, as defined in this policy. When an individual alleges discriminatory action that is not sexual misconduct, as defined in this policy, the allegations are assessed under the applicable university policy. For information regarding other university policies addressing discrimination and harassment, visit the Nondiscrimination Policy.

If the regulations implementing Title IX at 85 Fed. Reg. 30026, 30026-30579 are enjoined or invalidated by a Federal Court with jurisdiction over the university or reversed or replaced by any agency with sufficient authority, the Prohibited Sexual Misconduct Processes (§ 1-111(e)) will immediately begin to apply to all reports and complaints of Prohibited Sexual Misconduct, including Title IX Sexual Harassment, and the Title IX Sexual Harassment Process (§ 1-111(d)) will immediately be inoperative unless and until any such injunction, invalidation, reversal, or replacement is overturned.

(b) The University of Illinois Urbana-Champaign ("university") is committed to providing a safe and welcoming campus environment that is free from all forms of discrimination based on sex. Discrimination based on sex includes discrimination on the basis of sexual orientation or gender identity. The university does not discriminate against any person based on sex in its education programs or activities or in employment. This policy includes the processes to be used for all reports or complaints of sexual misconduct. The grievance processes for Title IX Sexual Harassment and other Prohibited Sexual Misconduct shall be distinct as set out in this policy.

The university also prohibits retaliation against any person who, in good faith, reports or discloses a violation of this policy, files a complaint, or otherwise participates in an investigation, proceeding, complaint, or hearing under this policy.

(c) This policy applies to
- (1) All students, Registered Organizations, Registered Student Organizations, and others subject to student discipline pursuant to § 1-301 of the Student Code;
- (2) All university employees;
- (3) Applicants for enrollment or employment with the university;
- (4) Other affiliated individuals, including but not limited to, for purposes of this policy, visiting faculty, visiting scholars, and post-doctoral fellows; and
- (5) Third parties, including but not limited to contractors, subcontractors, volunteers, and visitors.

(d) Title IX Sexual Harassment Process
The Department of Education Office for Civil Rights amended in 2020 the regulations implementing Title IX. Under the regulations, Title IX prohibits sex discrimination, including Title IX Sexual Harassment, as defined below, in an education program or activity of the university against a person in the United States. An education program or activity of the university includes locations, events, or circumstances over which the university exercised substantial control over both the respondent and the context in which the alleged

misconduct occurred, and also any building owned or controlled by a student organization that is officially recognized by the university.

Title IX Sexual Harassment is defined as conduct on the basis of sex that falls into one or more of the following categories as defined below in this policy: Quid Pro Quo Sexual Harassment, Hostile Environment Sexual Harassment, Sexual Assault, Dating Violence, Domestic Violence, or Stalking. If a reported incident of sexual misconduct falls under the scope of Title IX (as determined by the Title IX Coordinator or their designee), the university will promptly contact the Complainant to review the university's Title IX Sexual Harassment grievance process, review and offer available supportive measures, and provide information on the university's process for filing a Formal Complaint of Title IX Sexual Harassment, if desired. If a Formal Complaint of Title IX Sexual Harassment is filed or if the Title IX Coordinator signs a Formal Complaint, the university will respond promptly in a manner that is not deliberately indifferent and will follow its Title IX Sexual Harassment grievance procedures. Additional information about the university's Title IX Sexual Harassment grievance procedures for Formal Complaints involving an employee respondent and for student conduct can be found on the We Care website, specifically at https://wecare.illinois.edu/policies/campus/.

Reports of sexual misconduct that fall outside the university's jurisdiction for responding to complaints of Title IX Sexual Harassment will be dismissed under the university's applicable Title IX Sexual Harassment grievance procedure. Additionally, the university may dismiss a Formal Complaint of Title IX Sexual Harassment, or any allegations therein, if at any time during the investigation or hearing
(1) the Complainant notifies the Title IX Coordinator in writing that they would like to withdraw the Formal Complaint or any allegations therein;
(2) the respondent is no longer enrolled or employed by the university; or
(3) specific circumstances prevent the university from gathering evidence sufficient to reach a determination as to the Formal Complaint or any allegations therein.

(e) Prohibited Sexual Misconduct Processes
Reports or complaints of sexual misconduct that are not one of the categories included in Title IX Sexual Harassment will be addressed following the processes set out in the Office for Student Conflict Resolution's Student Conduct Procedures for Allegations of Non-Title IX Sexual Misconduct (for student respondents) or the Office for Access & Equity's Procedures for Addressing Discrimination, Harassment, and Non-Title IX Sexual Misconduct Complaints (for employee respondents). Additional information about these procedures can be found on the We Care website, specifically at https://wecare.illinois.edu/policies/campus/.

(f) Definitions
(1) Sexual Misconduct means Title IX Sexual Harassment, sexual harassment, sexual assault, dating violence, domestic violence, stalking, unwelcome sexual, sex or gender-based conduct, sexual violence, or sexual exploitation, as defined below.
(2) Prohibited Sexual Misconduct means any conduct prohibited by this policy other than Title IX Sexual Harassment.
(3) Title IX Sexual Harassment means conduct on the basis of sex that satisfies one or more of the following:
(A) Quid Pro Quo: A university employee conditioning the provision of an aid, benefit, or service of the university on an individual's participation in unwelcome sexual conduct;
(B) Hostile Environment: Unwelcome conduct that a reasonable person would determine to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the university's education program or activity;
(C) Sexual Assault (as defined in this policy);
(D) Stalking (as defined in this policy);
(E) Dating Violence (as defined in this policy);
(F) Domestic Violence (as defined in this policy).
(4) Sexual Assault (See 20 U.S.C. 1092(f)(6)(A)(v)) means:
(A) Nonconsensual Sexual Contact (Criminal SexualContact). The intentional touching of the clothed or unclothed body parts without Consent of the victim for the purpose of sexual degradation, sexual gratification, or sexual humiliation.

The forced touching by the victim of the actor's clothed or unclothed body parts, without Consent of the victim for the purpose of sexual degradation, sexual gratification, or sexual humiliation.

This offense includes instances where the victim is incapable of giving Consent because of age or incapacity due to temporary or permanent mental or physical impairment or intoxication for the purpose of sexual degradation, sexual gratification, or sexual humiliation.

(B) Incest. Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

(C) Rape. Penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, or by a sex-related object, without the Consent of the victim.

This definition also includes instances in which the victim is incapable of giving Consent because of temporary or permanent mental or physical incapacity (including due to the influence of drugs or alcohol) or because of age. Physical resistance is not required on the part of the victim to demonstrate lack of Consent.

(D) Statutory Rape. Statutory Rape is sexual intercourse with a person who is under the statutory age of consent.

(5) Consent means mutually understood words or actions indicating a freely given, informed agreement to engage in a particular sexual activity with a specific person or persons. Consent must be voluntarily given and cannot be the result of Coercion. A person's lack of verbal or physical resistance or submission resulting from the use or threat of force does not constitute consent. A person's manner of dress does not constitute consent. A person's consent to past sexual activity does not constitute consent to future sexual activity. A person's consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another. A person can withdraw consent at any time. A person cannot consent to sexual activity if the person is unable to understand the nature, fact, or extent of the activity or give knowing consent due to circumstances including without limitation the following:
(A) the person is incapacitated due to the use or influence of alcohol or other drugs;
(B) the person is asleep or unconscious;
(C) the person is under the legal age to provide consent; or
(D) the person has a disability that prevents such person from having the ability or capacity to give consent.
To be found responsible in a case involving a Complainant who could not consent to sexual activity, the Respondent must have known, or should have known, the Complainant was unable to understand the nature of the sexual activity or give knowing consent due to the circumstances. "Should have known" is an objective, reasonable person standard. That is, would a reasonable person have recognized that the Complainant could not consent to the sexual activity.

(6) Coercion is the use of force, threats, intimidation, or severe or persistent pressure that would reasonably cause an individual to fear significant consequences if they refuse to engage in sexual contact. In evaluating whether Coercion was used, the university will consider:
(A) the frequency, intensity, and duration of the pressure;
(B) the degree of isolation of the person being pressured; and
(C) any actual or perceived power differential between the parties in the context of their respective roles within the university. For example, when a person expresses a decision not to participate in a particular sexual activity, a decision to stop, or a decision not to go beyond a certain sexual interaction, continued pressure can become coercive.

(7) Stalking means engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others; or suffer substantial emotional distress. For the purposes of this definition:
(A) Course of conduct means two or more acts, including but not limited to, acts

which the stalker directly, indirectly, or through third parties, by any action, method, device or means follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

(B) Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim.

(C) Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

(8) Dating Violence means violence committed by a person:

(A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and

(B) where the existence of such a relationship is determined based on consideration of the following factors:

(i) of the length of relationship;

(ii) the type of the relationship; and

(iii) the frequency of the interaction between the persons involved in the relationship.

Dating violence does not include acts covered under the definition of Domestic Violence.

(9) Domestic Violence means any crime(s) committed against an individual by a current or former spouse or intimate partner (as defined under the family or domestic violence laws of Illinois), including but not limited to, domestic battery, aggravated domestic battery, stalking, aggravated stalking, cyberstalking, sexual assault, and sexual abuse.

(10) Unwelcome Sexual, Sex or Gender-Based Conduct means any unwelcome sexual, sex-based, or gender-based conduct occurring within or having an adverse impact on the workplace or academic environment, regardless of how it is conducted (physically, verbally, in writing, or via an electronic medium) and regardless of the sexes or genders of the individuals involved. This category of misconduct comes in three forms, each of which may also qualify as Title IX Sexual Harassment or violate the Nondiscrimination Policy in some circumstances:

(A) Gender-Based or Sexual Hostility: Objectively offensive treatment of another person or group, through words or conduct, with hostility, objectification, exclusion, or as having inferior status based on sex, gender (including gender identity or gender expression), or sexual orientation.

(B) Unwanted Sexual Attention: Objectively offensive sexual attention, advances, or comments that a person reasonably should know are unwanted or which continue to occur or persist after the recipient has communicated a desire that the behavior stop.

(C) Sexual Coercion: Use of force, violence, threats, or other threats of harm by an individual to compel or attempt to compel another individual to engage in unwelcome sexual activity.

Unwelcome sexual, sex or gender-based conduct need not be illegal under existing laws to violate this policy. To be disciplined through a formal complaint process, however, the behavior must be by an employee acting in the course of employment. In investigating and responding to reports of violations, due consideration will be given to an individual's rights to free speech, expression, and academic freedom. While speech can be used to harass or engage in unwelcome sexual, sex or gender-based conduct and can provide evidence of discriminatory intent, speech does not violate this policy just because it is subjectively offensive. A reasonable person must also find it offensive, it must lack bona fide academic purpose, and it must fall within one of the definitions of misconduct found in this policy. What sanctions or other responsive actions may be deemed appropriate, if any, will depend on the facts and circumstances of the case.

(11) Sexual Harassment means unwelcome conduct of a sexual nature or unwelcome conduct based on sex, sexual orientation, or gender identity when:

(A) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or educational opportunities, assessment or status at the university;

(B) submission to or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting such individual, or

(C) such conduct is sufficiently severe or pervasive; and objectively offensive; and unreasonably interferes with, denies, or limits a person's ability to participate or benefit from educational or employment opportunities, assessments, or status at the university.

(12) Sexual Exploitation means the use of another person's nudity or sexual activity without consent for the purpose of sexual gratification, financial gain, or anyone's advantage or benefit other than the person whose nudity or sexual activity is being used. Sexual Exploitation includes, but is not limited to:

(A) observing, recording, or photographing nudity or sexual activity of one or more persons without their Consent in a location where there is a reasonable expectation of privacy;

(B) allowing another to observe, record, or photograph nudity or sexual activity of one or more persons without their Consent; or

(C) otherwise distributing recordings, photographs, or other images of the nudity or sexual activity of one or more persons without their Consent.

(13) Sexual Violence means physical sexual acts attempted or perpetrated against a person's will or when a person is incapable of giving Consent.

(g) Retaliation means intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX, its implementing regulations, or this policy, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this policy. Retaliation may include, but is not limited to harassment, discrimination, threats, or adverse employment action. Any person or group within the scope of this policy who engages in prohibited retaliation is subject to a separate complaint of retaliation under this policy.

(h) Title IX

The lead Title IX Coordinator is responsible for and authorized to coordinate the university's efforts to comply with and carry out its responsibilities under Title IX, which prohibits sex discrimination in education programs and activities for institutions that receive federal financial assistance, as well as retaliation for the purpose of interfering with any right or privilege protected by Title IX. The lead Title IX Coordinator also oversees the university's response to all reports and complaints of Prohibited Sexual Misconduct and Title IX Sexual Harassment to monitor outcomes, identify any patterns, and assess their effects on the campus climate. The lead Title IX Coordinator evaluates requests for confidentiality by those who report or complain about Prohibited Sexual Misconduct and Title IX Sexual Harassment in the context of the university's responsibility to provide a safe and welcoming campus environment for all students free from discrimination based on sex. The lead Title IX Coordinator is also responsible for effective implementation of any supportive measures or remedies for Prohibited Sexual Misconduct and Title IX Sexual Harassment, and for overseeing the university's recordkeeping obligations under Title IX. All formal complaints of Title IX Sexual Harassment shall be reviewed and addressed in accordance with the grievance process set forth in the university's Title IX Sexual Harassment grievance procedures for Formal Complaints which are required to:

(1) Treat complainants and respondents equitably in all manners, including by providing remedies to a Title IX Complainant where a determination of responsibility for Title IX Sexual Harassment has been made against the respondent, and by following the grievance process before the imposition of any disciplinary sanctions or other actions that are not supportive measures against a Title IX respondent;

(2) Require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence, and provide that credibility determinations will not be based on a person's status as a complainant, respondent, or witness;

(3) Require that any individual designated by the university as a Title IX Coordinator, investigator, decision-maker, or any person designated by the university to facilitate an informal resolution process:

(A) not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent; and

(B) receive training on the definition of sexual harassment, the scope of the university's education program or activity, how to conduct an investigation and grievance process, and how to serve impartially;

(4) Require that any individual designated by the university as a decision-maker receive training on any technology to be used at a live hearing and on issues of relevance of questions and evidence;
(5) Require that any individual designated by the university as an investigator receive training on issues of relevance to create an investigative report that fairly summarizes relevant evidence.
(6) Include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process;
(7) Include reasonably prompt timeframes for conclusion of the grievance process;
(8) Describe the range of possible disciplinary sanctions and remedies or list the possible disciplinary sanctions and remedies that the university may implement following any determination of responsibility;
(9) Base all decisions on the preponderance of the evidence standard;
(10) Include the procedures and permissible bases for the complainant and respondent to appeal.
(11) Describe the range of supportive measures available to complainants and respondents; and
(12) Not require, allow, rely upon, or otherwise use questions or evidence that constitutes or seeks disclosure of, information protected under a legally recognized privilege unless the person holding such privilege has waived the privilege.

(i) Danielle Fleenor serves as the university's lead Title IX Coordinator and can be contacted in person or by mail at 614 E. Daniel Street, Suite 303, Champaign, IL 61820; by phone at (844) 616-7978; or by email at titleixcoordinator@illinois.edu.

(j) A person should contact the lead Title IX Coordinator's office to:
(1) seek information or training about rights and available actions to resolve reports or formal complaints involving potential sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct;
(2) file a formal complaint or make a report of sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct;
(3) obtain information about the availability of and for coordination of resources (including confidential resources) and supportive measures relating to sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct;
(4) notify the university of an incident, policy, or procedure that may raise potential Title IX concerns; and
(5) ask questions about the university's policies and procedures related to sex discrimination, including Title IX Sexual Harassment and other Prohibited Sexual Misconduct.

## PART 2. GENERAL RESPONSIBILITIES OF STUDENTS

### § 1-201 Responsibilities of Students

(a) Students are responsible for knowing and complying with the regulations of the university, their college, and the departments from which they take courses, and for fulfilling the requirements for a particular degree. Regulations applicable to given colleges may be obtained from the respective deans.

(b) It is expected that students enrolled in the university will conduct themselves at all times in accordance with accepted principles of responsible citizenship and with due regard for the rights of others.

(c) Email is the primary mechanism for sending official communications to students at the University of Illinois Urbana-Champaign as stated in the Financial Responsibility Agreement (https://go.illinois.edu/financialresponsibilityagreement). All students are assigned an official university email address. Students, therefore, must check email regularly to stay updated on important messages and notifications. Failure to read official university communications sent to students' official email address does not absolve students from knowing and complying with the content of official communications. Students may

forward their email from their official university email address to another email address of their choice. The university, however, is not responsible for email forwarded to another email address.

## PART 3. STUDENT DISCIPLINE

### § 1-301 Basis for Discipline – Source and Jurisdiction

(a) By authority of the Board of Trustees, the Urbana-Champaign Senate Committee on Student Discipline is responsible for the administration of student discipline for acts involving the violation of campus or university regulations. These regulations are formulated by a variety of sources, including, but not limited to, the Senate Council on Student Conduct Expectations and Accountability, the Senate, the Chancellor, the President, and the Board of Trustees.

(b) It is in the best interest of the university and all those who are students or who may desire to become students at the Urbana-Champaign campus that the basis for discipline at this campus be clearly defined. The university discipline system recognizes that not all violations of law affect the interests of the university community, and the discipline system accepts jurisdiction only in those instances in which the university community's interest is substantially affected. On the other hand, the university may take disciplinary action for incidents that violate the university's rules of conduct even though such conduct is not prosecuted in the courts. All members of the university community are expected to observe high standards of integrity and ethical behavior. The university discipline system may take action only upon the following basis:
  (1) all actions that are violations of law or Board of Trustees' action or any university rule of conduct and that occur on university premises or property
  (2) all actions that violate any of the laws or regulations cited in section (a) above and that substantially affect the university community's interest, even though such actions do not occur on university premises or property (for further information about the criteria used by the Senate Committee on Student Discipline in determining the kinds of conduct covered by this jurisdiction, see www.conflictresolution.illinois.edu or contact the Office for Student Conflict Resolution)
  (3) all cases referred to the discipline system following interim suspension by the Chancellor
  (4) academic violations
  (5) appeals and referrals from student judiciaries arising from violations of regulations
  (6) violations of university vehicle or bicycle regulations

(c) Individuals subject to student discipline include but is not limited to all persons:
  (1) taking courses at the university;
  (2) who cancel, withdraw, or graduate after committing behavior which may violate the code;
  (3) who are not officially enrolled for a particular term but have a continuing relationship with the university; and
  (4) who have been notified of and accepted their admission.

  This definition includes but is not limited to individuals between academic terms and persons who consent to participating in the student discipline process.

(d) The actions of a Registered Organization and Registered Student Organization in university-approved activities or university-sponsored activities that are in violation of university regulations for organizations may result in disciplinary action against that organization. In addition, individuals involved may also receive disciplinary action as well.

(e) The university reserves the right to deny admission to any person because of previous misconduct that may substantially affect the interest of the university, or to admit such a person on an appropriate disciplinary status. The admission of such a person will not be approved or denied until the case has been heard by the appropriate disciplinary committee. (This applies to a person not now enrolled in the university who might apply for admission, or to a person who has pre-enrolled whether or not the applicant has paid a deposit.) A favorable action of the appropriate disciplinary committee does not abrogate the right of any dean or director to deny admission on the basis of scholarship. (See § 1-303.)

(f) The university reserves the right to withhold authority to register to any student or former student because of previous misconduct that may substantially affect the interests of the university or to assign appropriate disciplinary status to the student or former student. Permission to register will not be approved or denied until the case has been heard by the appropriate disciplinary committee. A favorable action by the appropriate disciplinary committee does not abrogate the right of any dean or director to deny the authority to register on the basis of scholarship. (See § 1-303.)

(g) Students admitted to or enrolled in the Graduate College or any of the professional schools or colleges are subject to any additional conduct regulations of those units. Regulations will be available in printed form to those students.

(h) The university will take disciplinary action for conduct violating §§ 1-302 to 1-311 below. Disciplinary action also may be taken for violations of other sections. Examples include but are not limited to: (1) § 1-402 (Academic Integrity Infractions); (2) § 1-406 (Multiple Academic Integrity Infractions by the Same Student); (3) § 2-403 (Smoke and Tobacco Free Campus Policy); and (4) § 2-406 (Solicitation and Commercial Activity in university Residence Halls).

(i) Alleged violations of the Student Code noted in (h) above are resolved through procedures developed and approved by the Senate Committee on Student Discipline. These procedures may be found at conflictresolution.illinois.edu or by contacting the Office for Student Conflict Resolution. Among other rights delineated in these procedures, the right to written notice of charges and an opportunity to respond to those charges are guaranteed.

**§ 1-302 Rules of Conduct**

Students enrolling in the university assume an obligation to conduct themselves in a manner compatible with the university's function as an educational institution and suitable to members of the academic community. Conduct for which students are subject to discipline includes, but is not limited to, the following:

(a) Violent and/or dangerous conduct, including:
- (1) causing bodily harm to a person
- (2) inappropriate physical contact with another person, such as pushing, slapping, or spitting
- (3) reckless disregard for the health or safety of any person
- (4) any verbal threat or physically threatening behavior that would cause a reasonable person to fear for their safety

(b) Conduct that violates the university's sexual misconduct policy, including:
- (1) sexual assault, as defined by § 1-111(f)(4)
- (2) sexual harassment, as defined by § 1-111 (f)(11)
- (3) sexual exploitation, as defined by § 1-111(f)(12)
- (4) dating violence, as defined in § 1-111(f)(8)
- (5) domestic violence, as defined in § 1-111(f)(9)
- (6) retaliation, as defined in § 1-111(g)
- (7) Title IX sexual harassment, as defined in § 1-111(f)(3)
- (8) sexual violence, as defined in § 1-111(f)(13)

(c) Stalking: engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others, or suffer substantial emotional distress. For the purposes of this definition,
- (1) course of conduct means two or more acts, including but not limited to, acts which the stalker directly, indirectly, or through third parties, by any action, method, device or means follows, monitors, observes, surveilles, threatens, or communicates to or about, a person, or interferes with a person's property;
- (2) reasonable person means a reasonable person under similar circumstances and with similar identities to the victim; and
- (3) substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling. (See also § 1-111(f)(7) of the Student Code.)

(d) Hazing: any intentional, knowing, or reckless act committed by a person (whether individually or in concert with other persons) against another person or persons regardless of the willingness of such other person or persons to participate that is
 (1) committed in the course of an initiation into, an affiliation with, or the maintenance of membership in, a student organization; and
 (2) causes or creates a risk, above the reasonable risk encountered in the course of participation in the institution of higher education or the organization (such as the physical preparation necessary for participation in an athletic team), of physical or psychological injury including but not limited to:
  (A) whipping, beating, striking, electronic shocking, placing of a harmful substance on someone's body, or similar activity;
  (B) causing, coercing, or otherwise inducing sleep deprivation, exposure to the elements, confinement in a small space, extreme calisthenics, or other similar activity;
  (C) causing, coercing, or otherwise inducing another person to consume food, liquid, alcohol, drugs, or other substances;
  (D) causing, coercing, or otherwise inducing another person to perform sexual acts;
  (E) any activity that places another person in reasonable fear of bodily harm through the use of threatening words or conduct;
  (F) personal servitude;
  (G) degrading or humiliating activities;
  (H) any activity against another person that includes a criminal violation of local, state, or federal law; and
  (I) any activity that induces, causes, or requires another person to perform a duty or task that involves a criminal violation of local, state, or federal law.

(e) The use of force or violence, actual or threatened, to willfully deny, impede, obstruct, impair, or interfere with any of the following:
 (1) the freedom of movement of any person, including entering or leaving property or facilities
 (2) the performance of institutional duties by a member of the university or
 (3) by knowingly occupying or remaining in or at any property or facility owned or controlled by the university after receiving due notice to depart.

(f) Any conduct that substantially threatens or interferes with the maintenance of appropriate order and discipline in the operation of the university. Without excluding other situations, examples include shouting, noise making, obstruction, and other disruptive actions designed or intended to interfere with or prevent meetings, assemblies, classes, or other scheduled or routine university operations or activities.

(g) Providing false or misleading information to a member or agent of the university acting in the performance of their duty; or failing to comply with reasonable directions of a member or agent of the university acting in the performance of their duty, including but not limited to failing to provide identification to a university official upon request by that official or failing to comply with an order or instruction by a university official to depart from university property or any part thereof.

(h) Providing false or misleading information to a university or other law enforcement official acting in the performance of their duty; or failing to comply with the reasonable directions of a university or other law enforcement official acting in the performance of their duty.

(i) Conduct that violates the university's nondiscrimination policy, including but not limited to harassment: unwelcome conduct that is based on an individual's status within a protected classification covered by § 1-108 that, based on the totality of the circumstances, is (1) subjectively and objectively offensive; and (2) so severe or pervasive that it (3) adversely affects a term or condition of employment or participation in a university program or activity, or limits or denies a person's ability to participate in or benefit from a university program or activity.

(j) Theft, unauthorized use, or unauthorized possession of property or services of another; or knowing possession of stolen property.

(k) Intentional or reckless destruction or damage of university, public, or personal property of another.

(l) Indecent exposure of the body, including, but not limited to urination or defecation in public; knowingly providing images of nudity without the consent of the recipient.

(m) Unauthorized entry to or use of university, public, or private premises.

(n) Unauthorized or malicious use of computer and communications equipment / devices, software, or application services where the university community's interest is substantially affected, including, but not limited to:
  (1) entry into files, applications, databases, or cloud environments for any purpose
  (2) transfer or alteration of files, applications, databases, or source code
  (3) use of another individual's identification, account, or password
  (4) knowingly disrupting the work of another person or the normal operation of the university computing system or service
  (5) accessing child pornography
  (6) violation of copyright and patent laws.

(o) Abuse of the university disciplinary system including, but not limited to:
  (1) failure to obey the directive of a disciplinary body or university official acting in the performance of their duties
  (2) knowing falsification, distortion, or misrepresentation of information before a disciplinary body
  (3) deliberate disruption or interference with the orderly conduct of an investigation or disciplinary proceeding
  (4) knowingly reporting a student for disciplinary action without cause
  (5) attempting to influence the impartiality of any investigator or decision-maker prior to, or during the course of, the disciplinary proceeding
  (6) harassment or intimidation of any witness, complainant, respondent, investigator, decision-maker, or other participant in a disciplinary proceeding
  (7) failure to comply with the sanction(s) imposed under the Student Code

(p) Making, attempting to make, or distributing a sound or visual recording of any person(s) in bathrooms, showers, bedrooms, locker rooms, or any other premises where there is a reasonable expectation of privacy, without the knowledge and consent of all participants subject to such recordings.

(q) Violation of published university policies, rules, or regulations.

(r) Inciting, aiding, or encouraging others to engage in a behavior which violates the Student Code.

(s) Committing or attempting to commit any act which would be a violation of local, state, or federal law on or off university property, when such behavior is detrimental to the university community's interest.

(t) Sale or Distribution of Lecture Notes or Course Materials. No student shall sell, deliver or distribute copyrighted lecture notes or other course materials without the express permission of the copyright holder. An example of an infraction would include posting on a website or selling instructor copyrighted slides, lecture notes or other expressions fixed in a medium. (See also the University General Rules, Art. III, §4 regarding copyright policy.)

### § 1-303 Falsification of Documents

(a) Any student who, for purposes of fraud or misrepresentation, falsifies, forges, defaces, alters, possesses, or mutilates in any manner any document or representation thereof may be subject to discipline when this action substantially affects the university community's interest. Some examples of documents covered by this regulation include identification cards, program requests, change slips, receipts, transcripts of credits, library documents, petitions for reclassification of residency status, etc.

(b) Any applicant who withholds information pertinent to the admissions decision or gives false information while making application for admission to the university will be declared ineligible for admission. In cases discovered after admission has occurred but prior to initial registration, the admission will be canceled. If the falsification led to admission that would not have been granted based on the person's academic record, the student enrolled will have their registration canceled. The appropriate action will be invoked by the Director of Undergraduate Admissions, Director of Graduate and Professional Admissions and Recruiting or the Registrar and the dean of the college involved. Cases in which admission or registration cancellation is contested in writing by the applicant or student within ten working days after notification will be reviewed by the Office of the Provost or a designee.

If, however, the person would have been admissible based on their true record, the registered student will be referred for possible disciplinary action, including dismissal, to the Senate Committee on Student Discipline.

(c) Upon admission and prior to degree conferral, students are responsible to disclose and provide complete, official transcripts from any post-secondary work completed outside the University of Illinois System, including all international and domestic coursework for the purpose of consideration of transfer articulation. It is recommended that students receive appropriate advising from their college prior to undertaking outside coursework to be sure it will transfer for specific curricular needs. Failure to disclose information may result in the rescission of an offer of admission, cancellation of registration or disciplinary action at the discretion of the Dean of Students, college, and/or Director of Graduate and Professional Admissions and Recruiting.

(d) Any student who knowingly withholds information or gives false information in any document or materials submitted to any member or agent of the university may be subject to discipline.

### § 1-304 Identification Cards

(a) Each new student is issued a photo identification card, which must be retained by the student while the student is registered at the university. The University of Illinois System ID card (ID card) remains the property of the university and should be returned to the Campus ID Center upon leaving the university.

(b) Any person who alters or intentionally mutilates an ID card (including but not limited to punching holes in the card, applying stickers, etc.), or who uses the ID card of another or allows their ID card to be used by another, may be subject to discipline. (See § 1-303.)

(c) The ID card must be presented for identification purposes at the request of an agent of the university when the agent is acting in the performance of their supervisory or security function (for example, examination proctor, university police officer, residence hall director or adviser, recreational facility supervisor, ticket takers, ushers). Any student refusing to provide the ID card when requested by an agent of the university acting within the scope of their duties may be subject to discipline and may be provided notice to immediately depart from university property or any part thereof.

(d) An ID card may be confiscated by an agent of the university when acting in the performance of their duties if:

  (1) the ID card is in the possession of an individual other than the one to whom the ID was issued and that individual attempts to use the card to represent himself or herself as a duly registered student, or

  (2) the ID card is presented by the individual to whom it was issued but is not valid for the term of registration at the time and the individual attempts to represent himself or herself as a duly registered student.

(e) If an ID card is lost or stolen, a student should immediately notify the Campus ID Center to deactivate the online functionality of the ID card (e.g., meal plan, door access, etc.). Until the ID Center is notified, the student may be held responsible for unauthorized use of the ID card.

(f) A charge is made for replacing each lost, mutilated, confiscated, or stolen student ID card.

(g) Card data, including but not limited to the UIN, card number, and photo, may be used for university purposes in accordance with Article 3, Part 6 of the Student Code.

(h) An ID card is non-transferable and does not authorize the card holder to obligate the University of Illinois in any way.

(i) A student who links an ID card to an authorized, contracted university service provider (e.g., for banking services) understands and agrees that the student is releasing the UIN (as part of the card number) to said service provider. A student is responsible for notifying all said service providers if a linked ID card is lost or stolen.

(j) By accepting possession of the ID card, the cardholder agrees to hold harmless the Board of Trustees of the University of Illinois, and its officers, employees, representatives, or agents, from and against any claims, damages, costs, expenses, including an amount equal to reasonable attorney's fees, or liabilities, including for loss or damage to any property or for death or injury to any person or persons, arising out of or in any way connected with any incorrect or outdated phone numbers that may be listed on the ID card.

**§ 1-305 Policy on Drugs**

(a) The university seeks to inform all students about drugs and their effects. To this end, it is the policy on this campus to provide educational programs and counseling to drug users and those affected by the drug use of others, to discourage illicit drug use, to eliminate dealing in or providing of illegal drugs, and to uphold the law in these matters. Various local agencies on campus can provide help. These include the Counseling Center, Student Services Building, 610 East John Street, Champaign, IL 61820, (217) 333-3704, and the Health Education Department, Drug and Alcohol Educator, McKinley Health Center, 1109 South Lincoln Avenue, Urbana IL 61801, (217) 333-2816.

(b) Violations of the university's policy on drugs by a university student raises the question of a student's fitness to continue at the University of Illinois.

(c) Drugs include controlled substances, alcohol, and substances that may be detrimental to health, even though not subject to state and federal laws.

(d) The illegal possession or use of drugs or drug paraphernalia is prohibited. Although the possession and use of cannabis is allowed under Illinois state law in some circumstances, pursuant to federal law, the university prohibits the possession, use, and storage of cannabis for any purpose by students on university property and at university-sponsored events. All students are expected to observe the cannabis laws of the State of Illinois. (See § 1-201.) Under the cannabis laws of the State of Illinois and specifically, this rule:
   (1) Possession or consumption of cannabis by students under 21 years of age is prohibited.
   (2) Possession or use on university property by students of any age is prohibited.

(e) The illegal distribution, sale, making or manufacture of drugs is prohibited.

(f) Drug use resulting in incapacitation that requires transportation to the hospital by emergency medical personnel, or refusal to accept such transportation when it is recommended by emergency medical personnel, can trigger a mandatory assessment (see § 2-102).

**§ 1-306 Alcoholic Beverages – Preamble**

(a) The University of Illinois Urbana-Champaign expects all students to exhibit behavior compatible with membership in a community of scholars. Students shall conduct themselves in a civil and mature manner, respecting the rights and property of others. (See also § 1-201.) Having consumed alcohol is not an excuse for failure to meet these expectations.

(b) Because of the university's concern for the health and rights of individuals and because the excessive consumption of alcohol frequently results in the user becoming either a violator or a victim, the university will respond when inappropriate alcohol-related behavior is demonstrated. These interventions will include a team approach involving,

when appropriate, any or all of the following: the Division of Public Safety, Strategic Communications and Marketing, and Student Affairs units including the Office of the Dean of Students, the Office for Student Conflict Resolution, Residential Life, the Alcohol and Other Drug Outreach Team, the Counseling Center, and McKinley Health Center.

(c) Sections 1-307 and 1-308 apply to all University of Illinois Urbana-Champaign students and Registered Organizations and Registered Student Organizations while on campus, while involved in university-related activities, while within the environs of Champaign County, or in other circumstances where a substantial university community interest exists. A "substantial university community interest" exists, but is not limited to, situations in which individual or group alcohol consumption results in actual or threatened injury to persons, damage to property, or disruption of a university-related event.

### § 1-307 Alcoholic Beverages – General Rules

(a) All students, wherever they happen to be, are expected to observe the liquor laws of the local jurisdiction. (See § 1-201.) Under the liquor laws of the State of Illinois and the cities of Champaign and Urbana, and this rule:
 (1) Possession or consumption of alcoholic beverages by students under twenty-one years of age is prohibited.
 (2) No student may give or otherwise furnish alcoholic beverages to any person under twenty-one years of age. Additionally, no student may authorize or permit a residence which the student occupies to be used for possession or consumption of alcohol by any person under twenty-one years of age.

(b) In determining appropriate sanctions for violations of subsection (a) above, communal alcohol (for example, in kegs or not in its original container, or the distribution of cups with open access to alcohol), drinking games (or other activities that promote unsafe or inappropriate drinking), and open parties may be considered aggravating factors.

(c) The fact that a student may have been drinking shall not be accepted as an excuse for disruptive behavior. In such instances, appropriate sanctions will be applied and referral for personal assistance may be indicated. (See § 2-102 and § 3-603 concerning Mandatory Assessment and Parental Involvement, respectively.)

(d) The transfer or alteration of identification cards, the use or sale of the identification card of another or a false or forged identification card, or the use of false information to obtain an identification card is prohibited. Additionally, presentation or possession of false identification in an attempt to enter a liquor establishment or to procure alcohol is prohibited.

(e) Alcohol use resulting in incapacitation that requires transportation to the hospital by emergency medical personnel, or refusal to accept such transportation when it is recommended by emergency medical personnel, can trigger a mandatory assessment. (See § 2-102.)

(f) No minor (eighteen years of age or younger in Champaign; seventeen years of age or younger in Urbana) is allowed to be present in a liquor establishment unless otherwise permitted by local ordinances. Additionally, holding or carrying open containers of alcoholic beverages out of a liquor establishment or in public areas, in violation of federal, state, and/or local law, is prohibited.

(g) Driving under the influence of alcohol or other drugs poses a substantial risk to the safety of the campus community and is prohibited. Substantial penalties exist in Illinois for the operation of a motor vehicle by a driver with a blood alcohol concentration (BAC) of .08 or greater. Arrests are also possible at lower levels if driving is impaired. Drivers under twenty-one years of age with any trace of alcohol in their systems can lose their driving privileges. Transporting open alcohol containers in a motor vehicle or allowing an intoxicated person to operate a vehicle are also punishable under Illinois law.

### § 1-308 Alcoholic Beverages – Special Rules Relating to University Property

(a) Persons twenty-one years of age or older may possess or consume alcoholic beverages on the following property under control of the university:
 (1) Property at which the university furnishes the alcohol and holds a State of Illinois

liquor license or local catering license. These include, for example, Willard Airport, the Levis Faculty Center, Krannert Center for the Performing Arts, Illini Union, Spurlock Museum, Beckman Institute, and Allerton House.

