E-FILED
Friday, 10 April, 2026 03:32:41 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 03

**VIA EMAIL**

March 24, 2026

conflictresolution@illinois.edu

**RE: John Doe; Student ID [REDACTED]; Student Code of Conduct Appeal, Case Number: [REDACTED]**

## I. Introduction.

This appeal arises from profound procedural, jurisdictional, and due-process failures that materially affected the outcome of the disciplinary proceeding against me. The university's investigation and hearing process departed in multiple, significant respects from the requirements set forth in Appendix D, established due-process standards, and the institution's own Student Code of Conduct. These errors undermined the fairness, reliability, and legitimacy of the Panel's findings.

First, the university exceeded its jurisdiction by pursuing allegations based entirely on an online personal relationship with an individual unaffiliated with the university and without any showing that the alleged conduct occurred on university property or substantially affected a university community interest. Second, the complainant expressly requested to withdraw her complaint—an action that, by policy, permits dismissal—but the university nevertheless continued the proceeding. Third, the complainant was never interviewed, never appeared, and was never made available for cross-examination, despite explicit policy provisions guaranteeing these rights to respondents.

The Panel also relied on speculation rather than evidence, misapplied the relevant provisions of the Student Code of Conduct, and ignored exculpatory information. Fourth, multiple representatives involved in the investigation and hearing demonstrated overt bias through their conduct, questioning, and statements on the record, fundamentally compromising the neutrality required of investigators, hearing chairs, and Panel members. Finally, new evidence—unavailable to me at the time of the hearing due to the volume and disorganization of the record—directly contradicts a central factual determination relied upon by the Panel.

Because each of these defects independently constitutes a valid ground for appeal, and because collectively they reflect a process so compromised that it cannot support a reliable outcome, the university must reverse the Panel's findings and dismiss

the matter. This appeal is premised upon the following grounds outlined in relevant policies:

1. A procedural irregularity occurred that would change the outcome;
2. The Title IX Coordinator, investigator(s), or Panel members had a conflict of interest or bias for or against complainants or respondents generally or any individual complainant or respondent that would change the outcome of the matter;
3. New evidence that would change the outcome and that was not reasonably available when the determination whether sexual misconduct occurred, or dismissal was made; and
4. Any sanctions imposed by the Panel were not appropriate for the violation(s) for which the respondent was found responsible.

*See* Appendix D, § 8(b)(1-4). Each of these bases is addressed more fully herein.

**II. Procedural Irregularities Occurred that Would Change the Outcome.**

**A. The University Lacked Jurisdiction to Investigate this Matter.**

According to university policies, "[t]he university shall not regulate the social life of students or their organizations except as such regulations may apply to use of university premises, facilities, or premises approved for student residences." § 1-104(d) Privacy. This matter involved my entirely online social relationship with an individual unaffiliated with the university, whose identity and demographic information has not been confirmed. None of the communications at issue in this case were sent or received on university property.

According to university policies describing student discipline, specifically § 1-301 titled, Basis for Discipline – Source and Jurisdiction, states the "basis for discipline at this campus be clearly defined. The university discipline system recognizes that not all violations of law affect the interests of the university community, and the discipline system accepts jurisdiction only in those instances in which the university community's interest is substantially affected." The university may only take action on where instances of alleged violations of law or policy occur on university property or substantially affect the university community's interest. *See id.* at (b)(1-2). Here, there has been no analysis of whether or not any alleged conduct substantially affected a

university community interest, and there is no evidence that a university community interest has been implicated here.

Critically, §1.05 of the Student Disciplinary Procedures enumerates the specific factors the university must weigh when exercising off-campus jurisdiction. One expressly listed factor is "whether an alleged victim is a member of the campus community." The complainant claims to be a UK-based individual with no affiliation to UIUC — not a student, not an employee, and not a program participant. This factor weighs unambiguously against jurisdiction. Two further enumerated factors further emphasize the lack of jurisdiction over the alleged conduct, including: "the ability of the university to gather information, including the statements of witnesses" — here, the complainant never participated in the investigation or hearing — and "whether the off-campus conduct is part of a series of actions that occurred either on or off campus" — this was an isolated online relationship with no on-campus nexus at all. When these key factors under §1.05, which the university is required to consider, weighs against an exercise of jurisdiction, the continued pursuit of this matter is a procedural error that substantially impacted the outcome.

As I described to the investigator and to the hearing Panel, the relationship between myself and the complainant was entirely mutual and voluntary. Although the complainant claimed to be a UK-based minor in certain online chats, this information has not been supported with any evidence beyond a bare claim. Additionally, the complainant admitted that her motivation for filing a complaint was to take revenge on me for having an online relationship with someone else. Specifically, the Complainant admitted, "[n]othing you did was harmful to me. I was hurt that you were talking to Intro." (pg. 141, Evidence Packet). "Intro" is another individual who participates in the online community in which I met the complainant.