(2) Property used for specifically designated functions approved by the appropriate Vice Chancellor, dean or director of the academic or administrative unit sponsoring the event, or by the Chancellor. In cases governed by this subsection, furnished alcohol may be sold only if the provider holds a valid caterer's license.

Other than as outlined above, no person may possess or consume alcoholic beverages on any property under the control of the university.

(b) Possession and consumption of alcoholic beverages in university certified student housing is governed as follows:

(1) University Residence Halls: Persons twenty-one years of age or older may only possess and consume alcoholic beverages in their rooms or the room of another person twenty-one years of age or older, with the door closed. No alcoholic beverages are permitted in public areas. (Also see the "Hallmarks" handbook - https://housing.illinois.edu/MyHousing/Hallmarks)

(2) University Family or Graduate Housing: Persons twenty-one years of age or older may possess and consume alcoholic beverages in their room/apartment or the room/apartment of another person twenty-one years of age or older. Requests to allow consumption of alcoholic beverages for events/activities in public areas are to be directed to University Housing administration. Any approved functions must be in accordance with all applicable laws and ordinances.

(3) Other Certified Housing: Persons living in privately owned and/or operated certified housing, including fraternities and sororities, must abide by the decision of the owner-operator in accordance with all applicable laws and ordinances with regard to the consumption of alcoholic beverages; total prohibition may be required. In certified housing units where the possession and consumption of alcoholic beverages is allowed by those twenty-one years of age or older, all applicable laws and ordinances must be followed. The Board of Fraternity Affairs and the Board of Sorority Affairs also promulgate rules and regulations that apply to fraternity and sorority certified housing units.

### § 1-309 Possession or Storage of Weapons

(a) Except as provided in subsection (c), possession or storage of weapons by students is prohibited on any property owned or controlled by the university, including university certified housing units.

(b) Prohibited weapons include but are not limited to any: (1) firearm, firearm ammunition, BB gun, pellet gun, paintball gun (except as part of Registered Organization or Registered Student Organization activity), tear gas gun, stun gun, taser, or other dangerous or deadly device of similar type; (2) knife with a blade of at least 3 inches in length (except an ordinary eating utensil), dagger, dirk, switchblade knife, stiletto, ax, hatchet, or other deadly or dangerous weapon or instrument of similar type; (3) bludgeon, blackjack, slingshot, sandbag, sand club, metal knuckles, billy club, throwing star, nunchaku, or other dangerous or deadly weapon of similar type; (4) bomb, bombshell, grenade, firework, bottle or other container containing an explosive, toxic, or noxious substance, unless under academic/classroom supervision, (other than an object containing a nonlethal noxious liquid, gas, or substance designed solely for personal defense possessed by a person 18 years of age or older); and (5) souvenir weapon or other weapon that has been rendered permanently inoperative.

(c) With appropriate approval possession of a weapon on nonresidential university property may be permitted when it is used as a prop or accessory in situations such as (1) a university class; (2) a university-sponsored or sanctioned artistic performance; or (3) a activity of a Registered Organization or Registered Student Organization. Such weapons may not, however, be stored on university property, except in a facility approved for that purpose by the university.

(d) Subsections (a) to (c) above apply to possession or storage, not use of a weapon. Use of a weapon that results in harm or threat of harm to any person or property is governed by § 1-302, and subsection (e) below.

(e) In determining appropriate sanctions for violations of the student discipline rules contained in this Code (Article 1, Part 3), the use or threatened use of any object (whether or not defined as a weapon in this section) while committing the violation may be considered an aggravating factor.

### § 1-310 Unauthorized Use, Abuse, or Interference with Fire Protection Equipment, Building Security Systems, Security or Fire Personnel, or Warning Devices

(a) The unauthorized use, abuse, or interference with fire protection equipment, firefighting personnel, or warning devices may result in death, injury, or substantial property damage. It is critically important that all fire protection equipment be in its place and in proper working condition if the safety and welfare of the members of the university community are to be assured.

(b) It is a violation of Illinois criminal law to willfully or maliciously cut, injure, damage, tamper with, or destroy any fire hydrant, fire hose, fire engine, or other public or private firefighting equipment or any apparatus pertaining to such equipment or firefighting personnel, or to intentionally open any fire hydrant without proper authorization. It is also a violation of Illinois criminal law to knowingly, without authorization, damage any property supported in whole or in part with state funds or federal funds administered or granted through a state agency. Other Illinois laws may also relate to the unauthorized use, abuse, or interference with fire protection equipment or warning devices.

(c) A violation of any federal, state, or local law concerning fire protection equipment or firefighting personnel may result in suspension or dismissal from the university.

(d) Tampering with locks, other door hardware, cameras or other equipment used to provide security on campus (including the unauthorized propping of doors) may result in suspension or dismissal from the university.

(e) Enabling unauthorized access to campus facilities by providing keys or access cards or by other means may result in suspension or dismissal from the university.

### § 1-311 Certain Consequences of Disciplinary Action

(a) Sanctions may be imposed for violations of the student discipline rules stated in this part (Article 1, Part 3.)

(b) The Senate Committee on Student Discipline has the right to withhold privileges of the academic community, including the conferral of the degree itself, at any point prior to the conferral of the degree. In instances in which dismissal is a possibility for disciplinary infractions, the conferral of the degree is withheld until the disciplinary action has been resolved. (See § 3-313 and §§ 3-701 to §3-704.)

(c) Students dismissed or suspended from the university for disciplinary reasons may be excluded from university classes, activities, facilities, buildings, and/or premises by the appropriate disciplinary authority. The same exclusions may be applied by the Chancellor in exercising the power to suspend students. (See § 3-508 on refunds.)

(d) Cancellation or withdrawal from the university does not abrogate the authority of the institution to pursue disciplinary action (see subsection 3-313(a)(3)).

## PART 4. ACADEMIC INTEGRITY POLICY AND PROCEDURE

### § 1-401 Policy Statement; Application; Definitions

(a) Policy Statement. The university has the responsibility for maintaining academic integrity so as to protect the quality of education and research on our campus and to protect those who depend upon our integrity.

   (1) Expectations of Students. It is the responsibility of each student to refrain from infractions of academic integrity, from conduct that may lead to suspicion of such infractions, and from conduct that aids others in such infractions. Students have been

given notice of this Part by virtue of its publication. Regardless of whether a student has actually read this Part, a student is charged with knowledge of it. Ignorance is not a defense.

(2) Expectations of Instructors. It is the responsibility of each Instructor to establish and maintain an environment that supports academic integrity. An essential part of each Instructor's responsibility is the enforcement of existing standards of academic integrity. If Instructors do not discourage and act upon violations of which they become aware, respect for those standards is undermined. Instructors should provide their students with a clear statement of their expectations concerning academic integrity.

(b) Application. This Part contains the procedures for addressing course-based academic integrity infractions, including proficiency tests taken after enrollment, for all courses as well as academic integrity infractions in non-course-based degree requirements such as qualifying examinations. This Part does not apply to students enrolled in the degree programs with the Carle Illinois College of Medicine, the College of Veterinary Medicine, and the College of Law, each of which have their own policies. This Part also does not apply to pre-enrollment infractions (see § 1-301 and § 1-303) or infractions of the Academic Integrity in Research and Publications Policy.

(c) Definitions. For purposes of this Part, the following definitions shall apply:

(1) Appeal Manager. The administrator to whom the Appellant submits the Notice of Appeal and who is responsible for overseeing the appeal process. For department-level appeals, the Executive Officer is the Appeal Manager. For college-level appeals, the Dean is the Appeal Manager.

(2) Appellant. A student who submits a Notice of Appeal in accordance with these procedures.

(3) Business Day. Monday through Friday, excluding university and campus holidays and reduced service days.

(4) Consultant. A person with whom a student or Instructor may privately consult during the process. A Consultant may attend hearings with a student or Instructor, but may not participate in the hearings, and may not serve as a witness. Each participant may be accompanied by only one Consultant.

(5) Dean. The dean of the college or head of the equivalent academic unit in which a course or examination is conducted or their designee.

(6) Executive Officer (EO). The executive officer or head of the department or unit in which a course or examination is conducted or their designee.

(7) Instructor. A faculty member or authorized staff member who supervises any academic endeavor.

(8) Notice. A written communication conveying information to or from a participant in the process. E-mail notices are strongly encouraged.

(9) Record. The Instructor's Allegation Notice, written student Response, any materials relied upon by the Instructor to make the Instructor's decision, and the Instructor's Decision Notice.

### § 1-402 Academic Integrity Infractions

(a) Cheating. No student shall use or attempt to use in any academic exercise materials, information, study aids, or electronic data that the student knows or should know is unauthorized. Instructors are strongly encouraged to make in advance a clear statement of their policies and procedures concerning the use of shared study aids, examination files, and related materials and forms of assistance. Such advance notification is especially important in the case of asynchronous examinations. During any examination, students should assume that external assistance (e.g., books, notes, calculators, smart devices, and communications with others) is prohibited unless specifically authorized by the Instructor. A violation of this section includes but is not limited to:

(1) Allowing others to conduct research or prepare any work for a student without prior authorization from the Instructor, including using the services of commercial term paper companies.

(2) Submitting substantial portions of the same academic work for credit more than once or by more than one student without authorization from the Instructors to whom the work is being submitted.

(3) Working with another person without authorization to satisfy an individual assignment.

(b) Plagiarism. No student shall represent the words, work, or ideas of another as their own in any academic endeavor. A violation of this section includes but is not limited to:
(1) Copying: Submitting the work of another as one's own.
(2) Direct Quotation: Every direct quotation must be identified by quotation marks or by appropriate indentation and must be promptly cited. Proper citation style for many academic departments is outlined in such manuals as the *MLA Handbook* or K.L. Turabian's *A Manual for Writers of Term Papers, Theses and Dissertations*. These and similar publications are available in the university bookstore or library. The actual source from which cited information was obtained should be acknowledged.
(3) Paraphrase: Prompt acknowledgment is required when material from another source is paraphrased or summarized in whole or in part. This is true even if the student's words differ substantially from those of the source. A citation acknowledging only a directly quoted statement does not suffice as an acknowledgment of any preceding or succeeding paraphrased material.
(4) Borrowed Facts or Information: Information obtained in one's reading or research that is not common knowledge must be acknowledged. Examples of common knowledge might include the names of leaders of prominent nations, basic scientific laws, etc. Materials that contribute only to one's general understanding of the subject may be acknowledged in a bibliography and need not be immediately cited. One citation is usually sufficient to acknowledge indebtedness when a number of connected sentences in the paper draw their special information from one source.

(c) Fabrication. No student shall falsify or invent any information or citation in an academic endeavor. A violation of this section includes but is not limited to:
(1) Using invented information in any laboratory experiment or other academic endeavor without notice to and authorization from the Instructor or examiner. It would be improper, for example, to analyze one sample in an experiment and covertly invent data based on that single experiment for several more required analyses.
(2) Altering the answers given for an exam after the examination has been graded.
(3) Providing false or misleading information for the purpose of gaining an academic advantage.

(d) Facilitating Infractions of Academic Integrity. No student shall help or attempt to help another to commit an infraction of academic integrity, where one knows or should know that through one's acts or omissions such an infraction may be facilitated. A violation of this section includes but is not limited to:
(1) Allowing another to copy from one's work.
(2) Taking an exam by proxy for someone else. This is an infraction of academic integrity on the part of both the student enrolled in the course and the proxy or substitute.
(3) Removing an examination or quiz from a classroom, faculty office, or other facility without authorization.

(e) Bribes, Favors, and Threats. No student shall bribe or attempt to bribe, promise favors to or make threats against any person with the intent to affect a record of a grade or evaluation of academic performance. This includes conspiracy with another person who then takes the action on behalf of the student.

(f) Academic Interference. No student shall tamper with, alter, circumvent, or destroy any educational material or resource in a manner that deprives any other student of fair access or reasonable use of that material or resource.
(1) Educational resources include but are not limited to computer facilities, electronic data, required/reserved readings, reference works, or other library materials.
(2) Academic interference also includes acts in which the student committing the infraction personally benefits from the interference, regardless of the effect on other students.

### § 1-403 Initial Determination
(a) Overview. Instructors should regularly check for potential academic integrity violations as student work is submitted so that students can be informed of and learn from their

mistakes early in their coursework. Instructors should use the Faculty Academic Integrity Report (FAIR) portal to report potential academic integrity infractions. The software FAIR, used by most colleges, guides Instructors and students through the process exactly as stated in the Student Code and generates all letters and reports. A quick reference guide to academic integrity for Instructors that includes a link to the FAIR portal can be found on the Provost's website.

(b) Allegation. An Instructor who has credible evidence that a student has committed an academic integrity infraction shall notify the student in writing of the basis for the belief. The Instructor should review all the student's submitted work in the course for academic integrity infractions prior to making an allegation and include all infractions in the allegation. The Allegation Notice must contain the evidence (or instructions for accessing the evidence) and sufficient explanation to permit the student to respond to the concern. A copy of the Allegation Notice shall be provided to the department and college in which the course or examination is conducted. The college should, where applicable, submit a copy of the Allegation Notice to the college with which the student is affiliated (for graduate students, the Graduate College is always the applicable college).
   (1) Student Not Enrolled in Course. If a student is not enrolled in the affected course when the alleged infraction occurred, the Instructor shall not make an allegation but shall instead forward that student's case to the Office for Student Conflict Resolution for handling pursuant to its policies and procedures. This does not apply to allegations arising from non-course-based degree requirements.
   (2) Allegations After the Conclusion of the Course. If the course has already concluded when the Instructor discovers a possible academic integrity infraction, they should consult with their college before sending allegation.

(c) Student's Response. The student has ten (10) business days from the date of the Allegation Notice to submit a written response to the Instructor. The response should include all relevant information, all relevant materials, and the names of relevant witnesses the student wishes the Instructor to consider. This is the student's opportunity to make their case. Upon good cause shown, an extension may be requested in writing and may be granted by the EO.

(d) Instructor Fact-Finding. The Instructor shall act as fact-finder and explore information relevant to the alleged infraction. The Instructor should consider all information provided by the student in the response. The Instructor may collect additional relevant information to assist in making a determination. The Instructor will respect the privacy of any students involved when making inquiries, including when interviewing involved parties, by not sharing any unnecessary information.
   (1) Multiple Students. When two or more students have been accused of cooperating in an academic infraction, any fact-finding inquiries should establish their independent responsibility, and the sanctions for each individual should be decided separately.
   (2) New Allegations. If the Instructor identifies additional allegations, a revised allegation notice must be sent including all allegations. If academic integrity infractions occur in work submitted after the original allegation notification, the Instructor must initiate a new academic integrity process.
   (3) Timeline. The Instructor shall work to resolve the matter and make a determination on a timely basis, within 20 business days from the date of the Allegation Notice if possible. If no finding has been entered by 20 business days after the grade entry deadline for the course, or the date of the Allegation Notice, whichever is the later date, the college may choose to close the case administratively and notify the Instructor and student.

(e) Instructor's Decision.
   (1) If the Instructor concludes that the student did not commit an infraction, the student will have the course options listed in § 1-404(c)(2).
   (2) If the Instructor concludes, based on available information, that it is more probably true than not true that the student has committed an infraction, the Instructor shall make a finding of a violation and impose a sanction as permitted in § 1-404(a).
   (3) In either case (1 or 2), Notice of the Instructor's decision shall be given to the student and to the department and college in which the course or examination was conducted.

The college should, where applicable, submit a copy of the Instructor's Decision Notice to the college with which the student is affiliated (for graduate students, the Graduate College is always the applicable college). When an infraction is found, the Instructor's Decision Notice shall include at least: the finding of violation; a brief explanation of the facts establishing the violation; any sanctions and the basis for the same; and instructions for appealing the decision, including contact information for the Appeal Manager and a statement such as: "You have the right to appeal this decision and/or sanction by [insert date, i.e. within five (5) business days from the date of the Instructor's Decision Notice] pursuant to § 1-405 of the Student Code." The Instructor shall provide sufficient information regarding the case so that someone who is not familiar with the details of the case can understand the decision.

(f) Finality of Instructor's Decision. If a student does not appeal the Instructor's decision, it shall be final except to the extent the sanction includes a recommendation for suspension or dismissal from the university. A recommendation of suspension or dismissal will be handled pursuant to § 1-405(g).

(g) Forwarding the Record. Once a decision has been made, the Instructor shall forward the Record to the department or unit executive officer for retention pursuant to applicable policy.

**§ 1-404 Sanctions and Student Status**

(a) Authorized Sanctions. Authorized Sanctions for academic integrity violations are one or more of the following:
- (1) Category 1 – Any sanction discussed and agreed to in writing by the Instructor and the student. A Category 1 sanction must also be reported pursuant to § 1-407. A student who accepts a Category 1 sanction waives his or her right to appeal either the finding of a violation or the sanction under § 1-405(a).
- (2) Category 2 –
  - (A) A written warning
  - (B) Educational Sanctions including make-up assignments of a more difficult nature, assignments pertaining to academic integrity, and/or required attendance at a noncredit workshop or seminar on academic integrity
    - (i) The Instructor must check workshop or seminar availability with the offering unit before specifying this sanction.
    - (ii) The Instructor will set the deadline for the completion of educational sanctions.
    - (iii) Failure to complete these sanctions by the deadline may result in referral to the Office for Student Conflict Resolution.
  - (C) A reduced grade on the assignment
  - (D) A failing grade for the assignment
  - (E) A reduced grade for the course
  - (F) A denial of credit for the proficiency exam
- (3) Category 3 – A failing grade for the course or failing assessment for the degree requirement.
- (4) In addition to any other sanctions imposed, an Instructor may also recommend suspension or dismissal from the university. In such cases, the special procedures described in § 1-405(g) shall be followed.

(b) General Guidance for Sanctions. The variety of academic settings encountered in the university precludes establishing uniform sanctions for all infractions. Instructors may use their discretion in light of the nature of the class, the educational experience of the student, prior instructions or warnings the Instructor has given to the student, etc. Where applicable, the Instructor shall use the following principles in determining sanctions:

- (1) Knowledge and intent are not necessarily factors in determining whether an infraction occurred but shall be considered in determining an appropriate sanction. Instructors shall consider whether the student knew or should have known that an infraction was likely to occur based on the circumstances surrounding the incident. Careless conduct that results in an infraction should be sanctioned less severely than intentional conduct.

(2) Instructors shall consider aggravating factors, such as repeated violations within the same course in the same semester, cheating on the major work for the course, activity that was designed to hinder the academic performance of others, and similar conduct when determining an appropriate sanction.
(3) Violations in other courses or other semesters will be addressed through the Senate Committee on Student Discipline's procedures and shall not be considered by the Instructor when determining a sanction. See § 1-406.

(c) Student Status.
(1) While an academic integrity infraction is pending (from the date of the Allegation Notice until final resolution):
(A) No change in enrollment status in the course shall be permitted.
(B) If the final deadline for reporting a grade occurs prior to the resolution of the case, the Instructor shall request that the student's college assign an "Incomplete" grade to the student for the course until final resolution.
(2) Upon a finding of no infraction and resolution of the case, the student shall have the options to:
(A) Continue in the course and be given whatever grade the student is entitled to without regard to the charge of an infraction; or
(B) Drop the course at any time during the semester without a "W" on the transcript. However, to drop the course after the applicable drop deadline, the student must indicate their desire to drop the course within 10 business days of the finding of no infraction; or
(C) Change sections in the course, if possible.
(3) Upon a finding of an infraction and resolution of the case:
(A) If the sanction is Category 1 or 2 as provided in subsection (a) above, an undergraduate student may drop the course or change the course to Credit - No Credit status if they were otherwise eligible at the time of the infraction. Graduate students may drop the course or change the course to Credit - No Credit provided the infraction occurred before the usual deadlines. A record of the infraction will remain in the student's file even if the student drops the course.
(B) If the sanction is a Category 3 as provided in subsection (a) above, the student may neither change the course to a Credit - No Credit status nor drop the course.

(d) See § 3-107 for procedures regarding capricious grading, if relevant.

### § 1-405 Appeal Procedures

(a) How to Appeal. The student may appeal the Instructor's decision based on the set of grounds in subsection (c) below by submitting a written Notice of Appeal to the Appeal Manager within five (5) business days from the date of the Instructor's Decision Notice, except as provided in subsection (g)(1) below. In the Notice of Appeal, the Appellant must identify themselves, identify one or more grounds for appeal (see subsection (c) below) that apply in their case, and provide reasons in support of the grounds identified.

(b) Access to Record. From the date of the Instructor's Decision Notice to the date of the appeal hearing, if applicable, the student may request, in writing to the Appeal Manager, access to the Record of the case. The Appeal Manager must provide access, under reasonable conditions, by the end of the next business day. If an appeal hearing is held, the Appellant, the Instructor, and their consultants must be provided access to the Record for the duration of the hearing.

(c) Grounds for Appeal. The Appellant must base the appeal exclusively on one or more of the following grounds:

(1) The Instructor (or any other involved university official) did not follow the procedures described above, and this procedural error affected the outcome of the case.
(2) The Instructor (or any other involved university official) had a conflict of interest or bias that affected the outcome of the case.
(3) Any sanctions imposed were not appropriate for the violation(s).

(4) New information that was not available at the time of the Instructor's decision exists and would have affected the outcome of the case.

(d) Jurisdiction. If all sanctions issued are Category 1 or 2 (See § 1-404(a).) and the department or unit in which the infraction is alleged to have occurred has ten or more full-time faculty members, then the department is responsible for addressing the appeal. Otherwise, the college responsible for the course or degree requirement is responsible for addressing the appeal. If the Instructor has recommended suspension or dismissal, the special procedures described in subsection (g) below shall be followed.

(e) Initial Review. No more than five (5) business days after receiving the Notice of Appeal, the Appeal Manager will determine whether the Appellant has met the requirements set out in subsection (a) above and provide written notification of their determination to the Appellant. The Appeal Manager is not to evaluate whether the Appellant has successfully established any grounds for appeal, but only whether the Appellant has identified at least one ground for appeal and provided one or more reasons in support of that ground. If the ground identified is the existence of new information, the Appeal Manager will determine whether the information submitted "was not available at the time of the Instructor's decision" when deciding if the Appellant has met the appeal requirements. Overall, any uncertainty should result in a decision in the Appellant's favor. If the Appeal Manager determines that the appeal requirements have not been met, the Appeal Manager will reject the Notice of Appeal, and the Instructor's decision will become final.

(f) Appeal Hearings
(1) Appeal Committee Membership. The Appeal Manager will appoint a faculty chair, who will be a non-voting member of the appeal committee. The chair will then select at least two faculty and at least one student as additional members. Any student members will be of the same status as the Appellant (undergraduate or graduate). In matters involving both undergraduate and graduate Appellants, at least one undergraduate student and at least one graduate student must serve on the committee. Only faculty and students without a conflict of interest (as determined by the chair) shall serve.
(2) Challenges to Appeal Committee Membership. The Appellant and the Instructor will be given an opportunity to challenge the objectivity of any voting member of the appeal committee. Such a challenge must be based on an identified bias or an identified conflict of interest. The Appeal Manager will decide whether this opportunity is provided prior to the hearing or during the hearing itself. If provided prior to the hearing, the chair will consider these challenges when making a final decision regarding committee membership. If provided during the hearing, the chair will determine whether to excuse the challenged committee member from the hearing and whether any resulting vacancy requires that the hearing be postponed.
(3) Notice of Hearing. The Appeal Manager will notify the Appellant and the Instructor by email of the date and time of the hearing and any instructions for participating at least five (5) business days in advance. At the Appeal Manager's discretion, the hearing may take place virtually using video conference or other similar technology.
(4) Hearing Rules.
(A) Appeal hearings are closed to the public.
(B) The Appellant, the Instructor, and their consultants may attend the hearing but are not required to do so. At the chair's discretion, other faculty or staff members may be allowed to attend to advise, or provide administrative support to, the appeal committee.
(C) The chair may exclude from the hearing any person who disrupts the orderly process of the hearing but will do so only after first issuing a warning. The Chair need not consider this cause to reschedule the hearing or continue the hearing on a later date.
(D) The chair will identify reasonable breaks throughout the hearing Appellant and the Instructor may also request additional breaks as needed, provided the number of requests is not disruptive to the orderly conduct of the hearing. The chair will decide whether to grant any such requests.
(E) After consultation with the other committee members, the chair may decide to continue the hearing to another day for good cause, including the inability to complete all required steps of the hearing process within a reasonable time

frame. The Appellant and the Instructor must be notified of the date, time, and location at least five business days in advance, but prior notification of possible continuance dates will satisfy this requirement.

(F) The chair may set additional rules for the hearing as needed, provided they do not conflict with any provision of these procedures.

(5) Order of the Proceedings. The Appellant and the Instructor may each make a brief opening statement, after which the committee members may ask relevant questions of each. The chair will give both the Appellant and the Instructor an opportunity to suggest questions to be asked of the other, but the chair may choose not to pose a question if it has already been answered, is irrelevant, or is inappropriate. The chair may also reword a relevant question that is asked in a manner that, in the chair's opinion, is confusing or is intended to disparage, intimidate, or otherwise harass the individual being questioned. The committee, through the chair, may solicit information or statements from any person it deems relevant to the matter in dispute, either at its own initiative or at the suggestion of the Appellant or Instructor. All such information must be presented in the hearing and not in closed deliberation.

(6) Deliberation. The appeal committee will deliberate in closed session and will decide by simple majority vote whether the Appellant has met any of the grounds for appeal. Absent a majority to the contrary, the Instructor's original decision shall be affirmed. If one or more of the grounds for appeal have been met, the appeal committee may modify the finding and/or the sanction, overturn the Instructor's decision entirely, or return the case to the procedural step at which an error occurred for reconsideration. The appeal committee may not issue a sanction of a higher category than the Instructor's original sanction (See § 1-404(a).).

(7) Combined Hearings. At the sole discretion of the Appeal Manager, a single appeal hearing may be scheduled for multiple Appellants provided that the allegations against those Appellants arise out of the same facts or circumstances. Such a hearing will be conducted as described above with the following additional rules:

(A) Information about one Appellant's academic record or sanctions may not be shared with another Appellant unless, in the chair's opinion, that information is necessary for determining whether one or more grounds for appeal apply to the latter Appellant's case.

(B) Except as described in the previous subsection, any discussions of an Appellant's academic record or sanctions must be conducted separately.

(8) Appeal Decision Notice. The chair or their designee will provide written notification of the appeal committee's decision to the Appellant, Instructor, and EO within three (3) business days of the appeal hearing. If the appeal committee has found that one or more of the grounds for appeal have been met, this notice must identify the applicable grounds and must include an explanation of the committee's finding and a rationale for the specific relief provided.

(9) Finality of the Appeal Decision. The decision of the appeal committee is final and binding on the Appellant and the Instructor.

(g) Special Procedures for Handling Recommendations for Suspension or Dismissal

(1) If the Instructor recommends that the student be suspended or dismissed from the university, the EO shall review the Record, discuss the matter with the Instructor and with the student, and then determine whether to support the recommendation.

(A) If the EO declines to support the recommendation, the EO shall provide Notice to both the Instructor and the student. The student shall then have five (5) business days from the date of the EO's Notice to appeal the Instructor's finding and/or sanctions, as described in subsection (a) above.

(B) If the EO supports the recommendation, the EO shall provide Notice to both the Instructor and the student and forward the matter to the Dean for a hearing by the college in which the course or examination was offered. The college shall conduct an appeal hearing in accordance with subsection (f) above except, in the event the student is affiliated with a different college, the dean of the student's college shall be invited to name a representative from the student's college to serve as a non-voting member of the committee. The appeal committee shall consider the facts of the case and determine whether suspension or dismissal is warranted. If the student also intends to appeal the Instructor's finding(s) or sanction(s), the student

shall have five (5) business days from the date of the EO's Notice to submit a Notice of Appeal to the Dean, and that appeal shall be decided at the same hearing.

(2) If the appeal committee determines that suspension or dismissal is warranted, the Dean shall forward the recommendation to the Director of Office for Student Conflict Resolution, who will schedule a hearing before at least three members of the Senate Committee on Student Discipline.

(3) The question before the members of the Senate Committee on Student Discipline will be whether the breach of academic integrity in question is of such a nature as to warrant suspension or dismissal of the student. The members may take into consideration prior findings of academic integrity violations against the student when determining if suspension or dismissal from the university is warranted. If the members do not concur with the recommendation of suspension or dismissal, they may impose a lesser formal sanction and/or educational sanctions, along with any course-based sanctions imposed by the Instructor. (See the Student Disciplinary Procedures at https://conflictresolution.illinois.edu/policies/student-discipline/ for permissible sanctions.) The Director of the Office for Student Conflict Resolution shall inform the Dean of the members' decision, and the Dean shall notify the Instructor and EO of the unit in which the infraction occurred. The decision of the members of the Senate Committee on Student Discipline shall be final.

(h) Appeal Timeline. The Appeal Manager is responsible for promptly resolving any appeal. The anticipated duration of the appeal process is approximately 20 business days from the day the Notice of Appeal is received. The actual duration may vary depending on, for example, the complexity of the case, the need for language assistance or accommodation of disabilities, and the possibility of interruption by break periods. If the duration of the appeal process will substantially exceed 20 business days, the Appeal Manager will notify, in writing, both the Appellant and the Instructor of the delay and the reason for the delay. If the appeal is not held in a timely manner, as described above, the college may decide to dismiss the case.

### § 1-406 Continuing Jurisdiction of the Senate Committee on Student Discipline

Nothing contained herein shall be construed to limit or impair the jurisdiction of the Senate Committee on Student Discipline (SCSD) over student disciplinary matters. Departments that become aware of repeat offenders are encouraged to call these cases to the attention of their college. Colleges are encouraged to make special note of repeat offenders to the SCSD. The SCSD will address multiple violations of the academic integrity policy by the same student.

### § 1-407 Reporting and Record Keeping

(a) Report. Once a violation of academic integrity matter has been resolved (a finding of violation, sanction and completion of appeals process or expiration of time to appeal), the EO shall prepare a report of the violation. The report shall include:
- (1) the nature of the alleged violation of academic integrity;
- (2) if applicable, the appeal procedures followed and the recommendation of any hearing committee; and
- (3) the final decision and sanction(s) imposed.

(b) Transmittal. The EO shall send a copy of this report, including the student's name and University Identification Number, to the college in which the course or examination was conducted, to the college or equivalent academic unit in which the student is enrolled, and to the Director of the Office for Student Conflict Resolution within ten (10) business days of the resolution of a case.

(c) Record Retention. A record of the infraction will remain in the student's department and college files (both the student's college of enrollment and the college in which the course or examination was conducted), pursuant to the university's record retention policy. The Director of the Office for Student Conflict Resolution will retain the information pursuant to the university's records retention policy.

(d) Annual Report. The Director of the Office for Student Conflict Resolution shall compile an annual report to the Senate on the number and severity of such infractions of academic integrity, without identification of the individuals involved. The report shall be available to the public.

## PART 5. CLASS ATTENDANCE

### § 1-501 All Students

(a) Regular class attendance is expected of all students at the university. The authority to excuse absences rests with the course instructors, subject to the requirement to reasonably accommodate class absences as set forth in this part (Article I, Part 5).

(b) Instructors of fully online courses may not require in-person attendance for any course component, including exams, without the permission of the unit EO and the Office of the Provost. Permission for in-person components for fully online courses will require justification, and any approved requests necessitate clearly informing students in writing of the in-person requirement(s) prior to the first course meeting.

(c) Instructors are strongly encouraged to make a course syllabus available to all students prior to the deadline for an undergraduate student to add a course (see the Office of the Registrar Academic Calendars (https://registrar.illinois.edu/academic-calendars) for the current term for the specific date). A syllabus should include the instructor's course attendance policy and the due dates of all major assignments, quizzes, and examinations. The student is encouraged to inform the instructor of any known conflict as soon as possible, but no later than one week before the date of the quiz or examination or due date of the assignment. (Note that conflict policies stated in the syllabus take priority over this rule.) Students should notify the instructor in advance of missing any class or as soon as possible thereafter. If a student is unable to contact instructors due to hospitalization or other emergency, the student may contact the Connie Frank CARE Center in the Office of the Dean of Students during business hours to request that email notification be sent.

(d) Students whose absences meet the criteria below may contact the Connie Frank CARE Center in the Office of the Dean of Students to request an absence letter, if it is required by an instructor. Absence letters, however, do not excuse students from class or ensure that make-up work will be permitted. This authority rests with each instructor. These letters are intended to provide information to the instructors who require them and can be used to help the instructor determine whether or not to excuse the absence and allow make-up work. Students should request absence letters as soon as possible after the student's return from the absence, but no later than 10 business days after the student's return to class. The Connie Frank CARE Center will not provide letters requested outside of this timeframe.

An absence letter may be requested for documented absences resulting from:

(1) Prolonged illness or injury of student of three days or more. The illness must be formally documented by a health care provider who has provided the student treatment and must be on the provider's letterhead. Students with chronic health conditions and/or disabilities that may affect their class attendance should register with Disability Resources and Educational Services (DRES), in accordance with § 1-110.

(2) Life threatening or serious illness or injury of an immediate family member including parents, legal guardian, spouse/partner, siblings, children, or grandparents. Relatives-in-law and step relatives in categories above are also included. The condition of the family member must be formally documented by the treating health care provider and must be on the provider's letterhead.

(3) Death of a family member (See Student Bereavement Guidelines http://odos.illinois.edu/community-of-care/resources/students/bereavement).

(4) Significant and compelling circumstances beyond a student's control. This may include medical treatment or surgery related to a prolonged illness or injury; legal matters; citizenship or naturalization processes; or acts of nature which cause destruction to the student's primary residence or which disrupt air travel such that a student is unable to return to campus as planned. These circumstances must be documented. Absence letters will not be approved for classes missed: (i) to attend family events such as weddings, graduations, or reunions; (ii) to be present for circumstances related to extended family members including illness; (iii) to attend job or graduate school interviews; or (iv) for other reasons which do not satisfy the standard of significant and compelling, as determined by the Connie Frank CARE Center in the Office of the Dean of Students.

(e) University policy and state law require all instructors to reasonably accommodate conflicts with class attendance and work requirements resulting from a student's religious beliefs, observances, and practices (see § 1-107 Provision of Religious Accommodations for Students). University policy and state law also require all instructors to reasonably accommodate conflicts with class attendance and work requirements resulting from a student serving as a volunteer emergency worker under the Volunteer Emergency Worker Higher Education Act. The Office of the Dean of Students provides an optional resource on its website to assist students in making requests to their instructors for accommodations resulting from religious beliefs, observances, and practices or arising from service as a volunteer emergency worker. If an instructor denies a student's request for a reasonable accommodation related to service as a volunteer emergency worker under this section, the student may appeal the decision in writing to the dean or dean's designee of the unit offering the course.

(f) Instructors must also reasonably accommodate students whose class absence resulted from formal participation in scheduled activities of officially recognized groups such as athletic teams, performing groups, and the Urbana-Champaign Senate. Policy governing class attendance of student athletes, as adopted by the Senate, is found in § 1-502.

(g) Instructors shall hold all students who miss class for the reasons set forth in § 1-501(e) and § 1-501(f) to the same standard. Accommodating absences for some groups but not others amounts to invidious discrimination and is against university policy. (See § 1-108.)

(h) For an absence to be excused and make up work to be accepted, the student must provide an explanation to the instructor and supply supporting evidence as required by the instructor, which may include an absence letter, when the absence meets the criteria outlined above. The student must make arrangements with the instructor to make up missed work expeditiously. (See § 3-201 for information about absence from final examinations and § 3-202 for information about absence from outside of class period, midterm, and hourly examinations.) Any student may appeal in writing an instructor's decision regarding an absence to the executive officer of the academic unit offering the course. Before taking action, the executive officer should request that the instructor explain their denial in writing.

(i) The instructor decides when a student's attendance becomes irregular. In this case, the instructor may send oral, written, or electronic notice of the student's irregular attendance to the dean or designee of the student's college. The dean shall then notify the student in writing, with a copy to the instructor.

(j) If, after receiving a notice described in subsection (i) above, a student's attendance continues to be irregular, the instructor may report this fact to the student's college dean. The dean or designee of the student's college, in consultation with the instructor, may determine that the student's attendance has become so irregular that the student's progress in meeting course objectives is likely to be severely impaired. The dean may require the student to withdraw from the course with a grade of Withdrawal or Failure.

(k) General Provisions
  (1) A student may notify the Connie Frank CARE Center in the Office of the Dean of Students if the student will be unavoidably absent from class because of illness, death in the family, or other emergency. The Connie Frank CARE Center will pass this information along to instructors and the student's college as is appropriate. This communication is meant for information and does not certify the validity of the student's reason for absence.
  (2) Class absences before and after vacations are treated like any other absences during the semester.
  (3) Regularly scheduled classroom or laboratory work shall have precedence over instructional field trips except on the second Saturday of each month.
  (4) Because McKinley Health Center does not provide medical excuses, instructors should be aware that a student may not be able to provide formal documentation for minor illnesses of less than three days.