Critically, none of the complainant's claims, including her claimed age and demographic information was subject to any questioning, verification, or cross-examination, as more fully addressed below.

**B. The Complainant Requested to Withdraw the Complaint, Which Should Have Resulted in Dismissal.**

Section 4 of Appendix D: Student Conduct Procedures for Allegations of Non-Title IX Sexual Misconduct ("Appendix D"), permits OSCR to "dismiss a complaint, or

any allegations of sexual misconduct made through its grievance procedures therein, if, at any time during the investigation or hearing, it is determined that…[t]he complainant voluntarily withdraws any or all of the allegations in the complaint[.]"

When the complainant requested dismissal on October 25, 2025, the university's election to continue also required a documented multi-factor analysis under Appendix D, §11(b)(contained in the most recent approved PDF dated August 12, 2024 of the Student Disciplinary Procedures). The Title IX Coordinator must consider, among other factors: (2) "the complainant's request not to proceed," and (8) "the availability of evidence to assist a decisionmaker." Factor 8 is dispositive in this case: the complainant never participated in the investigation, never submitted to interview, and was excluded from the hearing. No documented §11(b) analysis appears in the record. If this mandatory analysis was omitted, the continuation of the proceeding after withdrawal was itself a procedural irregularity under §8(b)(1). *See also infra,* addressing alleged abuse of the university system.

**C. I was Denied Due Process Throughout the Investigation and Hearing Because the Alleged Complainant Was Not Subject to Any Interview or Cross-Examination.**

I was denied procedural protections due to me under both University policy and relevant law throughout this process, fundamentally undermining the reliability of the investigation, hearing, and outcome. The complainant was fully absent from both the investigation process and the hearing. In fact, Mariah Young, the OSCR investigator, stated that the complainant was not even invited to participate in the hearing, stating "[a]nd then so due to the complainant being a minor, she was not invited to review the investigative materials or participate in the hearing." Hearing Recording, [05:07]. There was no policy basis to exclude the complainant from reviewing the materials or participating in the hearing. Furthermore, the complainant's identity and demographic information has never been confirmed and the university presumed she is an "unaffiliated minor" in all of its documentation related to the investigation, starting with the Notice of Investigation.

The institution has not questioned the complainant about her claims at all. I have had zero opportunity to cross-examine the complainant or propose any questions to be asked of her. Thus, there has been no efforts made to test the veracity of the

complainant's claims in her initial report to the university. The complainant's claims, including her alleged age, sex, demographics, location, etc., were based on claims each initially made in an anonymized social media context, and always in a form of electronic communication rather than any face-to-face contact. I have never met the complaining party in person, and the claims about who this person is and what she allegedly experienced have not been verified.

Interview(s) of the complainant and cross examination is explicitly provided in the university's policies. In Appendix D at Section 7, the policies provide "[t]he Panel members will…question the complainant, after which the respondent will have the opportunity to question the complainant through the chair." The policy also provides that "[t]he respondent will have a final opportunity to question the complainant through the chair." *See id.*

The deprivation of cross-examination here was not caused by the Complainant's voluntary choice to be absent. Appendix D, §7(d) mandates that "OSCR staff will notify both the respondent and the complainant by email of the date, time, format, location, participants, and purpose of the hearing at least five business days in advance." The §7(f)(3) provision permitting a hearing to proceed without a party applies only when that party "has been notified in accordance with §7(d), "but failed to appear." Here, Mariah Young, OSCR Investigator, stated on the record at [05:07] that the complainant "was not invited to review the investigative materials or participate in the hearing." An uninvited party cannot have "failed to appear." No policy provision authorizes OSCR to unilaterally exclude a complainant from notification based on her alleged age or unaffiliated status. OSCR's affirmative exclusion of the complainant — not the complainant's choice — permanently extinguished my cross-examination rights under §7(g)(4) and §7(g)(9). This is a due process violation and a procedural error that impacted the outcome.