### § 1-502 Student Athletes

(a) The Athletic Board of the Urbana-Champaign Senate has delegated authority to review and approve or disapprove schedules for all intercollegiate athletic contests that involve participants from the Urbana-Champaign campus to the Academic Progress and Eligibility Committee (APEC). Each athletic team schedule must adhere to APEC guidelines for approved absences and must be submitted to APEC for approval.

(b) The maximum number of school days absent during a semester for each team cannot exceed ten, not including estimates for championship and other postseason events.
   (1) A school day is considered any day classes are scheduled during the semester, including Reading Day.
   (2) Any waivers of this regulation require the approval of the Athletic Board at the time of scheduling.
   (3) No athletic events are allowed during final examination periods without approval by APEC and approval by the Chancellor or the Chancellor's designee.

(c) Questions about these policies should be directed to either the Division of Intercollegiate Athletics' Academic Service Office or the chair of the Academic Progress and Eligibility Committee.

## PART 6. EDUCATIONAL TECHNOLOGIES

### § 1-601 All Students

(a) University of Illinois Urbana-Champaign courses frequently require the use of educational technologies such as learning management systems, audience response tools, e-textbooks, online homework systems, collaboration tools, discussion forums, online proctoring services, and synchronous online communication platforms. Students may be required to use university-contracted technologies to access course materials, participate in class activities, and complete course assignments. All university-contracted technologies are vetted for student data protection, privacy, and security commensurate with university standards as set by the Chief Information Officer, the Office of the Registrar, and the Office of University Counsel. Alternative options for required educational technologies will be made in the case of disability access accommodations or for religious reasons.

■

# ARTICLE 2 – GENERAL POLICIES AND REGULATIONS

## PART 1. MEDICAL POLICIES

### § 2-101 Health Requirements

(a) Physical and Mental Health

A student may be required to present evidence of satisfactory physical and mental health to the Director of the McKinley Health Center at Urbana-Champaign. Each admitted applicant will receive an Immunization Information Form, which they must use to report proof of immunity to certain vaccine-preventable diseases as defined by state law and required by university regulations, as well as any other pertinent medical data, to the director of the McKinley Health Center. A minor (under eighteen years of age by the time of registration) must submit the Immunization Information Form with a parent's or guardian's written authorization for the student to receive treatment at McKinley Health Center. A student who fails to return the completed Immunization Information Form by the date shown on the form and who fails to comply by the end of the first term of enrollment is prohibited from subsequent enrollment in the university. Upon the advice of a McKinley Health Center physician, admission of a student may be denied until the student is cleared by the McKinley Health Center.

(1) Students transferring from the University of Illinois at Chicago or at Springfield should request that their Immunization Information Form be transferred by the health center on that campus.

(2) Military personnel may have their Immunization Information Form completed by a military physician.

(b) Tuberculosis Control

(1) All new and returning students are encouraged to present evidence of freedom from tuberculosis to the McKinley Health Center. All new international students are required to complete tuberculosis screening via the electronic form on their MyMckinley portal before completing registration.

(2) A person who has a positive skin test is required to have a Quantiferon TB Blood Test and a chest X-ray. A person with a known history of positive reaction to the tuberculosis skin test will not have the TB Skin Test repeated, but will require a Quantiferon TB Blood Test and a chest X-ray to show evidence of freedom from active tuberculosis. An individual who has had a chest X-ray performed within the previous twelve months will not require an additional chest X-ray if the previous chest X-ray is obtainable and meets the university's chest X-ray standards. A student with a positive Quantiferon TB Blood Test must schedule an appointment at McKinley Health Center to review the student's health history.

### § 2-102 Mandatory Assessment

(a) Suicide Incident Referrals

(1) When the university is presented with a credible report that a student has threatened or attempted suicide, engaged in efforts to prepare to attempt suicide or has been psychiatrically hospitalized due to suicidal ideation, that student may be required to attend four sessions of professional assessment.

(2) Procedures

(A) The attending or responsible university employee who becomes aware of facts stated in subsection (a)(1) above must submit a Suicide Incident Referral Form including the student's name and circumstances of the student's suicide incident. An exception to this expectation includes campus mental health clinicians who are engaged in providing services to students. These clinicians do not need to submit a Suicide Incident Referral Form for their own clients.

(B) Members of the Suicide Intervention Team (SIT) will conduct an individualized clinical evaluation of the report to determine if assessment will be mandated. SIT

will notify the Connie Frank CARE Center in the Office of the Dean of Students of their determination.

(C) The Connie Frank CARE Center will notify the student via their official University of Illinois email account of the requirement. This notification will include relevant deadlines; enforcement mechanisms for noncompliance, including but not limited to registration holds; and instructions for appealing. (See subsection (c) below.)

(D) If the student is not subject to mandatory assessment, the Connie Frank CARE Center will contact the student via their official University of Illinois email account and provide them with information about relevant campus resources.

(b) Alcohol and Other Drug Transport Referrals

(1) The Office for Student Conflict Resolution (OSCR) may mandate that a student complete an alcohol and other drug assessment if:

(A) The student becomes incapacitated as the apparent result of alcohol or other drug use; and

(B) Emergency medical personnel are summoned to transport the student to a hospital for emergency care; and

(C) The student is in fact transported to the hospital for emergency care or refuses to accept such transportation when recommended by the emergency medical personnel.

(2) Procedures

(A) The attending or responsible university employee who becomes aware of facts stated in subsection (b)(1) above must notify the Office for Student Conflict Resolution (OSCR) of the student's name and the circumstances of the student's incapacitation. Other individuals, including law enforcement officers and emergency medical personnel, may also submit to OSCR reports of student emergency transportation or refusal to accept such transportation.

(B) OSCR will evaluate any report received to determine if the criteria for a mandatory assessment have been met.

(C) If a mandatory assessment is warranted, OSCR will notify the student via their official University of Illinois email account of the requirement. This notification will include relevant deadlines; enforcement mechanisms for noncompliance, including but not limited to registration holds; and instructions for appealing (See subsection (c) below.).

(3) In accordance with the Office for Student Conflict Resolution's Medical Amnesty & Survivor Protections Policy, students who complete a mandatory alcohol and other drug assessment will not face disciplinary action for their personal substance use, absent the exceptional circumstances described in that policy. See the Office for Student Conflict Resolution's website for additional details.

(c) Appeals of Mandatory Assessments. A student may appeal an assessment mandated under subsections (a) or (b) above within three business days of the date they were notified of the requirement by submitting a written appeal to the Dean of Students (or designee). In reviewing an appeal, the Dean of Students (or designee) may consult with appropriate campus professionals. The Dean of Students (or designee) will render a decision as soon as is practicable. The decision of the Dean of Students (or designee) is final and not subject to further appeal.

### § 2-103 Student Health Insurance

(a) The university Board of Trustees requires all students, except as allowed in § 3-506(c), to be covered by health insurance, either through a program provided by the university or one determined to be compliant with the Affordable Care Act (ACA).

(1) If the ACA is repealed or amended during any academic year, the university will review any law replacing it to determine what impact, if any, the new law has on the university's existing policies and practices and will notify the university community, including its students, as soon as practicable. Additionally, the university will work to revise this policy in line with the new law prior to the beginning of the next academic year.

(b) The fee for the Student Health Insurance Plan is assessed along with other tuition and fees. For graduate students, waiver-generating appointments include partial payment of the Health Insurance Fee.

(c) Coverage extends, including semester breaks, from the Saturday before the first day of classes for a given semester and terminates at midnight on the Friday prior to the next consecutive semester's coverage date. The summer term is considered a semester.

(d) Plan benefits are detailed in the Student Health Insurance Plan brochure hosted on the Student Health Insurance website, https://si.illinois.edu. The fee/premium is charged per semester. The summer term is considered a semester. No semester amount can be prorated.

(e) All changes to the plan, waiver of the fee, extension of coverage, and purchase of dependent coverage, must be completed during the semester's Enrollment /Change Period, which is posted on the website, https://si.illinois.edu. All changes must be completed according to the Student Health Insurance policy. Changes attempted by any other means will not be valid. Requests for changes included with tuition and fee payments will not be valid. Refer to the Student Health Insurance website at https://si.illinois.edu or call the Student Health Insurance office for details on insurance enrollment/change procedures.

(f) Students who wish to cover their dependents must purchase dependent insurance each semester during the Insurance Enrollment/Change Period. The summer term is considered a semester.
(1) Dependent coverage is only available if the student is covered, through registration or extension, by the Student Health Insurance Plan for the requested semester.
(2) Dependent coverage must be purchased during the Insurance Enrollment/Change Period, or within thirty-one days of acquiring a new dependent (marriage, birth, adoption, civil union, and entry into the U.S.).
(3) For dependents added after the Enrollment/Change Period, coverage becomes effective on the date of application and receipt of premium.
(4) Students wishing to enroll eligible dependents must submit approved documentation to the Student Insurance office before dependent enrollment can be completed. Each dependent needs to be verified only once. Once the Student Insurance office verifies dependent status, the student will be able to enroll said dependent(s) into their health insurance plan. A list of approved documentation can be found on the Student Health Insurance website: si.illinois.edu.

(g) Students who wish to apply for extension of coverage beyond the last semester enrolled and insured must apply for that extension during the specified dates given on the Student Health Insurance website at https://si.illinois.edu. Extension of dependent coverage must also be completed during that time. Only one consecutive semester of coverage beyond the semester for which the student was enrolled and assessed the fee can be granted.

(h) If a student wishes to opt out from the Student Health Insurance Fee, a waiver application must be completed and approved within the Insurance Enrollment/Change Period for the semester. A student who wishes to opt out from the fee must present health insurance coverage that is compliant with the ACA. Other coverage must meet the "Comparable Requirements" listed on the Student Insurance website (https://si.illinois.edu). The policy must be in force on or before the first day of coverage for the semester for which the waiver is being requested.

Evidence of ACA compliant health insurance coverage must be a copy of the schedule of medical benefits and a certificate of coverage or notice on company letterhead from the employer or company certifying coverage of the student. The waiver will continue in effect until the end of that academic year. If waiver from the Student Health Insurance Plan is approved, the student is responsible to maintain ACA compliant health insurance coverage while enrolled in the University of Illinois.

(i) Reinstatements are for students who have completed a waiver by showing proof of other ACA compliant health insurance and now wish to reinstate themselves into the Student Health Insurance Plan. Reinstatements must be done in person. No forms are available on the Student Health Insurance website. There are two ways to reinstate:

(1) Change of Status Reinstatement. Students who are in opted-out status from the Student Health Insurance Plan and want to be reinstated to the plan may apply by providing proof of loss of other insurance; i.e., notice of termination of insurance from the insurance company or employer. This must be done within 63 days of such loss of other insurance. Enrollment is guaranteed with coverage effective on the date of application or date of termination of other insurance, whichever is later. Students must be registered for the semester they wish to reinstate, and they must be eligible to be assessed the fee. Change of status reinstatement can be done throughout the semester, based on the termination of your other health insurance. The full semester fee will be charged.

(2) Enrollment/Change Reinstatement. Students who are in opted-out status from the Student Health Insurance Plan, and who want to be reinstated to the plan, MUST apply during the Insurance Enrollment /Change Period for the semester they wish to reinstate. They must be registered for the semester they wish to reinstate, and they must be eligible to be assessed the fee.

### § 2-104 Policy for Individuals With Contagious Diseases

(a) It is the policy and practice of the university to protect the public health on the campus and to respect the privacy rights and medical needs of individuals with contagious diseases.

(b) If modifications or restrictions of activities are warranted, procedures appropriate to the rights of the specific individual (student, nonacademic employee, faculty member, etc.) will be followed.

(c) Specific recommendations concerning academic, employment, and extracurricular activities of students with contagious diseases at the university are the responsibility of the Director of the Health Center in consultation with the patient's primary physician. In the event the Director of the Health Center is not a licensed physician, the authority and responsibility will be vested in the Medical Director of the Health Center.

(d) The Health Center will be responsible for complying with current standards of medical practice and public health guidelines from recognized authorities (e.g., Centers for Disease Control and Prevention, World Health Organization, etc.), and for using appropriate community/university resources as needed.

### § 2-105 Policy and Procedures for Medical Withdrawal

(a) The University of Illinois Urbana-Champaign (the university) is committed to supporting the health, safety, and welfare of its students and preserving the integrity of its learning environment. The purpose of a medical withdrawal is to provide students time away from campus for the treatment of a physical or mental health condition that significantly impacts their ability to function safely or successfully as a member of our community. The university has designed this policy to ensure that students are given the individualized attention, consideration, and support needed to address health issues that arise or escalate during their time at the university.

(b) Medical withdrawal is voluntary, and the decision to pursue a medical withdrawal shall be at the sole discretion of the student.

(c) A student is eligible for a medical withdrawal only when the following conditions have been met:

(1) The student has experienced a physical or mental health condition that significantly impacts their ability to function safely and/or successfully as a member of the university community;

(2) The student requires time away from campus for the treatment of said health condition;

(3) The student is seeking a withdrawal from the semester in which they are currently enrolled;

(4) The student initiates the request on or before the last day of classes for the term and has not taken any final exams; and

(5) The student has documentation from a treating healthcare provider attesting to and in support of the medical withdrawal.

(d) Procedures for Medical Withdrawal

(1) To request a medical withdrawal, the student must submit a petition online at https://go.illinois.edu/medicalwithdrawalrequest. As part of the petition, the student must:

(A) Submit a statement that addresses:

(i) Why they are requesting a medical withdrawal; and

(ii) Describes how they will spend the time away from campus, focusing specifically on what they will do to address the circumstances that led to the withdrawal;

(B) Provide a completed Academic Information Form

(C) Give explicit permission for the Office of the Dean of Students and McKinley Health Center to share any and all information pertinent to the medical withdrawal request;

(D) Give explicit permission for the Office of the Dean of Students and the student's academic college to share any and all information necessary for processing the medical withdrawal request; and

(E) Provide recent documentation from their treating, licensed healthcare provider that includes, at a minimum:

(i) The student's relevant medical history;

(ii) The approximate date of the onset of the condition (or, if a chronic condition, the date the condition was exacerbated);

(iii) An explanation of how the medical condition significantly impacts the student's ability to function safely or successfully as a member of the university community;

(iv) Current prescriptions and treatment;

(v) Treatment plan for medical withdrawal period;

(vi) Expected outcome of the treatment during the medical withdrawal period;

(F) McKinley Health Center reserves the right to request additional documentation

(2) After receipt of all required documentation, McKinley Health Center will conduct a timely individualized review of the student's medical documentation and will rely heavily on information received from the student's treatment provider. If McKinley Health Center determines that the student meets the conditions set forth in subsection (c), McKinley Health Center will notify the Associate Dean of Students (ADOS) of their recommendation for medical withdrawal, the effective date of withdrawal, any conditions the student must meet before returning to the university, and the rationale for those conditions. If McKinley Health Center determines that the student's documentation does not meet the criteria set forth in subsection (c), McKinley Health Center will notify the ADOS of their recommendation against medical withdrawal and will provide an explanation for this decision.

(3) If, for non-medical reasons, the ADOS does not agree with McKinley Health Center's recommendation, the ADOS will communicate their concerns in writing to McKinley Health Center and request revisions as appropriate. If, after reviewing the revised recommendation, the ADOS still does not agree, they will then decide whether to accept the recommendation, reject the recommendation, or modify the recommendation. In making this decision, the ADOS will not substitute their judgment for McKinley Health Center's on any medical matters.

(4) The ADOS will email official notification of the decision to the student's university email address. If the ADOS has denied the medical withdrawal, this notification will include a rationale for the denial and information about the appeal process (see subsection (e)). If the ADOS has approved the medical withdrawal, this notification will include the effective date of the withdrawal, the conditions for return (with a rationale), and information about the re-entry process. The student will have five business days to communicate their acceptance of the withdrawal and all conditions to the ADOS in writing. If the student does not accept the withdrawal in writing the medical withdrawal is not approved.

(5) If the student accepts the medical withdrawal, the ADOS will then notify the student's college in writing. This communication will include the decision, the effective date of the withdrawal, and the first semester for which the student may request to return.

(6) From the date of receipt of all required documentation, this process shall take no longer than three weeks, unless the ADOS can show good cause for the delay.

(e) Appeal Process
 (1) A student may appeal a denial of medical withdrawal to the Dean of Students/Associate Vice Chancellor for Student Affairs (DOS) within five business days of the date of email notification. To do so, the student must submit a written request by email to helpdean@illinois.edu, which must include the reasons for the appeal and any supporting documentation, to the DOS by the deadline.
 (2) The DOS will promptly review all appropriate records and documentation and confer with McKinley Health Center staff and other appropriate campus professionals. The DOS will then decide whether the medical withdrawal should be approved and will communicate the decision to the student in writing as soon as is reasonably practicable. The DOS's decision is final and is not subject to further review.
 (3) From the date of receipt of the appeal, this process shall take no longer than two weeks, unless the DOS can show good cause for the delay.

(f) Return to the University
 (1) A student who has medically withdrawn from the university must petition to return by completing an online form https://go.illinois.edu/medicalre-entry. For a student's petition to be considered, the student must:
  (A) Describe how they spent their time away from campus, focusing specifically on what was done to address the circumstances that led to the withdrawal;
  (B) Give explicit written permission for the Office of the Dean of Students and McKinley Health Center to share any and all information pertinent to the petition;
  (C) Give explicit written permission for the Office of the Dean of Students and the student's academic college to share any all information necessary for evaluating the petition; and
  (D) Provide documentation, which must be current within 90 days of its submission, from a licensed healthcare provider that includes, at a minimum:
   (i) Documentation regarding their work with the student;
   (ii) Documentation regarding the student's clinical status;
   (iii) A statement of opinion as to the student's readiness to resume academic study and university life; and
  (E) Submit any other documentation necessary to demonstrate that the conditions for return have been met.
  (F) Submit all materials by the deadlines below:
   (i) November 15 for Spring semester return
   (ii) April 15 for Summer semester return
   (iii) June 15 for Fall semester return
 (2) McKinley Health Center will conduct an individualized review of the student's medical documentation and will rely heavily on information received from the student's treatment provider. McKinley Health Center reserves the right to speak with students in person, by phone, or virtually. McKinley Health Center also reserves the right to request additional documentation from a healthcare provider. If, based on this review, McKinley Health Center determines that the student's medical condition is either resolved or addressed to such an extent that the condition is no longer significantly impacting the student's ability to function safely and/or successfully as a member of the university community, McKinley Health Center will notify the ADOS of their decision to approve the student's petition to return from medical withdrawal. If McKinley Health Center determines that the student's medical condition has not been addressed to such an extent that the condition is no longer significantly impacting the student's ability to function safely and/or successfully as a member of the university community, McKinley Health Center will notify the ADOS of their decision to deny the student's petition to return from medical withdrawal and will provide an explanation for the decision.
 (3) The ADOS will issue a decision letter to the student in writing, sent to the student's email address. If approved for return, the letter will include the decision, suggested campus resources, the day/time of a transition meeting with staff in the Office of the Dean of Students, and the name and contact information for a person in their college for further academic and registration assistance.
 (4) At this time, the ADOS will also issue a decision letter in writing to the student's college.

(5) If the student's request for return is denied, the letter will include the decision, rationale for the denial, recommendations that will enhance the student's chance of a positive recommendation the next time the student's request is considered, and appeal criteria and procedures.
(6) A student may appeal a denial of their petition to return to the Dean of Students/ Associate Vice Chancellor for Student Affairs (DOS) within five business days of the date of the emailed decision letter. To do so, the student must submit a written request via email to helpdean@illinois.edu, which must include the reasons for the appeal and any supporting documentation by the deadline.
(7) The DOS will promptly review all appropriate records and documentation and confer with appropriate campus professionals. The DOS will decide whether the ADOS decision should be overturned and will communicate the decision to the student in writing as soon as is reasonably practicable. The DOS's decision is final and is not subject to further review.
(8) From the date of receipt of the appeal, this process shall take no longer than two weeks, unless the DOS can show good cause for the delay.

**§ 2-106 Policy and Procedures for Retroactive Medical Withdrawal**

(a) The University of Illinois Urbana-Champaign (the university) is committed to supporting the health, safety, and welfare of its students and preserving the integrity of its learning environment. The purpose of a retroactive medical withdrawal is to provide academic relief for students who experienced a significant physical or mental health condition that significantly impacted their ability to function safely or successfully as a member of the university community. The university has designed this policy to ensure that students are given the individualized attention, consideration, and support needed to address health issues that arise or escalate during their time at the university.

(b) Retroactive medical withdrawal is voluntary, and the decision to pursue a medical withdrawal shall be at the sole discretion of the student.

(c) A student is eligible for a retroactive medical withdrawal only when the following conditions have been met:
(1) The student experienced a physical or mental health condition that significantly impacted their ability to function safely and/or successfully as a member of the university community;
(2) The health condition was debilitating (i.e. hospitalization and/or catastrophic event) and of a duration that rendered completion of the semester, even with accommodations, unmanageable;
(3) The health condition itself or the timing of the diagnosis of the health condition prevented the student from withdrawing in a timely manner;
(4) The student has documentation from a treating healthcare provider attesting to and in support of the retroactive medical withdrawal;
(5) The student has documentation from a healthcare provider attesting to their inability to withdraw according to published deadlines for withdrawal during the semester of attendance; and

(d) Except in extraordinary circumstances, students are only granted retroactive medical withdrawals if their request is submitted within one year of the last day of class for the semester in which the withdrawal is sought. Students who were unable to submit a request during this time period may request an exemption by submitting, along with the materials described in § (e)(1) below, an explanation of why they were unable to do so within one year and any supporting documentation.

(e) Procedures for Retroactive Medical Withdrawal
(1) To request a medical withdrawal, the student must submit a petition online at https://go.illinois.edu/retroactivemedicalwithdrawalrequest. As part of the petition, the student must provide the following:
(A) A personal statement that:
(i.) Explains why they are requesting a retroactive medical withdrawal;
(ii.) Explains why they were unable to withdraw according to published deadlines; and

(iii.) Describes how they addressed or are addressing the circumstances that led to the request for retroactive medical withdrawal.

(B) A completed Instructor Statement Form for each class for the semester in which they are requesting withdrawal;

(C) Give explicit permission for the Office of the Dean of Students and McKinley Health Center to share any and all information pertinent to the medical withdrawal request;

(D) Give explicit permission for the Office of the Dean of Students and the student's academic college to share any all information necessary for processing the medical withdrawal request; and

(E) Provide documentation from their treating, licensed healthcare provider that includes, at a minimum:

(i.) The student's diagnosis and relevant medical history;

(ii.) The approximate date of the onset of the condition (or, if a chronic condition, the date the condition was exacerbated) giving rise to the circumstances surrounding the request for a retroactive medical withdrawal, and the dates through which such condition(s) continued; and

(iii.) An explanation of how the medical condition significantly impacted the student's ability to function safely or successfully as a member of the university community, why it warrants the action sought, and how the medical condition impacted the student's ability to withdraw according to published deadlines.

(F) Within one month of receipt of all required documentation, McKinley Health Center will conduct an individualized review of the student's medical documentation and determine whether the student meets the conditions set for in subsection (c). McKinley Health Center will rely heavily on information received from student's treatment provider in making this determination. McKinley Health Center will then notify the Associate Dean of Students (ADOS) of their recommendation for or against retroactive medical withdrawal. If McKinley Health Center determines that the student's documentation meets the criteria set forth in subsection (c), McKinley Health Center will include the effective date of the withdrawal, any conditions the student must meet before registering for future semesters, and the rationale for those conditions. If McKinley Health Center determines that the student's documentation does not meet the criteria set forth in subsection (c), McKinley Health Center will provide an explanation for their recommendation.

(G) Upon receipt of McKinley Health Center's recommendation, the ADOS will convene a committee consisting of the ADOS, a representative of the Office of the Provost, and a representative of the student's college, to review McKinley Health Center's recommendation. This committee will make all decisions by simple majority vote.

(H) If, for non-medical reasons, the committee does not agree with McKinley Health Center's recommendation, the committee will communicate its concerns in writing to McKinley Health Center and request revisions as appropriate. If, after reviewing the revised recommendation, the committee still does not agree, it will then decide whether to accept the recommendation, reject the recommendation, or modify the recommendation. In making this decision, the committee will not substitute its judgment for McKinley Health Center's on any medical matters.

(I) The ADOS will email official notification of the committee's decision to the student's university email address. If the committee has denied the retroactive medical withdrawal, this notification will include a rationale for the denial and information about the appeal process (see subsection (e)). If the committee has approved the medical withdrawal, this notification will include the effective date of the withdrawal, the conditions for return, a rationale for any conditions, and information about the re-entry process. The student will have five business days to communicate their acceptance of this withdrawal to the committee in writing. If the student does not accept the withdrawal in writing the retroactive medical withdrawal is not approved.

(J) If the student accepts the retroactive medical withdrawal, the committee will then notify the student's college in writing. This communication will include the decision, the effective date of the withdrawal, and the first semester for which the student may request to return (if applicable).

(K) From the date of receipt of all required documentation, this process shall take no longer than two months, unless the committee can show good cause for the delay.

(f) Appeal Process
(1) A student may appeal a denial of a retroactive medical withdrawal to the Dean of Students/Associate Vice Chancellor for Student Affairs (DOS) within five business days of the date of email notification. To do so, the student must submit a written request by email to helpdean@illinois.edu, which must include the reasons for the appeal and any supporting documentation, to the DOS by the deadline.
(2) The DOS will promptly review all appropriate records and documentation and confer with McKinley Health Center staff and other appropriate campus professionals. The DOS will then decide whether to overturn decision and will communicate the decision to the student in writing as soon as is reasonably practicable. The DOS's decision is final and is not subject to further review.
(3) From the date of receipt of the appeal, this process shall take no longer than two weeks, unless the DOS can show good cause for the delay.

(g) Return to the University
(1) If the student was not enrolled at the time they were approved for retroactive medical withdrawal and the committee set conditions for their return, the student must follow the procedures as outlined in § 2-105(f).

## PART 2. HOUSING POLICIES

### § 2-201 Certified Single Student Housing

(a) Certified Student Housing
Certified housing is housing that meets the following criteria:
(1) The facilities are certified for compliance with municipal health and safety codes, municipal minimum housing standards, and the University of Illinois Certified Housing Standards (available from the Housing Information Office).
(2) The property owner or a designated representative, who may be the head of the unit student government, is registered with the Housing Information Office.
(3) The housing unit is operated in compliance with the university's policy regarding nondiscrimination.
(4) The housing unit is physically designed primarily for single individuals, as opposed to family occupancy; such housing units include university residence halls, fraternities, sororities, and privately owned student residences.
(5) Residence in the housing unit is restricted to university students, except when the Vice Chancellor for Student Affairs or designee waives this provision.

(b) Housing Requirement
All first time attending undergraduates must live in housing that has been certified by the Vice Chancellor for Student Affairs or designee for the entire academic year.
First time attending Undergraduates are defined as:
(1) Degree-seeking students who:
(A) apply for admission while attending high school, regardless of the amount of college credit earned, including advanced placement or similar programs;
(B) are enrolled in the fall term and who attended college for the first time in the prior summer term; or
(C) since graduating from high school, have not attended another postsecondary institution as a degree-seeking undergraduate student.
(2) Degree-seeking transfer students who apply for admission while attending a post secondary institution, but who have earned fewer than 30 hours of college credit (excluding academic credit earned by advanced placement, examinations, or similar programs.)

(c) Exceptions to this policy include:
(1) Undergraduates who have reached the age of 21 by August 15 of the first term in which they are registered for classes.

(2) Undergraduates who have elected eight or fewer credit hours during a regular academic semester.
(3) The following additional exceptions require submission of a first-year student live-on requirement exemption waiver application for official review and are subject to approval:
(A) Undergraduates living with a parent or a legal guardian within 40 miles of the Urbana-Champaign campus.
(B) Undergraduate students who are married or in a documented domestic partnership and are living with their partner.
(C) Undergraduate students who have lived in a residence hall at another collegiate institution for two or more semesters.
(D) Other extenuating circumstances not listed above.

(d) Additional Regulations for Certified Housing
(1) Residents of certified housing units shall abide by university policies and regulations and local, state, and federal laws with regard to the possession and use of alcoholic beverages, cannabis and controlled substances, and the possession of weapons. (See §§ 1-305 through 1-309.)
(2) All students shall comply with published university policies and municipal fire safety codes with special regard for emergency evacuation, fire and safety devices, and parties and decorations. (See § 1-310.)
(3) Students living in certified housing may entertain guests in their living units subject to regulations established by the student government of the unit and approved by the Vice Chancellor for Student Affairs or designee.
(4) The student government of each living unit (or the residents, in the absence of a student government) may establish regulations concerning social conduct that are consistent with requirements of the landlord or management.

### § 2-202 Living Quarters of Students
(a) Current Contact Information
Registered students are responsible for maintaining in the Office of the Registrar the current addresses of their local residence and permanent home (or permanent mailing address) and the name and telephone number of another responsible adult the university can contact in the event the student is incapacitated. Students should promptly report all changes using the address maintenance feature in the student self-service system.

(b) Missing Persons
Each registered student may also maintain a confidential contact who will be notified by authorized persons in the event the student is declared missing pursuant to the Missing Student Notification policy.

## PART 3. REGISTERED ORGANIZATIONS AND ORGANIZATION FUND

### § 2-301 Classification of Organizations
This section defines those organizations that are authorized, under certain conditions, to use university facilities and services at Urbana-Champaign and to which these regulations and procedures apply. Upon review by an appropriate university designee, eligible organizations may be registered and assigned to one of the following classifications:
(a) University Organizations: All university colleges, schools, institutes, departments, divisions, and other academic administrative units and committees, and the Urbana-Champaign Senate and its committees.

(b) Campus Boards: Those governing and advisory boards that have been so designated by the Chancellor or the Chancellor's designee.

(c) Registered Organizations and Registered Student Organizations: Those incorporated and unincorporated organizations that have been registered under Section 2-303. A "Registered Organization" is one formed under subsection 2-303(a)(3)(B). A "Registered Student Organization" is one formed under subsection 2-303(a)(3)(C). Registered Organizations and Registered Student Organizations are not affiliated with the university.

(d) Related Organizations: Those specifically designated organizations or agencies that relate directly and continually to the university and that have been designated as follows by the Board of Trustees or its designee.
   (1) University-Related Organizations—Those organizations defined in the Legislative Audit Commission Guidelines adopted by the university, which include university foundations, athletic associations, alumni associations, and corporate outgrowths. Relationships between the university and university-related organizations are governed by the Legislative Audit Commission Guidelines.
   (2) Allied Organizations—Those organizations closely associated with the university that support specific aspects of the university's program and those governmental/professional and technical organizations or agencies whose activities contribute directly to the university's program. Relationships between allied organizations and the university shall be in accordance with guidelines promulgated by the Office of the Vice Chancellor for Academic Affairs.

(e) Campus-Community Organizations: Those organizations of which the majority of the members and a minimum of two officers must be affiliated with the university (students, faculty, staff, alumni, and spouses of those).

(f) Outside Organizations: All other organizations that have not been designated or registered as set forth in the preceding definitions.

**§ 2-302 Preamble**

(a) The commitment of the university to the most fundamental principles of academic freedom, equality of opportunity, and human dignity requires that decisions involving students and employees be based on individual merit and be free from invidious discrimination in all its forms, whether or not specifically prohibited by law.

(b) It is the policy of the university that Registered Organizations shall be in full compliance with § 1-106(a)(5). Solely for the purpose of determining whether a Registered Organization or Registered Student Organization has violated the policy stated in this subsection, the official name of a Registered Organization or Registered Student Organization, in and of itself, shall not be construed or interpreted as denying open membership or prohibiting participation in any program or activity. Each Registered Organization or Registered Student Organization must agree with the University of Illinois Statement of Nondiscrimination when applying for registered organization status.

(c) Benefits provided by the university to Registered Organizations or Registered Student Organizations include, but are not limited to, (1) a regular use of university facilities (buildings, grounds, services); (2) fund-raising privileges; and (3) use of the Organization Fund.

(d) Inquiries on Registered Organizations and/or Registered Student Organizations or this policy should be directed to the Department of Student Engagement.

(e) Extracurricular activities at the university are an integral element of its intellectual and educational purpose. To the extent possible, the university should provide encouragement and support to these activities by extending to them such services and facilities as are possible. A well-rounded extracurricular program supported by the university should create an environment in which students may take full advantage of their educational opportunities.

(f) University services available to Registered Organizations or Registered Student Organizations are too numerous and diverse to list in this Code. For information concerning these campuswide services, procedures for reserving space, interpretation of regulations governing Registered Organizations or Registered Student Organizations, and supportive resources that can be utilized for organizational projects, contact the Department of Student Engagement. Reservations offices may develop policies and practices regarding the use of university facilities for Registered Organizations or Registered Student Organizations, and questions regarding the use of university facilities may be directed towards the appropriate reservations office.

(g) Voluntary organizations of students, faculty, and staff are an essential part of a university community. They provide an extension of the educational activities of the university beyond the curricular program. The existence of a diverse group of such organizations is in the best interest of the university and its students. Provision for Registered Organizations or Registered Student Organizations status and its attendant privileges is made to encourage and facilitate the formation and operation of such organizations.

### § 2-303 Requirements for Registration for Registered Organizations and Registered Student Organizations

(a) To register with the university, organizations must annually file for registration status with the Department of Student Engagement. To qualify for registration, the organization must meet the following requirements:
- (1) The name of the organization must not be preceded by "University of Illinois," "Illinois," or any abbreviation thereof. The title "at the University of Illinois Urbana-Champaign," "at Illinois," or any abbreviation thereof, may follow the organization's particular name. Illini and Illinois may be used in the organization's name. This includes both how the organization is registered and how the organization refers to itself, or in any other way that the organization presents itself.
- (2) The organization must identify name(s) of the member(s) of the organization who shall be called "required officers."
- (3) The organization must abide by the following:
  - (A) that the required officers are authorized to act on behalf of the organization in its relations with the university.
  - (B) that Registered Organization membership is restricted to emeritus/a faculty, staff, and their spouses/partners. Only emeritus/a faculty and currently appointed faculty and staff may serve as officers and authorized agents. Such an organization is not eligible for funding allocations from the Student Organization Resource Fee (SORF) (§ 3-505(h)); or
  - (C) that Registered Student Organization membership is comprised of student members, and that student membership is restricted to currently enrolled students at the Urbana-Champaign campus or those who pay fees for services at the Urbana-Champaign campus. Only currently enrolled students may serve as officers. Such organizations are eligible for funding allocations from the Student Organization Resource Fee (SORF) (§ 3-505(h)).
  - (D) that neither the organization nor its members shall discriminate on any basis prohibited by § 1-106(a)(5).
  - (E) that the organization will make available to the Department of Student Engagement its constitutions, bylaws, rules, and statements of purpose, and articles of incorporation, if such documents exist.
  - (F) that the organization agrees to abide by the regulations governing Registered Organizations and Registered Student Organizations (§§ 2-301 through 2-318 and §§ 2-501 through 2-507).
  - (G) that the purpose of the organization does not violate any laws or university policies or regulations.

(b) Each Registered Organization and Registered Student Organization must re-register with the Department of Student Engagement as part of its respective annual re-registration period. Student Engagement will establish at least two registration cycles including corresponding registration periods, requirements, and deadlines. Filing for re-registration includes completing all requirements of registration by the established deadline.

(c) As provided in § 2-506, Registered Organizations and Registered Student Organizations must submit an Event Registration for review by the Department of Student Engagement for all income-generating projects or events involving the use of university facilities, setting the time, place, and date thereof. The Department of Student Engagement coordinates directly with facility managers by forwarding the respective Event Registrations once they have been reviewed and meet expectations.

(d) Registered Organizations and Registered Student Organizations are independent and autonomous from the university and are responsible for managing their own affairs. Registered Organizations and Registered Student Organizations are not affiliated with

the university, nor are they units or agents of the university, and they shall not represent themselves as such. Events and activities conducted by Registered Organizations and Registered Student Organizations shall not be considered university-sponsored. Except as provided in § 2-303(a)(1), Registered Organizations and Registered Student Organizations shall not be permitted to use the name University of Illinois, any abbreviations thereof, or any symbol identified with the university or to conduct its affairs in such a manner as to imply that the organization is an official agency or part of the university. This includes uses in promotional materials, clothing and/or website/electronic media.

(e) The president and treasurer of a registered student organization (RSO), as the signatories of the terms and conditions with the Department of Student Engagement for organization registration, bear the responsibility for communicating to the RSO membership the requirement to abide by the Student Code, posted university policy, and the non-discrimination policy (§ 1-108). However, all members of the of the RSO are individually accountable for adhering to these policies, regardless of their familiarity with the terms or any claim of insufficient communication from the president and treasurer. Membership in an RSO implies acceptance of and compliance with all university policies and regulations.