The requirement for complainant participation and cross examination outlined in Appendix D comports with relevant law on the issue of due process and cross examination in the university context, applied to public universities through 42 U.S.C. Section 1983. The Fourth Circuit has recognized "the idea, embedded in the foundations of our adversarial system of justice, that cross-examination is 'the greatest legal engine ever invented for the discovery of truth.'" *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 316-317 (4th Cir. 2025)(quoting *Watkins v. Sowders, 449 U.S. 341, 349, 101 S. Ct. 654, 66 L. Ed. 2d*

*549 & n.4 (1981)* (5 John Henry Wigmore, Evidence in Trials at Common Law § 1367 (Chadbourn rev. 1974))). The court in *Univ. of N.C. Sys.* held, "as a matter of procedural due process, an accused student must be 'afforded the meaningful hearing to which they [are] entitled[,]'" including cross examination when addressing alleged sexual misconduct disputes in which witness recollection and credibility are crucial for determining truth. *See id.* (citing *Tigrett v. Rector & Visitors of Univ. of Va.,* 290 F.3d 620, 630 (4th Cir. 2002) (emphasis added)(discussing *Mathews v. Eldridge,* 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1999))).

Similarly, the Seventh Circuit has recognized that "confrontation and cross-examination are important procedural safeguards, especially where factual determinations are made." *Cooper v. Salazar*, 196 F.3d 809, 815 (7th Cir. 1999)(citing *Goldberg v. Kelly,*397 U.S. 254, 269, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.")). Here, the complainant not only failed to be invited to participate or appear at any point in the proceedings, but also actively requested the case be dismissed. *See supra,* Section A.

The consequences of this denial of due process are not abstract — they are embedded in the Panel's findings. Without cross-examination, the Panel was left to evaluate surface-level claims alone. The most consequential example: the Panel found that I had nude photographs from the complainant — the finding that drives the 5-year dismissal. Yet no image depicting nudity was ever identified, produced, presented, or independently verified in these proceedings. The Panel reached its most severe finding based solely on unverified, untested, unsworn text-chat claims — a characterization of images that no one at this university has ever seen. My testimony was the only evidence presented on this issue, and I testified that I did not have nude photos of the complainant, describing the images we exchanged mutually as "suggestive." Cross examination is precisely the mechanism that would have required the complainant to identify or describe any claimed images allegedly exchanged to combat my testimony. Instead, my unopposed statements were rejected by the Panel without an evidentiary basis.

Additionally, under Appendix D, all parties to a disciplinary proceeding are entitled to receive the outcome determination and to appeal. *See* Appendix D § 8(a). The

Subcommittee Decision Notification (Outcome Letter) was sent solely to me; the complainant was not copied.

As a result: (1) the complainant had no opportunity to appeal a decision that determined her own credibility and claims; (2) the findings were made final without any mechanism for her to contest them or correct them, where inaccurate; and (3) the university effectively stripped a party of appellate rights it is bound to provide under its own policies. This is an independent procedural defect separate from the cross-examination issues addressed above. Even where the statements in the Outcome Letter were grossly inaccurate, the complainant would have no opportunity to correct the information or otherwise respond as provided. *See* Outcome Letter (providing "all parties" have the ability to email a notice of appeal to the Office for Student Conduct Resolution).

Here, the university refused to dismiss the complaint upon request of the complainant, failed to interview the complainant, failed to provide any opportunity for cross-examination, failed to even invite the complainant to participate in the investigation and hearing process, and yet still reached a finding of responsibility effectively marking me as a perpetrator of a sexual crime. This sequence of events has caused me immediate and irreparable harm and represents a substantial violation of my rights under university policies and pursuant to the legal requirements of due process at a public university.

**D. The Findings of the Panel on the Issue of Alleged Abuse of the University Disciplinary System Were Unsupported by a Preponderance of Evidence and Applied the Wrong Policy.**

In this case, the Panel's finding on the issue of alleged abuse of the university disciplinary system was unsupported by a preponderance of evidence and applied the wrong policy, demonstrating two procedural defects.

First, the Panel's findings on the charge of "deliberate disruption or interference with the orderly conduct of an investigation or disciplinary proceeding" (§ 1-302.o.3) is unsupported by a preponderance of the evidence, representing a procedural defect in the Panel's failure to apply the evidentiary standard required under university policies. The findings of the Panel on this key issue were stated in the alternative, demonstrating the lack of evidence. The Panel speculated that I, "either directly [my]self or indirectly

through a third party influenced the complainant to request that her complaint with the University be withdrawn." *See* March 17, 2026, Subcommittee Decision Notification (the "Outcome Letter"). The evidence showed that on October 22, 2025, the complainant sent me a friend request on Discord and initiated a conversation. I did not know that an investigation by the university existed, as I did not receive a charge letter until after the complainant's initial contact. The complainant's own message — *"I'm sorry. I'll be trying to get the case with you dismissed"* — was unsolicited and was her own expression of her intent. I cannot have "influenced" someone to do something she had already independently decided to do before the contact occurred.