**§ 2-304 Sanctions of Registered Organizations**

(a) A Registered Organization and/or Registered Student Organization may be sanctioned for one or more of the following causes:
   (1) knowingly sponsoring, urging, or engaging in actions by individuals or organizations that violate university rules or regulations, including this Part.
   (2) knowingly sponsoring, urging, or engaging in actions on campus by individuals or organizations that violate local, state, or federal law
   (3) knowingly sponsoring, urging, or engaging in actions that substantially disrupt or interfere with the normal operation of the university or with the lawful activities of organizations or individuals authorized to use university facilities

(b) No Registered Organization or Registered Student Organization may be sanctioned except by action of the appropriate university authority after notice and opportunity for hearing in accordance with procedures adopted by the Senate Committee on Student Discipline or the Faculty Advisory Committee.

(c) The sanctions may include but are not limited to one or more of the following: warning; probation for a specified time; suspension of registered status for a specified time; revocation of registered status. Students involved with a Registered Organization and/or Registered Student Organization that is under disciplinary review, may also be reviewed individually by the Office for Student Conflict Resolution.

**§ 2-305 University Credit Policies**

Individuals, such as officers, who incur costs or expenses on their Registered Student Organization (RSO) or Registered Organization (RO) fund, shall be held personally responsible for payment should the RSO or RO lack funds in its custodial fund, other university fund accounts, or refuse to accept responsibility for the debt. Any deficit incurred within a RSO or RO fund must be cleared within thirty calendar days. No disbursements will be permitted from a Registered Organization's or Registered Student Organization's fund that is delinquent.

**§ 2-306 Alcoholic Beverages Policies**

As stated in § 1-306(c), all University of Illinois Urbana-Champaign students, Registered Organizations and Registered Student Organizations are subject to the alcoholic beverages policies stated in §§ 1-306 to 1-308. Individual students, Registered Organizations and Registered Student Organizations may be subject to disciplinary action for violations of these policies (See § 1-301(d)). In addition, the following regulations apply to Registered Organizations and Registered Student Organizations.

(a) Registered Organizations and Registered Student Organizations events supported in part by alcoholic beverage distributors, manufacturers, and retailers must be conducted in compliance with procedures and guidelines outlined by the Department of Student Engagement and the Campus Administrative Manual (CAM).

(b) Consistent with § 2-406(a), in promoting sponsored programs, a Registered Organization and Registered Student Organization may not use materials that: (1) advertise the availability of alcohol, or (2) contain information associated with solicitation for profit (for example, coupons, discounts, or commercial advertisements).

(c) Events involving the use of alcohol at Registered Organization and Registered Student Organization sponsored programs should subscribe to the philosophy of responsible and legal use of the beverages. Functions with alcohol should neither encourage any form of alcohol abuse nor place emphasis on quantity and frequency of use.

(d) A Registered Organization and Registered Student Organization may not use university resources to advertise or promote any event, the sole or primary purpose of which is the illegal consumption or overconsumption of alcohol. Such events include, but are not limited to, "bar crawls" and "happy hours."

**§ 2-307 Custodial Fund**

(a) Each Registered Student Organization (RSO) or Registered Organization (RO) has the option to establish a custodial fund which the university will manage on their behalf. A custodial fund is a fund held by the University of Illinois System in a purely custodial capacity as a fiscal agent for the owner of the money. In other words, all financial activity taking place in a custodial fund is not part of the University of Illinois System. All revenue, expense, or other financial activity recorded in a RSO or RO fund belongs to the owner of the RSO or RO, not the University of Illinois System.

(b) A custodial fund shall be the administrative responsibility of the Vice Chancellor for Student Affairs.

**§ 2-308 Registered Organization Administrative Custodial Fund – Purpose**

The Registered Organization Administrative Custodial Fund is a fiscal account that receives funds that supports registered organizations and registered student organizations. This fund hosts custodial funds, used to account for resources held by the university as custodian or fiscal agent for others, including student organizations. Registered Organizations and Registered Student Organizations may be granted the use of a custodial fund as mentioned in 2-305. The financial system of the Organization Administrative Custodial Fund is operated by the Department of Student Engagement and supported by University Accounting and Financial Reporting acting for the comptroller of the Board of Trustees, under the authority of the Board of Trustees, without liability of the university, in order to: (1) provide a depository for the safekeeping of Registered Organizations' and Registered Student Organizations funds, (2) consolidate and coordinate financial accounts of various organizations, (3) secure uniformity in accounting procedures and records, (4) maintain continuity of records of business officers and their successors,(5) aid organizations in keeping their activities on a sound financial basis, (6) ensure protection of interests of the state and the university in the use of its facilities, and (7) offer a service to organizations.

**§ 2-309 Organization Custodial Fund – Status**

(a) Under the authority of article II, section 3e, of the General Rules Concerning University Organization and Procedure, the Director of Student Engagement, or designee, is permitted to act as treasurer of student and other organizations affiliated with the university but in so doing shall not act on behalf of the university or as a university officer or employee, and shall not thereby create any liability on the part of the Board of Trustees of the University of Illinois. In all cases, the funds of such organizations shall be kept apart from the University of Illinois System funds.

(b) The Custodial Fund (successor to the Student Organization Fund established in 1923) has been established to handle the funds of all Registered Organizations and Registered Student Organizations at the Urbana-Champaign campus of the University of Illinois. Consistent with the understanding that all university facilities, premises, and services hereinafter referred to as university facilities are held in trust for the benefit of the people of Illinois, the philosophy for the regulations and procedures that follow is based on the principle that the use of all income or receipts of organization resulting from the use of university facilities will be consistent with the rules and regulations applying to all university funds.

### § 2-310 Organization Custodial Fund – Scope

(a) All funds received by a Registered Organization (RO) and Registered Student Organization (RSO) that are initially collected by the university, or received from, or directly or indirectly through, a university-related or RO/RSO, or generated in any way through the use of university facilities, are required to be deposited in the RO/RSO established Custodial Fund. Other funds, received by a RO or RSO and derived without the use of university facilities, including the collection of dues from the organization's own members, may at the option of the RO or RSO be deposited in the Custodial Fund, but if so deposited will be subject to the same rules, regulations, and policies governing mandatory deposits.

(b) The phrase "collected by the university" includes, unless otherwise specifically provided, here or elsewhere, student fees or other fees, and similar items the university assists in imposing or collecting for ultimate receipt by a Registered Organization or Registered Student Organization. The phrase "received from, or directly or indirectly through, a university-related Registered Organization and/or Registered Student Organization" includes funds transferred from one university-related or Registered Organization or Registered Student Organization to another. The phrase "generated in any way through the use of university facilities" excludes the collection of dues from the Registered Organization or Registered Student Organizations' own members and includes, but is not limited to, funds from (1) admission charges, ticket sales, registration fees, or any other money collected in connection with talks, lectures, entertainment, cultural, or other events on the campus, (2) receipts from the rental or sale of services or products on the campus, and (3) voluntary contributions or the proceeds of solicitations made on campus.

(c) Services of the Custodial Fund may be offered to university-related organizations with the approval of the director of Student Engagement. Other organizations may be offered the services of the Custodial Fund with the approval of the Chancellor. All references in § 2-310 of this rule applying to registered organizations apply to all other organizations participating in the Organization Fund.

(d) The Department of Student Engagement shall have primary responsibility for proper disbursement of all funds from the custodial fund, subject to review by University Accounting and Financial Reporting (UAFR). Individuals handling funds on behalf of an organization project utilizing university facilities shall be held personally accountable for such funds.

### § 2-311 Registered Organization Custodial Fund – Administration

(a) The comptroller or a designee shall serve as treasurer of the Organization Fund.

(b) The Vice Chancellor for Student Affairs or a designee shall serve as secretary of the Organization Fund.

(c) The operation of the Registered Organization Custodial Fund shall be under the direct supervision of the Department of Student Engagement along with accounting assistance provided by University Accounting and Financial Reporting.

(d) Requests for disbursements from the RSO Custodial Fund must be cosigned by the treasurer and the secretary of the RSO Custodial Fund, or their designees.

(e) The treasurer of the Registered Organization Custodial Fund shall select a depository bank and may invest, when advisable, the cash balance of the Custodial Fund over and above a working balance in any of those securities or investments in which the treasurer may—as provided under Illinois law—invest trust funds. Income from such investments, plus a service fee if necessary, shall be used to cover the direct expense of the administrative operation including, but not limited to voucher forms, receipt books, handbooks, printing, mailings, and other direct costs incurred in maintaining the operations and support for RO and RSO Custodial Fund. Income to the Custodial Fund not needed for the administrative operations shall be placed in a separate account designated as the Surplus Distribution Fund within the Registered Organization Custodial Fund. Up to one half of such income can be allocated by the Student Organization Advisory Board for the purchase of equipment or improvements to benefit Registered Student Organizations.

(f) Excess funds not currently needed by Registered Organizations and Registered Student Organizations may be separately invested by Registered Organizations and Registered Student Organizations through the treasurer of the Organization Fund, and such securities shall be held in the University Accounting and Finance Reporting according to appropriate policies and procedures of that office.

(g) The Student Organization Finance Center and University Accounting and Financial Reporting shall maintain a fund or funds as desired by each Registered Organization and Registered Student Organization. The Student Organization Finance Center shall be responsible for recording all deposits and disbursements. Registered Organization and Registered Student Organization treasurers may request their current balance at any time from the Student Engagement Student Organization Finance Center.

(h) The financial records, related documents, and accounts will be subject to audit by the university auditor.

### § 2-312 Purposes for Which Registered Organization Custodial Funds May Be Used

(a) The determination of the ways in which Registered Organization and Registered Student Organization Custodial funds are expended is largely the responsibility of the members of the Registered Organization and Registered Student Organization, subject to the general policies and procedures established by University Accounting and Financial Reporting, which acts in the name of the comptroller. While it is not possible to list all of the expenditure regulations, the items outlined below are listed to present the thrust of the regulations, and no attempt has been made to foresee all potential types of expenditures that may be requested. Therefore, authority to approve all expenditures remains with the Department of Student Engagement. Expenditures from the Registered Organization Custodial Fund must be for a lawful purpose and, in general, must:
   (1) be for payment for services rendered, or for material received,
   (2) be related to the educational goals and objectives of the university,
   (3) not be for the personal gain of an individual or individuals, except as payment for services rendered,
   (4) not be for the purchase of alcoholic beverages, or to enable or facilitate by any means the purchase of alcoholic beverages by any person,
   (5) not be for the purchase of weapons (as defined in § 1-309(b)), or to enable or facilitate by any means the purchase of weapons by any person, and
   (6) not be for the purchase of materials by, through, or from the university for resale to others.

(b) Requests for travel reimbursements must be for actual and necessary costs.

(c) All tax and legal matters relating to organization activities are the sole responsibility of the Registered Organization and Registered Student Organizations. Registered Organizations and Registered Student Organizations are not authorized to use the university's Employer Identification Number (EIN) or tax-exempt status. Funds deposited in the Organization Custodial Fund may not be used for donations to, gifts to, or support of charitable organizations, except with the special approval of the Chancellor. Currently, the Department of Student Engagement approves and supervises contributions to recognized charitable organizations.

(d) Funds may be transferred to another custodial fund provided that such transfer does not violate any university statutes or policies or this Code and does not provide the recipient organization with funds obtained in a manner otherwise prohibited to the recipient organization.

### § 2-313 Procedures for Registered Organization Custodial Fund Operations

(a) Access to Funds—All vouchers for funds from a Registered Organization or Registered Student Organization's fund must be signed by an authorized president and treasurer. Registered Organizations, presidents and treasurers must be faculty and/or staff. Presidents and Treasurers of Registered Student Organizations must be enrolled students.

(b) There is no need for a bond to ensure honest performance by treasurers of Registered Organization or Registered Student Organizations as each voucher processed is approved by the Student Organizations Finance Center and the treasurer of the Organization Fund for compliance with university rules and regulations.

(c) Deposits—Organizations' account treasurer(s) shall deposit applicable funds with the University Bursar, which will issue deposit slips showing the source of money deposited for entry in the Registered Organizations' or Registered Student Organizations' records.

(d) Disbursements—Registered Organizations and Registered Student Organizations' treasurer(s) will be given access to blank voucher forms by the Department of Student Engagement which they must use to request payments on properly approved bills against the organization's fund. These vouchers shall be completed and presented with an accompanying invoice or receipt to the Department of Student Engagement. That department shall
   (1) Confirm the organization is registered and in good financial standing;
   (2) Verify that the signature(s) are in place from the applicable members of the Registered Organization or Registered Student Organization
   (3) Ensure the expenditures are in compliance with the rules and regulations and
   (4) Transmit the approved voucher to University Payables for processing and generation of the check. All checks will be mailed by the university and require up to five university business days for processing. Vouchers under $1 will not be processed.
   (5) Student Engagement provides policies and guidelines for treasurers and requires all presidents and treasurers to attend mandatory trainings and workshops.

### § 2-314 Withdrawal of Registered Organization Fund Privileges
A Registered Organization or Registered Student Organization participating in the Organization Fund that does not follow the rules or regulations regarding the Organization Fund may have its Organization Fund privileges withdrawn by the appropriate university authority and be referred to the Office for Student Conflict Resolution, as applicable. For nonpayment of accounts, as provided under § 2-312, the actions taken may include a warning, a probation for a specified time, a suspension of right to use the Organization Fund for a specified time, or a revocation of right to use the Organization Fund, including in the latter instances the right to receive funds. Any such actions may be appealed through the conduct process that governs the entities. Additionally, guidelines are established by Student Engagement and outlined in the Department of Student Engagement website.

### § 2-315 Dormant Accounts
Any fund in the Organization Fund assigned to an organization that does not re-register for a period of at least three years will be closed. Any funds in the custodial fund at the time of closure will be transferred to the Organization Administrative Custodial Fund. Each year, the income generated from the Administrative Custodial Fund (as stated in § 2-309(e)) shall be used to help cover the direct expense of the fund operation. Excess interest will be retained in the Administrative Fund.

### § 2-316 Student Organization Advisory Board
(a) The purpose of the Student Organization Advisory Board is to foster intentional student engagement and involvement. The Student Organization Advisory Board provides feedback on pressing student issues that impact full engagement in the co-curricular experience. Meetings throughout the academic year encourage discussion on new initiatives and emergent issues. The Board's recommendations help to influence Department of Student Engagement goals, services, and overall effectiveness.

(b) The Board serves as a vehicle for information sharing and support between and among key student leaders, and advocates for university clubs and organizations.

(c) The Board encourages students, clubs and organizations to be contributors to an overall active student life on the campus.

(d) The Board encourages the exploration of programmatic efforts without taking away the ownership of events from sponsoring entities. Ultimately, the Board serves as a clearinghouse of information.

(e) The Board solicits and recommends fiscal support for student organization administration, operations and programming.

Membership of the Board shall consist of undergraduate and graduate students, faculty and staff that have interest and expertise in student organization matters. Student members shall be selected by annual application and interview. Membership shall include the following:

(a) The Vice Chancellor for Student Affairs or the Vice Chancellor's designee.

(b) Two faculty or staff, appointed by the Vice Chancellor or the Vice Chancellor's designee through the Student Affairs Committee process.

(c) Seven (7) students (graduate or undergraduate), selected from application and interview available in the fall and spring semesters.
  (1) Terms of student members shall be one year with vacancies filled via appointment by the Vice Chancellor for Student Affairs or a designee.
  (2) Terms of faculty and staff members shall be for no more than (3) consecutive years.
  (3) A chairperson of the Advisory Board shall be selected annually by the members of the board.

**§ 2-317 Functions of the Student Organization Advisory Board**

(a) Develops guidelines regarding the allocation of funds in the surplus distribution fund to Registered Student Organizations should there be excess funds.

(b) Assist Student Engagement is providing outreach and coaching to student organizations on a variety of leadership development topics to foster organizational success.

(c) Review and make recommendations to the Department of Student Engagement to improve existing policies and processes regarding student organizations.

(d) Advise the appropriate university or campus official(s) on all aspects of Student Organization engagement.

(e) Assist in strengthening communication among campus student organizations.

(f) Assist with the evaluation of student organizations in determining duplication in accordance with the Department of Student Engagement policy.

**§ 2-318 Annual Meetings**

An annual meeting of all RSOs will be called once a year to provide a review of the past year, make recommendations for any purchases from the Organization Fund surplus fund, should it be available, that has the greatest impact on the operations and success of student organizations.

(a) The chair and Director of Student Engagement shall serve as coordinators of the meetings.

(b) Registered Student Organizations in good standing may attend the annual meeting, however one person may not represent more than one organization, and one organization may not have more than one representative.

(c) The meeting may take place virtually or in person.

(d) As part of the annual meeting, attendees may:
  (1) Receive reports of the Organization Fund and the operations of the Student Organization Finance Center.
  (2) Vote on the expenditure proposal brought forth by the Advisory Board to enhance the student organization experience.
  (3) Transact such other business as the Advisory Board, or any organization through its accredited representative, may bring before the meeting.
  (4) A quorum consists of accredited representatives of at least 10 percent or 60, whichever is smaller, of those organizations that are in good standing.

## PART 4. UNIVERSITY PROPERTY AND FACILITIES – IN GENERAL

### § 2-401 Pets and Animals on University Property

(a) All dogs must be leashed and under the control of an individual. All dogs that are unleashed, or unattended if leashed, on university property may be impounded.

(b) Dogs on a leash and under the control of an individual are permitted on university grounds but are not permitted within university buildings. A loose dog trailing a leash, or one tied to a fixed object, is not under the control of an individual.

(c) Except for seeing-eye dogs, service animals, and animals in use in university laboratories or in veterinary clinics for official research, classroom, or observation purposes, dogs and other pets are not permitted within a university-owned or -leased building. Any unauthorized dog found within a university-owned or -leased building may be impounded. Single-family residential properties owned by the university are exempted from this requirement.

(d) Impounded dogs or other pets may be reclaimed by the owner upon the payment in full of all costs incurred as a result of the impoundment, including any veterinary expenses. The Champaign County Animal Services Facility, 210 S. Art Bartell Road, Urbana, IL 61802, (217) 384-3798, is the agency designated by the university for pick-up and impoundment of pets found in university buildings or on the campus.

(e) The owners of impounded dogs with identification or registration tags will be notified, if possible. Owners of dogs that are without means of identification may inquire at the university police station for information regarding impoundments.

(f) State of Illinois regulations require owners or managers of public food-service establishments to exclude dogs, cats, and other animal pets from such premises. Service dogs are excepted. When such pets are found in a university food-service area, they will be impounded.

(g) Those who have a concern about a particular dog should contact 9-911; those who wish to inquire about a dog that may have been impounded should call the University of Illinois Police Department, (217) 333-8911. Those with questions regarding the implementation of this policy should call the Executive Director of the Division of Public Safety, (217) 333-1216.

### § 2-402 Using Library Resources – Policies and Processes

The Library of the University of Illinois Urbana-Champaign (the Library) exists primarily to provide intellectual and physical access to information and services that support the university's educational mission. The Library provides students with an environment conducive to teaching, learning, research, study, and the conduct of university business. Students using the Library are expected to act responsibly, appropriately, and courteously in order to preserve the Library's environment, facilities, and collections as described in the Patron Conduct Policy: https://library.illinois.edu/geninfo/policies/patron_conduct/

The Library circulates library materials to the faculty, staff, and student body of the university. The privilege of borrowing materials for use outside the Library is given to all faculty, staff, students, and other persons accredited by the Library. Access to Library resources varies, and current policies are available through the Library website.

(a) Electronic Resources
Electronic resources made available by the Library to students are for activities that support the university's educational mission. The Library's ability to provide access, authorize use, and permit reproduction of licensed resources is subject to contractual agreements and U.S. Copyright Law. Contractual agreements, negotiated between the Board of Trustees of the University of Illinois and publishers or third-party brokers, allow students to access electronic resources for non-commercial, educational, scholarly and research purposes.

Student use of electronic resources made available by the Library must comply with the terms of license agreements. Students should be aware that publishers monitor use of electronic resources to ensure that the terms of their agreements are enforced. Breach of license may lead a publisher/vendor to turn off the university's access without warning.

*(Students who misuse commercially licensed electronic resources may be referred to appropriate campus disciplinary bodies and have access privileges suspended.)*

(b) Accessing Resources
 (1) A student ID card serves as a library card. The ID card can be used to access resources in the libraries of all three universities of the University of Illinois System or any libraries where the Library has a reciprocal borrowing relationship.
 (2) Upon presentation and validation of their current ID card, students have access to the main stacks, where a core subset of the Library's physical collections is stored. Any student may request to have materials retrieved for them from the stacks.
 (3) Some materials, due to their condition, scarcity, or value, may be restricted to building use only.
 (4) Some departmental libraries or locations may require students to show identification, register, and/or check bags and coats before using library materials.
 (5) A NetID is required for access to electronic resources from non-university machines or devices.

(c) Returning Library Materials
 (1) Library materials, with the exception of special items such as fragile materials, media materials, loanable technology, materials on reserve, and other short-term loans, can be returned to any library drop box on campus. Special items must be returned to the departmental library from which they were borrowed.
 (2) Interlibrary loan materials must be returned to the centrally designated location indicated when receiving the materials.

(d) Charges, Fees and Actions
 (1) Most library materials are not subject to accruing late, or overdue, charges. Exceptions include heavily used materials and building-use-only materials. If materials identified as being heavily-used or building-use only are not returned by the expected return time indicated in the Library's database, they will be assessed a late charge. Overdue notices are sent to borrowers as a courtesy only, and failure to receive one is not a reason for cancellation or reduction of late charges. Library fines such as late charges and lost book fees are subject to change without notice.
 (2) Lost library materials should be reported immediately to the departmental library from which they were borrowed. If the borrower cannot recover the materials within a reasonable period of time, the borrower will be charged the cost of replacing the items.
 (3) All charges for overdue and lost materials are forwarded to University Student Financial Services & Cashier Operations (USFSCO) for collection. Students wishing to appeal charges for overdue and lost materials may contact the Library Billing Office.
 (4) Students who steal or mutilate Library materials or violate any of these policies, or any other policies of the University of Illinois Urbana-Champaign, may lose their privileges to use the Library, be subject to university-imposed discipline, and/or be subject to criminal prosecution or other legal action, as appropriate.

### § 2-403 Smoke and Tobacco Free Campus Policy

(a) Smoking and the use of all non-combustible tobacco products and non-FDA approved nicotine delivery devices and products is prohibited on all Campus Property at the University of Illinois Urbana–Champaign, both indoors and outdoors, in university-owned vehicles and in privately-owned vehicles parked on Campus Property. The advertising, sale, or free sampling of Tobacco Products and non-FDA approved nicotine delivery devices and products are also prohibited on Campus Property. Littering the remains of Tobacco Products or any other related waste product on Campus Property is further prohibited. No individual or campus unit subject to this policy may discriminate or retaliate against any person who makes a complaint of a violation of this policy or provides information concerning a violation of this policy.
 (1) "Smoke" or "Smoking" means the carrying, smoking, burning, inhaling, or exhaling of any kind of lighted pipe, cigar, cigarette, cigarillos, hookah, beedies, kreteks, weed, herbs, electronic cigarettes, water pipes, bongs, cannabis or other lighted smoking equipment and includes products containing or delivering nicotine intended or expected for human consumption, or any part of such a product that is not a tobacco product as defined by Section 321(rr) of Title 21 of the United States Code, unless it

has been approved or otherwise certified for legal sale by the United States Food and Drug Administration for tobacco use cessation or other medical purposes and is being marketed and sold solely for that approved purpose. "Smoke" or "Smoking" does not include smoking that is associated with a native recognized religious ceremony, ritual, or activity by American Indians that is in accordance with the federal American Indian Religious Freedom Act, Sections 1996 and 1996a of Title 42 of the United States Code.

(2) "Non-FDA approved nicotine delivery devices and products" means any product or device containing or delivering nicotine or any other substance intended for human consumption that can be used by a person in any manner for the purpose of inhaling vapor or aerosol from the product. The term includes any such device, whether manufactured, distributed, marketed, or sold as an e-cigarette, e-cigar, e-pipe, e-hookah, or vape pen, or under any other product name or descriptor.

(3) "Campus Property" means any property owned, leased, occupied, operated or otherwise controlled by the University of Illinois, including but not limited to academic and auxiliary buildings, classrooms, laboratories, residences, residence halls, elevators, stairwells, restrooms, roofs, meeting rooms, hallways, lobbies and other common areas, hotel rooms and conference facilities, grounds, athletic complexes and facilities, exterior open spaces, shuttle buses, shuttle bus stops, university-owned parking garages and lots, driveways, loading docks, university-owned streets, sidewalks and walkways, and as set forth on the Smoke-Free Campus map, which is available at tobaccofree.illinois.edu. For purposes of this policy, "Campus Property" does not include enclosed campus laboratories, not open to the public, where the activity of smoking and tobacco use is exclusively conducted for the purpose of medical or scientific, health-related research, and the appropriate campus research oversight body has approved the inclusion of smoking and tobacco use in the program pursuant to the applicable procedures for such medical or scientific, health-related research program.

(4) "Tobacco Products" means products containing or delivering nicotine intended or expected for human consumption, or any part of such a product that is not a tobacco product as defined by Section 321(rr) of Title 21 of the United States Code, unless it has been approved or otherwise certified for legal sale by the United States Food and Drug Administration for tobacco use cessation or other medical purposes and is being marketed and sold solely for that approved purpose.

(b) This policy applies to any individual on Campus Property, including but not limited to students, faculty, staff, other employees, contractors, subcontractors, volunteers, visitors and members of the public, and is applicable twenty-four (24) hours a day, seven (7) days a week.

(c) The campus shall post notices bearing the international "No Tobacco" symbol or similar signage at critical areas across the campus, such as at building entrances. However, this policy applies to all Campus Property whether or not such notices are posted.

(d) Organizers of and attendees at public events, such as conferences, meetings, public lectures, social events, cultural events, and sporting events, as well as non-university events held on Campus Property must abide by this policy. Organizers of such events are responsible for informing attendees of this policy.

(e) An individual may inform someone Smoking or using Tobacco on Campus Property of this policy and request that the individual comply with the policy. To report non-compliant individuals, please call (217) 333-8911 to inform the University of Illinois Police Department.

(f) Individuals found to be noncompliant with this policy will be subject to a system of fines, sanctions, and an appeals process as set forth on the Smoke-Free Campus website.

**§ 2-404 Chalking Policy**

(a) The use of water-soluble chalk, easily removed by rain, for expressive activity regarding any non-commercial topic is permissible on university sidewalks. Chalking is prohibited:

(1) On university property other than sidewalks including, but not limited to, all vertical surfaces, buildings, walls, planters, doors, trash receptacles, steps, fountains, benches, tables, signs, poles, columns, bus stops, light posts, and trees; and

(2) Underneath any covering where chalk would not be washed away by rainfall.

(b) Chalking and other markings on university property that violate university policy or state or federal law are subject to removal by an authorized official of the university.

(c) Individuals must not remove or tamper with chalking done by another person or organization.

**§ 2-405 Protected Speech and Association**

(a) The right to speech and association protected by the First Amendment to the Constitution of the United States, such as peaceful protest and lawful demonstration, is recognized within the university community. The university retains the right to establish parameters to help provide a safe environment, protect property, and promote the proper functioning of the university's teaching, research, economic development and public service missions and business operations.

(b) Specifically, expressive activities protected by the First Amendment are permitted in outdoor, publicly accessible areas of university property subject to the restrictions in the Expressive Activity on Campus Policy in the Campus Administrative Manual.

**§ 2-406 Solicitation and Commercial Activity in University Residence Halls**

Solicitation or commercial activity is prohibited in university residence halls except under the following conditions:

(a) General Conditions for Canvassing
  (1) All canvassers shall register before canvassing. A canvassing permit will be issued if the applicant has completed the registration form, has not had a permit revoked in the last nine months, and agrees to abide by the general conditions for canvassing. Canvassers must first register in the Office of the Dean of Students (301 Turner Student Services Building). Second, canvassers must register with the Office of Residential Life, Clark Hall 300. Information regarding whom to contact within each unit may be obtained at registration with the Office of Campus Regulations.
  (2) Canvassers shall refrain from littering.
  (3) Canvassers shall conform with visitation regulations.
  (4) Canvassing may take place only between the hours of 2:00 p.m. and 10:00 p.m.
  (5) Canvassing is prohibited in dining rooms and meal lines, i.e., lines formed after entering a dining room.
  (6) Door-to-door canvassing is not permitted. Upon request to the housing unit, arrangements will be made to provide properly registered canvassers with space in high-traffic public areas of the residence hall.
  (7) Violation of any of these six conditions is cause for revocation of permission to canvass.

(b) Political Canvassing
  (1) Political canvassing includes, but is not limited to:
    (A) registering voters
    (B) soliciting signatures on a petition for purposes of legally qualifying an individual as a candidate.
    (C) campaigning for a political candidate for a municipal, township, school or other special district, county, statewide, or national election
    (D) presenting information (1) related to any amendment to the State of Illinois Constitution being presented for voter decision at a general election, or any amendment to the United States Constitution being presented for Illinois legislative decision; or (2) concerned with a public issue to be decided by a scheduled referendum in the governmental unit
    (E) representing candidates for the Urbana-Champaign Senate, student trustee, other offices for which students are the sole electorate, or student referenda.
  (2) Political canvassers shall not solicit contributions or attempt to sell, or advertise for purposes of sale, any item.
  (3) Canvassers campaigning for candidates wishing to schedule a formal meeting with a group of residents in public areas of a university residence hall must obtain permission from the hall student government or its duly authorized representative. The hall student government may impose limitations concerning time and location on

such meetings. The hall student government must follow procedures to reserve space with the appropriate housing authority of that unit.

If these canvassers represent candidates for the Urbana-Champaign Senate, student trustee, other offices for which students are the sole electorate, or student referenda, there must be equal time and opportunity given to canvassers representing all other candidates, or referendum positions, upon request.

(c) Mailbox Policy
Distribution of political literature in mailboxes of university residence halls for the purposes defined under subsection (b)(1)(D) above shall be guaranteed provided arrangements are made with the individual hall offices. Other literature may be distributed in accordance with the solicitation policy of each hall.

**§ 2-407 Posting and Distribution of Handout Materials**

Individuals may post written or printed materials regarding any non-commercial topic on general campus bulletin boards and general campus kiosks.

(a) Affixing or physically attaching written or printed materials to university property other than a designated area authorized by this policy, including but not limited to statues, doors, light posts, utility poles, walls, trees, and trash cans, is prohibited.

(b) Use of classroom bulletin boards is restricted to instructional information, as defined by the instructors who use that classroom. Classroom bulletin boards may not be used by other groups or individuals for other purposes.

(c) Use of unit bulletin boards that are assigned to specific university units is restricted to the assigned unit and may not be used by other groups or individuals for other purposes.

(d) The individual who posted material for an event or activity is responsible for ensuring that the material is removed within 48 hours after the event or activity.

(e) An authorized official of the university may remove and destroy the following posted materials:
   (1) Outdated, posted materials (e.g., materials publicizing a past event or activity);
   (2) Duplicate materials posted on the same general campus bulletin board or general campus kiosk as needed to create space for other university community members to post materials as permitted by this policy;
   (3) Any posted materials at the end of each semester;
   (4) Materials posted to the general campus kiosk located on the main university Quadrangle on a biweekly basis; and
   (5) Posted materials that violate university policy or state or federal law.

(f) Individuals must not remove, cover, or tamper with materials posted by another person or organization.

(g) Posting of written materials in residence halls is governed by applicable University Housing residence hall policies.

(h) Distribution
Individuals may distribute written or printed materials regarding a non-commercial topic on a person-to-person basis in outdoor, publicly accessible areas of university property. Individuals may distribute written or printed materials regarding a non-commercial topic on a person-to-person basis inside the common areas (g., foyers, vestibules, or hallways) of publicly-accessible buildings while open to the public. The interiors of computer labs, designated study lounges, classrooms, auditoriums, museums, theatres, lecture halls, offices, gymnasiums, retail shops, and dining or social reception halls, as well as mailboxes, are not "common areas" for this purpose.
   (1) Those individuals and groups engaged in the distribution of written materials must not litter and are encouraged to pick up any distributed materials dropped on the ground by others around the area of distribution.

(2) An authorized official of the university may remove any written materials left behind or unattended, and the university assumes no responsibility for the safety and care of such materials.
(3) Distribution of materials that violates university policy or state or federal law is prohibited.
(4) Distribution of written materials in residence halls is governed by applicable University Housing residence hall policies.

## PART 5. USE OF UNIVERSITY PREMISES AND FACILITIES

### § 2-501 Preamble

(a) All meetings or events utilizing university premises or facilities (collectively "University Property") shall be scheduled in accordance with the Campus Administrative Manual and this Code. It is the intent of these regulations to encourage optimal use of University Property in the furtherance of the university's educational, research, and public service mission without jeopardizing the overall condition or safety of University Property or its users. University Property shall only be used for private purposes or private gain in accordance with applicable law and university policies and procedures.

(b) Because these regulations cannot address all potential uses, the Chancellor has the authority to make exceptions to these regulations.

### § 2-502 Eligibility

Those organizations described in § 2-301, other than campus-community organizations, outside organizations, and individuals, may use University Property on the Urbana-Champaign campus in accordance with the facility use policies in the Campus Administrative Manual and these regulations. Campus-community organizations, outside organizations, and individuals shall be similarly eligible upon a finding by the facility Designated Official that the proposed event or activity is consistent with the rules and regulations referred to above and policies developed by the Chancellor's Special Event Advisory Committee. (See § 2-507.) The university's grant of permission to use University Property does not imply an endorsement of the purposes or viewpoints of the event or the sponsoring organization or individuals.

### § 2-503 Reservation Procedures

Those seeking use of University Property shall make their requests by following the reservation procedures set forth below.

(a) Requests from university organizations, campus boards, registered organizations, and related organizations shall be signed by a registered agent and shall be filed through a process determined by the Department of Student Engagement. Registered Organizations and Registered Student Organizations must first receive event approval from the Department of Student Engagement.

(b) Applicants other than recognized student organizations should submit a reservation request to the Designated Official of the proposed University Property. The Office of the Vice Chancellor for Administration and Operations maintains contact information for Designated Officials. Requests for space should be submitted in advance of the proposed event or activity to allow necessary evaluation and ample time for processing. Unless otherwise stated in an individual facility use policy, the Campus Administrative Manual or these regulations, requests should be submitted a minimum of 48 hours prior to the activity to allow ample time for processing. If event approval or special services are required, requests should be submitted at least one week prior to the activity. If specific staging or production services are required, advance filing of one month or more may be required. Student Engagement or the Designated Official receiving the request may refuse requests not submitted within the above time limits if it appears that proper review and clearance procedures cannot be satisfactorily accomplished.

(c) Upon receipt of a request for the use of University Property, the facility's Designated Official shall proceed as follows:
(1) Confirm applicant's eligibility to reserve space in accordance with this regulation and other applicable university policies;

(2) Confirm whether the requested space is available, suitable, and appropriate for the proposed activity or event, including but not limited to whether the space can accommodate the expected crowd size; anticipated noise level and impact, if any, on the academic activities or other university activities in the vicinity; impact on traffic; and any other relevant, viewpoint-neutral considerations;
(3) Recommend reasonable alternative spaces if necessary;
(4) Confirm that the proposed activity complies with applicable laws and university policies;
(5) Determine the need for additional support services regarding health and safety considerations, such as security;
(6) Advise on the need for special approvals; and
(7) Notify appropriate university stakeholders of reservations requests, including but not limited to Facilities and Services, Division of Public Safety, and University Risk Management.

**§ 2-504 The Priority System – Priorities for Use of Space**

(a) Except when outlined in other individual facility use policies or those listed below, the following priorities with respect to reservations of space shall be followed:

(1) the teaching, research, and public service programs of university organizations. In general, scheduled instructional usage shall take priority over all other uses.
(2) educational, informational, cultural, and recreational programs sponsored by university organizations, campus boards, registered organizations, and related organizations.
(3) approved events sponsored by (in order of priority) (1) campus-community organizations, (2) outside organizations, and (3) individuals.

(b) For space in the Illini Union, the following priorities with respect to reservations of space shall be followed:
(1) functions sponsored by the Illini Union Board.
(2) educational, informational, cultural, and recreational programs sponsored by university organizations, campus boards, registered organizations, and related organizations.
(3) the teaching, research, and public service programs of university organizations, including conferences.
(4) approved events sponsored by (in order of priority) (1) campus-community organizations, (2) outside organizations, and (3) individuals.