Secondly, the Panel's findings on the allegation do not address the orderly conduct of an investigation at all. The Panel's finding applies the wrong provision of the student code of conduct, demonstrating a second procedural defect. The code provision that actually addresses allegations of influencing, harassing, or intimidating parties, witnesses, and complainants is § 1-302.o.6, which prohibits "harassment or intimidation of any witness, complainant, respondent, investigator, decision-maker, or other participant in a disciplinary proceeding." The Panel explicitly found me NOT responsible for § 1-302.o.6, noting that I "did not harass or intimidate the complainant[.]" *See* Outcome Letter. I did not request or pressure the complainant (or incite a third party) to request to withdraw her complaint at any point, and no evidence presented in the investigation or at the hearing supported the finding that I did so. This is even more reason that the request by the complainant to withdraw her complaint should have ended the process and resulted in the dismissal of this proceeding.

E. **OSCR Failed to Issue Required Extension Notices and Conducted an Investigation Far Exceeding the Mandatory Timeline, Causing Substantial Prejudice to Me (App. D §9(a), §4(e), §4(m)).**

OSCR violated the 60-business-day investigation and decision timeline by nearly 85 business days without issuing a single required extension notice (App. D §9(a)), and separately failed to timely notify me of the investigation for 68 days without a valid individualized safety analysis (App. D §4(e), §4(m)) — each an independent procedural irregularity under §8(b)(1) that materially changed the outcome.

1. **OSCR Violated the Mandatory 60-Business-Day Investigation Timeline (Appendix D, §9(a)).**

Appendix D, §9(a) mandates: "[t]he anticipated duration of the investigation and hearing process, from the receipt of the complainant to the written notification of the Panel's decision, is no more than 60 business days, but the investigator may extend this timeframe in increments of 10 business days for good cause provided the investigator or their designee notifies both parties in writing of the delay and the reason for the delay." OSCR violated this provision in full.

The complaint was received August 29, 2025. The Panel's written decision was issued March 17, 2026 — a span of 200 calendar days and approximately 143 business days (~133 excluding major US holidays). This is more than double the 60-business-day maximum, exceeding the cap by approximately 83 business days. At no point did OSCR issue any written notice of delay or its reason, as §9(a) expressly requires for each 10-business-day extension increment. To comply, OSCR would have needed to issue approximately eight separate written extension notices citing good cause. None was provided. This procedural irregularity is independently cognizable under §8(b)(1) and materially affected the outcome by subjecting me to a process running more than twice the duration I was entitled to expect.

Even measuring only from the date I received my allegation notice — November 5, 2025, the most conservative starting point — the Panel's written decision was not issued until March 17, 2026: 132 calendar days and 95 business days later (86 business days excluding recognized university holidays). Either figure exceeds the 60-business-day maximum by 25 to 35 business days. The following milestone timeline demonstrates how far the process had drifted past the policy deadline:

- Business Day 7 (Nov 13, 2025): Respondent intake meeting completed.
- Business Day 27 (Dec 11, 2025): OSCR sent a vague status email noting it was "reviewing evidence" — the only communication during a 6-week stretch.
- Business Day 60 (~Jan 29, 2026): 60-business-day deadline passed. At this point, no follow-up meeting had occurred, no evidence packet had been sent, and no investigative report had been finalized.
- Business Day 74 (Feb 16, 2026): Follow-up meeting finally held.
- Business Day 79 (Feb 23, 2026): Evidence packet sent to parties.
- Business Day 84 (Mar 2, 2026): Investigative report finalized.
- Business Day 85 (Mar 3, 2026): Hearing notice issued.

- Business Day 90 (Mar 10, 2026): Panel hearing held.
- Business Day 95 (Mar 17, 2026): Panel written decision issued.

At no point during this 95-business-day period did OSCR issue any written notice of a delay or its reason — as §9(a) expressly requires for each 10-business-day extension increment. To extend the process to 95 business days in compliance with its own policies, OSCR was required to issue at minimum three to four separate written extension notices, each identifying good cause (such as investigation complexity, witness availability, or break periods). None was issued. The sole communication during the extended period — the December 11 email stating only that the investigator was "reviewing evidence" — does not satisfy §9(a)'s requirement for written notice of a delay and its reason. This is a procedural irregularity under §8(b)(1): I was entitled to a resolution within 60 business days; I received one 35 business days too late, with no notice and no stated reason.

**2. OSCR Failed to Timely Notify Me of Allegations Without a Valid Safety-Based Delay (Appendix D, §4(e) & §4(m)).**

The university received the report on August 29, 2025. I did not receive any allegation notice until November 5, 2025 — a gap of 68 calendar days (approximately 49 business days) during which an active investigation was underway without my knowledge. Appendix D, §4(m) permits notice delay only where "reasonable concerns for the safety of any person" are established through "an individualized safety and risk analysis which evaluates the severity and imminence of a threat." No documented case-specific risk assessment appears in the record.