(c) For space in Foellinger Auditorium, the following priorities with respect to reservations of space shall be followed:
(1) scheduled classes between 8:00 a.m. and 3:00 p.m. Mondays through Fridays during the fall and spring semesters.
(2) final examinations during the fall and spring semester final examination period.
(3) evening examinations (Monday, Tuesday, Wednesday, Thursday). (To ensure other events are not precluded, a maximum of two evening exams per week will be scheduled. Additional evening exams may be scheduled within four weeks prior to the exam date, if space is available.)
(4) events involving a large expected attendance, or the need for theater facilities and production equipment.
(5) Other matters concerning the operation of the priority system may be developed by the management of Foellinger Auditorium.

(d) For space in the Activities and Recreation Center and the Campus Recreation Center-East, the following priorities with respect to reservations of space shall be followed:
(1) scheduled Kinesiology classes between 8:00 a.m. to 11:00 a.m. and 1:00 p.m. to 3:00 p.m. Monday through Friday during the fall and spring semesters.
(2) recreational programs sponsored by Campus Recreation.
(3) programs sponsored by recognized Club Sports organizations within Campus Recreation.
(4) programs sponsored by Registered Organizations and Registered Student Organizations.

(e) For space in the Complex Fields and Outdoor Center Fields, the following priorities with respect to reservations of space shall be followed: recreational programs sponsored by Campus Recreation.

(f) For space in the Ice Arena, the following priorities with respect to reservations of space shall be followed: scheduled Kinesiology classes between 9:30 a.m. to 11:00 a.m. and 1:00 p.m. to 3:00 p.m. Monday through Friday during the fall and spring semesters.

### § 2-505 Operation of the Priority System

(a) Reservations will not be accepted more than 24 months prior to the proposed event if the proposed date is during the time when the university is in or preparing to be in active session.

(b) Reservations will be confirmed under the following guidelines:
- (1) Reservations will be confirmed up to 12 months in advance of the proposed event if such date is at a time when the university is not in or preparing to be in active session.
- (2) Reservations for space in the Illini Union (for use between 7:00 a.m. and 3:30 p.m. on weekdays) for conferences or other university organizations may be confirmed up to 12 months in advance.
- (3) If the event is to take place in a space normally needed for instructional purposes at that time, reservations will be confirmed up to one month in advance of the proposed event with the following exceptions:
  - (A) Events taking place during the first three weeks of an academic session are not considered confirmed until forty-eight hours in advance.
  - (B) Events taking place after the first three weeks of an academic session are considered confirmed at the start of the fourth week of that session.
- (4) If the event is to take place in a space that is not normally needed for instructional purposes at that time, reservations will be confirmed after March 1 for events in the summer terms, after June 1 for events in the fall semester, or after November 1 for events in the spring semester.

(c) The university retains the right to cancel or change reserved space when it is needed for university use. Whenever possible, comparable space and prior notification of the change will be provided.

(d) Applications for use of unreserved space as defined in subsection (b)(4) above received prior to March 1, June 1, or November 1 will be honored in the order of priority as delineated in § 2-504, with applicants of equal priority being given equal consideration. Applications of equal priority will be honored in such a manner to ensure the most appropriate space usage for the programs involved in accordance with policies developed by the Chancellor's Special Event Advisory Committee. (See § 2-507.) If such an appeal is to be made, it must be submitted in writing and received by the chairperson of the committee within five school days after the notice of denial is given.

(e) Applications received after March 1, June 1, or November 1 will not displace any previously approved assignments except by mutual consent of the parties concerned or successful appeal to the Chancellor's Special Event Advisory Committee. (See § 2-507.) All applications for as yet unreserved space received within three months of the date of requested use will be handled on a first-come, first-served basis. Events so scheduled may be displaced only by mutual consent of the parties involved, or through successful appeal to the Chancellor's Special Event Advisory Committee.

### § 2-506 Requirements and Limitations

(a) All events to which the public will be invited and/or for which a fee will be charged must receive formal approval prior to the assignment of space and advertising of the event. Such approval shall be given only if each of the following requirements is satisfactorily met:
- (1) The proposed use of University Property is in accordance with these and other applicable university regulations and policies.
- (2) The sponsoring organization is financially able to sponsor the event.

(b) Review of proposed events to determine approval shall be made by the following:
 (1) Student Engagement for events to be sponsored by recognized student organizations.
 (2) the Designated Official of the University Property.

(c) Event denial may be appealed by the sponsoring organization to the Chancellor's Special Event Advisory Committee. (See § 2-507.) An appeal must be submitted in writing and received by the chairperson of the committee within five school days after the notice of denial is given. Any such appeal shall be made in good faith and based on an alleged procedural violation, bias, or viewpoint discrimination.

(d) If an outside organization requesting space has a local affiliate, the local affiliate shall participate in the arrangements and be responsible for the use of University Property in accordance with these regulations.

(e) To ensure the proper accounting and application of funds, the sponsoring organization of all events involving income or disbursement of funds shall conform to all university policies, procedures, and regulations as may be prescribed in the Campus Administrative Manual and in §§ 2-301 to 2-317 of these regulations.

(f) To help protect students, faculty, staff, and the public from foodborne illnesses while using University Property, all requests involving the dispensing of food not provided by regular university food services will require special clearance from Facilities and Services Safety and Compliance.

(g) Organizations and individuals using University Property must comply with all reasonable requests related to such usage made by university officials having responsibility for the property concerned. Such requests may include, for example, the employment of facility attendants.

(h) University Property shall not be used for benefit events, charitable or otherwise, except with the special approval of the Chancellor. (Benefit events are those events intended to raise money for uses other than the expenses of the sponsoring organization or the support of other university activities.)

(i) University Property shall not be used for any activity inconsistent with federal or state laws or university policies or regulations.

(j) Outside organizations and all individuals may not use facilities for the following:
 (1) Meetings scheduled on a regular basis.
 (2) Any meeting for the purpose of instruction that would normally be offered by or in cooperation with any university unit, unless the offering of the instructional program is approved by the appropriate university unit.
 (3) Entertainment and social activities, such as dances, that are not scheduled as a part of an approved meeting or activity unless approved or sponsored by a university organization.
 (4) Sports events unless approved or sponsored by a unit of the university.
 (5) Any meeting or event that would substantially interfere with or detract from events sponsored by university organizations, campus boards, registered organizations, or related organizations.
 (6) Solicitations, collections, fund drives, or any events for which an admission will be charged, even though the funds are for public benefit, except as permitted in the Facility Use Agreement.

(k) An organization or individual that has reserved use of University Property shall not assign the reservation or allow another organization or individual to use the University Property.

(l) Safety
 (1) Adequate provisions must be made for the safety of persons and property at an event on University Property. Such provisions are the responsibility of the individual or organization(s) sponsoring the event. Actions required to ensure safety, as determined by the Designated Official of the facility involved or by the campus administrative staff, shall be adhered to.

(2) The university may inspect and approve all physical arrangements in and on University Property for safety reasons. Information and advice in these matters may be obtained through Facilities and Services Safety and Compliance.

(m) Alteration of Facilities
(1) Organizations or individuals shall not make or contract to make any revisions or alterations to University Property or its utilities (electric, water, steam, air, and gas) in connection with a reservation. All such work must be approved in advance by an appropriate official of the facility involved and, if approved, must be accomplished by or under the supervision of Facilities and Services or the regular maintenance forces of the facility involved.
(2) Requests for work to be done must be submitted for approval at least 48 hours in advance of the event. Work requested, as well as any work immediately required to return the facilities in question to their original use condition, shall be done at the entire expense of the organization or individual sponsoring the event.

(n) Dining Facilities
Nothing in these regulations shall be interpreted to restrict dining in areas so designated for such use and operated by the university. Specific regulations governing the use of these facilities may be developed separately by appropriate administrative units, when and if conditions so warrant. In general, the Illini Union facilities are intended to be available only for use by students, faculty, staff, alumni, and their immediate families, and by official guests of the university.

### § 2-507 Committees Related to the Use of University Premises and Facilities
(a) Chancellor's Special Events Advisory Committee
(1) The Chancellor's Special Events Advisory Committee has as its purposes:
(A) Review of policies and reservations priorities regarding the use of university facilities, in accord with the provisions of this Part and Campus Administrative Manual.
(B) Review of appeals and the adjudication of conflicts arising from the application of policies regarding the reservation of University Property.
(2) The committee shall meet at least once each two calendar weeks while the university is in session.

## PART 6. MOTOR VEHICLES AND BICYCLES

### § 2-601 Operation of Motor Vehicles
(a) The parking or storage of a motor vehicle, or motorcycle in any university building or structure other than a designated parking structure is prohibited without the prior written authorization of the Parking Department. Such unauthorized parking or storage shall be considered abandonment, and the motor vehicle, or motorcycle shall be removed at the owner's expense by the Parking Department.

(b) Complete information concerning parking limitations and other details of the student automobile regulations, including monetary and other penalties for noncompliance or violations, is available from the Parking Department, 1201 West University Ave, Urbana, or visit the department's website at https://parking.illinois.edu.

### § 2-602 Automobiles
(a) Use
(1) The parking of motor vehicles and motorcycles in university structures or lots is controlled by signs posted at the entrances. Unless special approval is received under Section VIII-8 of the Campus Administrative Manual, parking on university property is permitted only in areas marked as university streets or as areas posted with signs designating specific parking area, unless otherwise restricted.
(2) During restricted hours a current virtual permit is required in motor vehicles parked in rental facilities. A current motorcycle rental permit must be displayed on motorcycles parked in designated motorcycle areas.

(3) No parking is permitted on most university-administered parking facilities from 2 a.m. to 6 a.m. except for persons on duty. Motor vehicles and motorcycles parked by those persons on duty must display current permits.
(4) Definition of an automobile: For the purpose of these regulations, an automobile is defined as any motor-propelled vehicle used for transporting persons or property but excluding motorcycles, motor scooters, and motor bikes.
(5) Possession of an automobile: Possession of an automobile is defined as physical control or operation of an automobile or the right to control or operate an automobile even though ownership is vested in a parent, a spouse, or another person.
(6) Visitor: Any individual other than faculty, staff, or student who desires to visit a facility administered by the university or an approved allied agency.

(b) Operation of an Automobile
(1) Any student operating an automobile on any street, drive, parking lot, or service area shall do so with due regard for the safety of pedestrians and in compliance with the motor vehicle laws of the State of Illinois, the traffic ordinances of the cities of Champaign and Urbana, and such other specific safety regulations as may be adopted by the University of Illinois.
(2) In addition to university action, any violation of a state or municipal law or ordinance may result in the arrest of the violator or a notice to appear before the appropriate state court.

(c) Parking of Student Automobiles
(1) Parking of student automobiles in the university lots is permitted as posted by appropriate signs at the entrance to each lot. Authorization to park in university lots does not extend to spaces on a twenty-four-hour rented basis.
(2) Students may purchase permits to park in certain designated lots included in the university "lot rental" program. Hours for required permits are contained on each lot entrance sign. Application must be made to the Parking Department, prior to parking in such lots.
(3) Students are permitted to park on any city street in accordance with the appropriate city regulations without any requirement that their cars be registered with the university.
(4) Students may purchase permits to park their automobiles in Lot F-23, located on Florida Avenue west of Lincoln Avenue; Lot E-14, located on the southwest corner of First Street and Kirby Avenue, and parking deck B04, located on University Avenue between Goodwin and Mathews. Parking in these three lots is available twenty-four hours per day. Application must be made to the Parking Department prior to parking in these lots.
(5) Refund of rental lot fees will be prorated upon a request made to the Parking Department.
(6) Visitors who wish to park overnight on university property must first obtain a temporary parking permit from the Parking Department.

### § 2-603 Use of Motorcycles (Including Motor Scooters and Motor-Driven Bicycles)

All motorcycles and mopeds must purchase a permit and park in designated "Motorcycle Parking Permitted" parking areas. These areas are designated on the campus map. Permits are effective July 1 of each calendar year and expire the last day in June of the following year.

### § 2-604 Parking Citations

(a) All Parking Department citations issued for violations of the university regulations may be paid online at https://parking.illinois.edu, over the phone at (217) 333-3530, in person at the Parking Department, 1201 W. University Ave., Urbana, or placed in any red fine box.

(b) The penalty for each automobile and motorcycle citation shall increase as stated on the citation unless paid within 10 days.

(c) Appeals for violations or other matters concerning these regulations may be made online at https://parking.illinois.edu. Appeals must be made within 30 days of citation issuance and only after the citation is paid. Appeals are heard by the Parking Appeals Board, which consists of volunteer faculty, staff, and student members.

**§ 2-605 Operation of Bicycles**

(a) Bicycles on campus must be operated at all times in accordance with the current University Bicycle Ordinance located at https://go.illinois.edu/bikeordinance.

(b) Bicycles must be parked and locked on campus only in an area that is designated by the presence of racks for bicycle parking at https://go.illinois.edu/bikeracks.

(c) Students must register bicycles for campus use at a one-time cost per bicycle, as described in the Bicycle Regulations CAM policy FO-13, and collect a tamper resistant and theft deterrent Shield sticker (bicycle registration tag) from one of the several locations. More information at https://go.illinois.edu/mybike.

(d) Bicycle theft should be reported to the University Police Department at (217) 333-1216.

**§ 2-606 Use of In-Line Skates, Roller Skates, and Skateboards**

(a) It is the university's position to allow use of in-line skates, roller skates, skateboards, and similar devices for transportation on campus in accordance with the guidelines cited below. Regulation of these devices is deemed necessary to reduce risk of injury and use that causes damage to university property. For their safety, and the safety of others, skaters are also expected to follow other applicable university regulations and local traffic laws. Skaters should wear proper safety equipment at all times. Questions about this Rule may be directed to the Office of Campus Risk Management at (217) 333-4660.

(b) Use of in-line skates, roller skates, or skateboards is generally permitted for transportation on campus. However, skating is strictly prohibited:
  (1) in all university buildings (skates should be removed prior to or immediately upon entry)
  (2) in all multi-level parking structures
  (3) in other areas in which this prohibition has been posted by the university to enhance personal safety, reduce property damage, or prevent interference with campus operations
  (4) if it is performed in a manner that indicates a disregard for the safety of others or damages property.

(c) Recreational use of in-line skates, roller skates, and/or skateboards by groups and/or individuals (i.e., skill demonstrations, sports/competitions, stunts, tricks, and uses other than transportation) is prohibited from building entrances, steps, stairs, ramps, walls, sidewalks, parking lots, and other general campus space except when formally schedule and approved by the appropriate campus unit(s). A list of proper authorities to ask for permission to use campus space may be found in Article 2, Part 5, Use of University Premises and Facilities, of the Code.

(d) Failure to comply with this policy or other applicable university guidelines and traffic laws may result in either or both of the following:
  (1) referral to the student disciplinary system;
  (2) Illinois Vehicle Code citations and/or arrest for any criminal offense(s).

## PART 7. CHANCELLOR'S EMERGENCY POWERS

**§ 2-701 Basis for Chancellor's Emergency Powers**

(a) The Chancellor, in consultation with the President, will place into effect policies, regulations, procedures, and measures deemed necessary or appropriate to meet an emergency, to safeguard persons and property, and to maintain educational and research activities. Examples of emergency measures include, but are not limited to, the imposition of curfew or other crowd-control measures, and the imposition of interim suspension upon any student where there is reasonable cause to believe the student has posed or may pose a significant threat to the health and/or safety of the campus community (including persons or property) or the student substantially threatens or interferes with the maintenance of appropriate order and discipline in university operations. Those students placed on interim suspension shall be given prompt written notice of allegations and the opportunity for a prompt hearing in accordance with 4.03 of the Student Disciplinary Procedures.

(b) The Chancellor, in consultation with the President, will institute and implement the necessary procedures for referral of such cases to the appropriate disciplinary processes. Disciplinary procedures may be invoked for violation of System or campus policies or regulations, whether or not such violations are also violations of law, and whether or not proceedings are or have been pending in the courts involving the same acts.

## PART 8. MISSING STUDENT NOTIFICATION POLICY

### § 2-801 Confidential Contact Identification

Each registered student may maintain in the Office of the Registrar a confidential contact who will be notified by authorized persons not more than 24 hours after the student is determined to be missing. Students may update confidential contact information in the student registration system. Only authorized University of Illinois System and law enforcement officials in furtherance of a missing person investigation may access this confidential contact information.

### § 2-802 Reporting a Suspected Missing Student

A person that suspects a student has been missing for 24 hours should contact the University of Illinois Police Department or the Office of the Dean of Students to make a report. Students in University Housing may also report the matter to the Resident Director. The Office of the Dean of Students and University Housing shall then immediately convey the information to the University of Illinois Police Department.

### § 2-803 Handling

If university law enforcement determines that a student, for whom a missing persons report has been filed, has been missing for 24 hours and has not returned to the campus, the university will notify the confidential contact as identified by the student in the student registration system, and appropriate university officials.

(a) For students under 18 years of age, the university must also notify a custodial parent or guardian not later than 24 hours after any student is determined to be missing, unless the student has been emancipated and has submitted proof of the same to the university.

(b) The university will notify other appropriate law enforcement agencies no later than 24 hours after a student is determined to be missing, including local law enforcement that has jurisdiction in the area that the student is reported missing.

A person that suspects a student has been missing for 24 hours should contact the University of Illinois Police Department or the Office of the Dean of Students to make a report. Students in University Housing may also report the matter to the Resident Director. The Office of the Dean of Students and University Housing shall then immediately convey the information to the University of Illinois Police Department.

## PART 9. INVOLUNTARY WITHDRAWAL

### § 2-901 Policy and Procedures for Involuntary Withdrawal

(a) The University of Illinois Urbana-Champaign (the university) is committed to facilitating the health, safety, and welfare of its students and preserving the integrity of its learning environment. If the Dean of Students or designee (DOS) is provided with a credible report that a student may pose a significant risk to the health and safety of the campus community, the DOS will initiate an individualized review of the student's risk and may take interim action. If, after review, the DOS determines that a student poses a significant risk to the health and safety of the campus community that cannot be reduced through voluntary measures, the university may separate the student from the university and its facilities using this procedure.

(b) When practicable and appropriate, the university will take steps to facilitate a voluntary withdrawal under applicable procedures before initiating the involuntary withdrawal process.

(c) Upon recommendation from the Threat Assessment Team and based on an individualized review of the student's ability to safely participate in the university's programs and

academic pursuits, the DOS may involuntarily withdraw and separate a student from the university upon determining that:

(1) The student's continued presence poses a substantial risk to the health and safety of the campus community and/or the student cannot or will not comport their conduct with the Student Code to a degree that it disrupts the continuity of the educational process;

(2) The student's circumstances cannot be resolved with reasonable accommodations pursuant to § 1-110, either because no adequate accommodations are available or the student has refused such accommodations;

(3) The student's circumstances cannot be resolved through other applicable university responses (disciplinary, academic, etc.); and

(4) The student has failed to take voluntary action that would resolve this situation, or no such voluntary measures exist.

(d) Procedures for Involuntary Withdrawal

(1) The DOS will issue a written notice to the student. This notice must include:

(A) A statement that the DOS is considering an involuntary withdrawal;

(B) The basis for the possible involuntary withdrawal;

(C) The student's right to meet, either in person or remotely (the DOS maintains the sole discretion to determine whether the response will take place remotely), with the DOS to respond to the basis for the possible withdrawal and to present additional information;

(D) The date, time, and location/manner of this meeting or instructions for scheduling this meeting;

(E) The student's right to have an advisor or support person, who may not speak on behalf of the student, with them during the meeting;

(F) A statement that the student's failure to attend this meeting will not prevent the DOS from moving forward with this process; and

(G) A statement that if the student decides to withdraw voluntarily, the involuntary withdrawal process will be suspended.

(2) After meeting with the student or reasonably attempting to do so, the DOS will conduct an individualized review of appropriate records and documentation, confer with the Threat Assessment Team, and consult with any other university professionals as needed. As part of this process the DOS:

(A) Will consider the best available objective evidence and, if applicable, current medical knowledge, in the individualized assessment;

(B) May require the student to sign all reasonable and relevant records releases authorizing direct communication between the DOS and any individual holding information relevant to this matter, including but not limited to the student's medical provider(s), whether on-campus or off-campus, the student's friends and family, and/or employees of previous institutions the student attended, as appropriate; and

(C) If needed to aid the DOS in making an individualized assessment, may require the student to undergo a supplemental forensic evaluation at the university's expense by an independent health professional designated by the university.

(3) The DOS will then determine whether the criteria in subsection (c) apply and, if so, issue to the student a written decision, which will include the effective date of the withdrawal, information regarding the student's exclusion from university property, instructions for requesting permission to be on university property, any conditions for return, and information regarding the appeal process including contact information for the Vice Chancellor for Student Affairs or designee (VCSA). If the DOS has met with the student following the written notice described in subsection (c)(1), then the decision should be communicated to the student within 48 hours of that meeting unless the DOS can show good cause for the delay. The DOS will submit withdrawal paperwork to the Office of the Registrar and, if applicable, cancellation paperwork for any future registration.

(4) In an emergency situation where a student's continued presence is reasonably likely to pose a substantial risk to the health and safety of the campus community, the DOS may place the student on an emergency interim leave before a final determination, as described above, is made. The DOS will reasonably attempt to directly communicate with the student and to consider information provided by the student before deciding

on an interim leave. The student will receive written notice of the emergency interim leave. This notice will include information on how to appeal the interim leave. The emergency interim leave will remain in effect until the involuntary withdrawal process is concluded or a determination has been made that the emergency interim leave is no longer necessary.

(e) Appeal Process

(1) A student may appeal an involuntary withdrawal or an emergency interim leave to the VCSA within five business days of the date of the decision. To do so, the student must submit a written request, which must include the reasons for the appeal and any supporting documentation by the deadline.

(2) The VCSA will promptly review all appropriate records and documentation and confer with appropriate campus professionals. The VCSA will then decide whether the involuntary withdrawal should be continued, with or without modifications, and will communicate the decision to the student in writing as soon as is reasonably practicable. The VCSA's decision is final and is not subject to further review.

(3) From the date of receipt of appeal, this process shall take no longer than two weeks for an appeal of an involuntary withdrawal or three calendar days for an emergency interim leave, unless the VCSA can show good cause for the delay.

(4) If the student is allowed to return to classes after having been excluded for a period of time, the Office of the Provost will communicate with the instructor(s) of the courses in which the student was enrolled prior to initiation of the emergency interim leave to facilitate that return.

(f) Return to the University

(1) A student who has been involuntarily withdrawn must seek permission to resume studies by sending a written notice to the DOS. This notice must include, at a minimum, a request to return to the university and any appropriate documentation demonstrating compliance with the conditions for readmission. For full consideration, the student must submit these materials at least 60 calendar days prior to the semester in which the student is seeking to resume their studies.

(2) The DOS may require the student to sign all reasonable and relevant records releases authorizing direct communication between the DOS and any individual holding information relevant to this matter, including but not limited to the student's medical provider(s), whether on-campus or off-campus, the student's friends and family, and/or employees of previous institutions the student attended, as appropriate.

(3) The DOS will conduct a review of available information, confer with appropriate university professionals, and then determine:

(A) Whether the student has demonstrated that they have satisfied the conditions for return;

(B) Whether the student can function appropriately in an academic setting; and

(C) Whether the student no longer poses a substantial risk to the health and safety of the campus community based upon consideration of the best available objective evidence and, if applicable, current medical knowledge.

(4) The DOS will notify the student in writing of the decision within ten business days of the receipt of the student's request unless the DOS can show good cause for the delay. If the request for permission to return has been approved, the DOS may approve with the inclusion of additional recommendations or requirements. If the request has been denied, the DOS will include in the written communication what additional steps the student must take to meet the conditions for readmission. The DOS will also include in the written communication information on appealing the denial.

(5) The student may appeal the decision of the DOS to the VCSA by submitting a written request and any supporting materials within five business days of the date of the decision. The VCSA will promptly review all appropriate records and documentation and confer with appropriate campus professionals. The VCSA will then affirm, overturn, or modify the decision of the DOS and communicate the decision to the student in writing within ten business days, unless the VCSA can show good cause for delay. This decision is final and is not subject to further review.

(6) A successful request for permission to return to the university under these procedures does not guarantee reentry into the student's previous or desired major or program.

(g) Fees and Refunds

(1) The normal policies and procedures for tuition, financial aid, and fee refunds for students who withdraw during an academic term, as described in housing contracts and other university policies, will apply to students who are withdrawn pursuant to this policy.

■

# ARTICLE 3 – ACADEMIC POLICIES AND REGULATIONS

## PART 1. GRADES AND GRADING SYSTEM

### § 3-101 Academic Work Report Requirements

(a) Faculty members have the responsibility to provide the university with an individual evaluation of the work of each student in their classes. Final course grades are entered on the student's permanent university record at the close of each semester, term, or session.

(b) A dean may require reports from each instructor or faculty member, upon the work of all freshmen and upon all other students whose work is presumably below C.

(c) Reports of midsemester grades are required upon the work of all freshmen. They are not entered on the student's permanent university record.

### § 3-102 Grading System – Grades Authorized for All Colleges

Excellent (A+, A, A-); Good (B+, B, B-); Fair (C+, C, C-); Poor (D+, D, D-) (lowest passing grade); Failure (F) (not acceptable for degree credit), including courses dropped for academic integrity violations (see § 1-402). The A+ grade standing alone does not designate Honors Credit (see § 3-703). To recognize superior academic performance in courses designated as an honors course/section by the offering department or when the student has an Honors Credit Learning Agreement, the appropriate grade is A+H.

### § 3-103 Computation of Scholastic Averages

(a) Numerical Values

| Grade | Grade Points | Grade | Grade Points |
|---|---|---|---|
| A+ | 4.00 | C+ | 2.33 |
| A | 4.00 | C | 2.00 |
| A- | 3.67 | C- | 1.67 |
| B+ | 3.33 | D+ | 1.33 |
| B | 3.00 | D | 1.00 |
| B- | 2.67 | D- | 0.67 |

(b) F Failure (including courses dropped for academic integrity violations) = 0.00

(c) Undergraduates
A uniform method for calculating undergraduate grade-point averages has been established for all undergraduate colleges on the Urbana-Champaign campus. These averages are calculated on the basis of all courses attempted for which grades and credits are assigned and that carry credit in accordance with the Courses catalog. Grades of S, U, CR, NC, PS, PP, NP, PZ, and PX are reported on the official university transcript but are not included in the grade-point averages since grade-points are not assigned to these letter grades. This method of calculation is used to determine honors, academic standing, financial aid and scholastic awards, and transfer between colleges on this campus. For the purpose of computing a grade-point average for graduation, only the grades received in those courses counting toward the degree, including grades in repeated courses, are included in the average. (See also § 3-802.)

(d) Graduates
The graduate GPA includes all hours and grades for all courses taken while enrolled as a graduate student. The GPA component of academic status is calculated at the end of each semester. At the point of calculation, graduate students must have a cumulative graduate

GPA at or above their department's minimum and a semester GPA of at least 2.25 to be in good academic standing. To be eligible for an advanced degree, a graduate student must have a grade-point average of at least 2.75. Some departments require a higher average. See the Graduate College Handbook for Students, Faculty and Staff for more information about repeated courses and grade points used in computations.

### § 3-104 Other Grade Symbols in Use

Other symbols in use, which are not included in computation of averages, are:

AU Audit; indicates attendance as a visitor only.

NR Not reported.

NV Not valid.

FF Used only in courses taken under the pass/fail grading option from Spring 1968 through Fall 1974. A minimum of D was required for passing.

W Approved late course drop or term withdrawal without credit.

I Incomplete. Approved extension of time to complete the final examination or other requirements of the course. Applies to both undergraduate and graduate students. (Students who are assigned incomplete grades will be allowed to finish remaining course requirements without any additional fees. The final grade will be reported via the Online Grade Change system.)

Undergraduate Students
Only the dean of the student's college, or, for nondegree students not admitted through a college, the Office of the Vice Chancellor for Academic Affairs and Provost may authorize such extension of time in individual cases. A grade of "incomplete" that is not removed by the end of the first eight weeks of instruction in the next Fall or Spring semester becomes the grade of F (or U) by rule, depending on grading mode of the course. The exact date can be found on the Office of the Registrar Academic Calendars (http://registrar.illinois.edu/academic-calendars). With the approval of the dean of the student's college, the student who has not made up an "incomplete" examination may be withdrawn from the course retroactively, provided such withdrawal is completed before the grade of "incomplete" automatically becomes a grade of F (or U) by rule. In exceptional cases, a student who, because of absence for active military service, physical disability, or other sufficient cause, is unable to comply with the rule by removing the I grade within the specified time may be granted a limited extension by the dean of the student's college. A student whose status cannot be determined because of "incomplete" grades may register again only with the approval of the dean of the student's college. (See §§ 3-313 and 3-201.)

Graduate Students
A grade of "incomplete" may be assigned at the discretion of the instructor of the course to allow an extension of time to satisfy final exam requirements or other final course requirements. The period of time allowed to finish remaining course requirements will be set by the instructor and communicated to the student upon assignment of the I grade. The instructor may authorize such extension of time for a graduate student regardless of the level of the course. If no final grade is assigned by the deadlines described below, the grade becomes an F (or U) by rule, depending on grading mode of the course. Reasonable extensions of time are granted by the Graduate College for justifiable reasons. A student will not be certified for a degree with an Incomplete grade in the academic record.

• I grades assigned in Fall will become an F (or U) by rule after Reading Day in the Spring.

- I grades assigned in Spring will become an F (or U) by rule after the 10th day of Instruction in the following Fall semester.
- I grades assigned in the Summer will become an F (or U) by rule after Reading Day in the Fall.

CR Credit earned. To be used only in courses taken under the credit-no credit grading option. Instructors report the usual letter grades. As of Fall 2022, any grade of D- or better will automatically be converted to CR. Prior to Fall 2022, a minimum grade of C- was required for credit. Prior to spring semester 1975, CR was assigned for course work taken through the Study Abroad Program with a grade of D or better.

NC No credit earned. To be used only in courses taken under the credit-no credit grading option. Instructors report the usual letter grades. As of Fall 2022, a letter grade of F will automatically be converted to NC (Between Fall 2022 and Fall 2024, ABS grades will also convert to NC). Prior to Fall 2022, a grade of D+ or lower was converted to NC.

DFR Grade temporarily deferred. To be used only in those thesis, research, and special problems courses extending over more than one semester that are taken by graduate students as preparation for the thesis and by undergraduate students in satisfaction of the requirements for graduation with honors, and in other approved courses that extend over more than one semester.

Requests for approval to use the DFR grade in courses that extend over more than one semester, which therefore require postponement of the final grade report, must be submitted in writing by the executive officer of the department offering the courses to the dean of the college for concurrence. A copy of the approval will be sent to the Office of the Registrar, which maintains a list of all courses approved for the DFR grade.

*Graduate students:* The symbol DFR in courses other than thesis (499/599) must be converted to a permanent grade no later than the end of the next semester in which the student is registered. If no grade change is submitted within that period, the DFR will be converted as follows: for letter graded courses to an F, for courses graded Satisfactory/Unsatisfactory to a U, and for courses taken on Credit/No Credit basis to an NC. The DFR symbol for thesis courses (499/599) stands indefinitely until a Supplemental Grade Report Form is submitted by the adviser at the completion (successful or unsuccessful) of the thesis.

HON Honors. Used only for Carle Illinois College of Medicine core clerkship courses indicating completion with honors.

S Satisfactory.

U Unsatisfactory.

Satisfactory and Unsatisfactory are to be used only as final grades in graduate thesis research courses, in graduate and undergraduate courses given for zero credit, and in other courses that have been specifically approved by the head or chairperson of the department concerned, with concurrence of the college dean. A current list of courses that have received such approval is maintained in the Office of the Registrar. The fact that a particular course or a section of a course will be offered on the S/U basis must be clearly announced in the Course Explorer (https://courses.illinois.edu) along with other pertinent course or section information.

SR Satisfactory after Remediation. Used only for Carle Illinois College of Medicine.

PS Used for test-based credit (proficiency or special exam). A minimum grade of C is required.

## § 3-105 Credit-No Credit Grading Options

(a) The credit-no credit grading option is designed to encourage student exploration into areas of academic interest that they might otherwise avoid for fear of poor grades. All students considering this option are cautioned that many graduate and professional schools consider applicants whose transcripts bear a significant number of nongrade symbols, such as CR or NC, less favorably than those whose transcripts contain none or very few. Likewise, in computing a preadmission grade-point average, some of these schools may convert the NC symbol to a failing grade.

(b) All Students
- (1) Credit-no credit courses are not counted toward the grade-point average but are included as part of the total credit hours.
- (2) Instructors are not informed of those students in their classes who are taking work under the credit-no credit option, and they report the usual letter grades at the end of the course. These grades are automatically converted to CR or NC.
- (3) Grades of D- or better are required in order to earn credit.
- (4) Final grades of CR or NC (for credit or no credit) are recorded on the student's permanent academic record and subsequently will not be changed to letter grades.
- (5) Students enrolled in self-paced online courses may elect the credit-no credit option prior to completion of one-eighth of the lessons contained in the course; however, should they desire to return to a letter grade, an amended credit-no credit form must be filed prior to completion of one-half of the lessons.
- (6) Courses taken under the credit-no credit option, including self-paced online courses, may be dropped only in accordance with the normal procedures for dropping courses.

(c) Undergraduate Students
- (1) Any undergraduate student may elect the credit-no credit option.
- (2) To elect the credit-no credit option, students must obtain the approval of their adviser or, in the case of self-paced online courses, their adviser or college office, if applicable. Non-degree students not admitted through an academic unit must obtain approval from the Office of the Vice Chancellor for Academic Affairs and Provost.
- (3) A maximum of 18 semester hours earned under the credit-no credit option may be applied toward a degree at the Urbana-Champaign campus of the university. Self-paced online courses taken on a credit-no credit basis will be included in the 18 semester hour maximum credit-no credit limit allowed. A full-time student in good academic standing may take a maximum of two courses each semester under the credit-no credit option. Part-time students and students on academic probation may take one course each semester under this option. Summer session students may take one course under the credit-no credit option.
- (4) Students who are placed on probation after electing the credit-no credit option for more than one course must choose which course they wish to keep as credit-no credit and rescind their request for other course(s).
- (5) Any lower- or upper-division course may be chosen under the credit-no credit option except courses used to satisfy the university's general education requirements, courses designated by name or area by the major department for satisfying the major, minor, or field of concentration, or those specifically required by name by the college for graduation.
- (6) In cases of subsequent change of major or field of concentration, courses previously taken under the credit-no credit option in the new field may qualify for meeting major requirements.
- (7) An undergraduate student must choose between the graded option and the credit-no credit grade option prior to the midpoint of the course (e.g., the end of the eighth week in a sixteen-week course or the end of the fourth week in an eight-week course). The credit-no credit option form must be properly approved and submitted to the student's college office.

(d) Professional Students
   (1) Students in the Colleges of Law and Veterinary Medicine may elect the credit-no credit option only in undergraduate courses not required as part of the professional curriculum.
   (2) A student in either the College of Law or the College of Veterinary Medicine must choose between the graded option and the credit-no credit grade option prior to the midpoint of the course (the end of the eighth week in a sixteen-week term). The credit-no credit option form must be properly approved and deposited in the college office.
   (3) Students in the Carle Illinois College of Medicine are not eligible to use the credit-no credit option.

(e) Graduate Students
   (1) Graduate students may elect the credit-no credit option through the last day allowed for dropping a course without academic penalty. Students may elect to return to the regular grade basis by filing an amended request by the deadline date for dropping a course without academic penalty as indicated in the Graduate College calendar. The credit-no credit option form must be properly approved and submitted to the Graduate College.
   (2) The student's department must approve the election of this option in accordance with the policy established by the major department.
   (3) Over the entire course of a degree program, a student must earn at least two credit hours of standard graded (A+ to D-) course work for each hour of earned credit-no credit course work.
   (4) In any one semester, a student may take no more than four credit hours on a credit-no credit basis, except in these cases:
      (A) Students registering for Study Abroad or Domestic Study Away.
      (B) Students enrolling in one 5 hour undergraduate language course.
   (5) Hours transferred from another higher education institution cannot be used as part of the "graded course work."
   (6) If a student is admitted on a limited basis, or if a student falls below the Graduate College minimum grade-point average of 2.75 (or below the departmental minimum grade-point average) and is placed on probation, the student will not be allowed to register for credit-no credit course work for hours until the grade-point average has been raised to the minimum and the probation designation has been removed.

**§ 3-106 Grade Corrections**

When a student's grade has been incorrectly reported, the instructor may correct the grade with the approval of the executive officer for the unit in which the course is offered. The regular supplemental grade form is used to report the corrected grade; all copies of the form must be submitted to the student's college office.

**§ 3-107 Procedures for Review of Alleged Capricious Grading**

(a) (1) Capricious grading, as that term is used herein, constitutes any of the following: (1) the assignment of a grade to a particular student on some basis other than performance in the course; (2) the assignment of a grade to a particular student by using more exacting or demanding standards than were applied to other students registered for the same credit in that course; (3) the assignment of a grade representing a substantial departure from the instructor's previously announced standards. The following procedures are not to be used: (1) to review the judgment of an instructor in assessing the quality of a student's work, or (2) in cases involving alleged violations of academic integrity (see §§ 1-401 to 1-406).