This pre-notice delay caused direct and documentable prejudice. I could not preserve evidence, consult an advisor, or know of any restriction on contact. Most critically, the October 22, 2025 Discord conversation — the centerpiece of the Panel's "abuse of proceedings" finding — occurred 14 days before the No Contact Order was issued and 14 days before I received any notice that any investigation existed. A student cannot be found to have disrupted proceedings he did not know existed. The notice delay is a procedural irregularity under §8(b)(1) that directly changed the outcome.

**III. Evidence of Bias by the Investigator, Chair, and Panel Rendered the Process Fundamentally Unfair.**

### A. The Investigator Interrogated Me During the Hearing in Violation of University Policy.

Appendix D at Section 7 states, "[t]he Chair will invite the investigator to make a statement (if they choose) regarding the investigation, and Panel members may question the investigator. The respondent and the complainant will then have an opportunity to question the investigator through the chair." In my hearing, Mariah Young (OSCR Investigator) actively interrogated me throughout the hearing with at least 5 leading, guilt-presuming, and in one case degrading questions, far exceeding the role of a neutral investigator. Her questions are reproduced below.

| Timestamp | Quote |
|---|---|
| [26:48] | *"I know what the universal standard in terms of what nude means in that context…"* |
| [35:10] | *"Was your penis erected in that photo?"* |
| [01:16:48] | *"Did you share with anybody how old she was?"* |
| [01:17:03] | *"Why didn't you share with anybody that you all had a relationship beyond friendship?"* |
| [01:19:08] | *"You didn't see anything wrong with the relationship you had built with the complainant, correct?"* |

Ms. Young's role at the hearing solely included the option to present an overview of her investigation and to be available for questions from Panel members and parties. Appendix D, §7(g)(3) defines the investigator's entire role at the hearing: she may (1) make an opening statement if she chooses, (2) be questioned by Panel members, and (3) be questioned by the parties through the chair. There is no provision authorizing the investigator to conduct cross-examination of me. Ms. Young was not a party to the hearing herself and had no role in conducting a cross examination of me as she did during the hearing. One of my fundamental rights in the investigation and hearing process is to be "presumed not responsible for the alleged sexual misconduct until a determination is made at the conclusion…of this process." *See* Appendix D, §4(e)(7). Here, the investigator inappropriately took on the role of a complaining party, demonstrating both bias and a presumption of responsibility against me with inflammatory questioning. This inappropriate conduct implicates a procedural error in superseding Ms. Young's role designated under the policy and shows prejudgment and bias against me affecting the fairness of the proceedings.

Section §7(f)(9) further provides: "the investigator may attend the hearing but will leave the hearing prior to deliberation." By posing at least five leading, guilt-presuming questions directly to me— including the degrading question at [35:10] — Young assumed the role of an adversarial party. Section 12(b)-(c) mandates that any individual who "demonstrates a conflict of interest or bias" must recuse themselves. Young's conduct demonstrated bias requiring mandatory recusal under §12(c). Her failure to recuse, combined with the Chair's failure to intervene as required by §7(f)(12), constitutes both a procedural irregularity under §8(b)(1) and evidence of bias under §8(b)(3).

**B. Inappropriate Conduct by the Chair During the Hearing Demonstrated Bias and Exceeded the Neutral Role Prescribed by Relevant Policies, Demonstrating Bias.**

Alexander Vickery-Holland (Panel Chair, Asst. Dean of Students) was assigned the role of hearing Chair. According to relevant policies, the chair is "a non-voting OSCR staff member or other non-voting trained designee assigned by the Director to run a hearing." Superseding the role of a neutral facilitator, Mr. Vickery-Holland made three substantively biased statements on the record at the hearing:

| Timestamp | Quote |
|---|---|
| [20:03] | *"I will not entertain, we were just teenagers. That is not something that we're going to entertain in this conversation."* |
| [37:16] | *"John, why would we have a purple box here if it wasn't covering something up?"* |
| [45:52] | *"Would it be reasonable to assume that you blurred that because it was your penis?"* |

Mr. Vickery-Holland's [20:03] statement was made before deliberation and signaled to all voting Panel members that mitigating arguments were not to be considered.[1] Mr. Vickery-Holland's role was not to instruct the Panel in this manner, which should be addressed as a procedural error affecting the outcome. The remaining two quotes demonstrate his preconceived presumptions against me, which ultimately were not true. Under Appendix D §12, any individual who "demonstrates a conflict of interest or bias…must recuse themselves." *See also* Article II §2.07 (requiring OSCR staff and Panel

[1]The dismissal letter's complete absence of mitigating factors is a direct downstream consequence of this statement. *See* Outcome Letter.

members to recuse themselves if they are biased or have a conflict of interest). Here, Vickery-Holland demonstrated bias and a conflict of interest, did not recuse himself, and then signed the Outcome Letter, tainting the entire process.