(b) A Capricious Grading Committee shall be appointed or elected annually by each unit's executive officer. If the instructor of the course is a member of the committee, that instructor shall be disqualified from the consideration of any appeal involving the instructor. If a committee member has a significant professional or personal involvement with the facts of, or the parties to, the appeal (a conflict of interest), that committee member shall be disqualified from hearing the appeal. The determination that a conflict of interest exists shall be made by the EO (department or unit executive officer or designee) of the department offering the course or, if the EO has a conflict of interest, by the dean of the college or school that houses the department offering the course.

(c) A student who believes that a final grade is improper and the result of capricious grading should first confer promptly with the instructor in the course or, if the instructor is unavailable, with the EO of the department offering the course. If the student and the instructor (or, in the instructor's absence, the EO) are unable to arrive at a mutually agreeable solution, the student may file an appeal with the EO within 30 business days after the start of the fall semester (for a grade assigned the previous spring or summer); or spring semester (for a grade assigned the previous fall or winter).

(d) The student shall file an appeal by submitting to the EO a written statement particularizing the basis for the allegation of capricious grading and presenting any available supporting evidence. The EO shall submit a copy of the student's written statement to the instructor of the course with a request that the instructor promptly submit a written response thereto.

(e) The EO shall then submit the appeal and response to the unit's Capricious Grading Committee. The committee shall proceed to hold a fact-finding session concerning the allegations set forth in the appeal. A quorum consisting of 75 percent of the elected committee is required for this session. Both the student and the instructor shall be entitled to be present throughout this session and to present any evidence relevant to the manner in which the grade was assigned, including testimony by other persons. Both the student and the instructor shall have an opportunity to question or refute any evidence presented. The confidentiality of all evidence shall be preserved. The student and instructor may each be accompanied by a person to assist them in presenting evidence. The session shall not be open to the public.

(f) At the close of the session, the committee shall deliberate privately. If a majority of the elected committee, or a majority of those remaining if the committee member is disqualified under the procedure outlined in subsection (b) above, shall find the allegation of capricious grading not supported by substantial evidence, it shall dismiss the appeal. If the committee finds the allegation of capricious grading to be supported by substantial evidence, the committee shall proceed to determine the most appropriate remedy. The committee may direct the instructor to grade the student's work anew or to give the student a new examination in the course, or may take such other action as will bring about substantial justice in the individual case. However, except in the most extraordinary circumstances the committee should not award the student a new grade in the course. The decision of the committee shall be reported in writing to the student, the instructor, and the departmental office. Except as provided in subsection (i) below, the committee's decision is final.

(g) The committee is not authorized to reprimand or otherwise take disciplinary action against the instructor. Evidence put before the committee shall be admissible in any disciplinary proceedings that may thereafter be undertaken against the instructor, but the disciplinary body shall make an independent determination of whether that evidence and any other information before that body constitutes sufficient proof of the conduct charged.

(h) None of the established procedures available to the instructor to raise grievances before the Faculty Advisory Committee or alleged violations of academic freedom before the Senate Committee on Academic Freedom and Tenure shall be abridged or affected by the actions of the committee.

(i) If the academic unit involved fails to follow the procedures outlined in this section, the student may file an appeal within 30 days to the dean of the college or school in which the offering department is housed. If the dean (or dean's designee) finds that the academic unit failed to follow the procedures outlined in this section, the student shall be entitled to a new hearing in compliance with this section.

### § 3-108 Procedures for Review of Instructor's Ability to Communicate Clearly

(a) All academic departments are to take steps to ensure that all of their instructors are able to communicate clearly in the class.

(b) Students who find themselves in a class where their instructor is unable to communicate clearly should initiate the following procedure:
   (1) Immediately contact the Executive Officer (EO) of the department in which the course is being offered to report the problem.

(2) If the EO determines that the instructor is unable to communicate clearly, the EO will take appropriate action.

**§ 3-109 Academic Progress**

(a) The progress of the student toward a degree is the concern of the dean of the college or school in which the student is enrolled.

(b) A student whose progress is unsatisfactory is subject to action by the dean of the college or school in which the student is enrolled under general provisions adopted by the faculty.

**§ 3-110 Academic Standing Rules**

(a) The following rules are applied in the academic standing review process that takes place in all undergraduate academic units and in the Graduate College at the end of each semester. They do not apply in the professional programs in the Carle Illinois College of Medicine, the College of Law, and College of Veterinary Medicine. (See § 3-609(b) on notification.)

(1) Students are considered in Good Academic Standing when they meet or exceed all required university and program-specific grade point averages (GPAs) as well as other academic program-specific requirements.

(2) Students who are not in Good Academic Standing are considered in Academic Warning status. When students are placed on Academic Warning status, they receive notice from their college, division, or school that describes the reason(s) the student is on Academic Warning and requirements needing to be met to return to Good Academic Standing. Students who do not meet these requirements are subject to drop rules.

(b) Academic Standing Rules

The following regulations shall be used to determine a student's academic standing, provided drop rules do not apply. (See § 3-110(c).) GPA references are based on the University of Illinois Urbana-Champaign semester average or the cumulative GPA. (See § 3-103 on computation of scholastic averages.)

(1) Undergraduate students:

(A) An undergraduate student whose cumulative average is below 2.0 and/or who earns a semester GPA below 2.0 and/or does not meet program-specific requirements in the most recent semester or during summer session in which the student is registered will be placed on Academic Warning status beginning the next semester or summer session in which the student is registered.

(B) Undergraduate students on Academic Warning status are returned to Good Academic Standing upon meeting the requirements and stipulations communicated to them in their notification of being placed on Academic Warning status.

(2) Graduate students:

(A) A graduate student whose cumulative average is below the minimum set for their academic program and/or who earns a semester GPA below 2.25 in the most recent semester in which the student is registered is will be placed on Academic Warning status beginning the next semester in which the student is registered.

(B) Graduate students who are on Academic Warning status for failure to maintain the minimum GPA are returned to Good Academic Standing upon obtaining a cumulative GPA at or above the minimum and the most recent semester GPA of 2.25 or better.

(3) All students:

(A) In addition to the general requirements described above, a student may be notified by their college, division, or school that they are in Academic Warning status at any time when, in the judgment of the college, division, or school, the student's scholastic record warrants such action. The college, division, or school will review the student's scholastic record and return the student to Good Academic Standing when warranted.

(B) Likewise, the rules may be waived when, in the judgment of the college, division, or school, a student's scholastic record indicates that this action is unwarranted and the student can be in Good Academic Standing.

(C) A student's academic standing may not be changed by attendance at another institution except by special action of the dean of the student's college or school.

(c) Drop Rules
The following regulations shall be used to determine if a student is to be dropped from the university for academic reasons.
(1) A student is dropped if they earn a semester GPA below 1.0 (not including summer or winter session).
(2) A student on Academic Warning status who fails to meet the requirements communicated to them by their college, division, or school is dropped.
(3) A student who fails to make satisfactory progress toward their degree is dropped. Examples would be the repeated failure of a required course or failure to meet other conditions for continuation in the curriculum.
(4) A nondegree or part-time student who fails to complete the conditions of admission or continuation is dropped.
(5) The drop rules may be waived when, in the judgment of the student's college or school, the student's scholastic record warrants such action.

## PART 2. EXAMINATIONS

The following regulations will be applied with the understanding that the university must reasonably accommodate a student's religious beliefs, observances, and practices in regard to the scheduling of examinations if the student informs the student's instructor of the conflict within one week after being informed of the examination schedule. These examinations include: evening, midterm, final, hourly, proficiency, and special examinations. Any student may appeal a decision. (See § 1-107(b).)

### § 3-201 Final Examinations

(a) All Students: The following regulations will be applied with the understanding that the university must reasonably accommodate a student's religious beliefs, observances, and practices in accordance with § 1-107 and § 1-501 in regard to the scheduling of examinations if the student informs their instructor of the conflict within one week after being informed of the examination schedule. Appeal of an instructor's decision of such accommodation may be made to the dean or dean's designee of the academic unit in which the course is offered.
(1) *Synchronous courses* are defined as courses in which at least one component of the course meets in-person or remotely at a day and time published in the Class Schedule.
(2) *Asynchronous courses* are defined as courses in which no component of the course occurs at a day and time published in the Class Schedule.
(3) *Synchronous final exams* are defined as final exams where all students enrolled in the section or course are scheduled to begin the exam simultaneously at a scheduled day and time, either in the same location or remotely. Synchronous final exams may be required only in synchronous courses.
(4) *Asynchronous final exams* are defined as final exams that may be scheduled and completed in any period within a longer window of time. Asynchronous exams may be offered in synchronous or asynchronous courses.
(5) Requirement for final examinations: End of the semester synchronous final examinations that carry significant weight in calculating the final course grade may be given only during the scheduled final examination period for the term. Alternative assessments such as papers, projects, studio assignments, or take-home/asynchronous exams, including those assigned in teams, may be due during the last two weeks of instruction provided they are assigned with a clear due date in the class syllabus or other information distributed to students no later than the end of the first week of instruction.
(6) Change in final examination schedule: The beginning and ending dates for final examinations are defined within each term's Academic Calendar (https://senate.illinois.edu/a_calendar.asp). The Schedule of Final Examinations for all colleges (except Law, Veterinary Medicine, and the Carle Illinois College of Medicine) is prepared and published by the Office of the Registrar (https://registrar.illinois.edu).

Instructors who give synchronous final examinations, regardless of course modality, must do so at the time specified in the Schedule of Final Examinations (https://registrar.illinois.edu/final-exam-scheduling-guidelines/) unless a change is approved

in advance by the Office of the Provost. Requests for change should be submitted to the executive officer of the department in which the course is offered. Permission may not be granted to those instructors wishing to change final examinations to a time outside the final examination week. Reading Day should be left entirely free of any mandatory course obligations so that students may use this opportunity to prepare for their upcoming final exams.

(7) The window in which asynchronous exams are to be started must be at least 24 hours. In the case of an untimed take-home exam, this means students must be allowed a minimum of 24 hours to complete the exam.

(8) A student shall be said to have an exam conflict if that student has two synchronous exams scheduled during overlapping time periods. A conflict also exists if the student would be required to take three or more final exams with starting times all within a 24-hour window. Alternative final assessments shall be treated as if they are exams. They should be handled as synchronous exams if individual rescheduling is impractical, e.g. assessments involving group work.

(9) When a conflict exists, the student must first attempt to resolve the conflict with scheduled conflict exams and/or by choosing an alternate time for any asynchronous or self-scheduled exams that may be involved in the conflict. If conflict exams are offered for more than one course, the student must take the conflict for the course that has the largest number of students.

(10) If the conflict cannot be resolved using the methods described in 3-201(a)(9), the student must contact the instructors whose courses are involved in the conflict no later than the last day of class. The instructors and the student will collaborate to resolve the conflict.

(11) The following priority order should be used to determine how to resolve conflicts. That is, setting up any required special conflict exams is the responsibility of the course with the lowest priority.
   (A) National and state professional examinations (e.g. CPA, actuarial science, Architecture Registration Examination)
   (B) Synchronous noncombined exams scheduled by the Office of the Registrar
   (C) Synchronous combined-sections and arranged-time exams scheduled by the Office of the Registrar
   (D) Synchronous exams scheduled by the instructor
   (E) Synchronous conflict exams
   (F) Asynchronous exams

   When two conflicting exams involve courses of the same priority, the course with the largest number of students has the responsibility for offering a special conflict exam.

(12) A department offering a combined-sections, asynchronous, or arranged final examination must provide a conflict exam if required to accommodate student conflicts.

(13) In the event of a conflict not clearly resolved by the provisions of this section or which cannot otherwise be resolved, students should consult with the dean or appropriate designee in the home academic unit.

(b) Undergraduate Students

(1) Undergraduate students must obtain the approval of the dean of their college to defer a final examination. Undergraduate students who must miss a scheduled final examination should report this fact to the dean of their college as soon as possible and before the final examination period begins.

(2) For satisfactory reasons, students may be "excused" by the dean of their college and examined later by their instructor. Absence from a final examination for any other cause is reported as a final grade of "failure" (F) in the course. (See § 3-103.)

(c) Graduate Students

(1) Graduate students who are unable to take a final examination at the scheduled time or to complete other requirements of a course must make individual arrangements with the instructor. (See § 3-104.)

(2) Approval of this deferment by the dean of the Graduate College is not required.

### § 3-202 Outside-of-Class-Period Examinations

The following regulations will be adhered to regarding examinations given at times that extend outside of regular class periods. These policies do not apply to final examinations. They will be applied with the understanding that the university must reasonably accommodate a student's religious beliefs, observances, and practices in accordance with § 1-107 and § 1-501 in regard to the scheduling of examinations if the student informs the instructor of the conflict within one week after being informed of the examination schedule. Appeal of an instructor's decision of such accommodation may be made to the dean or dean's designee of the academic unit in which the course is offered.

(a) *Synchronous courses* are defined as courses in which at least one component of the course meets in-person or remotely at a day and time published in the Class Schedule.

(b) *Asynchronous courses* are defined as courses in which no component of the course occurs at a day and time published in the Class Schedule.

(c) *Synchronous exams* are defined as exams where all students enrolled in the section or course begin the exam simultaneously at a scheduled day and time, either in the same location or remotely. Synchronous exams may be required only in synchronous courses.

(d) *Asynchronous exams* are defined as exams that may be scheduled and completed in any period within a longer window of time. Asynchronous exams may be offered in synchronous or asynchronous courses.

(e) The window in which asynchronous exam are to be started must be at least 24 hours. In the case of an untimed take-home exam, this means students must be allowed a minimum of 24 hours to complete the exam.

(f) The scheduling of synchronous examinations given at a time extending outside of the regular class period requires the approval of the departmental executive officer. Approval is not required for evening examinations in courses with multiple sections.

(g) Students are to be excused from one or more regular class periods for an amount of time equivalent to that required for the outside-of-class period examination.

(h) Conflict or makeup examinations must be arranged for those students who cannot take the scheduled outside-of-class period examination because of the conflicts arising from participation in any of the following activities:
    (1) Other examinations, including special examinations, scheduled at a prior date. Priority will be given to the examination announced in class the earliest in the semester. If the two (or more) examinations being held at the same time were announced on the first day of class of each course, conflict and makeup examinations will be offered by the instructors of all of these courses and the students may choose which conflict or makeup examinations they wish to take.
    (2) Regularly scheduled university-affiliated performances or rehearsals. Students are expected to notify the instructor of the conflicting performance or rehearsal as soon as possible but no later than one week before the examination.
    (3) Regularly scheduled classes. Students are expected to notify the instructor of the conflicting regularly-scheduled class as soon as possible but no later than one week before the examination.
    (4) Sickness, regular employment, or other extenuating circumstances. Appeal of an instructor's decision regarding the excused absence may be made to the departmental executive officer.
    (5) Religious observances and practices in accordance with § 1-107. Appeal of an instructor's decision regarding the excused absence may be made to the dean or dean's designee of the academic unit offering the course.

(i) In the event of a conflict not clearly resolved by the provisions of this section or which cannot otherwise be resolved, students should consult with the dean or appropriate designee in their home academic unit.

(j) For synchronous examinations, conflict or makeup examinations should be held within one week of the regularly scheduled examinations. Conflict or makeup examinations should be held during the class period from which students are excused for the outside-of-class period examination whenever possible; when not possible, they should be held between the hours of 7:50 a.m. – 10:00 p.m. Central Time Monday – Thursday and 7:50 a.m. – 5:00 p.m. Central Time Friday, unless approved in advance by the Office of the Provost.

### § 3-203 Proficiency Examinations

(a) All Students
- (1) Proficiency exams offer students the opportunity to earn academic credit that counts toward degree completion without actually taking the course for which they earn the credit.
- (2) Information concerning proficiency examinations may be obtained from the student's college or from the department offering the course for which the student wishes to earn proficiency credit. Except as provided in subsection (3)(D) below, a student must secure the consent of the head or chairperson of the department concerned to take these examinations.
- (3) Departmental proficiency examinations may be taken only by the following:
  - (A) Students who are currently enrolled for courses on the Urbana-Champaign campus. (A person attending only as an auditor is not considered to be "currently enrolled.") For the purpose of this rule, a student who has completed the work of fall semester or winter session is considered to be "currently enrolled for courses" for fifteen days after the close of the final examination period, including graduating seniors; and a student who has completed the work of spring semester or a summer session is considered to be "currently enrolled for courses" up to the end of the registration period for the following fall semester, including graduating seniors.
  - (B) Persons who have been previously registered in a degree program and are currently registered in an online course or an extramural course offered by the university.
  - (C) Persons who are not registered in the university at the time they wish to take a departmental proficiency exam but who are candidates for undergraduate degrees at the University of Illinois who need no more than ten semester hours to complete the requirements for their degrees. (See § 3-204 on special examinations.)
  - (D) Students who participate in the proficiency testing sessions offered during New Student Welcome Week, at the beginning of the fall semester, or at the beginning of the spring semester. Credit earned by this method does not become a part of the student's university record until after the student has completed registration.
- (4) Departmental proficiency examinations may NOT be taken in the following circumstances:
  - (A) To earn credit for a course that has been failed, meaning the student earned a grade of F, FR, or ABS (prior to Fall 2025). (See § 3-204 on special examinations.)
  - (B) To change to a PS an earned grade that was lower than what the student desired.
  - (C) To earn credit for an elementary-level college course which is part of a sequence of courses covering elementary-and intermediate-level material when the student has already received credit, or is scheduled to receive credit, for one or more than one semester of work in the subject.
- (5) The grade for proficiency examinations is PS or F.
  - (A) A grade of PS is awarded when the student earns at least a C on the examination. Individual departments may set the minimum passing score for their departmental proficiency exams to be higher than a C.
  - (B) A grade of F is awarded when the student earns lower than a C, or lower than the department's minimum score. An F is not recorded in the student's official academic record and does not appear on the student's transcript. However, departments may keep internal records and prohibit a student from re-taking the departmental proficiency examination.
  - (C) The department that offers a departmental proficiency exam is responsible for submitting PS grades to the Registrar's Office within 4 weeks of the date of the proficiency exam.
- (6) Proficiency examinations are generally given at no cost to the student; however, a fee may be charged for proficiency examinations from agencies outside the university.

(7) Students wishing to take a proficiency examination in a subject not offered at the campus at which they are or have been registered, but offered at another campus of the university, may do so upon satisfying the above conditions, provided they obtain approval from their primary campus (the campus at which they were last registered) for concurrent registration prior to taking the examination.
(8) Departments have no obligation to administer proficiency exams to students from other institutions who are not currently enrolled at the University of Illinois, as defined in subsection (a)(3)(A) above.

(b) Undergraduate Students
(1) Proficiency examinations for advanced standing are offered in all university courses normally open to freshmen and sophomores.
(2) A student may take proficiency examinations in more advanced undergraduate courses on the recommendation of the head or chairperson of the department and with the approval of the dean of the college in which the department offering the proficiency exam is located.
(3) Proficiency examinations for advanced courses may be taken by graduating seniors at any time designated by the instructor within the time limits of subsection (a)(3)(A) above.
(4) Undergraduate students who pass a proficiency examination are given credit toward graduation for the amount regularly allowed in the course, provided such credit does not duplicate credit counted for admission to the university and provided the credit is acceptable in their curriculum.
(5) Credit earned by a proficiency examination does not count toward satisfying the minimum requirement of forty-five semester hours of University of Illinois Urbana-Champaign credit. (See § 3-801 for details on the credit requirements for a bachelor's degree.)

(c) Graduate Students
(1) Graduate students may satisfy specific requirements by passing proficiency examinations.
(2) Credit earned by passing a proficiency examination cannot be applied toward graduate degrees.

**§ 3-204 Special Examinations**

(a) Special examinations offer students who failed a course another opportunity to pass the course and earn academic credit counting toward degree completion.

(b) A special examination may be given only in the following circumstances:
(1) the student earned a failing grade of F, FR, or ABS (prior to Fall 2025) in the University of Illinois course.
(2) a special examination is recommended by the head or chair of the department offering the course which the student failed, or by an individual duly authorized by the head or chair, whether the course is traditional, blended, online, a self-paced online course, or other
(3) the special examination is approved by the dean of the college in which the student is enrolled.
(4) a special examination permit was issued by the Office of the Registrar because the individual seeking the special examination is a currently enrolled student, or is a former student who is not currently registered but who has no more than 10 semester hours remaining to complete their degree.
(5) the instructor designates when the special examination will be given, within the time limits of § 3-203, subsection (a)(3)(A), including for graduating seniors; but students who are not currently enrolled in the university and who have failed an online course or a self-paced online course must take the Special Examination within 30 days of grade roll.
(A) The exam must be administered after the close of the semester, winter session, or summer session in which the course was failed.
(B) The exam must be administered before the end of the next semester in which the student is registered following failure in the course.

(c) A student who has been dropped from the university is not eligible to take special examinations unless the student has been reinstated and meets the conditions stated in § 3-203(a)(3)(A) above.

(d) Special examinations are given at no additional cost to the student.

(e) Special examination grades are reported as PS or F.
 (1) A grade of PS is awarded when the student earns at least a C on the examination.
 (2) A grade of F is awarded when the student earns lower than a C.
 (3) An F is not recorded in the student's official academic record and does not appear on the student's transcript. However, departments may prohibit a student from retaking the examination.
 (4) The instructor that administers the special exam is responsible for submitting PS grades to the Registrar's Office within 4 weeks of the date of the exam.
 (5) A student given a grade of PS in a special examination will receive the credit normally allowed for the course, subject to all regulations governing the individual student's curriculum.
 (6) Grades earned on special examinations are not included in the computation of grade point averages. (A passing grade on a special examination does not remove the previously earned failing grade.)

## PART 3. REGISTRATION, COURSE CHANGES, AND WITHDRAWAL

### § 3-301 Number of Hours Required

(a) All Students
 (1) For undergraduate, graduate, and professional students, the minimum program required for receipt of maximum educational benefit payments under the Veteran's Readjustment Benefits Act of 1966 and receipt of Social Security benefits as a dependent is 12 hours in a semester (six hours in the summer term).
 (2) Twelve credit hours and above in a semester constitute a full program of study for tuition and fee assessment; in the summer term, the number of hours is six and above. (See § 3-501(b) on credit ranges.)
 (3) Registration requirements for certification purposes in individual semesters, if the student is registered, are as follows:

**Undergraduate and Professional Students**

| Semester | Full-time | Half-time |
|---|---|---|
| Fall | 12 credit hours | 6 credit hours |
| Spring | 12 credit hours | 6 credit hours |
| Summer | 6 credit hours | 3 credit hours |

**Graduate Students**

| Semester | Full-time | Half-time |
|---|---|---|
| Fall | 8 credit hours | 4 credit hours |
| Spring | 8 credit hours | 4 credit hours |
| Summer | 4 credit hours | 2 credit hours |

For purposes of load calculation, English as a Second Language courses required or recommended by the English as a Second Language Placement Test will count as four hours even if the registration is listed in the student registration systems as zero hours.

 (4) For university academic terms of other lengths, the number of hours are determined proportionately in accordance with the above principles.
 (5) Study Abroad students shall be considered full-time for academic purposes at the university when they are enrolled for at least the minimum full-time academic load as defined by the international institution. However, federal regulations require that students must take and transfer back 12 or more University of Illinois Urbana-Champaign hours to be considered full-time for financial aid purposes.

(b) Undergraduate Students
   (1) Each student is required to pursue a normal program of studies. The number of hours varies with the college and curriculum. More or less than a normal program may be permitted only by authority of the dean of the college or designated representative.
   (2) In most colleges, 12 semester hours are required for Dean's List recognition. (See § 3-401.)

### § 3-302 Classification of Undergraduate Students

(a) Classification of undergraduate students is made by the Office of the Registrar based upon the number of credit hours earned. Classification for registration, enrollment verification, and assessment purposes (except as indicated in subsection (b) below) is based on the following scale:

| | |
|---|---|
| Freshman standing | 0–29.9 hours |
| Sophomore standing | 30–59.9 hours |
| Junior standing | 60–89.9 hours |
| Senior standing | 90 or more hours |

(b) Students entering the university directly from high school as degree candidates with academic credit earned by advanced placement or similar programs for superior students are considered freshmen for the purpose of admission and registration, but not tuition assessment, regardless of the number of college credit hours they have earned at other institutions or by examination. A freshman applicant is a degree-seeking student who applies for admission while attending high school, regardless of the amount of college credit earned; or is a student enrolled in the fall term who attended college for the first time in the prior summer term; or who, since graduating from high school, has not attended another postsecondary institution as a degree-seeking undergraduate student.

### § 3-303 Registration

(a) When a student registers for courses, the student agrees to pay tuition and fees to the university according to the payment policies and schedules adopted by the Board of Trustees. If a student wishes to cancel their registration, and thus avoid payment of tuition and fee charges, the student must do so in accordance with § 3-308.

Unauthorized use of university computerized systems, data, or resources; unauthorized use of another individual's identification, account, or password; or an attempt to gain unauthorized access is prohibited by university policy and may constitute a violation of Illinois state law. Access to the student registration system will be terminated if the student is found to be making excessive unsuccessful registration attempts. The student's college should be consulted in that instance.

(b) Days for registration are designated for each term and are published in the Office of the Registrar Academic Calendars (http://registrar.illinois.edu/academic-calendars) for that term. Each term, students are assigned an earliest registration time (time ticket) when they may first use the course enrollment portion of the student registration system. Registration times are assigned on the basis of the college of enrollment and credit hours earned. Access is subject to holds that may be imposed by the student's college of enrollment or an administrative office.

(c) A student who has courses on their record as of the first day of instruction is registered in courses as shown on the student's schedule and thus obligated to pay all tuition and fees assessed.

(d) Course registration: A student may register in courses subject to conditions imposed by the colleges and academic departments.
   (1) Colleges and departments reserve the right to impose registration requirements and prerequisites; to reassign students to other sections in a course; to withdraw students from a course or section after the course is on the student's record; or to cancel a course offering or section for legitimate educational reasons (for example, whenever minimum enrollment standards have not been met).
   (2) The registration of a student who fails to meet conditions for continued enrollment may be canceled by college action.

(3) Conditions for course registrations and changes to them may be publicized in the Course Explorer (https://courses.illinois.edu) or other media available to the university and in department offices.

(e) Under certain conditions, a college, a department, or the Office of the Registrar may alter or create a student's course registration. For example:
(1) Students may request the appropriate administrative office to act if they are unable to take action because of deadlines and/or restrictions enforced by the student registration system.
(2) First-year students in law and veterinary medicine may be registered by their colleges.
(3) Students enrolled at Carle Illinois College of Medicine are registered by the Carle Illinois Registrar.

(f) The initial billing for each term will be available online as an electronic bill (E-Bill) no later than the first week of the next month after the term begins for all students who have courses on record as of the first day of instruction. The university no longer mails student account bills to registered students.

**§ 3-304 Registration of Nondegree Students**

(a) Nondegree students register under one of the two registration options:
(1) Academic year: Fall and spring semesters with optional summer and winter sessions.
(2) Summer term only: Registration for fall and spring terms is not allowed; application for admission is necessary to be considered for the academic year enrollment pattern.

(b) Part-time nondegree students are subject to the following restrictions:
(1) The college of enrollment (home department, at the graduate level) has the right to terminate a continuing nondegree student's registration authorization at any time prior to the beginning of a term.
(2) Registration is limited to part-time status (less than twelve credit hours) in the fall or spring semester.
(3) Part-time nondegree students are ineligible for early registration for the fall or spring semester; they may, however, register as follows:
(A) Starting on July 15 or the next business day for the fall semester.
(B) Starting the next business day after the advanced registration period concludes for degree-seeking students for the winter session and spring semester;
(C) Summer session opens to degree-seeking and nondegree students simultaneously.
(4) The same grading system is applicable to degree and nondegree students. Credit earned on nondegree status is not applicable to a degree except by subsequent admission to degree status and, at the graduate and professional level, successful petition for application of such credit to the degree. A maximum of twelve hours of graduate credit earned while on nondegree status may be applied to a degree.
(5) Nondegree students must apply for admission to be considered for degree status enrollment.

(c) Persons admitted to the university for participation in the following programs are eligible for full-time status, and thus early registration privileges:
(1) online and/or off-campus programs;
(2) university-affiliated exchange programs;
(3) study abroad programs for students who are enrolled at other institutions.

(d) No other students are given the privilege of full-time nondegree status without the permission of both the college admitting the student and the colleges offering the courses in which the student wishes to enroll.

(e) Students in concurrent enrollment at the University of Illinois Chicago or Springfield are part-time nondegree students, ineligible for early registration in the fall or spring semester.

**§ 3-305 Registration of Auditors**

(a) An "auditor" is only a listener in the classes attended; the auditor is not a participant in any part of the exercises.

(b) A student attending as an auditor only is not considered to be a current student.

(c) Auditors are not permitted in laboratory, military, kinesiology (other than theory), or studio classes.

(d) Permission to attend a class as an auditor is granted only by the instructor of the class, classroom space permitting, with the approval of the dean of the college concerned. Written approval must be obtained on an official Auditor's Permit. This form should be presented to the instructor at the first class meeting and submitted to the appropriate college office by the 10th day of instruction (7th day of instruction for summer term).

(e) Current students must obtain approval of the dean of their home college. Former students not currently registered must obtain the approval of the dean of the college in which they were last registered. Persons not previously registered obtain the approval of the dean of the college in which the course is offered.

(f) Audit requests submitted after the census date will require written proof from the instructor that the student has not participated in the class activities.

(g) Students on "dropped" status are not eligible to audit classes. (See § 3-110 on drop rules.)

(h) Staff employees of the university must secure the recommendation of the head of the department in which they work.

(i) Students registered full time (Tuition Range I) are not charged a fee for auditing classes. (See § 3-501(b).)

(j) Persons not registered in university courses and students registered in a partial program (Range II, III, or IV) are charged a fee of $15 (amount subject to change) for each course attended as an auditor. The auditor's fee is waived for persons sixty-five years of age or older. Proof of age must be presented at the Records Service Center, 901 West Illinois Street, Urbana.

(k) Students who change from credit registration to auditor status in the same course and who are not eligible for refund of tuition and/or fees for credit registration dropped are not charged the auditor's fee.

(l) An audited course will appear on the student transcript with a grade of AU.

(m) For graduate students, audited courses may not be repeated for graduate credit and otherwise do not count toward the registration requirement for fellows.

**§ 3-306 Payments**

(a) A student must remit payment by the due date shown on the "View Account" link in Student Self-Service. A student who fails to meet the due date is assessed a monthly Late Payment charge equal to 1.5 percent of the delinquent balance or $1, whichever is greater, a Past Due charge of $2 per month, and a one-time Collections Administration Fee of $42 if the account is referred for collection. In addition, delinquent accounts will be subject to a financial hold, which may prevent registration.

(b) A student who either fails to withdraw officially from the university or withdraws following the refund period is responsible for payment of all tuition and fee charges. (See § 3-508.)

**§ 3-307 Late Registration**

(a) Registration after the first ten days of a term
  (1) A student who registers after the first ten days of a term must have a Late Registration Form completed and approved by the department offering the course.
  (2) Undergraduate students must submit the completed Late Registration Form to their college office to complete the registration. Graduate students must submit the completed Late Registration Form to the Graduate College. A service representative will register the student in the courses approved on the form.

**§ 3-308 Cancellation of Registration**

(a) A student who has placed courses on their record and later decides not to attend the university may cancel registration before the first day of instruction for the semester of the courses, provided the student has neither attended any classes nor received any related student services.

(b) Once a student has attended a class or used campus services, the student may not cancel their registration. If the student leaves the university, the student must officially withdraw from the university as required by § 3-312. Refunds for students who withdraw from the university are governed by § 3-508.

(c) Before the first day of instruction for a term, a student may cancel registration and be relieved of all tuition and fee charges. A student may cancel registration in one of the following ways:
  (1) By using the online student registration system to drop all classes or submit a Cancel Registration request by 11:59 p.m. (CT) on the last business day before the first day of instruction for the term.
  (2) By submitting a written request for cancellation of registration to the student's undergraduate college or graduate department office. The request must be received no later than the close of business on the last business day before the first day of instruction.

**§ 3-309 Repeated Undergraduate Courses and Campus Grade Replacement**

(a) In General
  (1) A student who repeats a subject for which the student has previously received credit (either by class work at the university, or by advanced standing previously allowed for work done elsewhere) does not forfeit the original credit in the event the student should fail the course on the second attempt. Where a course has been repeated, both the original and subsequent grades are included in the average if the course is acceptable toward graduation, but the credit is counted only once. (See § 3-103 on computation of grades.)
  (2) If the course is repeated yet again, all grades received, passed or failed, are counted in the graduation average, except as indicated in § 3-802 on minimum scholarship requirements for graduation.

(b) Campus Grade Replacement
  (1) Undergraduate students may repeat courses for grade replacement according to the following set criteria. If these conditions are not met, the general policy governing repeated courses applies.
    (A) Students may repeat for grade replacement up to a total of 4 distinct courses, not to exceed a maximum of 10 semester hours, taken at the University of Illinois Urbana-Champaign.
    (B) A course in which an academic integrity violation, under § 1-403 of the Code has been officially reported may not be repeated for grade replacement.
    (C) A course may be repeated for grade replacement only once.
    (D) Courses may be repeated for grade replacement only in those cases in which students received grades of C-, D+, D, D-, or F on the first attempt.
    (E) Variable credit courses must be taken for the same number of credit hours when repeated for grade replacement. Special topics courses must be taken for the same topic when repeated for grade replacement.
    (F) A student who has been awarded a degree from the University of Illinois may not subsequently repeat a course from that degree program for the purposes of grade replacement.
  (2) When a student repeats a course for grade replacement, the transcript is affected as follows:
    (A) Both course enrollments and corresponding grades appear on the official transcript.
    (B) The first course enrollment on the student's transcript will be permanently identified as a course that has been repeated for grade replacement.
    (C) Where a course has been repeated for grade replacement, the course credit earned will be counted only once toward degree and program requirements. In

the event that the student should fail the course on the second attempt, the student does not forfeit the original credit (§ 3-309(a)(1)).

(D) When a course has been repeated for grade replacement, only the grade received in the second enrollment for the course will count in the student's grade point average. In the event that the student should fail the course on the second attempt, while having earned a passing grade in the first attempt, the general policy governing course repeats applies: all grades received, passed, or failed will be counted in the graduation average (§ 3-309(a)(2)) except as indicated in (§ 3-802) on minimum scholarship requirements for graduation.

(3) Students must register their intent to use the course repeat for grade replacement option by filing a form for this purpose at their college office during the first half of the term (e.g., the first eight weeks of the semester, the first four weeks of the summer session, or the first four weeks of an eight-week course) in which the course is taken.

### § 3-310 Self-Paced Online Courses

(a) Self-paced online courses are generally open to all students.

(1) High school students may enroll with the permission of the guidance counselor at their high schools or comparable permission and with university approval.

(2) Students seeking a degree from the University of Illinois Urbana-Champaign must obtain the approval of their college or academic advisor to enroll in self-paced online courses.

(3) Graduate students may earn credit for self-paced online courses and, with department approval, the credit can be applied toward an advanced degree as long as the course is at the graduate level.

(4) Students who have been placed on academic drop from the University of Illinois must obtain the approval of the dean of their college for submission of an application for enrollment in any course offered by the University of Illinois Urbana-Champaign.

(b) The number of self-paced online credit hours in which a student may enroll at one time is subject to the policies outlined in § 3-303 and § 3-304.

(c) Enrollment in self-paced online courses does not qualify a student for a student loan or an in-school deferment.

### § 3-311 Adding and Dropping Courses

(a) Except for courses described under subsection (b), a student may add a course during the Add Period, which is defined as the first ten instructional days of a semester or the first five instructional days of an eight-week part of term. A student may drop a course during the first eight weeks of instruction of a semester or the first four weeks of an eight-week part of term. The deadlines for adding and dropping non-standard courses are determined proportionately in accordance with these principles based on parts of term; exact dates can be found on the Office of the Registrar Academic Calendars (https://registrar.illinois.edu/academic-calendars). A college or department may place an advising hold on a student whom they wish to see prior to adding or dropping a course.

(b) However, some instructors or departments may shorten the Add Period for specific courses before the deadlines, as outlined above in subsection (a), in cases where missing early class sessions would severely impair the student's chances for successfully completing the course. An instructor who intends to shorten the Add Period must secure the approval of the unit's Executive Officer before doing so. The instructor should also announce this restriction in class and include it in the course syllabus. Where this restriction is known in advance, it should be included in the course description and in the Class Schedule.

(c) When students are allowed to add a class within the designated Add Period, the instructor must reasonably accommodate them in making up work they have missed. For admission to a class after the designated Add Period, a student must secure the consent of the departmental representative in charge of the course who may require the student to pass an examination in the work already covered by the class or to present other satisfactory evidence of ability to proceed with the class.