Furthermore, Mr. Vickery-Holland failed to intervene when other Panel members asked inappropriate questions intended to "disparage, intimidate, or otherwise harass" me in violation of Appendix D, Section 7(f)(12). To provide one example, at [35:10], Mariah Young asked: "Was your penis erected in that photo?" This question was degrading and humiliating in addition to being irrelevant to the charged violations. Mr. Vickery-Holland was obligated to intervene on my behalf and did not do so in reflection of his own demonstrated bias against me.

The bias documented above was not limited to non-voting participants. Jinyan Zhou, a voting Panel member whose vote directly determined the outcome, exhibited prosecutorial conduct exceeding the neutral fact-finder role. At [32:05], Ms. Zhou asked: "What was the purpose of that video call?" — presupposing a sexual purpose before hearing any answer. At [01:11:48], Ms. Zhou asked: "Did you obtain consent of the other party to publish those conversations, considering the nature?" This raised a new allegation not part of the charged violations and was prejudicial. A voting member who approaches evidence with a predetermined conclusion does not serve the impartial fact-finder role required by Appendix D. Ms. Zhou's demonstrated bias, combined with that of the Chair and investigator, infected every stage of the hearing.

**C. No Mitigating Factors Were Evaluated in the Outcome Letter.**

Review of the Outcome Letter demonstrates the bias of the Panel in showing that no mitigating factors were considered in this case despite my presentation of several mitigating factors, while only aggravating factors were considered. *See https://www.conflictresolution.illinois.edu/resources/forms/sanctioning-guidance.* I submitted evidence that I had completed 13 voluntary counseling sessions showing initiative in self-improvement. I also have no disciplinary history. The Chair explicitly refused to entertain mitigating arguments on the record at [20:03] when I attempted to showcase the lack of lasting harm that the complainant has experienced as a result of our online interactions. *See infra,* Section V, Disproportionate Sanction.

## IV. New Evidence That I Did Not Share Nude Content Online Exists that Would Change the Outcome and that Was Not Reasonably Available when the Determination Was Made.

I did not share images of any nude part of my body online, and I have new evidence that was not previously available to show this fact. In the Outcome Letter, the Panel stated, the

> *"Panel believes that the preponderance of information shows that the respondent did send a picture of part of his penis in that message. The Panel believes that in one message, the respondent sent a photo of his partially exposed penis to the complainant due to the complainant immediately responding with ''send me the whole thing.'"*

*See* Outcome Letter. The hearing Panel's determination was wrong. The three images below show (A) what the Panel saw in evidence Packet - purple-boxed overlaid image (B) an obscured, and Spoiler noted image (C) what actually exists — a photo showing gray Hanes underwear with no nudity. These images are the foundation of both the new evidence argument and the procedural error argument:

| A) Evidence Packet | B) PDF Rendering | C) Actual Image |
|---|---|---|
|  |   |   |
| The photo, as it appeared in the hearing evidence packet—with a purple rectangle completely | The panel encountered this image for the first time during the hearing itself, after considerable | **NEW EVIDENCE: [Actual Photo — Never Shown to the Panel]** |

| | | |
|---|---|---|
| obscuring the content—was the only version the panel saw prior to the hearing, and the Chair inferred nudity from this obscured image at [37:16]. | difficulty navigating a 3,000-plus-page evidence packet in real time to locate an image bearing the caption "SPOILER."<br><br>The following is the actual conversation in which I offered to provide the original image for clarity:<br><br>At [46:17], I stated that I wanted to be "abundantly 100% crystal clear" that I never depicted anything explicit or graphic to the other party.<br><br>At [46:39], I added that, if there were any further doubts, I could pull up my own conversation with the complainant, locate the image, and share it with the panel if necessary, emphasizing again that I wanted to make this point very clear. | The unobscured photograph from the Discord thread, which was not disclosed in any materials provided to the Panel. The image shows gray Hanes underwear and contains no nudity. |

The evidence provided in this appeal was not reasonably available at the hearing for the following reasons:

(1) The 3000-page Discord evidence PDF was hosted in a university Box folder with restricted access settings that prevented me from downloading or viewing it digitally. Access required an in-person visit to OSCR.