(d) The following rules apply only to undergraduate students. (See § 3-508 for refund deadlines.)

(1) Provided the minimum academic load required by the college is maintained, courses may be dropped, and will not appear on a student's transcript prior to the deadline found on the Office of the Registrar Academic Calendars (https://registrar.illinois.edu/academic-calendars).
(2) A student's college may grant an exception by petition to the drop deadline in the case of extraordinary circumstances beyond a student's control (such as medical or other emergency reasons). If the student's college determines a late drop is warranted, it will decide whether the course will be dropped without appearing on the student's transcript, assigned a grade of W, or assigned a grade of F.
(3) A Study Abroad student who is registered as full-time during the semester(s) abroad by a "placeholder" enrollment must maintain 12 credits or the full-time enrollment equivalent as defined by the international institution.

(e) Change of section within a course is permitted at the discretion of the department teaching the course.

### § 3-312 Withdrawal from the University – General Rules

(a) All Students
(1) A student who leaves the university during any term must officially withdraw from the university. A student who is registered in only one course and later requests to drop that course must withdraw from the university. Failing grades will be assigned to any student who leaves the university without completing withdrawal.
(2) Withdrawal procedures:
(A) Obtain a withdrawal form from the office of the dean of the college or graduate department. The date the student notifies the college or graduate department office of the student's intent to withdraw should be recorded as the official withdrawal date.
(B) Obtain the signatures of the university officers as indicated on the withdrawal form.
(C) Upon the student's request, the dean may file the withdrawal on behalf of the student.
(3) Cancellation or withdrawal from the university does not abrogate the authority of the institution to pursue disciplinary action.
(4) The student ID card remains valid for the term in which fees for services have been paid.

(b) Undergraduate Students
(1) The dean may issue a withdrawal form with a notation that failing grades are to be recorded in specified courses in which the student is seriously deficient.
(2) A student may be dropped or placed on probation for poor scholarship as of the date of the withdrawal at the discretion of the dean.
(3) A student who withdraws from the university within the last three weeks of instruction in the semester or within the last two weeks in the summer term or whose status cannot be determined because of excused grades may have an academic hold placed by their college on any future registrations.

### § 3-313 Excused Absences and Departure from the University for U.S. Military or Other U.S. National Defense Services

(a) Credit in Courses
(1) Undergraduate, graduate, or professional students who are members of the Active Reserve Forces (including the National Guard) called to active duty under normal training orders will not be granted excused absences or academic credit for courses in which they are enrolled unless they have requested a postponement of such a period of active duty for training until the summer, and unless the university has received a verification that such a request was officially denied. This requirement, however, shall not apply to individuals who are called to active duty as a result of national emergency or as a result of the mobilization of the Reserve Forces (including the National Guard).
(2) A student called to active duty shall be eligible for excused absences, subject to instructor approval, for up to 14 consecutive calendar days of in-progress courses prior to completing 75% of the semester in which they are enrolled. Any assignments

and assessments associated with those excused absences must be completed by the student in a timely manner as defined by the instructor after the student's return to campus. Courses must be at least 8 weeks in duration to receive up to 14 consecutive calendar days of excused absences. Courses less than 8 weeks in duration will be handled based on instructor and college office coordination. Training requiring more than 14 consecutive calendar days of absence, or students planning to continue coursework remotely, must coordinate with instructors. The Chez Veterans Center will confirm documentation of training orders for students called to active duty. Students should share this confirmation of training orders with instructors as soon as possible, but no later than five business days prior to the student's departure.

(3) When a student is called to active duty after completing at least 75% of the semester in which they are enrolled, the student may request incomplete grades (See § 3-104 Other Grade Symbols in Use) or depart from the semester. Students are permitted to request incomplete grades in some courses while departing from others.

(4) In the case of departure after completing at least 75% of the courses in which they are enrolled, students as specified in (1) are entitled to receive full credit. The grade reported shall be that attained in the course up to the time of departure. (Grades reported below C- are recorded as W [withdrawn]; grades of D- or higher reported in courses taken under the CR-NC option are recorded as CR.)

(5) Irrespective of their grade in any course in which they are then registered, students who depart from the university at any time for any of the above-mentioned reasons, shall be entitled at their discretion to complete alternative assignments or assessments approved by the instructor for credit in the course. The usual grading system applies. (See § 3-102 on grading system.)

(b) Graduation

(1) Students who have been at the university for not less than two full semesters, who have met all requirements for graduation (including minimum scholarship requirements), except those that they would fulfill by completing the courses for which they are registered at the time of departure from the university to enter active service with the Armed Forces, will receive full credit in those courses and may be recommended for a degree provided they have completed 50% of the course(s) in which they are enrolled, and provided they have a standing in the course(s) for which they are registered that, if maintained to the end of the semester, would satisfy the requirements for graduation. Courses that are not at least 50% completed at the time of departure will not earn any academic credit.

(2) A student who is eligible for continuing enrollment who at any time leaves the university to enter military service and does so enter within ten days, and who lacks no more than one-sixteenth of the total credit hours required for a degree, may, at the discretion of the college concerned and on approval of the student's major department, be recommended for such degree. But no student should be considered eligible for this privilege who has acquired hours under the provisions of subsection (b)(1) above.

(A) "A student who is eligible to continue" shall be interpreted to mean one whose progress during the student's university registrations has been satisfactory to the administrative officers of the student's college. Among grounds for dissatisfaction might be negligence in meeting requirements, or scholastic deficiencies.

(B) "At any time" shall be interpreted to mean "during any semester of enrollment or the interim between successive semesters." It is not intended that students who stay out of college for any semester, and who thus do not make continuous progress to their degrees, shall be eligible for the privilege extended in these rules.

## PART 4. UNDERGRADUATE ACADEMIC RECOGNITION

### § 3-401 The Dean's List

(a) The names of eligible undergraduates who have achieved a grade-point average for a given semester that places them approximately in the top 20 percent of their college will be included on a list prepared for the dean of the college. The GPA level for the Dean's List will be set by each college and may be adjusted periodically.

(b) To be eligible for Dean's List recognition, students must complete at least 12 academic semester hours taken for a letter grade (A through F). Students with I, DFR, or missing grades will be added as soon as letter grades are resolved and eligibility can be determined.

(c) Students who are registered with Disability Resources and Educational Services (DRES) who are enrolled less than 12 but a minimum of nine graded semester hours who are in the top 20 percent of their college are also eligible. Such students must sign a release with DRES indicating their consent for consideration for Dean's List eligibility and have submitted that consent to their home unit's academic affairs office no later than Reading Day in the semester in which they wish to be considered for Dean's List. These consent forms are valid only for the semester in which they are issued, and students must submit by the deadline updated consent forms for each semester in which they wish to be considered for Dean's List.

**§ 3-402 Campus Honors Program – Chancellor's Scholars**

(a) A select number of high-achieving students are admitted to the Campus Honors Program annually and are designated as "Chancellor's Scholars." This recognition is noted on the official university record for each term the student meets program requirements.

(b) Students may enroll in any undergraduate curriculum and are also encouraged to participate in departmental and college honors programs.

(c) As Chancellor's Scholars, students register in special small honors sections of classes that fulfill elective and general education requirements. They are able to participate in extensive co-curricular activities involving informal interaction with notable campus faculty members and outside speakers. Those students who elect to complete additional program requirements are eligible to graduate as a "Distinguished Chancellor's Scholar," which is noted on the official university record during the student's final semester in the program.

(d) For additional information, contact the Campus Honors Program website at https://honors.illinois.edu.

**§ 3-403 Edmund J. James Scholars**

Successful performance for one academic year as an Edmund J. James Scholar is recorded on the student's official university record as "Edmund J. James Scholar for Academic Year XXXX-XXXX." Specific criteria for appointment and recognition as a James Scholar vary from college to college.

**§ 3-404 University Honors – Bronze Tablet**

(a) Sustained academic achievement is recognized by inscribing the student's name on the Bronze Tablet. To qualify, undergraduate students must:
  (1) have at least a 3.5 (A = 4.0) cumulative grade-point average for all work taken at the university through the academic term prior to their graduation term; and
  (2) rank, on the basis of their cumulative grade-point average (including University of Illinois Urbana-Champaign and transfer work, if any) through the academic term prior to their graduation term, in the top 3 percent of the students in their college graduating class.

(b) Transfer students, in addition to meeting the general rules for qualification, must satisfy two additional requirements: (1) they must have cumulative University of Illinois Urbana-Champaign grade-point averages as high as the lowest ones listed for students in their college who qualify on the basis of having completed all of their work at the University of Illinois Urbana-Champaign; and (2) they must earn twenty-five or more semester hours at the University of Illinois Urbana-Champaign through the academic term prior to their graduation term.

(c) For the purpose of this award, college graduating class means all students receiving bachelor's degrees from the same University of Illinois Urbana-Champaign college between July 1 of each year and June 30 of the next.

(d) For the purpose of this award, academic term prior to graduation means: for August graduates, the preceding spring semester; for December graduates, the preceding summer

session; for May graduates, the preceding fall semester. The list will be determined each year following the availability of grades for the fall semester.

### § 3-405 Undergraduate College Honors

Each college prescribes the conditions under which candidates for its degrees may be recommended for graduation with honors in recognition of sustained intellectual achievement throughout the student's undergraduate career. These distinctions are noted on the student's baccalaureate diploma, permanent university record, and official transcript.

## PART 5. REGISTRATION CHARGES

### § 3-501 Tuition Assessment

(a) Students are assessed tuition on the basis of their college and curriculum of enrollment; residence classification; and credit range determined by the number of semester hours for which a student is registered. There is a tuition surcharge for undergraduate and graduate students enrolled in certain curricula. In addition, certain degree programs have specifically determined tuition charges. Information is available at the Records Service Center, 901 West Illinois Street, Urbana, (217) 333-6565.

(b) Credit ranges for tuition and fee assessment purposes are:

| | **Semester** | **Summer Term** |
|---|---|---|
| Range I | 12 hours or more | 9 hours or more |
| Range II | 6–11 hours | 6–8 hours |
| Range III | 1–5 hours | 3–5 hours |
| Range IV | 0 credit | 0–2 hours |

(c) The residency classification of students for admission and tuition assessment is determined on the basis of information given on the admission application and other credentials. Students who desire to change their assigned residency status must file a petition according to the procedures and within the time limits set forth in the regulations governing residency. (See §§ 3-901 to 3-904.)

(d) Students enrolled in the Veterinary Medicine Professional Program are assessed a single tuition rate for each of the four years of the professional curriculum; tuition is not prorated over the traditional four ranges since the professional curriculum requires a full course of study each term.

(e) Students enrolled in the Law Professional Program (JD or LLM degrees) are assessed a single tuition rate for each of the three years of the professional curriculum; tuition is not prorated over the traditional four ranges since the professional curriculum requires a full course of study each term.

(f) Students enrolled in the Doctor of Medicine (MD) program are assessed a single tuition rate for each of the four years of the professional curriculum; tuition is not prorated over the traditional four ranges since the professional curriculum requires a full course of study each term.

(g) The university Board of Trustees determines tuition rates; current rates may be found in the Office of the Registrar Tuition and Fee Rates (http://registrar.illinois.edu/tuition-fee-rates). Information regarding waivers is given in § 3-503. Students with questions about tuition may call the Record Service Center at (217) 333-6565 for clarification.

### § 3-502 Tuition Assessment – University Employees

(a) Academic employees of the university and of certain specifically identified related agencies and graduate assistants under appointment for less than 25 percent of full-time service, and staff employees under appointment for less than 50 percent of full-time service are not eligible for tuition and fee benefits.

(b) To be eligible for tuition and fee benefits, an appointment must be to an established position for a specific amount of time and at a salary commensurate with the percentage of time required. Service for at least three-fourths of the academic term is required.

(1) A term is defined as running from the first day of instruction through the last day of final examinations.
(2) Three-fourths of a term is defined as ninety-one days in a semester.

(c) Students who resign their appointments or whose appointments are canceled before rendering service for at least three-fourths of the term become subject to the full amount of the tuition and fees unless they withdraw from university classes at the same time or before the appointment becomes void, or they deposit their thesis with the Graduate College within seven calendar days of the resignation date.

(d) Employee tuition and fee privileges do not apply to students employed on an hourly basis in either an academic, graduate assistant, or nonacademic capacity, or to persons on leave without pay. university employees appointed to established civil service positions whose rates of pay are determined by negotiation, prevailing rates, and union affiliation are not considered as paid on an hourly basis and are entitled to the same tuition and fees privileges accorded to other staff members under the regulations.

(e) Tuition waivers are not granted for the Executive MBA Program, or other self-supporting programs.

(f) For the purpose of this section, the four employment categories at this campus are defined as follows:
(1) The faculty includes (1) those in the professorial ranks (i.e., professor, associate professor, assistant professor); (2) instructors and lecturers; and (3) teaching, research, and clinical associates. Various prefixes may be used in conjunction with these ranks, such as adjunct, clinical, visiting, or research.
(2) Academic professionals are those employees whose positions have been designated by the President and the Chancellor as meeting specialized administrative, professional, or technical needs. Academic professional employees receive an academic contract issued by the Board of Trustees for a term appointment. They are accorded the rights and privileges pertaining to other academic personnel except those that apply specifically to academic employees with faculty rank, such as eligibility for tenure.
(3) Graduate student assistants include teaching, research, graduate, and clinical assistants.
(4) Staff employees are those members of the university work force subject to the rules of the State Universities Civil Service System.

**§ 3-503 Tuition Waivers**

(a) Academic Employees
Tuition is waived for all faculty and academic professional employees of the university on appointment for at least 25 percent of full-time service, with an appointment that requires service for not less than three-fourths of a term. This waiver also applies to staff members of certain specifically identified related agencies, whose positions are considered equivalent to academic positions of the university. (See § 3-502.)

(b) Graduate Assistants
University graduate students with teaching, research, graduate or pre-professional graduate assistantship appointments of from 25 through 67 percent of full-time service, for at least three-fourths of the term hold a waiver-generating appointment. Students with these appointments will receive a tuition waiver.

In certain curricula, tuition waivers for students holding assistantships are "base-rate" waivers, i.e., the waivers cover the in-state lowest full-time tuition, regardless of the student's residency status and regardless of the source of assistantship. The students are responsible for paying the remaining tuition. It is the student's curriculum that determines the type of tuition waiver, not the unit granting the assistantship. Units that enroll students who qualify only for base-rate tuition waivers must provide written notification of the policy in advance, so that the students will know their status upon admission.

Assistants on appointment for 68 percent or more of full-time service do not receive a tuition waiver. Caution: Assistantship appointments are cumulative. For example, if a

person holds two appointments, a 25 percent and a 50 percent assistantship appointment, the person is ineligible for a tuition waiver.

(1) Students without summer waiver-generating appointments who held waiver-generating appointments for the previous spring semester are eligible to receive summer automatic tuition waivers if they chose to enroll in the summer semester. The summer automatic waiver provides the same tuition waiver (base rate or full) as that granted during the previous spring. However, it does not provide a waiver of the same fees as a waiver-generating appointment. Only the Service Fee, the AFMFA Fee, and the Library/Information Technology Fee are waived.
(2) Students holding waiver-generating summer session appointments receive the waivers appropriate for their appointment.
(3) Students may not be eligible for more than one waiver at a time.
(4) Authority to grant exceptions for graduate assistantship waivers is vested in the Graduate College as a unit of the Office of the Provost and Vice Chancellor for Academic Affairs.

(c) Fellows and Trainees

A fellowship or traineeship is defined as an award providing a living allowance and demanding no services in return. Fellowship/Traineeship appointments either: a) include payment by the funding agency of all tuition assessed; or b) include a full waiver; or c) supplement a waiver-generating appointment. To qualify for a waiver, the fellowship or traineeship must provide a living allowance at the established campus minimum or higher for the award period. A fellowship waiver is a full waiver regardless of whether or not the student's program is base-rate for assistantship waiver purposes. In case of dispute, the Graduate College decides whether an award is a fellowship.

(1) Students without summer waiver-generating appointments who held waiver-generating appointments for the previous spring semester are eligible to receive summer automatic tuition waivers if they chose to enroll in the summer semester. The summer automatic waiver provides the same tuition waiver (base rate or full) as that granted during the previous spring. However, it does not provide a waiver of the same fees as a waiver-generating appointment. Only the Service Fee, the AFMFA Fee, and the Library/Information Technology Fee are waived.
(2) Students holding waiver-generating summer session appointments receive the waivers appropriate for their appointment.
(3) Students may not be eligible for more than one waiver at a time.

(d) Staff Employees

(1) Staff employees of the university, of other institutions and agencies under the University Civil Service System, and of certain specifically identified related agencies in status appointments or in appointments designed to qualify for status in an established class (e.g., trainee, intern, etc.) for at least 50 percent of full-time service may be granted waiver of tuition in any regular courses for not more than eleven credit hours in a semester if on a full-time appointment (Range II), or five credit hours if on a 50 percent to 99 percent time appointment (Range III), provided that they (1) are eligible for admission, (2) are not students defined under Civil Service Rule 250.70 (f), and (3) have enrollment approval of their employing department.
(2) If an employee's total registration is in a higher range than authorized above, the employee must pay the difference between the authorized range and the higher range.
(3) Staff employees in a status, learner, trainee, apprentice, or provisional appointment may enroll without payment of tuition and service fee in regular courses directly related to the university employment not to exceed ten credit hours per semester provided that they have made application and received prior approval for enrollment as required by procedures issued by the director of nonacademic personnel and set forth in Policy and Rules—Staff.

(e) Child of Eligible Employee

(1) Illinois Public Act 87-0793 (SB 1353) provides, if certain eligibility criteria are met, a 50 percent tuition waiver for undergraduate education for children of university employees enrolled at an Illinois state institution of higher education.
(2) The Board of Trustees has established the following regulations:

(A) The waiver can be used only for undergraduate education.
(B) The waiver shall cover 50 percent of tuition, not fees.
(C) The waiver may be used for four years (including summers), as long as satisfactory academic progress is maintained.
(D) The parent must be a regular employee of the University of Illinois (or other Illinois state university) with at least seven years of service on the first day of instruction of the term for which the waiver is requested, and be one whose appointment qualifies for employer-provided insurance benefits. Excluded as "parent" are annuitants; employees of university-related organizations (i.e., Foundation and Alumni Association); Civil Service temporary and extra help; graduate and undergraduate assistants; and academic hourly and student employees.
(E) The child must be under twenty-five years of age and the child of the eligible employee by blood or adoption; or the legal child of the employee's current spouse; or the legal ward of the eligible employee.
(F) The child must qualify for admission to a degree program under the same requirements, standards, and policies applicable to general applications.
(G) To apply for the waiver, the employee or child must obtain an eligibility form available at one of the following offices:
- Office of Student Financial Aid, Student Services Arcade Building, 620 East John Street, Champaign
- Benefits Center, Fourth Floor, 807 South Wright Street, Champaign
- Staff Human Resources, 52 East Gregory Drive, Champaign

(f) Other Categories of Students
Tuition is waived for:
(1) Holders of tuition waiver scholarships.
(2) Graduate students with college-level waivers
(3) University of Illinois faculty, academic professional, and staff retirees.
(4) Holders of grants or contracts from outside sponsors that provide payments to cover the total cost of instruction.
(5) Cooperating teachers and administrators who receive an assignment of practice teachers, who receive assignment of students meeting the clinical experience requirement in teacher education curricula, or who cooperate in research projects related to teacher education: one semester, quarter, or summer term for each semester, quarter, or equivalent service rendered within two consecutive semesters. The waiver shall apply to the semester, quarter, or summer term of registration, as designated by the student, that is concurrent with, or following, the term of service, but must be applied no later than one calendar year from the end of the term of service. Concurrent registration on more than one campus of the university or in university extramural courses constitutes one semester, quarter, or session of eligibility for waiver.
(A) A similar waiver is authorized for cooperating librarians, school-nurse teachers, social welfare field supervisors, recreation field supervisors, health education field supervisors, speech pathology supervisors, developmental child care field supervisors, educational psychology supervisors, continuing education supervisors, industrial relations field supervisors, and physicians who participate without salary in the instructional program of the University of Illinois College of Medicine at Urbana-Champaign.
(B) Acceptance of more than one assignment from any of the above listed offices during any one term will generate only one waiver.

**§ 3-504 Tuition – Waiver of Nonresident Portion**

(a) The nonresident portion of tuition is waived for:
(1) academic and staff employees on appointment for at least 25 percent of full-time service with the university and with certain specifically identified related agencies, provided the appointment requires service for not less than three-fourths of the term.
(2) persons actively serving in one of the Armed Forces of the United States who are stationed and present in the state of Illinois in connection with that service and their spouses and dependent children, as long as the military person remains stationed, present, and living in Illinois.

(b) The following students are treated as residents for tuition purposes:
  (1) the teaching and professional staff (such as counselors, school psychologists, school social workers, librarians, and administrators) in the private and public elementary and secondary schools in Illinois who hold appointment for at least one-fourth time for not less than three-fourths of the term.
  (2) the spouses and dependent children of academic and staff employees and graduate assistants on appointment with the university and certain specifically identified related agencies for at least 25 percent of full-time service, and of those identified in subsection (b)(4) below. (Dependent children are those who qualify as dependents for federal income tax purposes.)
  (3) the spouses and dependent children of fellows and trainees who are appointed as teaching assistants to the fullest extent permitted by their fellowship appointment.
  (4) the faculties of state-supported institutions of higher education in Illinois holding appointments of at least one-fourth time, provided the appointment requires service for not less than three-fourths of the term.

**§ 3-505 Fee Assessments**

Registration fee charges are assessed on the basis of the number of semester credit hours for which a student is registered. For fee assessment purposes, there is no distinction between resident and nonresident, graduate or undergraduate. Fee rates are determined by the university Board of Trustees; current rates may be found in the Office of the Registrar Tuition & Fee Rates (https://registrar.illinois.edu/tuition-fee-rates). Waivers and exemptions are explained in § 3-506. Students with questions should call the Office of the Registrar at (217) 333-6565 for clarification. Brief descriptions of assessed registration fees follow.

(a) Service Fee
A fee to support salaries, programming, general expenses, and utilities for campus Auxiliary Service units such as the Illini Union, State Farm Center, and Campus Recreation. Students exempt from this fee because they are registered in Credit Ranges III or IV (Range IV in summer) may obtain these services by paying online. (https://go.illinois.edu/UIUCServiceFee)

(b) Health Service Fee
A fee to provide salaries, programming, general expenses, and utilities for McKinley Health Center and the Counseling Center.
  (1) Fall semester coverage extends from the Monday of the week prior to Fall's first day of instruction to the first day of instruction in the Spring semester. Spring semester coverage extends from the Monday of the week prior to Spring's first day of instruction to the first day of instruction in the Summer term. Summer term coverage extends from the Monday of the week prior to Summer's first day of instruction to the first day of instruction in the Fall semester.
  (2) Dependents of students (spouses and dependent children) are ineligible for health services at the McKinley Health Center unless they are registered university students.
  (3) Students who were covered by University Health Center services during the spring semester and who do not enroll in summer term may extend their eligibility through the summer by paying an additional fee. Application for extended McKinley Health Center coverage for the summer terms must be made at 131 McKinley Health Center. Students exempt from this fee because they are registered in Credit Ranges III or IV (Range IV in summer) may obtain its service by special arrangement with the provider. (See the Office of the Registrar's Campus Fee Information (https://registrar.illinois.edu/fee-info) for details.)

(c) Health Insurance Fee
A fee to cover the cost of premiums to the insurance carrier and the cost of administering the program. (See § 2-103.)

(d) Transportation Fee
A fee to support a plan to provide for unlimited student use of special campus bus routes and all existing Champaign-Urbana Mass Transit District bus routes, as well as to create service for additional student/commuter and long-term parking. (Students exempt from this fee because they are registered in Credit Ranges III or IV may obtain its service by special arrangement with the provider; see the online Class Schedule for details.)

(e) General Fee
A fee to support certain fixed costs of fee-supported buildings (Activities and Recreation Center, Ice Arena, State Farm Center, Illini Union, etc.) on campus.

(f) Academic Facilities Maintenance Fund Assessment (AFMFA)
An assessment to support deferred maintenance and facility renovations for academic buildings.

(g) Library/Information Technology Fee
A fee used to aid in the transition towards electronic media and digitalization, increase library hours, improve information technology services, strengthen opportunities for research technology and assistance, and enhance access to both electronic and print material collections.

(h) Student Initiated Fees
Student Initiated Fees – All Student Initiated Fees (1-11) listed below were implemented as referenda questions approved by the students during the student election process. Upon approval each Student Initiated fee was approved by the University of Illinois Board of Trustees. Similarly, a student referendum affirmed the role of the Student Fee Advisory Committee (SFAC) to provide recommendations to the Chancellor regarding the dollar amount of each Student Initiated Fee. The SFAC review process will at least follow the rotation schedule below. Continuation of an existing fee will be reaffirmed by student vote as per the rotation schedule below. A new Student Initiated Fee may be established upon affirmation of a student body vote. The following fees will be reviewed at least every four years in the following order: Year 1-Krannert Center Fee; Year 2-Cleaner Energy Technologies Fee, Sustainable Campus Environment Fee, and Legacy of Service and Learning Scholarship Fee; Year 3-Cultural Programming Fee, Students for Equal Access to Learning Fee, Bicycle Programs and Infrastructure Fee, and Helping Others' Personal Excellence Fee; Year 4-Student Organization Resource Fee, Study Abroad and Travel Scholarship Fee, and Media Fee. All Student Initiated Fees shall be reviewed by the Student Body via student referendum no less than once every four years.

(1) Cleaner Energy Technologies Fee (CET)
A fee used to purchase cleaner energy technologies for campus, including solar, wind, hydrogen and geothermal projects, energy efficiency purchases, and the purchase of renewable energy from non-university producers. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(2) Cultural Programming Fee (CP)
A fee that supports cultural programming within six areas: African-American, Asian-American, Latina/o, LGBT, Native American and women's programming. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(3) Krannert Center Fee
A fee to support productions at the Krannert Center for the Performing Arts (KCPA). This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(4) Legacy of Service and Learning Scholarship (LSLS) Fee
A fee creating a new and permanent source of need/merit-based scholarships which include a community service component. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(5) Student Organization Resource Fee (SORF)
A fee to help fund programs and/or services of Registered Student Organizations. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(6) Students for Equal Access to Learning (SEAL) Fund
A fee which supplements existing financial aid for students with financial need. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(7) Study Abroad and Travel Scholarship Fee
A fee to provide scholarships to undergraduate students for study abroad and the graduate and professional students for travel scholarships. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(8) Sustainable Campus Environment Fee (SCEF)
A fee to help establish a sustainable campus environment by financing initiatives such as green buildings, engagement of the university community, recycling, energy efficiency, and environmentally responsible purchasing. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(9) Media Fee
A fee to support Illini Media Company which operates The Daily Illini, Illio, WPGU, and other campus-based media. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(10) Bicycle Programs and Infrastructure Fee
A fee used to fund better bike infrastructure, expanding bike parking, creating safety courses and materials for bike encouragement and education, and creating a bike rental program. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(11) Helping Others' Personal Excellence (HOPE) Fee
A fee to provide scholarships for students who demonstrate financial need but do not otherwise qualify for financial aid. This fee shall be reviewed by the Student Body via student referendum no less than once every four years.

(i) Online Fee
A mandatory fee assessed to students enrolled in degree-seeking or non-degree academic credit-bearing experiences that are not based on campus (including off campus and online), for online counseling support, support by the Connie Frank CARE Center and Office for Student Conflict Resolution, access to library services and collections, and access to technology systems and services. This fee is assessed per credit hour.

## § 3-506 Fee Waivers and Exemptions

(a) Students enrolled in Tuition Ranges III or IV (fewer than 2 hours in summer) are assessed the General Fee and the Health Insurance Fee only and are exempt from all other remaining fees. Services covered by the remaining fees may be obtained by making individual arrangements with service providers. (See § 3-505 for such arrangements.)

(b) Health Insurance Fee Waivers
(1) graduate students with waiver-generating appointments, as defined in the section on tuition (See § 3-503(b)), receive a partial payment of the Health Insurance Fee.

(c) Health Insurance Fee Exemptions
(1) students presenting evidence of approved equivalent medical insurance coverage (See § 2-103.)
(2) students registered in absentia
(3) students registered in off-campus programs, or study-abroad courses for zero credit; however, the fee is required of students in study-abroad courses registered for more than zero credit and of all Division of Intercollegiate Athletics (DIA) student athletes.
(4) university employees registered at the request of their departments in zero-credit courses especially established to improve work performance
(5) university employees registered as students but eligible for and participating in the mandatory State of Illinois Employees Insurance Program
(6) employees of specifically identified related agencies who are eligible automatically to receive hospital-medical coverage as an employee benefit at the cost of their employing agency
(7) Illinois Teacher of the Year recipients
(8) Big Ten Academic Alliance (BTAA) Visiting Scholars
(9) students in concurrent enrollment at the University of Illinois Chicago or Springfield

(d) Service Fee Waivers
(1) graduate students with waiver-generating appointments, as defined in the section on tuition (See § 3-503(b))
(2) foreign exchange students with a Service Fee waiver as part of the exchange contract
(3) graduate students with college-level waivers
(4) law students with Service Fee waivers
(5) participants in the International Exchange Program in Agriculture

(6) participants in the Bridge Program
(7) Illinois Teacher of the Year recipients
(8) BTAA Visiting Scholars
(9) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(10) Department of Children and Family Services dependents

(e) Service Fee Exemptions
(1) students enrolled in Credit Ranges III or IV (fewer than 3 hours in summer)
(2) students registered in absentia
(3) students registered in study-abroad programs
(4) students registered as participants in the official high school concurrent enrollment program
(5) students registered in recognized off-campus programs
(6) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(7) staff members holding at least 50 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(8) employees (as defined in (6) and (7) above) holding appointments with the University of Illinois Chicago or Springfield
(9) interinstitutional staff members
(10) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(11) faculty, academic employees, or staff members of specifically identified related agencies
(12) University of Illinois faculty, academic professional, and staff retirees

(f) Academic Facilities Maintenance Fund Assessment Waivers
(1) graduate students with waiver-generating appointments, as defined in the section on tuition (See § 3-503(b))
(2) foreign exchange students with a Service Fee waiver as part of the exchange contract
(3) graduate students with college-level waivers
(4) law students with Service Fee waivers
(5) participants in the International Exchange Program in Agriculture
(6) participants in the Bridge Program
(7) Illinois Teacher of the Year recipients
(8) BTAA Visiting Scholars
(9) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(10) Department of Children and Family Services dependents

(g) Library/Information Technology Fee Exemptions
(1) students registered in absentia
(2) students registered in study-abroad programs
(3) students registered as participants in the official high school concurrent enrollment program
(4) students registered in recognized off-campus programs
(5) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(6) staff members holding at least 50 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(7) employees (as defined in (5) and (6) above) holding appointments with the University of Illinois Chicago or Springfield
(8) interinstitutional staff members
(9) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(10) faculty, academic employees, or staff members of specifically identified related agencies
(11) University of Illinois faculty, academic professional, and staff retirees

(h) Library/Information Technology Fee Waivers
(1) graduate teaching or research assistants holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(2) foreign exchange students with a Service Fee waiver as part of the exchange contract

(3) holders of Graduate College waivers
(4) law students with Service Fee waivers
(5) participants in the International Exchange Program in Agriculture
(6) participants in the Bridge Program
(7) Illinois Teacher of the Year recipients
(8) BTAA Visiting Scholars
(9) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(10) Department of Children and Family Services dependents

(i) Academic Facilities Maintenance Fund Assessment Exemptions
(1) students registered in absentia
(2) students registered in study-abroad programs
(3) students registered as participants in the official high school concurrent enrollment program
(4) students registered in recognized off-campus programs
(5) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(6) staff members holding at least 50 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(7) employees (as defined in (5) and (6) above) holding appointments with the University of Illinois Chicago or Springfield
(8) interinstitutional staff members
(9) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(10) faculty, academic employees, or staff members of specifically identified related agencies
(11) University of Illinois faculty, academic professional, and staff retirees

(j) General Fee Waivers
(1) BTAA Visiting Scholars
(2) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(3) Department of Children and Family Services dependents
(4) Illinois Teacher of the Year recipients

(k) General Fee Exemptions
(1) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(2) staff members holding at least 50 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(3) employees (as defined in (1) and (2) above) holding appointments with the University of Illinois Chicago or Springfield
(4) interinstitutional staff members
(5) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(6) faculty, academic employees, or staff members of specifically identified related agencies
(7) University of Illinois faculty, academic professional, and staff retirees

(l) Health Service Fee Waivers
(1) graduate students with the waiver-generating appointments, as defined in the section on tuition (See § 3-503(b))
(2) BTAA Visiting Scholars
(3) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(4) Department of Children and Family Services dependents
(5) Illinois Teacher of the Year recipients

(m) Health Service Fee Exemptions
(1) students enrolled in Credit Ranges III or IV (fewer than 3 hours in summer)
(2) students registered in absentia
(3) students registered in study-abroad programs
(4) students registered as participants in the official high school concurrent enrollment program
(5) students registered in recognized off-campus programs

(6) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(7) staff members holding at least 50 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(8) employees (as defined in (6) and (7) above) holding appointments with the University of Illinois Chicago or Springfield
(9) interinstitutional staff members
(10) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(11) faculty, academic employees, or staff members of specifically identified related agencies
(12) University of Illinois faculty, academic professional, and staff retirees
(13) University employees registered as students but eligible for the mandatory State of Illinois Employees Insurance Program

(n) Transportation Fee Waivers
(1) Graduate students with waiver-generating appointments, as defined in the section on tuition (See § 3-503 (b))
(2) BTAA Visiting Scholars
(3) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(4) Department of Children and Family Services dependents
(5) Illinois Teacher of the Year recipients

(o) Transportation Fee Exemptions
(1) students enrolled in Credit Ranges III or IV (fewer than 3 hours in summer)
(2) students registered in absentia
(3) students registered in study-abroad programs
(4) students registered as participants in the official high school concurrent enrollment program
(5) students registered in recognized off-campus programs
(6) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(7) staff members holding at least 50 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(8) employees (as defined in (6) and (7) above) holding appointments with the University of Illinois Chicago or Springfield
(9) interinstitutional staff members
(10) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(11) faculty, academic employees, or staff members of specifically identified related agencies
(12) University of Illinois faculty, academic professional, and staff retirees

(p) Student Initiated Fee Waivers
(1) BTAA Visiting Scholars
(2) students in concurrent enrollment at the University of Illinois Chicago or Springfield
(3) Department of Children and Family Services dependents
(4) Illinois Teacher of the Year recipients

(q) Student Initiated Fees
(1) students enrolled in Credit Ranges III or IV (fewer than 3 hours in summer)
(2) students registered in absentia
(3) students registered in study-abroad programs
(4) students registered as participants in the official high school concurrent enrollment program
(5) students registered in recognized off-campus programs
(6) faculty or academic professional employees holding at least 25 percent time appointments for three-fourths of the semester, as defined in the section on tuition
(7) staff members holding at least 50 percent appointments for three-fourths of the semester, as defined in the section on tuition
(8) faculty, academic employees, or staff members of a specifically identified related agency
(9) interinstitutional staff members

(10) cooperating teachers, administrators, or field supervisors, as defined in the section on tuition
(11) employees (as defined in (6) and (7) above) holding a combined appointment with the University of Illinois Chicago or Springfield
(12) University of Illinois faculty, academic professional, and staff retirees

**§ 3-507 Payment Requirement**

(a) Tuition and fees assessed for any semester or session are due and payable in full by the due date shown on the student account statement in Student Self-Service.

(b) A monthly Late Payment charge of 1.5 percent or $1, whichever is greater, and a Past Due charge of $2 per month are assessed on any delinquent amount. In addition, delinquent accounts will be subject to a financial hold, which may prevent registration and/or release of the student's academic record.

(c) Payments returned for non-sufficient funds or any other reason are subject to penalties and must be repaid with guaranteed funds within 5 business days of notification. In addition, students who present payment that is subsequently returned may have their registration cancelled and be denied future registration until their delinquent student account balance has been paid with guaranteed funds.