(2) The PDF was generated from Discord using a 'spoiler' feature that renders uploaded images as opaque overlays in PDF format — the image was literally unviewable in the format the Panel possessed.

(3) At the hearing, the investigator screen-shared the university's PDF and navigated to a specific page showing the spoiler-rendered image, asking questions based on what was obscured. I had no opportunity to navigate to page 2,696 of a 3000-page document in real time.

(4) I explicitly offered [46:39 of the hearing recording] to produce the actual image during the hearing, and I said: "*And, you know, I can add on, if there's like a further doubt about that, I can pull up my own conversation live with the complainant and try to find that image and share it with the panel if necessary*." The Panel did not accept this offer and moved to a new line of questioning, making me believe that they had accepted and understood my uncontroverted statements.

(5) I was not on reasonable notice that the university's version of the evidence would be rendered unviewable by a Discord spoiler feature and that the evidence would be misread as depicting nudity when no nudity was actually depicted.

The procedural context in which this new evidence was missed is itself a separate violation. Appendix D, §5(b) provides parties five business days to review the Evidence Packet. Here, the Packet comprised 3000+ pages. Five business days — approximately 40 working hours — to meaningfully review 3000+ pages while remaining a full-time student does not constitute meaningful access as guaranteed by §2(d) ("equal opportunity to inspect and review all evidence").

The direct consequence was my inability to locate and isolate the unedited image before the hearing — evidence that was in existence but not "reasonably available" within the compressed review window. *See* Appendix D §8(b)(2).

Critically, no pre-hearing disclosure identified this specific image as the basis for the § 1-302.l charge. Omitting notice that this image would be used to support that specific charge violated my right to due process, including proper notice of the factual basis of the allegations against me. Without proper notice, the ability to "respond" to these allegations is rendered a meaningless exercise. As such, this new evidence should

be considered to overturn the finding against me indicating that I had shared any "nude" images with the complainant.

## V. The Sanctions Imposed by the Panel Were Not Appropriate for the Violations.

The Panel's 5-year dismissal is unsupported under the university's Sanctioning Guidance and dramatically exceeds what the university prescribes for the violations alleged in this case. Across each charged code section, university sanctioning guidance mandates substantially lower sanctions—often as low as Conduct Probation—yet the Panel repeatedly imposed the maximum penalty on me. Even the most severe alleged charge should have required some effort to verify the identity of the complainant before supporting a 5-year suspension, yet this basic element of due process was not provided.

Comparing the sanction imposed in this case to others across the entire system shows that a 5-year dismissal exceeds or matches punishments for rape (dismissal, 2 years before petition), arson (dismissal, 3 years before petition), or armed robbery (dismissal, 1 year before petition). This is especially disproportionate for a student with no prior disciplinary history and a 4.0 GPA. Below is a chart separately outlining nine (9) mitigating factors for which evidence was presented, none of which were addressed in the Outcome Letter:

| Mitigating Factor | Guide Reference | Evidence in Record |
|---|---|---|
| No prior disciplinary history | "Prior violations are aggravating — their absence is mitigating" | No prior violations at UIUC or any institution |
| Voluntary counseling (13 sessions) | "Did respondent take immediate steps to address underlying issues?" | Began counseling Aug/Sep 2025 — before charge letter received |
| Full cooperation with investigation | Guide expects cooperation; non-cooperation is explicitly aggravating | Attended every meeting, submitted all requested materials, appeared at hearing |
| No physical harm / no in-person conduct | Degree of harm; physical vs. non-physical | All alleged conduct at issue was online |
| No distribution to third parties | Degree of harm; community impact | There was no distribution of any of our conversations/ interactions with anyone else |

| | | |
|---|---|---|
| Complainant stated she was not harmed | "Level of physical, emotional, or financial damage to impacted parties" | Complainant sought dismissal; stated herself that she did not feel harmed (pg. 141 Evidence Packet) |
| Complainant initiated dismissal request | Context of 302.o.3 charge | October 22 message was complainant-initiated, 14 days before no-contact directive |
| Academic record | Purpose of sanctioning: education — does student benefit from continued enrollment? | 4.0 GPA; accelerated 3-year CS graduation path; 8 weeks from semester completion |
| No community harm | Scope of conduct limited to private channel | Conduct alleged involved no UIUC community members, no campus resources, no university affiliation of complainant |

In the alternative, the appropriate sanction—consistent with the guidance, the findings, and all mitigating factors—is Conduct Probation until graduation. This is especially so considering the majority, if not all, of the courses required for my graduation can be completed off-campus and online.