**§ 3-508 Refunds of Registration Charges**

(a) Withdrawal from the University
(1) A student who, for reasons other than active military service or other approved national defense service, withdraws from the university on or before 60 percent of the enrollment period has elapsed shall receive a refund. Assessed tuition, the service fee, the general fee, Academic Facilities Maintenance Fund Assessment (AFMFA), Library/Information Technology Fee and the transportation fee are refunded on a pro-rata basis less a fifty dollar ($50) Administrative Fee. The Administrative Fee is not charged for withdrawal from the summer term.
(2) The Health Service Fee (HSF) is not refundable. If the HSF was originally assessed, students remain eligible to receive McKinley Health Center services until the close of the term.
(3) The Student Health Insurance Fee (SHIF) may be waived. If the SHIF was originally assessed but coverage has not been used, students who withdraw from the university may contact the Student Insurance office (insure@illinois.edu) to request that the insurance coverage be waived. All such requests must be completed within an insurance Enrollment Period; otherwise, students will continue to be covered by student health insurance until the close of the term.
(4) Before a refund is made to the student, the university must make a refund to appropriate financial aid programs providing assistance to the student. Students indebted to the university at the time of withdrawal will have the amount owed deducted from the amount of any refund available.
(5) Students who either fail to withdraw officially from the university or withdraw following the refund period are responsible for payment of all tuition and fee charges billed. (See § 3-306.)

(b) Students Dismissed
A refund to a student dismissed from the university during a term is on the same basis as indicated for a student who withdraws from the university.

(c) Withdrawal for Military and Other National Defense Service
In cases of withdrawal for active duty in the Armed Forces or other approved national defense service under the circumstances described in § 3-313, special refund provisions have been adopted by the university as follows:
(1) Irrespective of the time of withdrawal, students will receive full refunds of all tuition and refundable fees, unless credit is granted as part of the withdrawal.
(2) Students who receive credit as part of their withdrawal will receive a full refund of their tuition and refundable fees, less the amounts associated with the credit given.

(d) Reduction of Program
Students who reduce their course enrollment to a lower credit range receive a refund of the full amount of the difference in tuition and fees, provided the changes are made during the first ten days of instruction for a semester. For university academic terms of other lengths, refund periods are determined proportionately. The exact refund dates for these terms can be found in the Office of the Registrar refund schedule (http://registrar.illinois.edu/refunds). Thereafter, no refund is allowed. Credit ranges are found in § 3-501.

(e) Cancellation of Registration
(1) Students who cancel their registration as described in § 3-308 will not be charged tuition and fees.
(2) Students who either have attended classes or have used campus services during a term may not cancel their registration. They must withdraw as described in § 3-313 and be subject to the refund regulations governing withdrawals.

(f) Auditors
A person registered as an auditor who withdraws receives no refund of the auditor's fee.

### § 3-509 Students in Debt to the University

(a) A $25 penalty is assessed to the student account for each check, paper or electronic, that is returned for non-sufficient funds or any other reason. In addition, the university may refuse to accept e-checks or personal checks as payment on a student account after two checks, paper or electronic and regardless of issuer, were posted to that account and then returned for any reason by the bank. Future payments to that student's account must be made by money order, cashier's check or credit card. Further penalties, including dismissal from the university, may be imposed on students who fail to bring their delinquent account current or attempt to defraud the university.

(b) A student who is in debt to the university at the end of any academic term shall not be permitted to register in the university again and shall not be entitled to receive the student's diploma or an official statement or transcript of credits until the indebtedness has been paid or suitable arrangements for payment have been made unless there is a pending bankruptcy petition of the student seeking a discharge of all such indebtedness or all such indebtedness has been discharged.

## PART 6. STUDENT RECORDS – GUIDELINES AND REGULATIONS GOVERNING ACCESS AND RELEASE

### § 3-601 Authorization and Responsibility for Policy Implementation

(a) It is university policy to comply fully with the Family Educational Rights and Privacy Act of 1974 (FERPA) as amended. On November 13, 1974, the Board of Trustees authorized the President of the university to promulgate guidelines and regulations for discharge of the university's obligation under FERPA to identify the responsibility for its implementation. The integrated nature of our administrative information systems means that some student information could be accessible throughout the University of Illinois. The University of Illinois will not disclose student record information that it maintains except as provided by law.

(b) Except as otherwise provided in these Guidelines and Regulations, the responsibility for implementation of FERPA is assigned to the Chancellor. Among these responsibilities are:
(1) publication of parents' and students' rights and procedures under FERPA;
(2) publication of the types of records kept and the names of the persons in charge;
(3) notification to students of directory information categories that may be released without the student's consent in each individual instance; and
(4) notification of a reasonable period of time during which currently enrolled students may indicate that any or all items of directory information should not be released without the student's prior consent.

(c) The Chancellor shall designate persons to perform the necessary functions.

**§ 3-602 Definitions**

For the purpose of FERPA:

(a) "Student" is defined as a person who is or has been in attendance at the University of Illinois, in a course of study either on campus or off campus, and for whom the university maintains education records or personally identifiable information.
   (1) "Attendance" includes, but is not limited to, attendance in person or remotely. It includes the period during which a person is working under a work-study program.
   (2) "Denied Applicants" are persons who applied for admission but were not admitted are not considered students and have no rights under this policy.

(b) "Education records" are those records, files, documents, and other materials that contain information directly related to the student and are maintained by the university or by a person acting for the university. Under FERPA, each student has the right to inspect their education record (see § 3-604 Regulations for Record Custodians).
   Exclusions:
   (1) Sole possession records (personal memory aids that are not accessible or revealed to others except to a temporary substitute for the maker of the record).
   (2) Alumni records that are created or received by the university after an individual is no longer a student in attendance and are not directly related to the individual's attendance or academic progress as a student.
   (3) Grades on peer graded assignments until they are collected and recorded by an instructor.

(c) At the university, "directory information" for currently enrolled students includes the student's name, addresses (including email), telephone numbers, University Identification Number (UIN), college, curriculum, and major field of study, class level, date of admission, expected graduation date, date of birth, dates of attendance and full- or part-time status, attendance site (campus/location), eligibility for membership in registered university honoraries, degrees, honors, and certificates received or anticipated; for students appointed as fellows, assistants, graduate, or undergraduate hourly employees, the title, appointing department, appointment dates, duties, and percent time of the appointment; weight and height if the student is an athletic team member; participation in officially recognized activities and sports; and institutions previously attended.

(d) For former students, "directory information" may include the student's name; date of birth; last known addresses and telephone numbers; college, curriculum, and major field of study; dates of admission, attendance, and full or part-time status; class level; honors; certificates or degrees earned at the university and the date(s) conferred; weight and height if the student was an athletic team member; participation in officially recognized activities and sports; attendance site (campus/location), and institutions previously attended.

(e) "university officials" may include:
   (1) any person employed by the university in an administrative, supervisory, academic, research, student employee, or support staff position (including persons employed by the university law enforcement unit and health staff);
   (2) a person serving on an official committee, including but not limited to a scholarship, disciplinary or grievance committee, or otherwise assisting a university official in performing their tasks;
   (3) a person serving on the Board of Trustees;
   (4) a person or company with whom the university has contracted to provide a service (such as an attorney, auditor, or collection agent).

(f) A school official has a "legitimate educational interest" if the official is:
   (1) performing a task that is specified in the official's position description or contract agreement;
   (2) performing a task related to a student's education (e.g. providing academic or personal advice and counsel, creating and/or maintaining educational records, supervising and/or certifying student educational progress for university or government purposes);
   (3) performing a task related to the disciplining of a student;
   (4) providing a service or benefit relating to the student (e.g. health care, counseling, job placement, housing, financial aid); or

(5) maintaining the safety and security of the campus.

Whether or not a legitimate educational interest exists will be determined on a case-by-case basis by the head of the unit with which the records are affiliated or, if the request would include records that do not belong to that unit, by the Registrar.

(g) "Parent" means a parent of a student and includes a natural parent, a guardian, or an individual acting as a parent in the absence of a parent or guardian.

(h) "Personally Identifiable Information" includes, but is not limited to:
- (1) The name of a student, the student's parent(s), the student's spouse or other family member;
- (2) The address of the student or the student's family;
- (3) A personal identifier such as the student's social security number or University Identification Number (UIN);
- (4) A list of personal characteristics or other information which can be used to distinguish or trace an individual's Identity either directly or indirectly through linkages with other information.

(i) "Record" means any information recorded in any way, including, but not limited to, handwriting, print, computer media, video or audio recordings, film, microfilm, and microfiche.

**§ 3-603 Access to Student's Personally Identifiable Education Records**

(a) By Students: A student's education record shall be made accessible to the student requesting access to their record within a reasonable time, but in no case more than forty-five (45)days after the request for access has been made.

(b) By Parents (including legal guardians): Access to a student's education record will generally be granted to a parent only with the student's prior written consent, except in the following circumstances:
- (1) Dependent student. Parents of a dependent student, as defined in section 152 of the Internal Revenue Code of 1954, may be given the same access to that student's education records as is available to the student without the student's written consent if the parent documents to the satisfaction of the record's custodian that the parent claimed the student as an exemption on the filing of the last federal income tax statement.
- (2) Incidents involving alcohol or a controlled substance. The university may disclose information from a student's education record to parents regarding the violation of any federal, state, or local law, or any rule or policy of the institution, governing the use of alcohol or a controlled substance if: (A) The student is under the age of twenty-one, and (B) The student is found to have committed a violation of the Student Code relating to alcohol or controlled substances, and (C) the Dean of Students determines it to be in the best interest of the student and the university.
- (3) Health and safety emergency. The university may disclose information from a student's education record to parents in connection with an emergency if knowledge of the information is necessary to protect the health and safety of the student or other individuals.

(c) By Others:
- (1) Information from a student's education record may be disclosed to others:
  - (A) with the prior written consent of the student, specifying the records to be disclosed, the purpose of the disclosure, and to whom the disclosure is made, with a copy of the information disclosed provided to the student if requested;
  - (B) in compliance with judicial order, or lawfully issued subpoena, provided the university makes a reasonable effort to notify the student of the order or subpoena in advance of compliance, unless the order or subpoena directs otherwise; or
  - (C) by the Dean of Students or the emergency dean on duty, to appropriate parties, including parents, in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals.
  - (D) if deemed by the Dean of Students to be necessary to protect public safety, the following information may be disclosed to the public:

(i) The name, code violation, and sanction of a student found (after all appeals through the disciplinary system) to be in violation of those provisions of § 1-302 applying to crimes of violence or nonforcible sex offenses; or

(ii) Information about sex offenders and other individuals required to register under section 170101 of the Violent Crime Control and Law Enforcement Act of 1994, 42 USC 14071 received pursuant to federal law and guidelines.

(2) Otherwise, personally identifiable education records of students may be disclosed without the student's written consent only to the following persons, subject to certain conditions as specified in FERPA:

(A) to other university officials, including faculty who have legitimate educational interests;

(B) to officials of other schools or school systems in which the student seeks or intends to enroll or where the student has already enrolled so long as the disclosure is for the purposes related to the student's enrollment or transfer;

(C) to those representatives of the federal government and state agencies who are identified in FERPA;

(D) in connection with the student's application for, or receipt of, financial aid;

(E) to state and local officials or authorities to which such information is specifically required to be reported or disclosed concerning the juvenile justice system;

(F) to organizations (including the federal, state and local governments and independent organization) conducting studies for, or on behalf of the university under a written agreement for the purpose of developing, validating, or administering predictive tests, administering student aid programs, and improving instruction, if such studies are conducted in such a manner as will not permit the personal identification of students and their parents by persons other than representatives of such organizations and such information will be destroyed when no longer required for the purpose for which it is conducted;

(G) to accrediting organizations in order to carry out their accrediting functions;

(H) to the victim of an alleged perpetrator of a crime of violence or a non-forcible sex offense, the final results of a disciplinary proceeding under the conditions set forth in FERPA;

(I) to the apparent record originator in order to verify authenticity of a record.

(3) Except as set forth in FERPA, records may be disclosed, with or without the student's consent, to a third party only on the condition that the recipient will not permit others to have access to the personal information without the written consent of the student. With the exception of university officials described under § 3-602(e), persons desiring access to a student's record must sign a written form, available for inspection by the student and the official responsible for the record maintenance, indicating specifically thereon the legitimate educational or other interest for which the information is sought.

(4) Custodians of records and other record-maintenance personnel shall have access to student records while performing the record-keeping function, without the necessity of executing access forms.

(5) In the interests of public safety, the name, code violations, and sanction(s) of a student found (after all appeals through the disciplinary system) to be in violation of those provisions of § 1-302 applying to violent offenses and nonforcible sex offenses may be released to the public. This release of information is permitted under FERPA Section 951.

## § 3-604 Regulations for Record Custodians

(a) Directory Information Suppression and Default display:

(1) Prior to the sixth day of instruction for a specific term, students have the right to request that directory information be kept confidential. Requests will be in force until the student notifies the Office of the Registrar in writing that the information is no longer to be restricted. On the sixth day of instruction, all directory information that has not been restricted by the student may be released without the student's prior consent. Nothing contained herein prevents the university from disclosing directory information as permitted in 3-603(c).

(2) Students may not request directory information be kept confidential for the purpose of preventing the university from disclosing or requiring a student to disclose the student's name, UIN, or university email address in a class in which the student is enrolled.

(3) The default public online display for unsuppressed directory information will be the student's first and last name and email address. Students may choose to include additional information for general public online display.

(b) Request to Review Record. A student's request to see their education record must be granted within a reasonable period of time, but in no case more than forty-five days after the request for access has been made. For the purpose of FERPA, records that are not accessible to students for review are:
(1) Financial records of parents,
(2) Confidential letters of recommendation received prior to January 1, 1975, or confidential letters of recommendation received after January 1, 1975 for which the student has waived the right to review
(3) Sole possession records (personal memory aids that are not accessible or revealed to others except to a temporary substitute for the maker of the record),
(4) Law enforcement records,
(5) Medical, psychiatric or similar records made, maintained or used by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in such capacity and in connection with the treatment of the student, and disclosed only to individuals providing treatment.
(6) Alumni records created or received by the university after an individual is no longer a student in attendance and are not directly related to the individual's attendance or academic progress as a student,
(7) Grades on peer graded assignments until they are collected and recorded by an instructor, and
(8) Any other records exempted from review under FERPA.

(c) Reproductions. Students have the right to reproductions of their education records if failure to provide copies would effectively prevent students from exercising the right to inspect and review their education records. A charge not to exceed $1 per page may be made for this service. Offices that charge the students are to keep in mind the regulations in the Office of Business and Financial Services Policies and Procedures, Section 10 - Cash Handling.

(d) Corrections. Every reasonable effort should be made to verify or correct any information in the student education record that is misleading, inaccurate, or otherwise in violation of the student's privacy or other rights. If a dispute cannot be settled by the record custodian, the student may request the appropriate dean, director, or their designee to resolve the matter. If the conflict cannot be resolved at that level, the student may request a hearing pursuant to § 3-607 before a FERPA Hearing Panel appointed by the Registrar.

(e) Recordkeeping. A written record of access requests that have been processed must be maintained for as long as the education record requested is maintained.

**§ 3-605 Classification, Locations, and Custodians of Student Records**

(a) Records available to students fall within the following three classifications:
(1) biographical data, including but not limited to:
(A) name and addresses of student
(B) student's birth date and place
(C) name and address of parent(s) or guardian(s)
(2) application data, including but not limited to:
(A) high school transcript
(B) class rank and test scores
(C) transfer courses and grades
(D) solicited and unsolicited correspondence
(E) summary of interviews and/or auditions
(3) matriculation data, including but not limited to:
(A) new student test results
(B) cumulative record of courses
(C) grades and other evaluations
(D) proficiency, probation, and other related information
(E) summary of conferences

(F) fellowship and assistantship appointment records
(G) irregular attendance reports
(H) honors received
(I) disciplinary records

(b) Student records and record custodians are located as follows:
(1) Agricultural, Consumer and Environmental Sciences, College of: Office of Academic Programs, 128 Mumford Hall
(2) Applied Health Sciences, College of: Associate Dean, 120 Huff Hall
(3) Carle Illinois College of Medicine: Office of Student Affairs, Medical Sciences Building, 506 South Mathews Avenue, First Floor
(4) Education, College of
(A) Student Academic Affairs Office: 110 Education Building
(B) Graduate Student Services Office: 142 Education Building
(C) Council on Teacher Education: 130 Education Building
(5) Fine and Applied Arts, College of: Associate Dean, 110 Architecture Building
(6) General Studies, Division of: Director, Campus Center for Advising and Academic Services, 807 South Wright Street, Fifth Floor
(7) Gies College of Business: Associate Dean, 1055 Business Instructional Facility
(8) Graduate College: Associate Dean, 507 East Green Street, Suite 101
(9) Grainger College of Engineering: Associate Dean, 206 Engineering Hall
(10) Information Sciences, School of: 112 Library and Information Science Building
(11) Innovation in Teaching and Learning, Center for, 249 Armory Building
(12) International Student and Scholar Services: Director, 423 Turner Student Services Building
(13) Labor and Employment Relations, School of: Assistant Dean, 149 Labor and Employment Relations Building
(14) Law, College of: Assistant Dean, 101 Law Building
(15) Liberal Arts and Sciences, College of: Associate Dean, 2002 Lincoln Hall
(16) Media, College of: Student Services Center, 18 Gregory Hall
(17) Medicine, College of, at Urbana-Champaign: Associate Dean for Student Affairs, Carle Forum, 611 West Park Street, Lower Level
(18) Military Education Council
(A) Air Force Aerospace Studies, Department of: Commandant, 229 Armory Building
(B) Military Science, Department of: Commandant, 113 Armory Building
(C) Naval Science, Department of: Commandant, 236 Armory Building
(19) Registrar, Office of the, 901 West Illinois Street
(20) Social Work, School of: Assistant Dean, 1010 West Nevada Street
(21) Student Affairs at Illinois
(A) Career Center, The: Director, Student Services Arcade Building, 715 South Wright Street
(B) Counseling Center: Director, 206 Turner Student Services Building
(C) McKinley Health Center: Director, 1109 South Lincoln Avenue
(D) Connie Frank CARE Center in the Office of the Dean of Students: Associate Dean of Students, 300 Turner Student Services Building
(E) Student Conflict Resolution, Office for: Director, 300 Turner Student Services Building
(22) Student Financial Aid, Office of: Director, Student Services Arcade Building, 620 East John Street
(23) Undergraduate Admissions, Office of: 901 West Illinois Street
(24) Veterinary Medicine, College of: Associate Dean, 2271G Veterinary Medicine Basic Sciences Building

### § 3-606 Procedures for Student Access and Challenge

(a) Gaining access to the record:
(1) Go to designated office for help in locating record(s);
(2) Make written request to the custodian(s) of the record(s);
(3) Examine record(s).

(b) Challenging the contents:
(1) If a student's challenge cannot be satisfied by the record custodian, the student may appeal to the following official, or the official's designee:

(A) law students, dean of the College of Law.
(B) veterinary medicine students, dean of the College of Veterinary Medicine.
(C) medical students, dean, Carle Illinois College of Medicine at Urbana-Champaign.
(D) graduate students, dean of the Graduate College regarding academic matters; Dean of Students regarding nonacademic matters.
(E) undergraduate students, dean of the college regarding academic matters; Dean of Students regarding nonacademic matters.

(2) If no resolution can be effected, the matter will be referred to the FERPA Hearing Panel, pursuant to § 3-607.

**§ 3-607 FERPA Hearing Panel**

(a) General principles:
(1) Request for a hearing must be specific to a record, be submitted in writing, and include an explanation or justification of the request for a hearing.
(2) Once a hearing has been held in accordance with some other university activity by a duly constituted board or committee, a separate FERPA hearing on the content of a record will not be allowed. The existing hearing processes (capricious grading, student disciplines) already provide for an opportunity for appeal.
(3) The Registrar will appoint a hearing panel and serve as the chair.
(4) Decisions reached by the hearing panel will be final; there is no further appeal within the university.

(b) A FERPA Hearing panel shall operate in accordance with the following guidelines:
(1) Hearings will not be open to the public.
(2) Neither party, nor representatives thereof, shall serve on the panel.
(3) Decisions of the hearing panel will be by majority vote.
(4) Decisions of the hearing panel will be based solely on the information presented at the hearing and must include a summary of the information and the reasons for the decision.
(5) The student shall have the right to attend the hearing; present information, request witnesses, and to be assisted by one or more individuals of their choice at their expense, including an attorney. If the student chooses to have an attorney present, they must notify the hearing panel no later than three (3) days prior to the hearing. The role of an attorney in the hearing process is limited to advising the client and, in no event, shall the attorney have a speaking part in the proceedings.
(6) Results of the hearing will be communicated in writing to the student and the custodian within a reasonable amount of time.
(7) If, as a result of the hearing, the hearing panel determines the record is inaccurate, misleading or otherwise in violation of the privacy rights of the student, the record shall be amended accordingly by the record custodian.
(8) If, a hearing is not permitted under § 3-607(2), or as a result of the hearing, the hearing panel determines the record is not inaccurate, misleading or otherwise in violation of the student's privacy rights, the student will be informed of the right to place a statement in the record commenting on the contested information and/or stating why the student disagrees with the decision of the university. That statement will be maintained with the contested part of the record for as long as the record is maintained and will be disclosed whenever the part of the record to which it relates is disclosed.

**§ 3-608 Disposal of Inactive Records**

With the exception of placement office files, the permanent ledger file, and computer-based records useful for research purposes, all student records shall be reviewed within five years of the last academic term in which they were considered active files. At the time of this review, files should be cleared of all correspondence, interview notations, and other items of short-term significance. All records other than placement files and the permanent ledger file shall be destroyed on or before the tenth anniversary of their withdrawal from active status. Records are destroyed subject to approval and procedures of the university archivist or federal and state laws. In any case, records will be inaccessible for normal use.

The university will not destroy any education records if there is an outstanding request to inspect and review the records.

### § 3-609 Release of Student Information and Academic Records by the Office of the Registrar

(a) To Agencies or Persons outside the university
The following policies and procedures govern the release of student information by the Office of the Registrar to persons outside the university.

(1) The university may release information concerning current or former students that appears in directories and publications available to the public without the student's consent except when requested by the student to hold such information confidential. For currently enrolled students, this information includes the student's name; addresses; telephone numbers; University Identification Number; college, curriculum, and major field of study; class level; date of birth; dates of attendance and full- or part-time status; eligibility for membership in registered university honoraries; degrees, honors, and certificates received or anticipated; for students appointed as fellows, assistants, graduate, or undergraduate hourly employees, the title, appointing department, appointment dates, duties, and percent time of appointment; weight and height if the student is an athletic team member; participation in officially recognized sports; and institutions previously attended. For former students, this information may include the student's name; date of birth; last known addresses and telephone numbers; University Identification Number; college, curriculum, and major field of study; dates of attendance and full- or part-time status; class level; honors, certificates, or degrees earned at the university and the date(s) conferred; weight and height if the student was an athletic team member; participation in officially recognized activities and sports; and institutions previously attended.

(2) Transcripts are released only by written request to whomever a student or former student designates.

(3) Upon written authorization of the student concerned, individuals may view a student's records in the Office of the Registrar or may have the information sent to them. A document, signed by the student, listing the University of Illinois Urbana-Champaign as a reference, is considered written authorization.

(4) The Registrar may release student academic information to organizations conducting studies for, or on behalf of, educational agencies or institutions for the purpose of developing, validating, or administering predictive tests, administering student aid programs, and improving instruction. Such studies must be conducted in such a manner as will not permit the personal identification of students and their parents by persons other than those conducting the study, and such information must be destroyed when no longer needed for the stated purpose.

(5) The Registrar may release student academic information in the support of financial assistance without the student's written consent.

(6) Copies of student records will not be provided to parents without the student's prior written consent; however, parents of a dependent student, as defined in section 152.f of the Internal Revenue Code of 1954, may be granted access to the student's record without such consent under the following procedures. Any parent who in writing states that they are the parent of a student who was claimed as an exemption at the time of the filing of the last federal income tax statement may be sent a copy of the student's transcript upon verification of their most recent Federal Income Tax return and payment of the regular fee.

(b) To Agencies or Persons within the University

(1) All requests to the Division of Management Information or the Office of the Registrar from individuals, departments, and/or groups of departments, except the offices of the President, the Vice-Presidents, the Chancellor, or Bureau of Institutional Research, for data based on confidential records of students in a particular college, must first be cleared through the appropriate college office.

(2) Requests involving students in more than one college must be cleared through the Registrar.

(c) Grade Reports
Final grades for each semester and winter session are made available to all students.

(d) Credentials Presented from Other Sources
All academic credentials presented to the University of Illinois become the property of the

university and are not subsequently released to the student or to another individual or institution.

## PART 7. TRANSCRIPTS

### § 3-701 Availability

(a) Students who have paid their university fees and charges are entitled to receive, upon written request, a transcript of their academic records. Upon graduation, or withdrawal from the university, students with outstanding loans will not be issued a transcript until they have completed an exit interview with the Office of Business and Financial Services. Transcripts that are provided directly to students are marked "Issued to Student in Sealed Envelope" to distinguish them from transcripts that are sent by the Office of the Registrar to other recipients. Each transcript routinely includes a student's entire academic record to date and current academic status. Incomplete transcripts are not issued. Upon request, separate transcripts shall be issued that include only the academic record for undergraduate programs or the academic record for graduate and professional programs. Any separate transcript shall be appropriately labeled "partial transcript." The charge for an official transcript is $8 per copy (amount subject to change).

(b) Transcripts issued at the request of students for whom possible disciplinary action is pending are followed by a corrected transcript issued without charge to the original recipient showing the final status in the event that the student involved is subsequently suspended or dismissed from the university as a result of the pending action.

(c) A student requesting a transcript near the end of a term must specify that the transcript not be released prior to the posting of final grades for that term. Final grade posting normally occurs approximately thirty days after the end of the final examination period.

### § 3-702 Information Appearing on All Transcripts

(a) Student's name

(b) University Identification Number

(c) Level (undergraduate, graduate, law, medicine, veterinary medicine)

(d) Birth date (month and day only)

(e) Degree and the date graduated from the University of Illinois

(f) Recognition as a James Scholar or a Chancellor's Scholar

(g) Honors recognition—Bronze Tablet, Dean's List, etc.

(h) Institutional courses, grades, hours of credit, and grade-point average, listed by semester

(i) When a student changes their college and/or curriculum of enrollment, the new college and/or curriculum is recorded on the student's record in the semester in which the change is effective.

(j) When a student withdraws during a term, the withdrawal date is recorded on the student's record at the end of the term.

### § 3-703 Other Symbols Appearing on Transcripts

The grading system itself is described in § 3-102. The following symbols provide additional information

& Immediately following the letter grade for Religious Foundation courses indicates the grade and credit are not included in the GPA.

* Immediately following the letter grade indicates grade does not count toward the student's GPA or earned hours.

H Immediately following the letter grade indicates that the student has received honors credit for the course because either: 1) the student has successfully completed an Honors Credit Learning Agreement negotiated with the instructor of the course; or 2) the course/section was certified as an honors course/section by the department offering the course. Appropriate grades using the H designation include A+H, AH, A-H, B+H, BH and B-H.

A Signifies a repeated course that is included in the GPA calculation. Course is excluded from the term, overall, and earned hours.

E Repeated course that is excluded from the GPA but included in attempted hours only.

### § 3-704 Description and Definition of Information Appearing on Transcripts

(a) Student Status
Student status is determined on the basis of a student's academic performance and conduct. Unless otherwise indicated by the notation of 'drop' status, the student is eligible to enroll either without condition or on a probationary basis.

(b) Credit
(1) Undergraduate credit is recorded in semester hours. Each semester hour represents one fifty-minute period of class-room work each week for the duration of one semester of sixteen weeks (two periods of classroom work per week during an eight-week part of term), or the equivalent in laboratory, field work, or approved independent study.
(2) Graduate credit is recorded in semester hours.

(c) Transfer Credit
(1) Undergraduate credit earned at another accredited university or college and accepted by the University of Illinois Urbana-Champaign is recorded in semester hours. Grades earned are not indicated.
(2) Graduate credit earned at another accredited university or college and accepted by the University of Illinois Urbana-Champaign will be indicated on the transcript with the institution's name, total credit hours, GPA hours, Grade Points, and total GPA. GPA hours and Total GPA will generally be zero because the grade value of accepted transfer credit is recorded as "CR," for satisfactory, without differentiation by letter grade, except for courses transferred for work taken at the University of Illinois Chicago or Springfield or as a BTAA Traveling Scholar. Graduate credit earned at another accredited university or college and accepted by the University of Illinois prior to Fall 2004 will be indicated on the transcript as total transfer credit without indication of the institution(s) attended.
(3) If an undergraduate student is not currently enrolled and has earned the required 45 or more semester hours of University of Illinois Urbana-Champaign credit (§ 3-801(a)(1)), credit earned elsewhere and submitted to the Office of Undergraduate Admissions for the purpose of fulfilling degree requirements will be evaluated and recorded on the student's permanent record. The official transcript must be sent directly from the institution attended and accompanied by a letter from the student requesting that the credit be added to the student's record for degree purposes.

(d) Course Numbering System
(1) Courses numbered 000-099 do not carry academic credit but do count for tuition and load. In general, the 000-level courses are for preparatory work that does not count toward a degree.
(2) Courses numbered 100-199 are lower level undergraduate courses. In certain instances they may be taken by graduate students to make up undergraduate deficiencies, but they may not be taken for graduate credit.
(3) Courses numbered 200-299 are lower level undergraduate courses intended for students who satisfy the published prerequisite(s), if any. In certain instances they may be taken by graduate students to make up undergraduate deficiencies, but they may not be taken for graduate credit.
(4) Courses numbered 300-399 are upper level undergraduate courses intended for students who satisfy published prerequisite(s), if any. In certain instances they may

be taken by graduate students to make up undergraduate deficiencies, but they may not be taken for graduate credit.
(5) Courses numbered 400-499 are upper level undergraduate and graduate courses.
(6) Courses numbered 500-599 are graduate level courses.
(7) Courses numbered 600-799 are professional and select graduate courses. These courses apply primarily to law, medical, and veterinary programs.

## PART 8. GRADUATION

### § 3-801 Credit Requirements for Degrees

(a) First Bachelor's Degree
(1) In addition to specific course and scholastic average requirements, each candidate for a bachelor's degree from the University of Illinois Urbana-Champaign must earn at least 45 semester hours of University of Illinois Urbana-Champaign credit, of which at least 21 hours must be 300 or 400 level courses of University of Illinois Urbana-Champaign credit.
(2) A student on drop status may not graduate until the student has been reinstated by the dean of the student's college. A student who meets the conditions of subsection (a)(1) above must notify the dean of the student's college of the student's intent to apply credit earned elsewhere toward the degree requirements and arrange to have a final official transcript from the other collegiate institution(s) attended sent to the Office of Undergraduate Admissions.
(3) Only those courses that are applicable toward the degree sought may be counted in satisfying the above minimum requirements. (See the Academic Catalog at http://catalog.illinois.edu/)
(4) Students transferring from the University of Illinois at Chicago or at Springfield to Urbana-Champaign as candidates for degrees must satisfy the degree requirements in subsection (a)(1) and academic requirements for graduation established for the curriculum entered on the Urbana-Champaign campus.
(5) A student who requests that the credit requirement for graduation be waived should complete and submit a petition to the dean of the student's college, who will take action on the petition.

(b) Additional Bachelor's Degree
(1) A student who has received one bachelor's degree from the University of Illinois Urbana-Champaign may be permitted to receive an additional bachelor's degree from the University of Illinois Urbana-Champaign, provided all specified requirements for each degree are fully met and provided also that the curriculum offered for the additional degree includes at least 30 semester hours of University of Illinois Urbana-Champaign credit that is not counted for the other degree.
(2) The additional bachelor's degree may be earned either concurrently with or subsequent to the first degree.
(3) Only those courses that are acceptable toward the degree sought may be counted in satisfying the above minimum requirements. This includes the 30 additional hours required for the additional degree.

(c) Graduate Students
(1) At least half of the hours required for a master's degree must be earned in courses meeting on the Urbana-Champaign or Chicago or Springfield campus, or in courses meeting in other locations that have been approved by the Graduate College.
(2) At least two-thirds of the total hours required for a doctoral degree must be earned in courses meeting on the Urbana-Champaign or Chicago campus, or in courses meeting in other locations that have been approved by the Graduate College.
(3) BTAA Traveling Scholars Program work may fulfill the "on-campus" requirement in subsections (c)(1) and (c)(2) for as much as 20 semester hours of course work at BTAA institutions each semester, for a maximum of two semesters.

### § 3-802 Minimum Scholarship Requirements for the Bachelor's Degree

(a) All candidates for a degree must have at least a 2.0 (C) average on all University of Illinois Urbana-Champaign credits counted for graduation requirements and at least a 2.0 average

on the combined transfer and University of Illinois Urbana-Champaign credits counted for graduation requirements. Certain colleges have established higher scholastic graduation requirements for specific curricula. (Grades in courses taken at the other campuses of the university are counted as transferred.)

(b) Where a course has been repeated, both the original and subsequent grades are included in the average if the course is acceptable toward graduation, but the credit is counted only once. An original failing grade is not removed from the student's record for a course subsequently passed by special examination. (See § 3-309 on repeated courses.)

(c) Students at the Urbana-Champaign campus who do not meet the requirements stated above may graduate if they have the minimum grade-point average calculated by either of the following alternate methods:
  (1) Exclude courses in which grades of D or F have been recorded not to exceed a total of ten semester hours completed prior to the last thirty hours of work completed at the University of Illinois, Urbana-Champaign campus, and counted for graduation requirements, or
  (2) A grade average of no less than 2.1 for the last sixty semester hours of work counted for graduation requirements and completed at the University of Illinois, Urbana-Champaign campus, except in those curricula where a higher scholastic graduation requirement is specified.

(d) Each college office, on request, informs the student regarding the scholarship regulations of that college.

## PART 9. RESIDENCY STATUS REGULATIONS

The University of Illinois System has a policy regarding residency status for the purposes of admission and assessment of student tuition available at www.uaps.uillinois.edu/student_programs/residency_information/residency_status_requirements/. In general, except as otherwise provided in this policy, a person must be domiciled in Illinois for at least 12 consecutive months immediately preceding the first day of classes for the term for which residency is sought to be classified as a resident by the U of I System. Further information or clarification may be secured by contacting the Office of Undergraduate Admissions or the Office of the Registrar.

## DEFINITIONS

| Term | Reference |
|---|---|
| Abuse of Computers | 1-302(n) |
| Academic Interference | 1-402(f) |
| Allegation Notice (academic integrity) | 1-403(a)(1) |
| Bribes | 1-402(e) |
| Business Day | 1-401(c)(1) |
| Cheating | 1-402(a) |
| Consent | 1-111(f)(5) |
| Consultant | 1-401(c)(2) |
| Dating Violence | 1-111(f)(7) |
| Dean | 1-401(c)(3) |
| Decision Notice (academic integrity) | 1-403(a)(5)(C) |
| Domestic Violence | 1-111(f)(8) |
| Drugs | 1-305(c) |
| Executive Officer | 1-401(c)(4) |
| Fabrication | 1-402(c) |
| Hazing | 1-302(d) |
| Instructor | 1-401(c)(5) |
| Notice | 1-401(c)(6) |
| Plagiarism | 1-402(b) |
| Prohibited weapons | 1-309(b) |
| Reasonable accommodations | 1-110(a) |
| Record | 1-401(c)(7) |
| Retaliation | 1-111(g) |
| Sexual Assault | 1-111(f)(4) |
| Sexual Exploitation | 1-111(f)(11) |
| Sexual Harassment | 1-111(f)(10) |
| Sexual Misconduct | 1-111(f)(1) |
| Sexual Violence | 1-111(f)(12) |
| Stalking | 1-111(f)(6) |
| Student: definition for purposes of FERPA | 3-602(a) |
| Title IX Sexual Harassment | 1-111(f)(3) |

## ACRONYMS

| Acronym | Definition |
|---|---|
| ACT | American College Testing |
| ADOS | Associate Dean of Students |
| AFMFA | Academic Facilities Maintenance Fund Assessment |
| APEC | Academic Progress and Eligibility Committee |
| AVCSA | Associate Vice Chancellor for Student Affairs |
| BTAA | Big Ten Academic Alliance |
| CET | Cleaner Energy Technologies Fee |
| CP | Cultural Programming |
| CT | Central Time |
| CWVHE | Center for Wounded Veterans in Higher Education |
| DOS | Dean of Students or designee |
| DRES | Division of Disability Resources and Educational Services |
| EO | Executive Officer |
| EPT | English Placement Test |
| FERPA | Family Educational Rights and Privacy |
| KCPA | Krannert Center for the Performing Arts |
| LGBT | Lesbian, Gay, Bisexual, Transgender |
| LSLS | Legacy of Service and Learning Scholarship Fee |
| MLA | Modern Language Association |
| RO | Registered Organization |
| RSO | Registered Student Organization |
| SAS | Study Abroad and Travel Scholarship Fee |
| SAT | Scholastic Assessment Test |
| SCEF | Sustainable Campus Environment Fee |
| SCSD | Senate Committee on Student Discipline |
| SEAL | Students for Equal Access to Learning |
| SFAC | Student Fee Advisory Committee |
| SORF | Student Organization Resource Fee |
| USFSCO | University Student Financial Services & Cashier Operations |
| VCSA | Vice Chancellor for Student Affairs or designee |