I am only one year away from graduation, and the courses I need to graduate are as follows:

| **Semester** | **Course** | **Credits** | **Delivery** | **Running Total** |
|---|---|---|---|---|
| Completed | Fall 24 + Spr 25 + Fall 25 | 83 | Complete | 83 / 128 |
| Spring 2026 (in progress, 7 weeks left) | CS 211, CS 374, CS 411, CS 441 | 13 | On-campus | 96 / 128 |
| Summer 2026 | PHYS 211 | 4 | Online transfer (PHY210, PHY211 IWCC) | 100/128 |

| | | | | |
|---|---|---|---|---|
| Summer 2026 | CS 341 | 4 | Online transfer (CS351 - IIT) | 104/128 |
| Summer 2026 | CS 421 | 3 | Online transfer (CSCE314 - TAMU) | 107/128 |
| Fall 2026 | PHYS 212 | 4 | Online transfer (PHY220, PHY221 - IWCC) | 111/128 |
| Fall 2026 | CS 498 - Data Management in the Cloud | 3 | Online | 114/128 |
| Fall 2026 | CS 498 - AI Agents in the Wild | 3 | Online | 117/128 |
| Fall 2026 | CS 447 | 3 | Online | 120/128 |
| Fall 2026 | CS 410 | 3 | Online | 123/128 |
| Fall 2026 | CS 427 | 3 | Online | 126/128 |
| Fall 2026 | CS 445 | 3 | Online | 129/128 |

**In theory, all of these courses should be eligible for transfer to UIUC as course credit. However, this plan would be subject to approval by the University Registrar to ensure the transferability of credits to support my UIUC graduation and receipt of a diploma.

In the further alternative, I respectfully request Conduct Probation until graduation, subject to the following conditions, which collectively eliminate any residual campus-safety concern while preserving the ability to complete my degree:

(a) Spring 2026 Completion. Permission to complete the Spring 2026 semester, which has approximately seven weeks remaining (concluding May 14, 2026), in order to preserve 13 credits currently in progress and my 4.0 cumulative GPA[2];

(b) Immediate Campus Restriction. Effective upon the conclusion of Spring 2026 finals, and continuing through my graduation, I will have no physical presence on the UIUC campus. I will not attend in-person classes, events, or activities of any kind on university property during this period;

---

[2] Article II, 2.09(b)(vi) also permits dismissal to be held in abeyance, which could be imposed in this scenario.

(c) Remote Degree Completion. All credits required for graduation beginning Fall 2026 will be completed entirely through remote or online coursework. The courses necessary for my graduation are identified in the record and are available in remote format;

(d) Ongoing Counseling and Compliance Reporting. Mandatory weekly counseling sessions, with quarterly written compliance reports submitted to OSCR, for the duration of the probationary period.

Under this plan, I will not set foot on the UIUC campus from May 2026 through my graduation. The university's stated community-safety interest is fully and verifiably addressed. Enforcement is straightforward: any unauthorized campus presence constitutes an immediate probation violation. See Article II, §2.09(c)(ii) (behavioral restrictions may include removal from specific campus locations).

A five-year dismissal is inappropriate where a zero-campus-footprint degree-completion pathway exists for a student with a 4.0 GPA who is one academic year from graduation, has no prior disciplinary history, and has voluntarily completed 13 counseling sessions. The Sanctioning Guidance's stated purposes — education, accountability, and community protection — are each fully served by this alternative. Dismissal for five years serves none of them.

## VI. Conclusion

For the reasons set forth above, the Panel's decision cannot stand. The university failed to adhere to its own policies, denied me the most basic procedural protections guaranteed under Appendix D and long-standing due-process principles, and relied on speculation rather than verified evidence. The Panel acted outside the university's jurisdiction; ignored the complainant's explicit request to withdraw her complaint; failed to interview, verify, or permit questioning of the complainant; misapplied key sections of the Student Code of Conduct; and allowed significant bias by the investigator, chair, and Panel members to permeate the proceeding. These defects fundamentally compromised the integrity of the investigation and hearing, resulting in findings unsupported by a preponderance of the evidence.

Additionally, new evidence—unavailable at the time of the hearing—directly refutes a central factual assumption underlying the Panel's decision. The combination of these jurisdictional errors, procedural irregularities, due-process failures, demonstrated bias, and newly available evidence requires reversal of the decision and dismissal of the charges.

To preserve the fairness and credibility of the university's disciplinary system, and in accordance with the grounds for appeal under Appendix D, I respectfully request that the outcome of the Panel be overturned in full, or, in the alternative, that the sanctions imposed against me be reduced to Conduct Probation, with a path to complete my degree online.

Sincerely,
John Doe